No. 26-50418

# In the United States Court of Appeals for the Fifth Circuit

———

L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

*v.*

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant–Appellant.*

———

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

———

## APPELLANT'S OPPOSED MOTION FOR STAY PENDING APPEAL

———

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

DANIEL M. ORTNER
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

D. BOWIE DUNCAN
Assistant Solicitor General

Counsel for Defendant–Appellant

No. 26-50418

L.M.L. and K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,
*Plaintiffs-Appellees*,

*v.*

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,
*Defendant–Appellant.*

Under the fourth sentence of Fifth Circuit Rule 28.2.1, appellant, as a governmental party, need not furnish a certificate of interested persons.

/s/ Daniel M. Ortner
DANIEL M. ORTNER

Counsel    for    Defendant–Appellant

# Introduction

Texas Senate Bill 4 (S.B.4) was enacted in November 2023 in response to a crisis at the Texas border and gives the State tools needed to effectively control illegal immigration, cross-border drug trafficking, and other crimes. Before the law could go into effect, it was enjoined as a result of several legal challenges.

This Court, sitting en banc, recently determined that the plaintiffs in one of those challenges lacked standing and vacated a preliminary injunction granted in their favor. *United States v. Texas*, 173 F.4th 659 (5th Cir. 2026) (en banc) (*Texas IV*). Before the mandate in that case issued, L.M.L and K.G.S. filed this class action lawsuit against Director Freeman F. Martin of the Texas Department of Public Safety (DPS), attempting to enjoin enforcement of aspects of S.B.4.

The district court provisionally certified a class and granted a preliminary injunction against several provisions of S.B.4. This Court should stay the injunction pending appeal.

Director Martin is likely to prevail on the merits of his appeal both because the district court lacked jurisdiction and because S.B.4 is not preempted by federal immigration law but rather compliments it. Even if the named Plaintiffs were entitled to preliminary injunctive relief, provisional class certification of an indeterminate class was improper, and the class-wide injunction should be stayed.

## BACKGROUND

This Court recently acknowledged the tremendous damage unchecked illegal immigration has caused in Texas, noting the "jarring statistics of the human toll." *Texas IV*, 173 F.4th at 662. This included the "more than 6 million illegal aliens" that flooded Texas's borders from 2021–2023, the arrest of "over 15,000 illegal aliens with criminal convictions," and the apprehension of "roughly 2,000 gang members," as well as the devastating effect of illegally smuggled fentanyl and human trafficking. *Id.*

In response to this border crisis, Texas enacted Senate Bill 4 in 2023, Act of Nov. 14, 2023, 88th Leg., 4th C.S., ch. 2, 2023 Tex. Gen. Laws 4750 (S.B.4). S.B.4 amends Chapter 51 of the Texas Penal Code to include two state offenses that track federal immigration crimes prohibiting unlawful entry and reentry. 8 U.S.C. §§ 1325(a), 1326(a). The first, Section 51.02(a), criminalizes entering the State of Texas "directly from a foreign nation at any location other than a lawful port of entry." Plaintiffs have not challenged this provision, and it is not at issue in this appeal. Tex. Penal Code § 51.02(a).

The second, Section 51.03(a), criminalizes reentering the country after being "denied admission to" or "excluded, deported, or removed" from the United States (or after departing while an order of exclusion, deportation, or removal is outstanding). Tex. Penal Code § 51.03(a)(1). A prosecution under these sections may not be abated merely because a federal determination regarding an individual's immigration status is pending. Tex. Code Crim. Proc. art. 5B.003.

2

If a person charged with violating Section 51.02 or Section 51.03 agrees, a court may dismiss the charge and enter a written order (referred to as a "return order"), "requir[ing] the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc. art. 5B.002(d). If a person is convicted of an offense under Chapter 51, the court is instructed to enter a return order that takes effect after confinement or imprisonment. *Id.* Texas officials have "consistently represented that they will coordinate with federal immigration authorities if aliens have return orders or pending asylum applications," *Texas IV*, 173 F.4th at 66, and enforce return orders by transferring control of aliens to federal immigration officials at a lawful point of entry.

A person commits a criminal offense if that person "refuses to comply with" a return order, Tex. Penal Code § 51.014(a). "Refusal" does not include a situation where the foreign nation refuses to accept the person or the federal government otherwise opposes removal. *See United States v. Texas*, No. 24-50149 (5th Cir.), Oral Arg. at 5:11-6:12 (April 3, 2024).[1]

Immediately after S.B.4 was enacted in 2023, Governor Abbott, Director Martin, and other Texas officials were sued in the Western District of Texas. The district court entered a preliminary injunction in February 2024. *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024). A panel of this court denied a stay, *United States v. Texas*, 97 F.4th 268 (5th Cir. 2024), and ruled against the State. *United States v. Texas*, 144 F.4th 632 (5th Cir. 2025) *(Texas III)*. But this Court sitting en banc

---

[1] https://www.ca5.uscourts.gov/OralArgRecordings/24/24-50149_4-3-2024.mp3.

recently held that the plaintiffs in that case lacked standing and vacated the injunction. *Texas IV*, 173 F.4th at 662.

Before the mandate from the en banc court issued, Plaintiffs, L.M.L. and K.G.S., filed this new action on behalf of themselves and a putative class. Appx.1-14. Plaintiffs argue that the illegal reentry and return order provisions of S.B.4 are preempted by federal immigration law. Appx.12-13. L.M.L. was previously deported, and K.G.S. left the United States before a deportation order could be entered against her. Appx.45 ¶ 5, 50 ¶ 5. Both claim they reentered the United States without legal permission. Appx.4 ¶¶ 8-9. Both now contend they are lawfully present in the United States: L.M.L. claims that he is a lawful permanent resident, and K.G.S. claims she has "been approved for a U-visa." Appx.4 ¶¶ 8-9.[2]

Plaintiffs moved for provisional certification of a class of:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

Appx.97. Plaintiffs also sought a preliminary injunction to enjoin enforcement of Sections 51.03 and 51.04 of the Texas Penal Code and Articles 5B.002 and 5B.003 of the Texas Code of Criminal Procedure. Appx.13, 41

---

[2] During her deposition, K.G.S. clarified that she has received "preapproval" (a Bona Fide Determination) and is still waiting for final approval of her pending U-visa application. Dkt. 53-2 at 11; *accord* Appx.186.

Director Martin opposed provisional class certification and asked the district court to continue or defer determination on that motion. Dkt. 26; Appx.88-108. He also opposed the request for a preliminary injunction, Dkt. 27; Appx.109-127, and moved to dismiss Plaintiffs' complaint on jurisdictional grounds, Appx.77-87. Director Martin also asked the district court to stay any injunctive relief pending appeal to this Court. Appx.126, 361.

Director Martin requested and was granted limited discovery, including depositions that were limited in both duration and subject matter to be "narrowly tailored to address questions related to Plaintiffs' standing and to test assertions made in the Plaintiffs' Declarations." Dkt. 19.

The United States filed a Statement of Interest expressing its position that the challenged provisions of S.B.4 are not preempted by federal law. Appx.159-182.

The district court held a preliminary injunction hearing on May 13. Appx.184, 262-366. It granted provisional class certification and issued a preliminary injunction on May 14, adhering to its view that the challenged provisions of S.B.4 were preempted. Appx.260-61.

The district court denied the request for a stay pending appeal because it concluded that Director Martin was unlikely to succeed on the merits, that existing federal law could prevent irreparable harm to the State, and that Plaintiffs faced the risk of removal. Appx.258-261; *See* Fed. R. App. P. 8 (a)(2)(A)(ii).

Director Martin has now appealed the preliminary injunction and respectfully requests a stay pending appeal from this Court.[3]

---

[3] Director Martin believes that the appeal of the class-wide preliminary injunction allows this Court to exercise pendent appellate jurisdiction over the class certification but, out of an abundance of caution, is filing a petition under Rule 23(f).

# Argument

In determining whether to stay an order pending appeal, this Court considers Director Martin's likelihood of success on the merits, whether he will suffer irreparable harm without a stay, whether Plaintiffs will be substantially harmed by a stay, and the public interest. *Nken v. Holder*, 556 U.S. 418, 426 (2009).

## I. Director Martin Is Likely to Succeed on the Merits.

Director Martin is likely to succeed on the merits of his appeal. Plaintiffs lack standing to challenge Article 5b.002 and Section 51.04. Plaintiffs are also unlikely to succeed on their facial pre-enforcement challenge, and the District Court's provisional class determination was in error.

### A. Plaintiffs lack standing to challenge the return order provisions.

Courts have an obligation to consider challenges to their subject matter jurisdiction. *re Paxton*, 60 F.4th 252, 256 (5th Cir. 2023) (orig. proceeding); *Mi Familia Vota v. Ogg*, 105 F.4th 313, 334 (5th Cir. 2024).

To show Article III standing, plaintiffs must allege an injury in fact—*i.e.*, an invasion of a "legally protected interest" that is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). A plaintiff's injury must "affirmatively appear in the record" before the court; it "cannot be 'inferred argumentatively from averments in the pleadings.'" *Spencer v. Kemna*, 523 U.S. 1, 10–11 (1998) (citation omitted).

Standing is not dispensed in gross. Rather, "plaintiffs must establish standing for each and every provision they challenge." *In re Gee*, 941 F.3d 153, 160 (5th Cir. 2019) (orig. proceeding) (per curium). Even if Plaintiffs have adequately alleged an

injury based on "a substantial threat of future enforcement" of the illegal reentry provisions of Section 51.03 against them, *Wang v. Paxton*, 161 F.4th 357, 362 (5th Cir. 2025), that is not enough to give them standing to challenge the return order provisions (Article 5b.002 and Section 51.04).

Neither individual Plaintiff nor any class member could presently be prosecuted for violating Section 51.04, which applies only after a person is subject to and "refuses to comply with" a return order. Tex. Penal Code § 51.04(a)(3). Neither Plaintiff is presently the subject of a return order. To be prosecuted under Section 51.014, Plaintiffs would have to: (1) be arrested for violating § 51.02 or § 51.03, (2) be convicted of violating one of those provisions, the judgment for which would include a return order; (3) serve whatever prison time the judgment required; (4) be delivered to federal immigration authorities; (5) be capable of returning to the foreign nation from which the Plaintiff entered Texas; and (6) refuse to do so. Thus, it is presently impossible for the Plaintiffs to be prosecuted for violating Section 51.04 because an entire antecedent criminal prosecution would have to occur, and the Plaintiffs would then have to choose to violate a provision of that presently non-existent judgment. That "speculative chain of possibilities," shows that these Plaintiffs lack any "actual or imminent" injury that is "certainly impending" vis-à-vis enforcement of Section 51.04. *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409, 414 (2013). Rather, Plaintiffs state only "allegations of possible future injury" as to that provision. *Id.* at 409.

Further, even assuming that Plaintiffs were prosecuted for violating Section 51.02 or Section 51.03, neither individual Plaintiff even alleges an "intent to engage

in a course of conduct" that is "arguably proscribed" by Section 51.04, *Wang*, 161 F.4th at 359. That is, Plaintiffs do not even allege that if they were convicted under Section 51.02 or Section 51.03, they would subsequently choose to disobey the part of that hypothetical judgment subjecting them to a return order. And Article 5B.002 only inflicts a cognizable injury under Article III if a return order carries criminal penalties, like those found in Section 51.04. At this point in time, whether Section 51.04 would or could ever be enforced against either Plaintiff or any class member is purely speculative. Neither is subject to a return order and thus not even capable of committing an offense under Section 51.04. Any alleged injury from Section 51.04 and Article 5B.002 is far too speculative to confer standing. *Clapper,* 586 U.S. at 409.

**B. Plaintiffs are unlikely to prevail on the merits.**

"[P]reemption analysis begins 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008)). Contrary to the district court's contrary conclusion, Appx.222, this presumption against preemption applies here because "[r]estrictions on persons entering a State from a foreign country have historically been within the States' domain." *Texas III*, 144 F.4th at 720 (Oldham, J., dissenting) (citing *Mayor of New York v. Miln*, 36 U.S. 102, 132-33 (1837)). Plaintiffs are unable to overcome that presumption here and are unlikely to prevail on either of their field or conflict preemption theory.

### 1. S.B.4 is not field preempted.

Field preemption applies only where Congress has "occupie[d] an entire field," reflecting "a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." *Arizona v. United States*, 567 U.S. 387, 401 (2012). Nothing short "of an unambiguous congressional mandate to that effect" suffices. *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 147 (1963). Field preemption is "rare," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020), because it represents a "serious intrusion into state sovereignty," *Va. Uranium Inc. v. Warren*, 587 U.S. 761, 773 (2019) (lead opinion of Gorsuch, J.).

Plaintiffs claim that the whole field of "entry and removal" is "an exclusively federal field," Appx.28, and the district court even found that the whole "field of immigration" is preempted by federal law, Appx.216, 219. This expansive theory of field preemption is incompatible with precedent and current practice.

The Supreme Court has never defined a field so abstractly, based on the presence of "some brooding federal interest." *Garcia*, 589 U.S. at 202 (quoting *Va. Uranium*, 587 U.S. at 767). In *Arizona,* the Supreme Court carefully analyzed four different provisions of Arizona's S.B.1070 related to illegal immigration, concluding that only one was field preempted due to Congress's "comprehensive" regulation of "the field of alien registration." 567 U.S. at 400–03. Two challenged provisions were preempted because they conflicted with federal law, *id.* at 403–16, and one challenged provision was not preempted at all, even though its application might well conflict with the Attorney General's "federal enforcement priorities," *id.* at 412. Had the Supreme Court agreed that Congress had preempted the entire field of

"entry and removal" as Plaintiffs claim, this careful provision-by-provision analysis would have been unnecessary. Rather than looking closely at each provision of Arizona's law, the Supreme Court would have declared that because the laws were in the field of "entry and removal," they were preempted in their entirety.

Unlike the field of alien registration in *Arizona*, the federal immigration code is replete with provisions that presuppose states will "cooperate" in the "apprehension, detention, or removal of aliens not lawfully present in the United States," 8 U.S.C. § 1357(g)(10)(B), refuting any suggestion that "Congress occupies" the field of entry and removal and leaves no role for the States. This includes authorizing State and local officials to arrest illegal immigrants or those harboring them, 8 U.S.C. §§ 1252c(a)(1)–(2), 1324(c), agreeing to let state officials "perform a function of an immigration officer," *id.* § 1357(g)(1) and admitting state officials to immigration stations to "preserve the peace and make arrests" for state crimes, *id.* §1358. *See also id.* § 1357(g)(10)(A)–(B); 18 U.S.C. § 758. This kind of cooperation between the United States and DPS is a regular occurrence. Appx.130-32.

For this reason, the United States agreed in the district court that S.B.4 is not field-preempted. Appx.173-176. Plaintiffs are unlikely to prevail in their argument that S.B.4 is field preempted.

### 2. The challenged provisions of S.B.4 do not conflict with federal immigration law in all its applications.

Plaintiffs claim that the challenged provisions of S.B.4 "creat[e] an unacceptable obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crystal Clear Special Util. Dist. v. Jackson*, 142 F.4th 351, 364 (5th Cir.

2025) "This kind of preemption claim must clear a 'high threshold.'" *Deanda*, 96 F.4th at 761 (quoting *Barrosse v. Huntington Ingalls, Inc.*, 70 F.4th 315, 320 (5th Cir. 2023)). In particular, "[e]vidence of pre-emptive purpose [must be] sought in the text and structure of the [federal provision] at issue." *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 329 (5th Cir. 2025) (alterations in original) (quoting *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993)). It is not enough to invoke "some brooding federal interest" or to appeal "to a judicial policy preference," *Va. Uranium*, 587 U.S. at 767, or the mere "possibility that federal enforcement priorities might be upset." *Garcia*, 589 U.S. at 212.

Because they bring a facial challenge, Plaintiffs' burden here is even higher. A facial challenge is "the most difficult challenge to mount successfully." *United States v. Rahimi*, 602 U.S. 680, 693 (2024). To prevail, Plaintiffs must prove "that no set of circumstances exists under which [S.B.4] would be valid." *Id.* Accordingly, if S.B.4 can be lawfully applied in some circumstances, Plaintiffs' facial challenge must be rejected and "courts must handle unconstitutional applications as they usually do—case-by-case." *United States v. Hansen*, 599 U.S. 762, 770 (2023).

There are circumstances where there is little question that each of the challenged provisions of S.B.4 can be lawfully applied. For instance, the illegal-reentry provision (Section 51.03) could lawfully be enforced against an alien who has already been adjudicated to have illegally reentered the United States without a lawful defense against removal or to an alien whom the United States encourages Texas to arrest and charge. In such circumstances, there is no possible conflict between federal objectives and the enforcement of S.B.4. Similarly, there is no conflict with

federal objectives if the State enters a return order that is agreed to by the alien and that order is enforced by state officials transferring the alien to federal immigration authorities. Tex. Code Crim. Proc. art. 5B.002(c)(1). And if that alien subsequently refuses to comply with the return order (perhaps after escaping custody), prosecuting that violation under Section 51.04 does not conflict with federal law. Because each of S.B.4's challenged provisions can lawfully be applied in at least some circumstances, Plaintiffs' facial challenge fails.

S.B.4 does not conflict with, but instead mirrors and complements, federal immigration law. As the United States explains, "far from *conflicting* with the INA's objectives, state-level penalties like those in Senate Bill 4 *advance* those objectives, further combatting and disincentivizing the very conduct that Congress has sought to eliminate in full." Appx.181.

S.B.4's illegal-reentry provision makes it a crime to illegally re-enter after having previously been "denied admission," having been involuntarily "removed," or having voluntarily "departed from the United States," Tex. Penal Code § 51.03(a). Federal immigration law prohibits the exact same things. *See* 8 U.S.C. §1326(a). And as this Court recently explained, "parallel state regulation" does not raise conflict preemption concerns. *Zyla*, 134 F.4th at 338. Such an "overlap" between state and federal law "does not even begin to make a case for conflict preemption." *Garcia*, 589 U.S. at 212.

The purported conflicts Plaintiffs and the district court point to largely stem from a misunderstanding of how the provisions of S.B.4 interact with federal immigration law. For instance, the court assumes that Section 51.03 and Article 5B.003

create a conflict because an individual with lawful residence or a pending status determination may be prosecuted for illegal reentry. Appx.226. But under federal immigration law, a pending status determination, or even being granted lawful residence, does not "establish a defense to criminal charges under section 1326." *United States v. Gutierrez-Alba*, 128 F.3d 1324, 1328 (9th Cir. 1997).

S.B.4's return order provisions likewise compliment rather than conflict with federal law. In fact, federal law allows an alien to voluntarily agree to return in lieu of prosecution just as S.B.4 does. *Compare* Tex. Code Crim. Proc. art. 5B.002(b), *with* 8 U.S.C. §§ 1229a(d), 1229c(a)(1). And federal law similarly penalizes refusing to depart from the United States pursuant to a removal order. *Compare* Section 51.04 *with* 8 U.S.C.A. § 1253 (criminal penalties) and 8 U.S.C.A. § 1324d (civil fines).

Plaintiffs and the district court improperly construe the removal provisions "in a way that creates conflict with federal law." *Texas IV*, 173 F.4th at 663 n. 8. The court assumed that Texas will "remove noncitizens from the United States without notice or consent from the federal government," Appx.228, and Plaintiffs claim that this "blatantly overrides federal decisions about who can reenter and remain in the United States." Appx.35. But these claims run contrary to what Texas has "consistently represented" regarding cooperation with federal immigration authorities regarding those with "pending asylum applications," *Texas IV*, 173 F.4th at 663, or other basis for lawful presence. Texas will transport an alien to a port of entry, *see* Tex. Code Crim. Proc. art. 5B.002(e)(1)-(2), where a federal immigration official may repatriate the alien, *see* 8 U.S.C. § 1225(b)(1)(A)(i), and that method of

14

enforcement creates no conflict with federal immigration law as the United States has explained.

If there are specific instances where Texas law allows for prosecution or a removal order despite the existence of federal defenses, then that may be an appropriate scenario for an as-applied challenge.[4] But Plaintiffs purport to represent a class of all individuals who have reentered Texas illegally and seek sweeping injunctive relief—whether they have federal defenses or not. Identifying "one possible unconstitutional application here, and another there" does not demonstrate facial invalidity. *Texas III*, 144 F.4th at 726 (Oldham, J., dissenting). Plaintiffs do not even show that the potential conflicts they point to are common among class members, let alone that there is "no set of circumstances" where the challenged provisions of S.B.4 may be lawfully enforced. *Rahimi*, 602 U.S. at 693. And as the United States notes this "mere possibility of some conflict is not sufficient to render Senate Bill 4 *facially* in conflict with federal law." Appx.180-81.

---

[4] One of the theoretical conflicts that Plaintiffs raise is the possibility that Texas could prosecute someone who had the United States Attorney General's permission to reenter the country pursuant to 8 U.S.C. § 1326(a)(2)(A). Appx.35. This is precisely the kind of specific conflict that should be raised as an as-applied challenge, not a facial challenge. Plaintiffs could not raise such a challenge because they admittedly reentered the country illegally without the Attorney General's permission. Appx.4 ¶¶ 8-9, 45 ¶ 6, 51 ¶ 6.

### C. Provisional certification was improper, and the injunction is overbroad as a result.

Just ten days after Plaintiffs filed their motion for class certification, the district court provisionally[5] certified the following class:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

Appx.256-57.[6]

The district court's decision to certify a class was an abuse of discretion in two respects:

*First*, by certifying a class on an expedited basis, the district court failed to conduct the "rigorous analysis" required by Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). Rather than requiring Plaintiffs to "affirmatively demonstrate" their entitlement to class certification, the court treated class certification as a "mere pleading standard," *id.*, without requiring adequate evidence. *See Dickinson v.*

---

[5] Rule 23 does not provide for "provisional" certification. The district court used the term "provisional" to indicate that it was making an early decision on certification that it might revisit later in the lawsuit. It specifically stated that its certification is "for provisional purposes only for the purposes of injunctive relief" and that "further inquiry into the appropriateness of formally certifying the class should be conducted." Appx.256.

[6] At the preliminary-injunction hearing, the district court heard argument only from Plaintiffs on certification and asked for their characterization of the depositions that were held the day before the hearing. Appx.255; Appx.277-86. The district court did not give Director Martin an opportunity to respond at the hearing or discuss the deposition testimony. Appx.364.

*Trump*, No. 26-1609, 2026 WL 1133353, at *9 (9th Cir. Apr. 27, 2026) (noting that the "demanding requirement[s]" of Rule 23 "appl[y] equally to so-called provisional classes, even assuming that they are valid"); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 55 (D.D.C. 2025) ("Provisional certification does not lessen the rigor of Rule 23").

*Second*, the district court erroneously determined that the proposed class was ascertainable. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 n.36 (5th Cir. 2023) (citation omitted) (identifying this implied prerequisite to class certification under Rule 23). A class is not ascertainable if the district court is unable "'to identify class members at some stage of the proceeding.'" *Frey v. First Nat'l. Bank Sw.*, 602 F. App'x 164, 168 (5th Cir. 2015) (quoting William B. Rubenstein, Newberg on Class Actions § 3:3 (5th ed.2011)); *Cline v. Sunoco, Inc. (R&M),* 159 F.4th 1171, 1194 (10th Cir. 2025). Here, it would be practically impossible for the district court to identify all "noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas." Appx.63, 256-57. This is particularly true because most class members have also violated federal law by reentering Texas and thus endeavor not to be detected—*i.e.*, not to be ascertained. Indeed, most individuals would have to waive their Fifth Amendment rights by admitting that they violated federal criminal law in order to identify as members of the class. And membership in the class will change in the future as new noncitizens attempt to enter the State of Texas.

At a minimum, the district court erred by not limiting preliminary injunctive relief to the named Plaintiffs, and this Court should stay enforcement of the class-wide injunction.

## II. The Remaining Factors Favor a Stay.

The remaining factors also all favor the State. "When a statute is enjoined, the State necessarily suffers the irreparable harm of denying the public interest in the enforcement of its laws." *Veasey v. Abbott*, 870 F.3d 387, 391 (5th Cir. 2017) (per curiam). And the irreparable harm to the State is compounded by the broad and sprawling scope of the district court's provisional class certification.

The balance of the equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. The public has a strong interest in permitting the State to control its border and preventing illegal entry and reentry, especially given the "human toll" of illegal immigration that is still impacting the state today. *Texas IV*, 173 F.4th at 662.

Conversely, a stay will not "substantially injure" Plaintiffs. *Nken*, 556 U.S. at 426. Plaintiffs admit that they have violated federal criminal law and are subject to arrest and prosecution at any time. The additional potential for arrest and prosecution for violation of S.B.4 does not materially change their circumstances. And a stay would not prevent Plaintiffs or any other class member from raising as-applied defenses to prevent enforcement of S.B.4 if they are arrested and charged.

## Conclusion

For these reasons, this Court should stay the injunction pending appeal.

Respectfully submitted.

| | |
|---|---|
| Ken Paxton<br>Attorney General of Texas | William R. Peterson<br>Solicitor General |
| Brent Webster<br>First Assistant Attorney General | /s/ Daniel M. Ortner<br>Daniel M. Ortner<br>Assistant Solicitor General |
| Office of the Attorney General<br>P.O. Box 12548 (MC 059)<br>Austin, Texas 78711-2548<br>(512) 936-1700 | D. Bowie Duncan<br>Assistant Solicitor General |
| | Counsel for Defendant–Appellant |

## CERTIFICATE OF CONFERENCE

On May 20, 2026, counsel for Appellant conferred with counsel for Appellees, who stated that Appellees oppose the relief requested in this motion and intend to file a response.

/s/ Daniel M. Ortner
DANIEL M. ORTNER

## CERTIFICATE OF SERVICE

On May 21, 2026, this document was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Daniel M. Ortner
DANIEL M. ORTNER

## CERTIFICATE OF COMPLIANCE

This motion complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 4,539 words, excluding the parts of the motion exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Equity) using Microsoft Word (the same program used to calculate the word count).

/s/ Daniel M. Ortner
DANIEL M. ORTNER

# In the United States Court of Appeals for the Fifth Circuit

L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

*v.*

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant–Appellant.*

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

## APPELLANT'S APPENDIX IN SUPPORT OF OPPOSED MOTION TO STAY PRELIMINARY INJUNCTION PENDING APPEAL

KEN PAXTON
Attorney General of Texas
BRENT WEBSTER
First Assistant Attorney General
Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

WILLIAM R. PETERSON
Solicitor General

DANIEL M. ORTNER
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

BOWIE DUNCAN
Assistant Solicitor General

Counsel for Defendant–Appellant

# Index

Tab

Complaint for Declaratory and Injuctive Relief ......................................................A

Motion for Temporary Restraining Order and Preliminary Injunction ................... B

Declaration of L.M.L ............................................................................................C

Declaration of K.G.S..............................................................................................D

Plaintiffs' Motion for Class Certification and Memorandum of Law in Support .... E

Defendant's Priority Motion to Dismiss for lack of Subject Matter Jurisdiction..... F

Defendant's Response in Opposition to Plaintiffs' Motion for Class
Certification..........................................................................................................G

Defendant's Amended Response in Opposition to Plaintiffs' Motion
for Temporary Restraining Order and Preliminary Injunction............................... H

Declaration of Freeman F. Martin ......................................................................... I

Plaintiffs' Reply in Support of Motion for Class Certification.................................J

Plaintiffs' Reply in Support of Motion for Temporary Restraining Order
and Preliminary Injuction......................................................................................K

Statement of Interest of The United States of America.......................................... L

Preliminary Injunction Decision and Order............................................................M

Transcript of May 13, 2026 Preliminary Injuction Hearing ................................... N

# Tab A: Complaint For Declaratory And Injunctive Relief

Appx.0001

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| L.M.L., K.G.S., on behalf of themselves and all those similarly situated,<br><br><br>Plaintiffs,<br><br>v.<br><br><br>FREEMAN F. MARTIN, in his official capacity as Director of the State of Texas Department of Public Safety,<br><br><br>Defendant. | Case No. 1:26-cv-1170 |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Appx.0002

1.      This action challenges Senate Bill 4 (88th Leg. (4th special session)) ("S.B. 4"), which purports to give Texas state officials the unprecedented power to arrest, detain, and deport noncitizens in the State of Texas.  Under this novel system, the State of Texas has created its own immigration crimes; state police arrest noncitizens for alleged violations of these crimes; state prosecutors bring charges in state courts; state judges order deportation to Mexico (no matter the country a person is from); and state officers carry out those orders.  The federal government has no role in, and no control over, Texas's scheme.

2.      Among other provisions, S.B. 4 creates a state crime for "reentry"—coming back to or being found in the United States after deportation.  Unlike federal law, it contains no exceptions, including for individuals granted federal permission to reenter the country.

3.      S.B. 4 violates the Supremacy Clause of the United States Constitution. Immigration is a quintessentially federal authority.  Congress has created a carefully calibrated immigration system, with detailed procedures that determine whether a person may remain in the United States, when criminal immigration charges may be deployed in the exercise of prosecutorial discretion, and what protections people receive to ensure that they are not removed to a place where they face persecution.

4.      Congress placed all of the relevant tools and decision-making in the hands of *federal* officials—in keeping with the federal government's exclusive immigration powers and the sensitive foreign policy implications of these powers.  S.B. 4 jettisons this system, grasping control over immigration from the federal government and depriving people subject to that system of *all* of the federal rights and due process that Congress provided to them, including the rights to contest removal and seek asylum.

Appx.0003

5. S.B. 4 is preempted. A state cannot replace Congress's immigration scheme with its own.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. Venue is proper in the Western District of Texas because a substantial portion of the relevant events occurred or will occur in the District and because Defendants reside in the District. 28 U.S.C. § 1391(b).

## PARTIES

8. Plaintiff L.M.L. is a 56-year-old lawful permanent resident of the United States and citizen of Honduras. He lives in Austin, Texas with his lawful permanent resident wife, his 21-year-old lawful permanent resident daughter, and his 11-year-old United States citizen son. He entered the United States for the first time in 1997 and was deported. In 2006, he entered the United States without inspection. In about 2023, he became a lawful permanent resident of the United States. L.M.L fears that he will be arrested, detained, and deported under S.B. 4's reentry provision. L.M.L. is the primary breadwinner and caretaker for his wife and children because his wife's diabetes and high blood pressure make it difficult for her to work.

9. K.G.S. is a 29-year-old citizen of Honduras. She currently lives in Austin, Texas with her two children, ages seven and three, one of whom is a United States citizen. In about 2014, when she was a child, K.G.S. entered the United States without inspection; she was later issued a deportation order. In 2021, she entered the United States without inspection for the second time. She has been approved for a U-visa. She fears she will be arrested, detained, and deported under S.B. 4's reentry provision. She is the primary breadwinner and caretaker for her children.

3

Appx.0004

10. Defendant Freeman F. Martin is the Director of the Texas Department of Public Safety ("DPS"). He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities. Tex. Gov't Code § 411.006(a)(1)-(2). He is sued in his official capacity.

11. Director Martin has emphasized what he perceives to be the benefits of "[e]nforcement of S.B.4," and cited plans for DPS's enforcement of the law. Defs'-Appellants' Suppl. En Banc Br. 24, 49, *United States v. Texas*, No. 24-50149, ECF No. 360 (*filed* Oct. 13, 2025). Under Director Martin's leadership, DPS has made it a priority to arrest noncitizens. Texas Governor Greg Abbott recently affirmed that S.B. 4 is an "unprecedented law" that "empower[s] state officials to arrest and deport."

## STATEMENT OF FACTS

### A.    Legal Background: Comprehensive Federal Immigration System

12. The federal government has exclusive power over immigration. *See*, *e.g.*, *Arizona v. United States*, 567 U.S. 387, 409-10 (2012).

13. Congress has created a comprehensive system of federal laws regulating and enforcing immigration in the Immigration and Nationality Act ("INA"). *See* 8 U.S.C. § 1101 *et seq*.

14. Federal immigration statutes and the associated implementing regulations and precedential administrative law decisions form an exceptionally detailed, complex, and finely reticulated regulatory regime. Congress has frequently amended the relevant provisions of the INA, including particularly significant legislation in 1952, 1965, 1980, 1986, 1990, 1996, 2000, 2001, 2005, and 2008, along with dozens of other Acts modifying the immigration regime in

Appx.0005

countless ways.  Immigration legislation is proposed in every single Congress and frequently forms a point of major national debate.

15.    The INA was amended in 1980 by the Refugee Act, Pub. L. No. 96-21, to codify certain protections for those fleeing violence and danger.  Under U.S. law, every noncitizen "who is physically present in the United States or who arrives in the United States" has the right to apply for asylum, "whether or not" they enter at a port of entry.  8 U.S.C. § 1158(a)(1).

16.    Congress provided a range of other protections within the INA.  Consistent with international obligations, people cannot be removed to countries where they will face persecution, 8 U.S.C. § 1231(b)(3)(A), or torture, *id*. § 1231.  Likewise, Congress has provided various other forms of relief, including status for unaccompanied children, *id.* § 1101(a)(27)(J), trafficking victims, *id.* § 1101(a)(15)(T), and victims of crimes, *id.* § 1101(a)(15)(U).  All of these protections allow the federal government to permit a person who otherwise would have no legal status to avoid removal.

17.    The INA contains complex and exclusive procedures for determining immigration and citizenship status and for determining whether an individual may lawfully remain in the United States, either temporarily or permanently.  *See, e.g.*, 8 U.S.C. § 1229a(a)(3).  Under federal law, there is no single, readily ascertainable category or characteristic that establishes whether a particular person may or may not be permitted to remain in the United States.  The answer to that question can only be reached through the processes outlined in the INA and may depend on the discretionary determinations of federal officials.

18.    Many people who enter the United States between ports of entry ultimately obtain federal authorization to remain in the United States temporarily, indefinitely, or permanently.

Appx.0006

19.     Congress has provided various forms of relief from removal that are available to those who enter between ports of entry, including asylum, *id*. § 1158; withholding of removal and relief under the Convention Against Torture, *id*. § 1231(b)(3); and status (such as the "U visa") for victims of crime, trafficking, and domestic violence, *id*. §§ 1101(a)(15)(U), (T), 1182(a)(6)(A)(ii), (d)(13), (14).

20.     Congress has established that entry into the United States is a crime under certain circumstances.  8 U.S.C. § 1325 ("Improper Entry by Alien") provides criminal penalties for noncitizens who, *inter alia*, enter the United States at any time or place other than as designated by immigration officers.  8 U.S.C. § 1326 provides criminal penalties for noncitizens who reenter the United States without authorization after entry of an order of removal.  8 U.S.C. § 1253 ("Penalties related to removal") provides criminal penalties for a failure to comply with a federal order of removal.

21.     Congress also created specific procedures to remove individuals from the United States.  These are generally called removal proceedings and can take multiple forms, including full removal proceedings, pursuant to 8 U.S.C. § 1229a; expedited removal proceedings, pursuant to 8 U.S.C. § 1225(b)(1); and reinstatement of removal proceedings, pursuant to 8 U.S.C. § 1231(a)(5). Each of these proceedings requires, at a minimum, notice and an opportunity to contest the grounds for removal, as well as an opportunity to raise humanitarian claims for protection from removal, including under the withholding of removal statute and the Convention Against Torture.

22.     Under federal law, people are allowed to remain in the United States while administrative removal proceedings prescribed by the INA are pending.

23.     Prosecution for the federal entry and reentry crimes, the decision to pursue the removal of a given person from the country, and the choice of which of the available removal

6

Appx.0007

processes to invoke are matters of federal discretion.  Federal agents and policymakers may choose to deploy these tools—or not—for a wide range of reasons, including national priorities, migration patterns, international relationships, and humanitarian concerns.

**B.     S.B. 4**

24.     On December 18, 2023, Governor Abbott signed S.B. 4 into law.

25.     S.B. 4. creates three new state law offenses: Illegal Entry from Foreign Nation, Tex. Penal Code § 51.02; Illegal Reentry By Certain Aliens, *id.* § 51.03; and Refusal to Comply with [State] Order to Return to Foreign Nation, *id.* §51.04.

26.     Each of these offenses applies to a "person who is an alien," meaning any person who is not a citizen or national of the United States.

27.     S.B. 4 creates a new state judicial power to deport individuals from the United States.  Specifically, it authorizes state judges to "order [a defendant] to return to the foreign nation from which the person entered."  Tex. Code Crim. Pro. art. 5B.002.  S.B. 4 makes a "State Order to Return" a mandatory part of all judgments imposed for a conviction under the new illegal entry and reentry crimes.

28.     S.B. 4 creates a state crime of Illegal Entry ("State Illegal Entry"). Texas Penal Code § 51.02 ("State Illegal Entry") criminalizes a noncitizen's entry or attempt to enter into Texas directly from a foreign nation at any location other than a port of entry.

29.     S.B. 4 creates a state crime of Illegal Reentry ("State Illegal Reentry").  Texas Penal Code § 51.03 makes it a state crime if a noncitizen "enters, attempts to enter, or is at any time found in this state after the person: (1) has been denied admission to, excluded, deported, or removed from the United States; or (2) departed from the United States while an order of exclusion, deportation, or removal is outstanding."

7

30.     For purposes of State Illegal Reentry, S.B. 4 defines "removal" to include a state Order to Return to a foreign nation.

31.     S.B. 4 creates no affirmative defenses to a violation of State Illegal Reentry, such as a subsequent grant of lawful immigration status.

32.     State Illegal Reentry is punishable as a Class A misdemeanor.  Where an individual was previously removed subsequent to certain criminal convictions or based on certain criminal charges, a violation is punishable as a felony of the second or third degree, authorizing sentences of up to twenty years in prison.

33.     S.B. 4's removal provision amends the Texas Code of Criminal Procedure to require state magistrates and judges to issue a State Order to Return as part of the judgment for every conviction of State Illegal Reentry.

34.     A State Order to Return "takes effect on completion of the term of confinement or imprisonment imposed by the judgment" and requires a person to return to the foreign nation from which they entered or attempted to enter.  Tex. Code Crim. Proc. Art. 5B.002(d).

35.     Alternatively, a state magistrate or judge may enter a State Order to Return prior to a conviction for State Illegal Reentry in lieu of continuing the prosecution.  After making a determination that probable cause exists, a state magistrate or judge may issue an Order to Return if the individual agrees to the order and meets certain requirements.  Tex. Code Crim. Proc. Art. 5B.002(c).

36.     Texas Penal Code § 51.04 creates a third criminal offense: Refusal to Comply with Order to Return to Foreign Nation.

37.     Refusal to Comply with Order to Return to Foreign Nation is a felony of the second degree, punishable by between 2 and 20 years in prison.

Appx.0009

38.     S.B. 4 provides no affirmative defense to a violation of § 51.04.

39.     S.B. 4 creates a new state system to regulate immigration that completely bypasses and conflicts with the federal system.  It allows state officers to unilaterally arrest, detain, and remove individuals from the United States and mandates removal orders for those who are convicted of the new state crimes of illegal entry and reentry.

40.     S.B. 4 requires state officers to make determinations of federal immigration status and to incarcerate and remove noncitizens pursuant to these determinations, but it does not provide noncitizens with any of the mechanisms or pathways to apply for or receive federal protection from removal.   Moreover, the statute prohibits state courts from pausing cases to obtain determinations of status from the federal government or abstaining while federal immigration proceedings take place.  *See* Tex. Code Crim. Proc. Ann. 5B.003.

41.     The State enacted S.B. 4 to bypass federal officials.  Indeed, the State enacted S.B. 4 to address a perceived lack of border enforcement by the federal government.

42.     In testimony before the Texas legislature in 2023, then-Director of Public Safety Steven McCraw stated that DPS estimates there could be approximately 72,000 arrests per year under the new law.

43.     Governor Greg Abbott has publicly stated that S.B. 4 was drafted "to be consistent with the dissent" in *Arizona v. United States*, 567 U.S. 387 (2012)—implicitly admitting that it is inconsistent with binding Supreme Court precedent.[1]

---

[1]  CBS Austin, *Gov. Greg Abbott Gives Opening Keynote Texas Public Policy Foundation Policy Summitt* (Mar. 20, 2024), https://www.youtube.com/watch?v=lL9SkIyv49U&t=4319s (~ 1:11:45).

Appx.0010

44.     In separate litigation, S.B. 4 was enjoined in full before its effective date, and has remained enjoined (except for a period of hours on March 19, 2024) ever since. *United States v. Texas*, 97 F.4th 268, 274 (5th Cir. 2024). The en banc Fifth Circuit recently held that the plaintiffs in that ligation lacked standing. *United States v. Texas*, No. 24-50149, 2026 WL 1122127 (5th Cir. Apr. 24, 2026). Its mandate is set to issue on May 15, 2026.

## CLASS ACTION ALLEGATIONS

45.     Plaintiffs bring this action under Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of themselves and a class of other persons similarly situated.

46.     Plaintiffs seek to represent the following class: All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

47.     The proposed class satisfies the requirements of Rule 23(a)(1) because it is so numerous that joinder of all members is impracticable. Hundreds if not thousands of noncitizens will be subjected to arrest, detention, and prosecution under S.B. 4 and its implementation by Defendant. The proposed classes also include numerous future noncitizens who will enter Texas and will be subjected to S.B. 4.

48.     The class satisfies the commonality requirements of Rule 23(a)(2). The members of the class are subject to the same policy; they all face the same harms of arrest, detention, and prosecution under S.B. 4; and they all have the same claim under the Supremacy Clause.

49.     The proposed class satisfies the typicality requirements of Rule 23(a)(3), because the claims of the Plaintiffs are typical of the claims of the class. Each proposed class member, including Plaintiffs, will face the same principal injury (arrest, detention, prosecution, and

10

Appx.0011

removal), based on the same government practice (S.B. 4 and its implementation), which is unlawful as to the class because it violates the Supremacy Clause.

50.     The proposed class satisfies the adequacy requirements of Rule 23(a)(4).  Plaintiffs seek the same relief as the other class members: an order declaring S.B. 4's provisions unlawful and an injunction preventing their enforcement.  In defending their rights and the rights of their members, Plaintiffs will defend the rights of all proposed class members fairly and adequately.

51.     The proposed classes are represented by experienced attorneys from the American Civil Liberties Union Foundation Immigrants' Rights Project, the American Civil Liberties Union Foundation of Texas, and the Texas Civil Rights Project.  Proposed Class Counsel have extensive experience litigating class action lawsuits and other complex systemic cases in federal court on behalf of noncitizens, including cases asserting very similar claims to the claims asserted here.

52.     The proposed class also satisfies Rule 23(b)(2).  Defendant will act on grounds generally applicable to the class by subjecting class members to arrest, detention, and prosecution under S.B. 4.  Injunctive and declaratory relief is therefore appropriate with respect to the class as a whole.

## CLAIMS FOR RELIEF

### Count One: Preemption (In Equity)

53.     The Supremacy Clause, Article VI, Section 2, of the U.S. Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof, and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land."

11

Appx.0012

54. Federal law preempts state law in any area over which Congress expressly or impliedly has reserved exclusive authority or which is constitutionally reserved to the federal government, or where state law conflicts or interferes with federal law.

55. S.B. 4 violates the Supremacy Clause because it attempts to regulate matters that are exclusively reserved to the federal government and because it operates in a field over which Congress has exercised exclusive authority.

56. S.B. 4 further violates the Supremacy Clause because it conflicts with federal laws, contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration classifications, and authorizes state officers to take unilateral immigration enforcement actions.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs request that the Court grant the following relief:

a. Declare that Texas Penal Code §§ 51.03 and 51.04 and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003 are unlawful;

b. Preliminarily and permanently enjoin Defendant from enforcing Texas Penal Code §§ 51.03 and 51.04 and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003; and

c. Grant any other and further relief that this Court may deem fit and proper.

Appx.0013

Dated: May 4, 2026

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)**
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
Daniel Woodward
(TX Bar No. 24138347)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org
danny@texascivilrightsproject.org

Dustin Rynders
(TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

/s/ *Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Steinberg*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org

Kathryn Huddleston*** (TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat*
Lee Gelernt
Grace Choi*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
gchoi@aclu.org

*Pro Hac Vice Application Forthcoming
** Application for Admission to Western District of Texas Pending
*** Application for Admission to Western District of Texas Forthcoming; barred in Texas and Arizona, not barred in the District of Columbia, practice supervised by a member of the D.C. Bar

13

# Tab B: Motion for Temporary Restraining Order and Preliminary Injunction

Appx.0015

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| L.M.L., K.G.S., on behalf of themselves and all those similarly situated,<br><br><br>Plaintiffs,<br><br><br>v.<br><br><br>FREEMAN F. MARTIN, in his official capacity as Director of the State of Texas Department of Public Safety,<br><br><br>Defendant. | Case No. 1:26-cv-01170 |

**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

i

Appx.0016

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................... 2

    A. The Federal Government Has Exclusive Authority to Regulate Immigration.................. 2

    B. Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country. ................... 4

STANDARD OF REVIEW ...................................................................................... 5

ARGUMENT ........................................................................................................ 5

    I. S.B. 4 IS PREEMPTED. ................................................................................. 5

        A. S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal. ......... 5

        B. S.B. 4 Conflicts with the Federal Immigration System.................................... 10

    II. THE EQUITIES STRONGLY FAVOR AN INJUNCTION.................................. 16

        A. S.B. 4 Will Irreparably Harm Plaintiffs Absent Injunctive Relief.................. 16

        B. The Balance of Equities and Public Interest Support an Injunction. ............... 17

CONCLUSION..................................................................................................... 18

CERTIFICATE OF SERVICE ................................................................................ 20

Appx.0017

**TABLE OF AUTHORITIES**

**Cases**                                                                                                    **Pages**

*Arizona v. United States*,
   567 U.S. 387 (2012).................................................................................................. *passim*

*Biden v. Texas*,
   597 U.S. 785 (2022)......................................................................................................4, 15

*BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*,
   17 F.4th 604 (5th Cir. 2021) .......................................................................................16

*Chy Lung v. Freeman*,
   92 U.S. 275 (1875).....................................................................................................6, 14

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000).........................................................................................................15

*De Canas v. Bica*,
   424 U.S. 351 (1976) .........................................................................................................7

*Farmworker Ass'n of Fla., Inc. v. Moody*,
   734 F. Supp. 3d 1311 (S.D. Fla. 2024) ........................................................................17

*Fellowship of Christian Univ. Students at Univ. of Texas at Dallas v. Eltife*,
   806 F. Supp. 3d 662 (W.D. Tex. 2025)........................................................................18

*Fla. Immigrant Coal. v. Uthmeier*,
   780 F. Supp. 3d 1235 (S.D. Fla. 2025) ...........................................................................1

*Fla. Immigrant Coal. v. Uthmeier*,
   No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025)......................................1, 6

*Fong Yue Ting v. United States*,
   149 U.S. 698 (1893)..........................................................................................................7

*Fuld v. Palestine Liberation Org.*,
   606 U.S. 1 (2025)..............................................................................................................7

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
   691 F.3d 1250 (11th Cir. 2012) ...................................................................8, 9, 12, 16

*Grace v. Barr*,
   965 F.3d 883 (D.C. Cir. 2020)......................................................................................13

*Gutierrez v. State*,
   380 S.W.3d 167 (Tex. Crim. App. 2012)........................................................................8

Appx.0018

*Hernandez v. State,*
  613 S.W.2d 287 (Tex. Crim. App. 1980).................................................................8

*Hines v. Davidowitz,*
  312 U.S. 52 (1941).................................................................................................6, 14

*Huisha-Huisha v. Mayorkas,*
  27 F.4th 718 (D.C. Cir. 2022)...............................................................................17

*Idaho Org. of Res. Councils v. Labrador,*
  780 F. Supp. 3d 1013 (D. Idaho 2025) ...................................................................1

*INS v. Cardoza-Fonseca,*
  480 U.S. 421 (1987)...............................................................................................13

*INS v. Yueh-Shaio Yang,*
  519 U.S. 26 (1996)...................................................................................................4

*Iowa Migrant Movement for Just. v. Bird,*
  157 F.4th 904 (8th Cir. 2025) ....................................................................... *passim*

*Iowa Migrant Movement for Just. v. Bird,*
  166 F.4th 688 (8th Cir. 2026) .................................................................................1

*Jama v. ICE,*
  543 U.S. 335 (2005)...............................................................................................14

*Lozano v. City of Hazleton,*
  724 F.3d 297 (3d Cir. 2013).....................................................................................8

*Make the Road New York v. Pompeo,*
  475 F. Supp. 3d 232 (S.D.N.Y. 2020).................................................................18

*Murphy v. NCAA,*
  584 U.S. 453 (2018)...............................................................................................16

*Nishimura Ekiu v. United States,*
  142 U.S. 651 (1892)..................................................................................................7

*Nken v. Holder,*
  556 U.S. 418 (2009)...............................................................................................17

*Ortega-Melendres v. Arpaio,*
  836 F. Supp. 2d 959 (D. Ariz. 2011) ...................................................................17

*Padres Unidos de Tulsa v. Drummond,*
  785 F. Supp. 3d 993 (W.D. Okla. 2025)................................................................1

Appx.0019

*Singh v. Gonzales*,
  499 F.3d 969 (9th Cir. 2007) ...............................................................................8

*Speaks v. Kruse*,
  445 F.3d 396 (5th Cir. 2006) ...............................................................................5

*Takahashi v. Fish & Game Comm'n*,
  334 U.S. 410 (1948) ............................................................................................7

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ................................................................................7

*Trans World Airlines, Inc. v. Mattox*,
  897 F.2d 773 (5th Cir. 1990) .............................................................................17

*Truax v. Raich*,
  239 U.S. 33 (1915) ..............................................................................................6

*United States v. Alabama*,
  691 F.3d 1269 (11th Cir. 2012) .................................................................. *passim*

*United States v. Curtiss-Wright Exp. Corp.*,
  299 U.S. 304 (1936) ............................................................................................7

*United States v. Iowa*,
  737 F. Supp. 3d 725 (S.D. Iowa 2024) ...............................................................1

*United States v. South Carolina*,
  720 F.3d 518 (4th Cir. 2013) .............................................................................12

*United States v. Texas*,
  144 F.4th 632 (5th Cir. 2025) ..............................................................1, 6, 10, 17

*United States v. Texas*,
  2026 WL 1122127 (5th Cir. Apr. 24, 2026) ........................................................1

*United States v. Texas*,
  599 U.S. 670 (2023) ..........................................................................................11

*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex. 2024) .................................................1, 6, 10, 17

*Uthmeier v. Fla. Immigrant Coal.*,
  145 S. Ct. 2872 (2025) ........................................................................................1

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ...........................................................................16

v

Appx.0020

*Villas at Parkside Partners v. City of Farmers Branch,*
    577 F. Supp. 2d 858 (N.D. Tex. 2008) ..................................................................16

*Villas at Parkside Partners v. City of Farmers Branch,*
    726 F.3d 524 (5th Cir. 2013) ............................................................... *passim*

**Statutes**

8 U.S.C. § 1101(a)(15)(T)..........................................................................................3, 13

8 U.S.C. § 1101(a)(15)(U) .........................................................................................3, 13

8 U.S.C. § 1101(a)(27)(J) ................................................................................................3

8 U.S.C. § 1103(a)(1)......................................................................................................10

8 U.S.C. § 1103(a)(5)......................................................................................................10

8 U.S.C. §§ 1151–1382...................................................................................................2

8 U.S.C. § 1158(a)(1)................................................................................................3, 9, 13

8 U.S.C. § 1158(d) ..........................................................................................................9

8 U.S.C. § 1182.............................................................................................................2, 8

8 U.S.C. § 1182(a)(6)......................................................................................................2

8 U.S.C. § 1182(d)(5)(A) ...............................................................................................9

8 U.S.C. § 1225...............................................................................................................8

8 U.S.C. § 1225(b) .........................................................................................................9

8 U.S.C. § 1225(b)(1) ............................................................................................3, 9, 11

8 U.S.C. § 1225(b)(1)(A)(ii) ..........................................................................................13

8 U.S.C. § 1225(b)(1)(B) ............................................................................................9, 13

8 U.S.C. § 1226(a) .........................................................................................................9

8 U.S.C. § 1226(b) .........................................................................................................9

8 U.S.C. § 1226(c) .........................................................................................................9

8 U.S.C. § 1227...............................................................................................................8

8 U.S.C. § 1229...............................................................................................................9

Appx.0021

8 U.S.C. § 1229a ....................................................................................................3, 9, 11

8 U.S.C. § 1229a(a)(3) .....................................................................................................8

8 U.S.C. § 1229b .............................................................................................................8

8 U.S.C. § 1229b(b) .........................................................................................................3

8 U.S.C. § 1229c .............................................................................................................8

8 U.S.C. § 1231 ...............................................................................................................8

8 U.S.C. § 1231(a)(5) .......................................................................................................9

8 U.S.C. § 1231(b)(3) ...........................................................................................3, 9, 13

8 U.S.C. § 1232 .............................................................................................................13

8 U.S.C. § 1254(a) ..........................................................................................................3

8 U.S.C. § 1321 ...............................................................................................................3

8 U.S.C. § 1323 ...........................................................................................................3, 9

8 U.S.C. § 1324 ...........................................................................................................3, 9

8 U.S.C. § 1325 ...........................................................................................................3, 9

8 U.S.C. § 1325(a) ........................................................................................................12

8 U.S.C. § 1326 ....................................................................................................3, 9, 11

8 U.S.C. § 1326(a)(2)(A) ...............................................................................................12

8 U.S.C. § 1327 ...............................................................................................................9

8 U.S.C. § 1328 ...............................................................................................................9

8 U.S.C. § 1329 ...............................................................................................................9

Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546 .......................................................................9

Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952) .......................9

Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681 (1998) .............3, 9, 13

Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102 ......................................................9

Senate Bill 4 (88th Leg. (4th Special Session)) ................................................... *passim*

vii

Appx.0022

Tex. Code Crim. Proc. art. 5B.002 ............................................................................2, 18

Tex. Code Crim. Proc. art. 5B.002(a) ..............................................................................4

Tex. Code Crim. Proc. art. 5B.002(b) ..............................................................................4

Tex. Code Crim. Proc. art. 5B.002(c) ..............................................................................4

Tex. Code Crim. Proc. art. 5B.002(d) ..........................................................................4, 14

Tex. Code Crim. Proc. art. 5B.003 ..................................................................2, 5, 13, 18

Tex. Penal Code § 51.02 ................................................................................................15

Tex. Penal Code § 51.02(c) ............................................................................................14

Tex. Penal Code § 51.02(c)(2) .......................................................................................12

Tex. Penal Code § 51.03 ......................................................................................2, 12, 18

Tex. Penal Code § 51.03(a) .........................................................................................4, 12

Tex. Penal Code § 51.04 ......................................................................................2, 5, 18

## Rules and Regulations

8 C.F.R. § 208.4 ..............................................................................................................9

Fed. R. Civ. P. 65(d)(2) ..................................................................................................18

## Other Authorities

Government of Mexico, Press Release 476 (Nov. 15, 2023),
   https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-
   immigrant-legislation-passed-in-texas?idiom=en; ..................................................15

W.D. Tex. Loc. R. CV-7(i) ...............................................................................................2

Appx.0023

**INTRODUCTION**

In separate litigation pending in this District, Texas's S.B. 4—an unprecedented state-law immigration regime—has been enjoined since before its effective date. *See United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024) (Ezra, J.). While a panel of the Fifth Circuit affirmed that injunction, 144 F.4th 632 (5th Cir. 2025), the en banc Court of Appeals subsequently vacated it, holding that the organizational and governmental plaintiffs in that suit lacked standing without reaching the merits, 2026 WL 1122127 (5th Cir. Apr. 24, 2026) (en banc). **That means that S.B. 4 will take effect when the mandate issues on May 15, 2026.**

But that standing decision does not remotely impact the correct conclusion reached by the district court and the *Texas* panel that S.B. 4 is both field and conflict preempted. Indeed, courts throughout the country have held that similar state laws establishing state deportation systems are unconstitutional. *See Iowa Migrant Movement for Just. v. Bird,* 157 F.4th 904 (8th Cir. 2025), *reh'g en banc denied*, 166 F.4th 688 (8th Cir. 2026); *Fla. Immigrant Coal. v. Uthmeier*, No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025) (denying application for stay); *Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993 (W.D. Okla. 2025); *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013 (D. Idaho 2025) ("IORC"); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025); *United States v. Iowa*, 737 F. Supp. 3d 725, 751 (S.D. Iowa 2024). And the Supreme Court declined to stay the injunction of Florida's version of S.B. 4's entry-and-reentry crimes—with no noted dissents. *Uthmeier v. Fla. Immigrant Coal*., 145 S. Ct. 2872 (2025) (mem.).

Plaintiffs bring this new action to challenge S.B. 4's reentry and removal provisions on behalf of a putative class of individuals subject to arrest, detention, prosecution, and removal under its preempted terms. Plaintiffs and putative class members will face these unconstitutional harms

1

regardless of whether they have federal permission to live in the United States, and without access to the federally mandated removal process and protections. And communities will face the arrest and summary removal of loved ones, with widespread separation of families.

Because S.B. 4's reentry and removal provisions will take effect when the Court of Appeals' mandate issues, Plaintiffs seek this Court's prompt intervention. They respectfully request that the Court grant the accompanying motion for provisional class certification and enjoin the enforcement of Texas Penal Code §§ 51.03 and 51.04 and Texas Code of Criminal Procedure articles 5B.002 and 5B.003 on behalf of themselves and the putative class by May 15, 2026. Pursuant to Local Rule CV-7(i), counsel informed the Texas Attorney General's office of this motion, and it has not yet indicated a position.

## BACKGROUND

### A. The Federal Government Has Exclusive Authority to Regulate Immigration.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 567 U.S. 387, 394 (2012). In the Immigration and Nationality Act ("INA"), Congress created a complex system to regulate entry into and removal from the United States. *See generally* 8 U.S.C. §§ 1151–1382.

That scheme balances policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see* 8 U.S.C. § 1182, including those who enter between ports of entry, *see id*. § 1182(a)(6). To decide whether a person who entered without inspection at a port will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals,

2

8 U.S.C. § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, 8 U.S.C. § 1225(b)(1).  On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other criminal regulations related to irregular entries. 8 U.S.C. §§ 1325, 1326; *see also, e.g.*, §§ 1321, 1323, 1324 (criminalizing the "unauthorized landing of aliens," and "unlawful bringing of aliens" into the country).

Even as it rendered noncitizens entering between ports "inadmissible" and subject to criminal penalties, Congress enacted a range of protections that are available despite unlawful entry.  Asylum, a form of humanitarian protection that can lead to permanent residence and eventually citizenship, is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status."  8 U.S.C. § 1158(a)(1). Congress also barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties. *See id.* § 1231(b)(3); Pub. L. No. 105-277, Div. G, Title XXII, § 2242, 112 Stat. 2681, 2681-822 (1998) (codified as Note to 8 U.S.C. § 1231).  In addition, individuals who are placed in full removal proceedings may apply for other forms of relief Congress has extended, including cancellation of removal.  8 U.S.C. § 1229b(b).  Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, 8 U.S.C. §§ 1101(a)(15)(U), 1101(a)(15)(T); temporary protected status, § 1254(a), and Special Immigrant Juvenile Status for noncitizens under 21 years of age, § 1101(a)(27)(J).

Given the complexities of the immigration system, federal discretion and control is vital. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.  Federal officials "decide whether it makes sense to pursue

3

Appx.0026

removal at all." *Id.* Federal officials choose among the several removal processes Congress established. *See Biden v. Texas*, 597 U.S. 785, 792 (2022). Federal officials decide whether to deploy the associated criminal immigration charges. *See Iowa*, 157 F.4th at 924. And once removal procedures have been initiated, federal officials decide whether to extend relief to otherwise removable noncitizens. *See, e.g.*, *INS v. Yueh-Shaio Yang*, 519 U.S. 26, 30 (1996).

### B. Texas Enacts S.B. 4 to Regulate Entry into and Removal from the Country.

S.B. 4 is a blatant attempt to supersede this complex federal system. It establishes new state crimes that criminalize irregular entry into the United States and direct state officers to effectuate deportations without any federal discretion or protection from removal.

As relevant here, S.B. 4 creates a new state "reentry" charge, applicable if a noncitizen enters, attempts to enter, or is at any time found in Texas after the person has been denied admission to, excluded, deported, or removed from the United States, or departed from the United States while an order of exclusion, deportation, or removal was outstanding. Tex. Penal Code § 51.03(a). There are no affirmative defenses for this crime. *Id.* A person can be prosecuted by Texas under this provision even if the United States authorized their reentry, even if they are in federal removal proceedings or seeking federal humanitarian relief, and even if they have lawful immigration status under federal law.

S.B. 4 also creates a mechanism for the State of Texas to unilaterally deport individuals from the United States. If a person is convicted under S.B. 4's entry or reentry provisions, the state judge *must* enter an Order to Return, which requires the defendant to return to the foreign nation from which they entered. Tex. Code Crim. Proc. art. 5B.002(d). To push people to quickly accept state removal orders, a state magistrate or judge may alternatively enter an Order to Return at the beginning of prosecution if certain conditions are met. *Id.* Art. 5B.002(a)-(c). Refusal to

4

comply with an Order to Return is a state crime punishable by up to 20 years in prison; there are no affirmative defenses.  Tex. Penal Code § 51.04.  S.B. 4 provides that an "Order to Return" is, like federal deportations, a predicate for the State's reentry crime.  *Id*.

As to all of these offenses, S.B. 4 specifically prohibits "abat[ing] the prosecution . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code of Crim. Proc. Art. 5B.003.

## STANDARD OF REVIEW

The substantive standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction.  "A preliminary injunction should issue if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury . . . , (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest."  *Speaks v. Kruse*, 445 F.3d 396, 399-400 (5th Cir. 2006).

## ARGUMENT

### I.   S. B. 4 IS PREEMPTED.

S.B. 4 is preempted for the same reasons explained in the holdings of this Court and a panel of the Fifth Circuit, prior to the en banc standing ruling.  It regulates entry and removal—an exclusively federal field.  S.B. 4 also conflicts with federal law in numerous ways, eliminating immigration relief and federal discretion and interfering with foreign policy and Congress's calibrated regulation of irregular entry.

### A.  S.B. 4 Intrudes on the Exclusively Federal Field of Entry and Removal.

In S.B. 4, Texas established an unprecedented state immigration system that entirely bypasses Congress's comprehensive scheme.  Texas has regulated and criminalized entry into the

5

Appx.0028

United States; chosen for itself who will be permitted to remain in the country, what statuses will qualify as defenses to removal, and what procedures will apply; and claimed the power to deport noncitizens by ordering them to depart the United States on pain of severe additional punishment. But immigration is an exclusively federal power, and Congress has long occupied the field of entry and removal.  S.B. 4 is field preempted.

Courts may infer field preemption from either a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject," or "a framework of regulation 'so pervasive . . . that Congress left no room for the States to supplement it.'"  *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  Here, both tests are satisfied.  *See Fla. Immigrant Coal.*, 2025 WL 1625385, at *3 (citing "the federal government's longstanding and distinct interest in the exclusion and admission of aliens, and the Immigration and Nationality Act's extensive regulation of alien admission"); *Texas*, 719 F. Supp. 3d at 663-66; *Texas*, 144 F.4th at 667-77.

The federal interest in entry and removal is unquestionably dominant.  "Policies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress." *Arizona*, 567 U.S. at 409 (quoting *Galvan v. Press*, 347 U.S. 522, 531 (1954)) (cleaned up).  Indeed, for 150 years—ever since Congress began systematically regulating immigration—the Supreme Court has been crystal clear: Regulation of entry into and expulsion from the United States are exclusively federal matters from which the States are excluded.  *See, e.g.*, *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal government."); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10

6

(1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) ("The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States [and] the period they may remain," and "the states are granted no such powers"); *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Arizona*, 567 U.S. at 409 ("the removal process is entrusted to the discretion of the Federal Government").

That unbroken line of precedent is grounded in the principle that immigration powers are "inherent in [the] sovereignty" of the United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). The federal government's sovereign authority includes the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Id.*; *see also Fong Yue Ting v. United States*, 149 U.S. 698, 705 (1893); *Arizona*, 567 U.S. at 394-95. States, by contrast, are not endowed with such "powers of external sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025) ("the Federal Government's broader sovereign authority" is "categorically different" than states').

In light of this unbroken line of precedent, the Fifth Circuit has likewise recognized that entry, exclusion, and deportation are exclusively federal matters. *See, e.g.*, *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (because "[p]olicies pertaining to the entry of aliens and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted") (cleaned up); *Villas at Parkside Partners v. City of Farmers Branch, Tex.*, 726 F.3d 524, 537 (5th Cir. 2013) (en banc). Other lower federal courts are in accord. *See, e.g.*, *United States v. Alabama*, 691 F.3d 1269, 1293 (11th

Appx.0030

Cir. 2012) ("The power to expel aliens has long been recognized as an exclusively federal power."); *Lozano v. City of Hazleton*, 724 F.3d 297, 315 (3d Cir. 2013) (similar).  Texas's state courts recognize that "the matter of entry into the United States" is "wholly preempted by federal law," *Hernandez v. State*, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as are "matters involving deportation," *Gutierrez v. State*, 380 S.W.3d 167, 176 (Tex. Crim. App. 2012).

Consistent with this dominant federal interest, Congress's entry-and-removal regime is highly "pervasive."  *Arizona*, 567 U.S. at 399 (internal quotation marks omitted).  Through the INA, Congress has established an exceptionally detailed, complex, and finely reticulated regulatory framework governing the inspection, admission, and removal of noncitizens seeking to enter the United States.  *See, e.g.*, 8 U.S.C. §§ 1182, 1225, 1227, 1229c, 1229b, 1231; *see also Alabama*, 691 F.3d at 1294 (discussing "Congress's comprehensive statutory framework governing alien removal").  Congress has specifically provided that the INA's provisions shall be "the sole and exclusive procedure" for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States.  8 U.S.C. § 1229a(a)(3); *see Farmers Branch*, 726 F.3d at 537.  To call the immigration statutes—and their implementing regulations and precedential administrative adjudications—comprehensive is an understatement; the immigration laws have "been described as second only to the Internal Revenue Code in complexity."  *Singh v. Gonzales*, 499 F.3d 969, 980 (9th Cir. 2007) (cleaned up).  And Congress has frequently amended this statutory scheme, including multiple significant amendments to the provisions most relevant here.  *See Ga. Latino All. for Hum. Rts. v. Governor*

8

Appx.0031

*of Ga.*, 691 F.3d 1250, 1263 n.10 (11th Cir. 2012) (discussing similar history of legislation to support field preemption).[1]

In particular, Congress has extensively regulated individuals who enter between ports of entry—those whom Texas is attempting regulate through S.B. 4. On one hand, as explained, the federal scheme contains a variety of enforcement mechanisms. Congress has created multiple removal pathways, with detailed procedures and multiple layers of review by federal officials, including a special "expedited removal" system specifically for those who arrive at our borders without visas or other valid immigration documents. *See, e.g.*, 8 U.S.C. §§ 1225(b)(1) (expedited removal procedures), 1229, 1229a (regular removal procedures), 1231(a)(5) (reinstatement of removal). Congress has also criminalized entry and reentry between ports of entry, along with efforts to assist or facilitate entry between ports. *See id.* §§ 1325, 1326, 1323, 1324, 1327, 1328, 1329; *Ga. Latino All.*, 691 F.3d at 1264 (discussing the "larger context of federal statutes" addressing entry). And Congress has provided a detailed set of standards and procedures for when people who enter between ports may be arrested and detained by federal officials. *See, e.g.*, 8 U.S.C. §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A). On the other hand, Congress has established numerous forms of relief from removal for people who enter between ports: Asylum is available "whether or not" a noncitizen arrives "at a designated port of arrival," *id.* § 1158(a)(1), and can be accessed through multiple procedural channels, *see id.* § 1225(b)(1)(B), 1158(d); 8 C.F.R. § 208.4. Withholding of removal bars a person's removal to any country where they face persecution or torture. *See* 8 U.S.C. § 1231(b)(3) and Note. And Congress has given federal officials "broad

---

[1] *See, e.g.*, Immigration and Nationality Act, Pub. L. No. 414, 66 Stat. 163 (1952); Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 102; Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104–208, Div. C, 110 Stat. 3009-546. Further changes are proposed in every Congress—and are often a focus of intense national political debate.

9

Appx.0032

discretion" to decide whether it makes sense to detain, remove, or prosecute in the first place. *Arizona*, 567 U.S. at 396; 8 U.S.C. § 1103(a)(1), (a)(5).

Through these many intricate and interrelated provisions, Congress has established "a full set of standards governing" those who enter between ports, "including the punishment for noncompliance"—a system that is "designed as a 'harmonious whole.'"  *Arizona*, 567 U.S. at 401 (quoting *Hines*, 312 U.S. at 72).  As such, "States may not enter" this field "in any respect," and "even complementary state regulation is impermissible."  *Id*. at 401-02.

In sum, when it comes to regulating noncitizens' entry into the United States, their permission to remain, and their removal, the case for field preemption is straightforward.  S.B. 4 represents an extraordinary intrusion on the field of entry and removal of noncitizens, *see Texas*, 719 F. Supp. 3d at 666-68, and is therefore field preempted.

### B.  S.B. 4 Conflicts with the Federal Immigration System.

In addition, S.B. 4 is conflict preempted because it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in multiple respects.  *Arizona*, 567 U.S. at 399 (quoting *Hines,* 312 U.S. at 67); *see Texas*, 719 F. Supp. 3d at 673-78; *Texas*, 144 F.4th at 677-86.

*First*, S.B. 4 obstructs federal law by eliminating federal immigration discretion and instead allowing state officers to unilaterally make immigration enforcement decisions.  *See Iowa Migrant Movement for Just.*, 157 F.4th at 921-24 (state reentry law was preempted as "an obstacle to the exercise of the discretion that Congress gives federal officials charged with enforcing federal immigration law").

S.B. 4 wrests from the federal government *all* discretion over the immigration processing, prosecution, and removal of noncitizens who reenter the United States between ports.  "A principal

Appx.0033

feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396.  Specifically, Congress has provided federal Executive Branch officials with a range of tools to address noncitizens re-entering the United States between ports.  Federal prosecutors may choose to bring criminal charges under 8 U.S.C. § 1326; immigration officials may initiate ordinary removal proceedings, *id*. § 1229a, or expedited proceedings if applicable, *id*. § 1225(b)(1); and immigration agents or administrative hearing officers may exercise discretion to forego removal proceedings, defer removal, or take other discretionary action to ameliorate the potential harshness of the immigration laws.  *See Arizona*, 567 U.S. at 396, 409.  Such discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'"  *United States v. Texas*, 599 U.S. 670, 679 (2023) (quoting *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)).

But under S.B. 4, *State* officers decide whether a noncitizen is prosecuted, detained, or removed.  The statute thus blatantly "violates the principle that the removal process is entrusted to the discretion of the Federal Government."  *Arizona*, 567 U.S. at 409; *Farmers Branch*, 726 F.3d at 534 (same); *id*. at 546 (Dennis, J., specially concurring) (same).  Indeed, the violation is even starker here than in *Arizona*, which involved state police conducting arrests but otherwise left the removal process in federal hands.  *See Farmers Branch*, 726 F.3d at 534 (discussing *Arizona*). S.B. 4 "empowers [Texas] to contradict the policy decisions of Congress, and the policy decisions made with the discretion that Congress grants to federal immigration officials, frustrating U.S. law enforcement and foreign policy interests."  *Iowa Migrant Movement for Just.*, 157 F.4th at 923.

That "is not a decision for [Texas] to make."  *Alabama*, 691 F.3d at 1295.  The Supreme Court and courts of appeals have rejected state efforts like this to make "unilateral" state decisions about immigration enforcement.  *Arizona*, 567 U.S. at 410 (conflict preemption on these grounds);

11

Appx.0034

*see Farmers Branch*, 726 F.3d at 530, 535 (cleaned up) (rejecting "unilateral state authority to prosecute as well as to detain" because "the federal government retains sole authority under the statute to prosecute, convict, and sentence offenders" for unlawful entry and reentry); *Alabama*, 691 F.3d at 1295 (statute conflict preempted where state had "taken it upon itself to unilaterally determine that any alien unlawfully present in the United States cannot live within the state's territory, regardless of whether the Executive Branch would exercise its discretion to permit the alien's presence"); *United States v. South Carolina*, 720 F.3d 518, 531-32 (4th Cir. 2013) (provisions preempted where they "improperly place in the hands of state officials the nation's immigration policy, and strip federal officials of the authority and discretion necessary in managing foreign affairs"); *Ga. Latino All.*, 691 F.3d at 1265 (similar, emphasizing discretion of federal prosecutors over immigration crimes).

*Second*, S.B. 4 blatantly overrides federal decisions about who can reenter and remain in the United States.  It criminalizes anyone who is "found" in Texas after a prior removal, Tex. Penal Code § 51.03(a), even if they had federal permission to reenter the country and reside in the United States.  It's hard to imagine a starker conflict with federal law.  Under federal law, a noncitizen cannot be convicted of illegal reentry if she has obtained federal "consent" to again seek admission to the United States.  8 U.S.C. § 1326(a)(2)(A).  But the new Texas law contains no such limitation. *See* S.B. 4 §51.03 (criminalizing noncitizen "found in this state after" she "has been . . . removed"); *cf.* S.B. 4 §51.02(c)(2) (providing affirmative defense, inapplicable to reentry crime, where "the defendant's conduct does not constitute a violation of 8 U.S.C. Section 1325(a)").  The result is that people who the federal government has expressly permitted to return to the United States, and who have been granted long-term legal status, are nevertheless criminalized by Texas. *See Iowa Migrant Movement for Justice*, 157 F.4th at 921 (citing this conflict); *Farmers Branch*, 726 F.3d

12

at 531 n.9 (quoting *Alabama*, 691 F.3d at 1288) (rejecting "untenable expansion of the federal [reentry] provision").

S.B. 4 similarly bypasses *all* of the defenses to removal that Congress has established. Perhaps most notably, as explained above, Congress carefully enshrined protection from persecution and torture as defenses to removal, specifically providing that such protections would be available to individuals who enter the country between ports of entry. *See* 8 U.S.C. §§ 1158(a)(1) (providing for asylum "whether or not at a designated port of arrival"), 1231(b)(3), 1231 Note; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 436 (1987). And when Congress established the expedited removal system to address noncitizens arriving at our borders without valid visas, it took care to provide access to such humanitarian protections through the "credible fear" screening process. *See* 8 U.S.C. § 1225(b)(1)(A)(ii), (B); *Grace v. Barr*, 965 F.3d 883, 887, 902 (D.C. Cir. 2020) (discussing credible fear process). Other relief is also available in the federal system, including special protections for unaccompanied minors and victims of crime and trafficking. 8 U.S.C. § 1232; 8 U.S.C. § 1101(a)(15)(T)-(U).

Under Texas's new immigration system, all this is wiped away. Noncitizens are arrested by state officers, held in state custody, and then ordered deported by state agents. Because this new process entirely sidesteps Congress's removal system, noncitizens will be subjected to state removal without the opportunity to seek asylum or other forms of humanitarian protection available under federal law. Indeed, S.B. 4 makes this explicit, providing that a "court may not abate the prosecution of an offense under" its new criminal provisions "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003; *see Iowa Migrant Movement for Just.*, 157 F.4th at 927 (rejecting same provision). And the reentry crime does not contain any exceptions—even for

13

Appx.0036

people who are *granted* asylum by the federal government.  *Cf.* Tex. Penal Code § 51.02(c) (providing affirmative defenses only for entry, not reentry, crime).

A state cannot simply take away people's federal right to enter the country, remain in the country, or seek asylum and numerous other defenses to removal.  Texas has impermissibly declared that noncitizens with prior removals "cannot be tolerated within its territory, without regard for any of the [federal] statutory processes or avenues for granting an alien permission to remain lawfully within the country." *Alabama*, 691 F.3d at 1295.

*Third*, S.B. 4 also injects Texas directly into sensitive foreign policy matters reserved exclusively for the federal government.  *See Iowa Migrant Movement for Justice*, 157 F.4th at 922-23 (explaining that a state reentry law "complicate[s] U.S. foreign relations").  Determinations regarding the entry into the United States by foreign nationals, and their removal from it, "touch on foreign relations," and therefore "must be made with one voice." *Arizona*, 567 U.S. at 409; *see also Jama v. ICE*, 543 U.S. 335, 348 (2005) (similar).  Indeed, the obvious danger that unilateral state immigration regulation could "embroil us in disastrous quarrels with other nations" has for 150 years been a cornerstone of the doctrine (explained above) that "[t]he passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States." *Chy Lung*, 92 U.S. at 280; *see Hines*, 312 U.S. at 63-64 (similar).  That risk is only heightened in this case, as the United States has negotiated and committed to humanitarian international commitments, and Texas now proposes to toss those agreements aside.

Here, that general interference with federal foreign affairs authority is heightened because S.B. 4 has already created a direct conflict with national policy towards Mexico.  Under its terms, state judges order noncitizens—regardless of their nationality—"to return to the foreign nation from which the person entered," on penalty of even more severe punishment.  Tex. Code Crim.

14

Proc. Art. 5B.002(d).  For all (or nearly all) defendants, that will be Mexico.  *See* Tex. Penal Code § 51.02 (criminalizing entry into Texas "directly from a foreign nation" and not at a port).  That "undermines the discretion of federal officials to decide who will be removed" and "conflicts with federal regulations over *where* to remove an alien to."  *Iowa Migrant Movement for Just.*, 157 F.4th at 925.

As the Supreme Court recently observed in rejecting another Texas effort to dictate immigration policy, given Mexico's sovereignty even the federal government "cannot unilaterally return . . . migrants to Mexico."  *Biden v. Texas*, 597 U.S. 785, 806 (2022).  The same is obviously true of Texas.  As the Court explained, the federal government's efforts to negotiate such returns with Mexico had "played a particularly outsized role in diplomatic engagements with Mexico, diverting attention from more productive efforts to fight transnational criminal and smuggling networks and address the root causes of migration."  *Id.* (internal quotation marks omitted).  The Court rejected Texas's proffered statutory interpretation, which would have "tie[d] the hands of the Executive" by allowing a court to supervise such foreign policy negotiations to obtain Mexican agreement.  *Id*.  Here, the interference with foreign policy is worse.  Rather than supervising federal negotiations, S.B. 4 purports to cut the federal government out entirely, as it would be Texas—not the United States—either negotiating with Mexico or ignoring Mexico's wishes and violating its sovereignty.[2]

---

[2] Notably, in response to S.B. 4's passage, Mexico stated that it "categorically rejects any measure that allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory."  Government of Mexico, Press Release 476 (Nov. 15, 2023), https://www.gob.mx/sre/prensa/mexican-government-opposes-the-anti-immigrant-legislation-passed-in-texas?idiom=en; *see Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 382-85 (2000) (citing protests lodged by foreign nations as evidence that state statute interfered with federal foreign policy).

Appx.0038

## II.    THE EQUITIES STRONGLY FAVOR AN INJUNCTION.

### A.  S.B. 4 Will Irreparably Harm Plaintiffs Absent Injunctive Relief.

Absent an injunction, Plaintiffs and members of the putative class will suffer irreparable harm by being placed at immediate risk of arrest, prosecution, detention, and removal under a state statute that is preempted by federal law.

L.M.L. is a lawful permanent resident who lives in Austin with his wife, daughter, and son. L.M.L.  Decl. ¶¶ 2-3.  His wife and daughter are both lawful permanent residents, and his son is a U.S. citizen.  *Id.* ¶ 3.  L.M.L. is the primary breadwinner and caretaker for his family due to his wife's diabetes and high blood pressure, which make it difficult for her to work.  *Id.* ¶ 8.  K.G.S. is also a resident of Austin, where she lives with her two children, one of whom is a U.S. citizen. K.G.S. Decl. ¶ 3. K.G.S. has been approved for a U visa.  *Id.* ¶ 7.  She is the primary breadwinner and caretaker for her two children.  *Id.* ¶ 8.  Both L.M.L. and K.G.S. face arrest, prosecution, and removal if S.B. 4's reentry and removal provisions go into effect.  L.M.L. Decl. ¶¶ 5-6; K.G.S. Decl. ¶¶ 5-6.

"[T]he threatened enforcement of [this] preempted law" against the plaintiffs constitutes irreparable injury.  *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008), *aff'd* 726 F.3d 524 (5th Cir. 2013) (en banc); *see also Iowa Migrant Movement for Just.*, 157 F.4th at 927 (similar); *Ga. Latino All.*, 691 F.3d at 1269 (similar); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (similar).  Preemption represents a "federal right to be free from" impermissible state regulation, *Murphy v. NCAA*, 584 U.S. 453, 479 (2018), and "the loss of constitutional freedoms for even minimal periods of time … unquestionably constitutes irreparable injury," *BST Holdings, L.L.C. v. Occupational Safety & Health Admin.*, 17 F.4th 604, 618 (5th Cir. 2021) (internal quotation marks omitted).  Furthermore,

16

Appx.0039

under S.B. 4, individuals will be arrested, prosecuted, and removed without any opportunity to raise federal defenses to removal.  That harm is acute because S.B. 4 directs that noncitizens be removed to Mexico, where it is well documented that migrants face truly extraordinary dangers of abduction, rape, torture, and death.  *See* Roma Decl., Exh. 1-18 (documenting harms to asylum seekers in Mexico); *Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (pointing to "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico).  They will also be separated from their families, including their young children who need their caregiving support.  *See Farmworker Ass'n of Fla., Inc. v. Moody*, 734 F. Supp. 3d 1311, 1339 (S.D. Fla. 2024).

**B.  The Balance of Equities and Public Interest Support an Injunction.**

Any interest the State has in enforcement of S.B. 4 is far outweighed by the harms to plaintiffs, the putative class, and the public.  *See Trans World Airlines, Inc. v. Mattox*, 897 F.2d 773, 784 (5th Cir. 1990) (finding states faced no injury from injunction of preempted regulation); *Alabama*, 691 F.3d at 1301 ("[W]e discern no harm from the state's nonenforcement of invalid legislation").  States' "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301.  That is particularly so where state action invades federal domains, and threatens "friction with foreign countries and weakening the effective diplomacy of the Executive Branch." *Iowa Migrant Movement for Just.*, 157 F.4th at 929; *see Texas*, 144 F.4th at 687-88.  And "there is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm." *Nken v. Holder*, 556 U.S. 418, 436 (2009); *see Texas*, 719 F. Supp. 3d at 699.

Even those who are not subject to S.B. 4 will reasonably fear being targeted and racially profiled.  *See Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 979-980 (D. Ariz. 2011).

17

Appx.0040

Noncitizens and their families will fear that interaction with officials, to report crimes, or obtain assistance, will result in their removal.  S.B. 4 will erode the public trust that governments have worked to create with migrant communities that is integral to public safety.  *See Make the Road New York v. Pompeo*, 475 F. Supp. 3d 232, 270 (S.D.N.Y. 2020) (enjoining public charge rule because of chilling effect the rule had on immigrants seeking services).

In sum, the equities weigh the heavily in favor of a preliminary injunction.

## CONCLUSION

The Court should grant a preliminary injunction enjoining enforcement of Tex. Penal Code 51.03 and 51.04 and Tex. Code Crim. Pro. arts. 5B.002 and 5B.003.  It should enjoin Defendant Martin and his officer, agents, servants, employees, and attorneys, and all other persons who are in active concert or participation with them.  Fed. R. Civ. P. 65(d)(2).[3]

---

[3] The Court should require only a nominal bond of $1.  "The amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court."  *Fellowship of Christian Univ. Students at Univ. of Texas at Dallas v. Eltife*, 806 F. Supp. 3d 662, 689 (W.D. Tex. 2025) (quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (cleaned up).  For all the reasons already explained, nominal bond is appropriate here.  *See id*. at 689-90.

18

Appx.0041

Dated: May 4, 2026

David A. Donatti (TX Bar No.
24097612)
Adriana C. Piñon (TX Bar No.
24089768)
Carolina Rivera Nelson (TX Bar No.
24132741)**
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
Daniel Woodward
(TX Bar No. 24138347)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org
danny@texascivilrightsproject.org

Dustin Rynders
(TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

*/s/ Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Steinberg*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org

Kathryn Huddleston*** (TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat*
Lee Gelernt
Grace Choi*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
gchoi@aclu.org

*Pro Hac Vice Application Forthcoming
** Admission to Western District of Texas
Pending
*** Application for Admission to Western District
of Texas Forthcoming; barred in Texas and
Arizona, not barred in the District of Columbia,
practice supervised by a member of the D.C. Bar

19

Appx.0042

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2026, I electronically filed the foregoing with the

Clerk of Court by using the District Court CM/ECF system. I have also caused a copy to be

emailed to the following attorneys with the Texas Office of the Attorney General: Ryan

Kercher (Ryan.Kercher@oag.texas.gov); Kyle Tebo (Kyle.Tebo@oag.texas.gov); Munera Al-

Fuhaid (Munera.Al-Fuhaid@oag.texas.gov); David Bryant (David.Bryant@oag.texas.gov).

*/s/ Cody Wofsy*
Cody Wofsy

20

Appx.0043

# TAB C: DECLARATION OF L.M.L.

## DECLARATION OF L.M.L.

I, L.M.L., hereby declare under the penalty of perjury under the laws of the United States of America:

1. I make this declaration based on my personal knowledge, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2. I am a lawful permanent resident of the United States and a citizen of Honduras. I am 56 years old.

3. I currently live in Austin, Texas, along with my wife who is a lawful permanent resident, my 21-year-old daughter who is a lawful permanent resident, and my 11-year-old son who is a United States citizen. My 11-year-old son has special needs and takes special education classes.

4. I also have a son who lives in Orlando, Florida, and is a lawful permanent resident, and a daughter who lives near me and is also a lawful permanent resident. My grandkids, several of whom are United States citizens, also live in the United States. My brother, who is a lawful permanent resident, and my nephews and nieces also live in the United States.

5. I entered the United States for the first time in 1997. I was detained for one month and then was deported.

6. In 2005, I entered the United States without inspection.

7. In about 2023, I became a lawful permanent resident in the United States after I had received a U visa as a victim of a crime.

8. I am worried that I will be arrested under S.B. 4. If I am arrested and detained under S.B. 4, it would be very difficult for my family and me, as my family depends on me for everything. I am the primary breadwinner in my household, as my wife is very sick due to her diabetes and high blood pressure and is not able to work regularly. I also help take care of my wife and my children, including my minor son, who has special needs.

9. I want to be a class representative in this case. I understand that, if the Court grants the motion for class certification, I would represent a large number of people who will now and/or in the future enter, attempt to enter, or be found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

10. I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just my own personal interests. I also understand the need to stay informed about what is happening in the case.

11. I understand that I am agreeing to represent many people like myself. I believe it is important to do so.

12. I do not want my name to become public with this lawsuit as I fear that revealing my identity will create a risk of retaliation by local law enforcement officials and may result in my arrest, detention, and separation from my family. I am also very worried about the social stigma and harassment my family and I might face if details of our identities, personal lives, and immigration history—including my status as a victim of a crime— are made public.

I declare under penalty of perjury under the laws of the United States of America that the information provided above is true and correct.

Executed on April 30th, 2026, in Austin, Texas



L.M.L.

**CERTIFICATE OF TRANSLATION**

My name is Ana Sofia Barrios, and I hereby swear under penalty of perjury under the laws of the United States of America that I am fluent in English and Spanish. I certify that I have read this statement to L.M.L. in the Spanish language, a language he is fluent in, and that he stated that he understood perfectly and agreed with its contents in their entirety.

Executed this 30th day of April, 2026, in New York, New York.

Date: April 30, 2026                              _____

                                                  Ana Sofia Barrios

# Tab D: Declaration of K.G.S.

**DECLARATION OF K.G.S.**

I, K.G.S., hereby declare under the penalty of perjury under the laws of the United States of America:

1.  I make this declaration based on my personal knowledge, except where I have indicated otherwise. If called as a witness, I could and would testify competently and truthfully to these matters.

2.  I am a citizen of Honduras. I am 29 years old.

3.  I currently live in Austin, Texas, with my two children, including my seven-year-old son who is on a special immigrant juvenile visa and my three-year-old son who is a United States citizen. I also live with my two sisters, one of whom is a legal permanent resident, and the other of whom is on a special immigrant juvenile visa.

4.  My father, who has a U visa, lives in Austin. I have aunts, uncles, and cousins who also live in Austin.

5.  When I was a child, in about 2014, I entered the United States without inspection. I was detained for a month. I initially applied for a visa but left the United States in about 2015. After I left the United States, I did not appear for an immigration court hearing, so I was issued a deportation order.

Appx.0050

6. In July 2021, I entered the United States without inspection for the second time. I was detained for about four days. I was issued a reinstated removal order and was placed on an order of supervision.

7. About a year ago, I learned that my petition for a U visa due to domestic violence had been approved.

8. I fear that I will be arrested, prosecuted, and ordered out of the country under S.B. 4. If I am arrested and prosecuted under S.B. 4, it would be very hard for me and my children. I am the only caregiver for my sons, as my older son's father is deceased and my younger son does not have contact with his father. I also send money to my mother, who lives in Honduras and is not able to find work.

9. I want to be a class representative in this case. I understand that, if the Court grants the motion for class certification, I would represent a large number of people who will now or in the future enter, attempt to enter, or be found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

10. I understand that, as a class representative, it would be my responsibility to represent the interests of all the class members in this lawsuit, and not just

Appx.0051

my own personal interests. I also understand the need to stay informed about what is happening in the case.

11. I understand that I am agreeing to represent many people like myself. I believe it is important to do so.

12. I do not want my name to become public as I fear that, if my identity were revealed, law enforcement could retaliate against me and could arrest me, detain me, and separate me from my family. I am also very worried about the stigma and harassment my children and I might face if intimate details of our identities, personal lives, and immigration history—including the fact that I crossed the border without inspection, as well as the fact that I am a victim of domestic violence—are made public.

I declare under penalty of perjury under the laws of the United States of America that the information provided above is true and correct.

Executed on May 3, 2026, in Austin, Texas



K.G.S.

## CERTIFICATE OF TRANSLATION

My name is Kate Gibson Kumar, and I hereby swear under penalty of perjury under the laws of the United States of America that I am fluent in English and Spanish. I certify that I have read this statement to K.G.S. in the Spanish language, a language she is fluent in, and that she stated that she understood perfectly and agreed with its contents in their entirety.

Executed this 3rd day of May, 2026, in New York, New York.


Date: May 3rd, 2026

_____

Kate Gibson Kumar

# Tab E: Plaintiffs' Motion for Class Certification and Memorandum of Law in Support

Appx.0054

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

|  |  |
|---|---|
| L.M.L. and K.G.S., on behalf of themselves and all those similarly situated, <br><br><br> Plaintiffs, <br><br><br> v. <br><br><br> FREEMAN F. MARTIN, in his official capacity as Director of the State of Texas Department of Public Safety, <br><br><br> Defendant. | Case No. 1:26-cv-01170 |

**PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
AND MEMORANDUM OF LAW IN SUPPORT**

Appx.0055

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    I.      Texas Senate Bill 4 ....................................................................................... 2

    II.    Class Representatives .................................................................................... 3

PROPOSED CLASS DEFINITION ................................................................................ 4

ARGUMENT .................................................................................................................... 4

    I.      THE PROPOSED CLASS SATISFIES THE NUMEROSITY REQUIREMENT OF RULE 23(A)(1). .......................................................................................... 5

    II.    THE PROPOSED CLASS'S CLAIMS RAISE COMMON ISSUES OF LAW AND FACT…………………………………………………………………….. 8

    III.   THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL OF THE PROPOSED CLASS………………………………………………………………… 9

    IV.   THE REPRESENTATIVES ARE ADEQUATE………………………………. 10

    V.    CLASS COUNSEL IS ADEQUATE UNDER RULE 23(G)................................. 10

    VI.   THE CLASSES SATISFY RULE 23(B)(2). ..................................................... 12

CONCLUSION.................................................................................................................. 13

Appendix A: L.R. CV-23 Statement................................................................................. 17

CERTIFICATE OF SERVICE ......................................................................................... 17

Appx.0056

## TABLE OF AUTHORITIES

Cases                                                                                                      Pages

*Allison v. Citgo Petroleum Corp.*,
    151 F.3d 402 (5th Cir. 1998) ................................................................................12

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..............................................................................................10

*Angell v. GEICO Advantage Ins. Co.*,
    67 F.4th 727 (5th Cir. 2023) .............................................................................9, 10

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ..................................................................................8

*Fla. Immigrant Coal. v. Uthmeier*,
    780 F. Supp. 3d 1235 (S.D. Fla. 2025) ...............................................................7, 12

*Gardner v. Westinghouse Broad. Co.*,
    437 U.S. 478 (1978)..................................................................................................7

*Idaho Org. of Res. Councils v. Labrador*,
    780 F. Supp. 3d 1013 (D. Idaho 2025) ...............................................................7, 11

*Iowa Migrant Movement for Just. v. Bird*,
    157 F.4th 904 (8th Cir. 2025) ................................................................................11

*Iowa Migrant Movement for Just. v. Bird*,
    166 F.4th 688 (8th Cir. 2026) ................................................................................11

*Jack v. Am. Linen Supply Co.*,
    498 F.2d 122 (5th Cir. 1974) ...................................................................................5

*James v. City of Dallas, Tex.*,
    254 F.3d 551 (5th Cir. 2001) ...................................................................................9

*James v. City of Dallas, Tex.*,
    254 F.3d 551 (5th Cir. 2001)  ..................................................................................9

*Jones v. Diamond*,
    519 F.2d 1090 (5th Cir. 1975) .................................................................................7

*La Union del Pueblo Entero v. Texas*,
    No. 1:24-cv-00270-DAE (W.D. Tex. filed Mar. 12, 2024).......................................2

*Las Americas Immigrant Advocacy Center v. Martin*,
    No. 1:23-cv-01537-DAE (W.D. Tex. filed Dec. 19, 2023) .......................................2

Appx.0057

*Mullen v. Treasure Chest Casino, LLC*,
    186 F.3d 620 (5th Cir. 1999) ...........................................................................5, 7, 10

*Padres Unidos de Tulsa v. Drummond*,
    783 F. Supp. 3d 1324 (W.D. Okla. 2025) ..........................................................7, 12

*Pederson v. La. State Univ.*,
    213 F.3d 858 (5th Cir. 2000) ...................................................................................5

*Penson v. Terminal Transp. Co.*,
    634 F.2d 989 (5th Cir. 1981) .................................................................................12

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
    559 U.S. 393 (2010)..................................................................................................4

*M.D. ex rel. Stukenberg v. Perry*,
    675 F.3d 832 (5th Cir. 2012) ...................................................................................9

*Uthmeier v. Fla. Immigrant Coal.*,
    145 S. Ct. 2872 (2025)...........................................................................................11

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011)..................................................................................... *passim*

*Yates v. Collier*,
    868 F.3d 354 (5th Cir. 2017) ...............................................................................5, 8

*Zeidman v. J. Ray McDermott & Co., Inc.*,
    651 F.2d 1030 (5th Cir. Unit A July 1981).............................................................5, 7

**Statutes**

8 U.S.C. § 1231(a)(5)..................................................................................................6

Tex. Code Crim. Proc. art. 5B.001 .............................................................................1

Tex. Code Crim. Proc. arts. 5B.002............................................................................1, 2

Tex. Code Crim. Proc. arts. 5B.003............................................................................1

Tex. Penal Code § 12.33 .............................................................................................3

Tex. Penal Code § 51.02 .............................................................................................1

Tex. Penal Code § 51.03 .............................................................................................1

Tex. Penal Code § 51.03(a).........................................................................................2

Tex. Penal Code § 51.04 .............................................................................................3

Appx.0058

Tex. Penal Code § 51.04(b) ................................................................................................2

**Rules and Regulations**

Fed. R. Civ. P. 23(a) ....................................................................................................1, 4

Fed. R. Civ. P. 23(A)(1)...................................................................................................5

Fed. R. Civ. P. Rule 23(a)(2) ...........................................................................................8

Fed. R. Civ. P. 23(a)(3)....................................................................................................9

Fed. R. Civ. P. 23(a)(4)..................................................................................................10

Fed. R. Civ. P. 23(b)(2).................................................................................1, 4, 12, 13

Fed. R. Civ. P. 23(g)(1)(A)(i) ........................................................................................11

Fed. R. Civ. P. 23(g)(1)(A)(ii) .......................................................................................11

Fed. R. Civ. P. 23(g)(1)(A)(iii) ......................................................................................11

Fed. R. Civ. P. 23(g)(1)(A)(iv) ......................................................................................11

Fed. R. Civ. P. 23(g)(1)(B) ............................................................................................12

W.D. Tex. Loc. R. CV-23 ................................................................................................2

W.D. Tex. Loc. R. CV-7(i) ..............................................................................................2

**Other Authorities**

Jeffrey S. Passel and Jens Manuel Krogstad, *What We Know About Unauthorized
    Immigrants Living in the U.S.*, Pew Research Center, (2024) ....................................6

Newberg and Rubenstein on Class Actions § 3:21 (6th ed.) ...........................................8

v

Appx.0059

**INTRODUCTION**

A class action lawsuit is appropriate to challenge Texas Senate Bill 4 (88th Leg. (4th special session)) ("S.B. 4"), which enacts new state immigration crimes.  S.B.4 is codified at Tex. Penal Code §§ 51.02–.03 and Tex. Code Crim. Proc. arts. 5B.001–003.  This law impermissibly regulates noncitizens' entry into and removal from the United States, intrudes upon the federal government's exclusive authority over immigration, and obstructs Congress's scheme for enforcement of federal immigration laws.  *See* Pls.' Mot. for TRO and Prelim. Inj.

Plaintiffs respectfully request that this Court certify a class of all noncitizens who are subject to S.B. 4's felony reentry and removal provisions based on a prior removal, exclusion, or denial of admission under federal immigration law.  This class satisfies the requirements of Rule 23(a) and falls squarely within Rule 23(b)(2).  S.B. 4 threatens thousands of noncitizens across Texas.  The class raises the uniform legal question of whether the statute is preempted by federal immigration law.  And Plaintiffs' claims are typical of all other class members, because they all face the same harms under the same preempted law. Plaintiffs' counsel—including the ACLU Immigrants' Rights Project, the ACLU of Texas, and the Texas Civil Rights Project—have extensive experience in complex class litigation and immigration law.

Class certification is also appropriate under Rule 23(b)(2) because Defendants have "acted or refused to act on grounds that apply generally to the class," and a single injunction barring the enforcement of S.B. 4's reentry and removal provisions will redress the harm facing all class members.  Fed. R. Civ. P. 23(b)(2).

S.B. 4 will inflict grave harms on thousands of noncitizens and their families.  It empowers Texas law enforcement to detain, criminally prosecute, and remove noncitizens for preempted state immigration crimes, even if the federal government has authorized their reentry or continued

1

Appx.0060

presence, even if they have ongoing removal proceedings, and even if they are eligible for asylum. Given the serious risk of irreparable harm should S.B. 4 go into effect, Plaintiffs respectfully request provisional class certification in tandem with the issuance of a temporary restraining order or preliminary injunction.

Pursuant to Local Rule CV-7(i), counsel informed the Texas Attorney General's office of this motion, and it has not yet indicated a position.[1]

## BACKGROUND

### I.        Texas Senate Bill 4

S.B. 4 creates three new state immigration crimes: Illegal Entry, Illegal Reentry, and Refusal to Comply with Order to Return to Foreign Nation, codified at Texas Penal Code §§ 51.01-51.04.

As relevant here, S.B. 4 criminalizes the reentry of any noncitizen who, after having "been denied admission to or excluded, deported, or removed from the United States," enters, attempts to enter, or is found in Texas. Tex. Penal Code § 51.03(a). The offense is a third-degree felony, punishable by up to ten years' imprisonment—or twenty years if the individual has certain prior convictions. *Id.* § 51.04(b).

In addition to these entry crimes, S.B. 4 imposes a state-law removal scheme. If a person is convicted of illegal entry or reentry, S.B. 4 requires the state judge to issue a removal order, called an Order to Return to Foreign Nation. Tex. Code Crim. Proc. art. 5B.002. S.B. 4 imposes

---

[1] Pursuant to Local Rule CV-23, the following are pending cases alleging the same or similar causes of action: *Las Americas Immigrant Advocacy Center v. Martin*, No. 1:23-cv-01537-DAE (W.D. Tex. filed Dec. 19, 2023) and *La Union del Pueblo Entero v. Texas*, No. 1:24-cv-00270-DAE (W.D. Tex. filed Mar. 12, 2024). Counsel for plaintiffs have discussed and thoroughly explained to the plaintiffs the nature of a class action and potential advantages and disadvantages to the named plaintiffs by proceeding in a class action rather than individually. No class notice is anticipated. No settlement negotiations have occurred, or are likely.

Appx.0061

criminal penalties for failure to comply with the state removal order of up to 20 years in prison. Tex. Penal Code §§ 51.04, 12.33.  These provisions direct Texas officials to remove noncitizens from the country even if the noncitizen has federal permission to remain in the United States, and with none of the protections that Congress provided in federal law.

## II.        Class Representatives

Plaintiffs are two noncitizens who reside in Texas and face a credible threat of prosecution and removal under S.B. 4's reentry and removal provisions.  Each named plaintiff seeks declaratory and injunctive relief to prevent the enforcement of S.B. 4.

L.M.L. is a 56-year-old lawful permanent resident of the United States and citizen of Honduras.  *See* Decl. of L.M.L. ¶ 2, ECF 3-1.  He lives in Austin, Texas, with his lawful permanent resident wife, his lawful permanent resident daughter, and his United States citizen son.  *Id.* ¶ 3. He entered the United States for the first time in 1997 and was deported.  *Id.* ¶ 5.  In 2005, he entered the United States without inspection.  *Id.* ¶ 6.  In about 2023, he became a lawful permanent resident of the United States.  *Id.* ¶ 7.  He fears being arrested, detained, and deported under S.B. 4's reentry provision.  *Id.* ¶ 8.  He is the primary breadwinner and caretaker for his wife and children because his wife's diabetes and high blood pressure make it difficult for her to work.  *Id.*

K.G.S. is a 29-year-old citizen of Honduras.  *See* Decl. of K.G.S. ¶ 2, ECF 3-2.  She currently lives in Austin, Texas, with her two children, one of whom is a United States citizen.  *Id.* ¶ 3.  In about 2014, when she was a child, she entered the United States without inspection and was later issued a deportation order.  *Id.* ¶ 5.  In 2021, she entered the United States without inspection; her removal order was later reinstated.  *Id.* ¶ 6.  She has since been approved for a U-visa.  *Id.* ¶ 7.  She fears being arrested, detained, and deported under S.B. 4's reentry provision. *Id.* ¶ 8.  She is the primary breadwinner and caretaker for her children. *Id.*

3

Each of these plaintiffs faces imminent harm from S.B. 4's enforcement and seeks injunctive relief on behalf of themselves and all others similarly situated. Their legal theories are uniform across the class: S.B. 4 is preempted by federal immigration law and violates the Supremacy Clause of the U.S. Constitution. Their claims are typical of the class, and they are committed to pursuing this litigation to protect themselves and others facing the same injury.

## PROPOSED CLASS DEFINITION

The proposed class representatives, L.M.L. and K.G.S., seek certification of a Plaintiff Class defined as:

All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

## ARGUMENT

A plaintiff whose suit satisfies the requirements of Federal Rule of Civil Procedure 23 has a "categorical" right "to pursue his claim as a class action." *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398 (2010). The "suit must satisfy the criteria set forth in [Rule 23(a)] (*i.e.*, numerosity, commonality, typicality, and adequacy of representation), and it also must fit into one of the three categories described in subdivision (b)." *Id.*

As set forth below, the proposed class satisfies all four of the Rule 23(a) requirements. In addition, Defendants "ha[ve] acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole," as required under Rule 23(b)(2). "[A] single injunction or declaratory judgment would provide relief to each member of the class," and therefore certification is appropriate under

4

Rule 23(b)(2). *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011); *see also Yates v. Collier*, 868 F.3d 354, 367 (5th Cir. 2017).

## I.    THE PROPOSED CLASS SATISFIES THE NUMEROSITY REQUIREMENT OF RULE 23(A)(1).

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A fixed number of plaintiffs is not required for numerosity, but courts routinely presume joinder is impracticable when the class exceeds forty individuals. *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 624 (5th Cir. 1999) (citing *Newberg on Class Actions* § 3.05). Numerosity is evaluated "in view of the numerosity of the class and all other relevant factors," including "the geographical dispersion of the class, the ease with which class members may be identified, the nature of the action, and the size of each plaintiff's claim." *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. Unit A July 1981). The presence of future class members, who add to the size of the class and cannot yet be identified, weighs in favor of certification. *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000); *see Jack v. Am. Linen Supply Co.*, 498 F.2d 122, 124 (5th Cir. 1974). The ultimate question is "whether joinder of all members is practicable," and a "reasonable estimate of the number of purported class members" when combined with additional factors making joinder impracticable is sufficient for numerosity. *Zeidman*, 651 F.2d at 1038-39.

Here, the proposed class includes noncitizens across Texas who are, or will be, subject to arrest and prosecution under Senate Bill 4's "Illegal Reentry" provision. Public data confirms that thousands of individuals could be exposed to arrest and prosecution pursuant to S.B. 4's enforcement. There are two methods of estimating the number of class members—either of which is an underestimate.

Appx.0064

The first method relies on the number of people charged with the federal reentry crime and apportions them to Texas based on its undocumented population.  In 2019, the federal government charged 25,426 individuals with the federal reentry crime which S.B. 4's state reentry crime purports to track.  The number of people prosecuted for illegal reentry is likely much lower than the number who could be subject to S.B. 4, since many people will not be prosecuted for illegal reentry.  And Texas, which has the second largest undocumented population of any state, accounts for roughly 14.5% of the total undocumented population in the United States.  *See* Jeffrey S. Passel and Jens Manuel Krogstad, *What We Know About Unauthorized Immigrants Living in the U.S.*, Pew Research Center, (2024), (estimating 1.6 million undocumented noncitizens in Texas and 11 million in the United States).  Assuming that Texas had roughly this proportion of illegal reentry prosecutions, 14.5% of the total number of individuals charged with federal reentry crimes in 2019 would be 3,698 individuals, which is well above the threshold required for numerosity.

The second method relies on the number of people who are subject to reinstatement of removal—summary removal procedures which apply to noncitizens who return to the United States without authorization after having been removed under a prior order of deportation, exclusion, or removal. 8 U.S.C. § 1231(a)(5).  127,671 reinstatements of removal were conducted in 2019. Assuming that Texas had roughly 14.5% of the total number of reinstatements of removal, approximately 18,512 individuals in Texas would have reinstatements of removal, which is also well above the threshold required for numerosity.

Additionally, the class includes not just people who live in Texas after a prior removal, but also any such person who travels through or to the state.  And there will be countless future members of the class given the ongoing application of S.B. 4 to any person found in the state and suspected of past immigration violations.  The class easily satisfies the numerosity requirement.

6

Indeed, in several challenges to laws modeled on S.B. 4, courts have found numerosity. *See Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1047 (D. Idaho 2025) (finding numerosity of class in challenge to law modeled on S.B. 4 based on illegal reentry prosecutions and reinstated removal orders); *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1351 (W.D. Okla. 2025) (finding numerosity of class in challenge to law modeled on S.B. 4); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1266 (S.D. Fla. 2025) (same).

Joinder is further complicated by the geographic dispersion of class members across Texas and the transitory nature of many individuals subject to S.B. 4—who may be incarcerated, deported, or forced to leave the state. Courts have recognized that joinder may be impracticable where plaintiffs "transient" or "geographically dispersed." *Mullen*, 186 F.3d at 624; *Zeidman*, 651 F.2d at 1038. That is particularly true here, where class members are likely to face state prosecution, incarceration, or forced removal—limiting their ability to file individual suits or seek relief on their own.

Finally, certifying a class here promotes judicial efficiency by preventing individuals throughout the state from needing to file the same, duplicative litigation on the same constitutional question. The general rule encouraging liberal construction of civil rights class actions "applies with equal force to the numerosity requirement of Rule 23(a)(1)." *Jones v. Diamond*, 519 F.2d 1090, 1100 (5th Cir. 1975), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978); *see also Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1038 (5th Cir. 1981) (explaining that, when entertaining class actions to vindicate civil rights, courts should not to apply rules about the burden of proof "rigidly or blindly"). For these reasons, the proposed class satisfies Rule 23(a)(1)'s numerosity requirement.

Appx.0066

## II.    THE PROPOSED CLASS'S CLAIMS RAISE COMMON ISSUES OF LAW AND FACT.

The proposed class satisfies Rule 23(a)(2), which requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  To meet this requirement, plaintiffs must demonstrate "a common contention" that is "capable of classwide resolution."  *Dukes*, 564 U.S. at 350.  This requirement may be satisfied by only "one common question of law or fact."  *Yates*, 868 F.3d at 365 n.6 ("we reaffirm that Rule 23(a)(2) requires only that a plaintiff demonstrate at least one common question of law or fact"); *accord In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014); 1 Newberg and Rubenstein on Class Actions § 3:21 (6th ed.).

Here, all class members face the same threatened harm: enforcement of S.B. 4's reentry and removal provisions.  They all raise the same preemption claims against the statute.  And the statute threatens them with the same injuries of arrest, prosecution, and removal.  These features of S.B. 4 apply statewide and to each class member, creating multiple common questions of fact and law central to the litigation.

There are multiple common legal questions, including:

- whether S.B. 4 is field preempted because it regulates matters of dominant federal interest and operates in a field over which Congress has exercised exclusive authority;

- whether S.B. 4 is conflict preempted because it contradicts federal admission and release decisions, imposes burdens and penalties not authorized by and contrary to federal law, creates its own immigration procedures, and directs state officers to take unilateral immigration enforcement actions.

These defects in S.B. 4 apply to every single class member.

8

The answer to whether the challenged conduct violates the law will drive the resolution of the litigation for the class as a whole. *Dukes*, 564 U.S. at 350. Because Plaintiffs' claims turn on issues common to all members of the proposed class, the commonality requirement is satisfied.

### III. THE NAMED PLAINTIFFS' CLAIMS ARE TYPICAL OF THE PROPOSED CLASS.

The proposed class also satisfies Rule 23(a)(3), which requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is met when the named plaintiffs' claims "have the same essential characteristics of those of the putative class," even if not completely identical. *James v. City of Dallas, Tex.*, 254 F.3d 551, 571 (5th Cir. 2001), *abrogated on other grounds by M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832 (5th Cir. 2012). The typicality test is satisfied when the class representatives' claims arise from the same course of conduct and rest on the same legal theories as those of the class. *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023).

Here, Plaintiffs' injuries and legal claims are the same as all other class members. Their claims arise from the same challenged conduct as the class they seek to represent: arrest, prosecution, and removal under S.B. 4. Like all members of the proposed class, they face arrest and criminal charges under the reentry provision. Like every class member, Plaintiffs' claims turn on whether S.B. 4 is field and conflict preempted. The factual and legal basis for Plaintiffs' claims are thus coextensive with those of the proposed class. As the Fifth Circuit has made clear, when "the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality." *James*, 254 F.3d at 571.

For these reasons, Plaintiffs' claims are typical of those of the class, and the proposed class satisfies Rule 23(a)(3).

Appx.0068

## IV.    THE REPRESENTATIVES ARE ADEQUATE.

The proposed class satisfies Rule 23(a)(4), which requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The primary factors in evaluating adequacy are: "(1) the zeal and competence of the representatives' counsel; [and] (2) the willingness and ability of the representatives to take an active role in and control the litigation and to protect the interests of absentees." *Angell*, 67 F.4th 727, 737 (quoting *Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 412 (5th Cir. 2017)). As discussed below, there can be no question as to counsel's zeal and competence.

The proposed class representatives seek relief that would protect not only themselves but all persons subject to S.B. 4's illegal reentry and removal provisions. They understand their responsibilities as class representatives and have demonstrated a strong interest in vindicating the constitutional rights of others similarly situated. *See* L.M.L. Decl. ¶ 9, K.G.S. Decl. ¶ 9. Neither of the representative Plaintiffs have interests antagonistic to the proposed class, and each is committed to pursuing prospective relief that would benefit all class members equally. *See Mullen*, 186 F.3d at 625–26 (5th Cir. 1999) (noting that "[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests").[2]

## V.    CLASS COUNSEL IS ADEQUATE UNDER RULE 23(G).

Under Federal Rule of Civil Procedure 23(g), any order certifying a class must appoint class counsel who will "fairly and adequately represent the interests of the class." In making this

---

[2] Plaintiffs do not anticipate a need for subclasses.

Appx.0069

determination, courts consider: "(i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)–(iv).

Plaintiffs' counsel satisfy these criteria. They have been litigating S.B. 4's validity since its enactment—in this Court, the Fifth Circuit, and the Supreme Court. Counsel have deep familiarity with complex federal litigation, including civil rights actions, preemption challenges, and class-based requests for injunctive and declaratory relief. Members of the litigation team are also litigating challenges to similar laws in other jurisdictions, including in Iowa, Idaho, Oklahoma, and Florida. *See, e.g.*, *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904 (8th Cir. 2025), *reh'g en banc denied*, 166 F.4th 688 (8th Cir. 2026); *Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025).

Counsel possess the experience and institutional resources necessary to effectively litigate this case through discovery, motion practice, class-wide relief, and any future enforcement proceedings. The American Civil Liberties Union Foundation Immigrants' Rights Project, the American Civil Liberties Union of Texas, and the Texas Civil Rights Project are nationally recognized organizations with substantial expertise and capacity. Each has a proven track record of litigating large-scale constitutional and immigration-related challenges, including numerous class actions. No conflicts of interest exist, and proposed counsel have demonstrated a commitment to vigorously representing the interests of the entire class. *See* Decl. of Cody Wofsy, Ex. A; Decl. of Dustin Rynders, Ex. B. The ACLU Immigrants' Rights Project has been previously appointed class counsel in three challenges to laws modeled on S.B. 4. *See Idaho Org. of Res.*

11

*Councils*, 780 F. Supp. 3d at 1051; *Padres Unidos de Tulsa*, 783 F. Supp. 3d at 1353; *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1268.

Under these circumstances, the appointment of Plaintiffs' counsel as class counsel is appropriate. Counsel "will fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(g)(1)(B). The Court should therefore appoint the ACLU Immigrants' Rights Project, the ACLU of Texas, and the Texas Civil Rights Project as class counsel upon granting class certification.

## VI.    THE CLASSES SATISFY RULE 23(B)(2).

Class certification under Rule 23(b)(2) is appropriate where "the party opposing the class has acted or refused to act on grounds that apply generally to the class," such that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). Rule 23(b)(2) is specifically designed to permit civil rights actions that seek "uniform group remedies" rather than individual damages. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 414 (5th Cir. 1998); *accord Dukes*, 564 U.S. at 360–61. The Rule "was intended primarily to facilitate civil rights class actions," especially where plaintiffs seek "broad injunctive or declaratory relief against discriminatory practices." *Penson v. Terminal Transp. Co.*, 634 F.2d 989, 993 (5th Cir. 1981).

This case exemplifies the purpose and structure of a Rule 23(b)(2) action. S.B. 4 authorizes the arrest, detention, and expulsion of broad categories of noncitizens. The statute applies in the same way to all class members: It exposes them to the same threat of unconstitutional enforcement. And it violates the Supremacy Clause as to all of them in the same ways. Plaintiffs seek class-wide injunctive and declaratory relief prohibiting this uniform, unlawful conduct.

Appx.0071

Because they raise the same legal claims against the same statute, one injunction and declaration will remedy every class member's injuries in one fell swoop. *See Dukes*, 564 U.S. at 360 ("The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy."). An injunction prohibiting Texas officials from enforcing S.B. 4's reentry and removal provisions would necessarily apply in the same manner to every class member. That is precisely the kind of relief Rule 23(b)(2) is designed to support.

Moreover, the efficiency and equity of class treatment weigh strongly in favor of certification. Many proposed class members are unlikely to file individual suits due to fear, limited resources, language barriers, or fast removal orders under S.B. 4. A class-wide injunction is not only legally appropriate—it is practically necessary to safeguard access to the courts and prevent inconsistent adjudications.

Because Plaintiffs challenge state conduct that applies broadly and uniformly to all members of the class, and because they seek declaratory and injunctive relief that would redress the class-wide harm, Rule 23(b)(2) is satisfied.

## CONCLUSION

The Court should grant class certification.

13

Dated: May 4, 2026

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)\*\*
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
Daniel Woodward
(TX Bar No. 24138347)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org
danny@texascivilrightsproject.org

Dustin Rynders
(TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

/s/ *Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Steinberg\*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org

Kathryn Huddleston\*\*\* (TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat\*
Lee Gelernt
Grace Choi\*
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
gchoi@aclu.org

\*Pro Hac Vice Application Forthcoming
\*\* Admission to Western District of Texas
Pending
\*\*\* Application for Admission to Western District
of Texas Forthcoming; barred in Texas and
Arizona, not barred in the District of Columbia,
practice supervised by a member of the D.C. Bar

14

Appx.0073

**Appendix A: L.R. CV-23 Statement**

| Requirement | Section |
|---|---|
| (1) A brief statement of the case. | Introduction & Background |
| (2) A statement defining the class plaintiff seeks to have certified including its geographical and temporal scope. | Proposed Class Definition |
| (3) A description of plaintiff's particular grievance and why that claim qualifies plaintiff as a member of the class as defined. | Background |
| (4) Whether the plaintiff contends that the action may be maintained under Rule 23(b)(1), 23(b)(2), or Rule 23(b)(3) and why. | Part VI |
| (5) A statement respecting the four prerequisites of Federal Rule of Civil Procedure 23(a). The statement shall set forth: | |
| a) The anticipated number of class members and how this number was determined. | Part I |
| b) The common questions of law and fact involved. | Part II |
| c) The reasons why plaintiff's claim is typical of those of the other class members. | Part III |
| d) The reason why representation by the named plaintiff is adequate to protect the interests of the class. This part of the statement shall specifically answer the following questions: i) Is the claim of the named plaintiff presently or potentially in conflict with that of any members of the class?  ii) Will the claims of the class require subclasses presently or in the future?  iii) What is the prior experience of counsel for the plaintiff that would indicate capability to handle the lawsuit?  iv) Is counsel presently representing or has he at any time represented, a class in any other class action, and if so, when, and how many instances? v) How many cases is plaintiff's counsel now handling in which class allegations are made? | Parts IV and V; Declaration of Cody Wofsy |
| (6) A statement describing any other pending actions in any court against the defendants alleging the same or similar causes of action. | Fn. 1 |

15

Appx.0074

| | |
|---|---|
| (7) A statement that the attorney for the named plaintiff has discussed and thoroughly explained to the plaintiff the nature of a class action and potential advantages and disadvantages to the named plaintiff by proceeding in a class action rather than individually. | Fn.1 |
| (8) A statement of the proposed notices to the members of the class and how and when the notices will be given, including a statement regarding security deposit for the cost of notices. | Fn. 1 |
| (9) A description of the extent of any settlement negotiations that have taken place and the likelihood of settlement with the named plaintiff on an individual basis. If such settlement is likely, include a statement specifying:<br>a)    Whether or not counsel have any knowledge of any person who has relied on the fact that this suit was initially filed as a class action.<br>b)    The manner in which counsel will protect the class in the event of settlement with the named plaintiff on an individual basis. | Fn. 1 |
| (10) A statement of any other matters that the plaintiff deems necessary and proper to the expedition of a decision on the motion and the speedy resolution of the case on the merits. | n/a |

16

Appx.0075

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2026, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system. I have also caused a copy to be emailed to the following attorneys with the Texas Office of the Attorney General: Ryan Kercher (Ryan.Kercher@oag.texas.gov); Kyle Tebo (Kyle.Tebo@oag.texas.gov); Munera Al-Fuhaid (Munera.Al-Fuhaid@oag.texas.gov); David Bryant (David.Bryant@oag.texas.gov).

/s/ Cody Wofsy
Cody Wofsy

17

Appx.0076

# TAB F: DEFENDANT'S PRIORITY MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Appx.0077

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

+

| | |
|---|---|
| L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED<br><br><br>PLAINTIFFS,<br><br>V.<br><br>FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,<br><br><br>DEFENDANT | CIVIL CASE NO. 1:26-CV-1170 |

**DEFENDANT'S PRIORITY MOTION TO DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

Defendant Freeman F. Martin, in his official capacity as Director of the Texas Department of Public Safety of Texas ("Director Martin"), files his priority motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure. Plaintiffs have failed to demonstrate their standing to bring this suit; sovereign immunity and the Eleventh Amendment to the United States Constitution bar their suit against Director Martin, and this case is nonjusticiable under Article III of the United States Constitution because it presents political questions that cannot be resolved by the federal judiciary. Accordingly, this suit should be dismissed.

1

Appx.0078

**I.    This Motion to Dismiss for Lack of Subject Matter Jurisdiction Has Priority and Must be Considered and Resolved by the Court Prior to Proceeding to the Merits of This Case.**

As will be shown below, Plaintiffs have failed in their burden to show that they have standing to sue Director Martin. Moreover, Director Martin asserts his right to state sovereign immunity against this suit and all of Plaintiffs' claims in this suit (as well as those of alleged class members). Such claims by private plaintiffs, like those who filed this suit, are also barred by the Eleventh Amendment to the United States Constitution. Moreover, this case is nonjusticiable because it presents political questions that cannot be resolved by the federal judiciary. All of these matters go directly to the subject matter jurisdiction of this Court. *See, e.g., James v. Hegar*, 86 F.4th 1076, 1080 (5th Cir. 2023) ("Standing is a component of subject matter jurisdiction."); *National Press Photog. Ass'n v. McCraw*, 90 F.4th 770, 780 (5th Cir. 2024) (standing and sovereign immunity are "jurisdictional issues").

"Jurisdiction comes first." *E. g., In re GenOn Mid-Atl. Dev., L.L.C.*, 42 F.4th 523, 533 (5th Cir. 2022). Courts have a non-discretionary obligation to consider a challenge to their subject matter jurisdiction. *In re Paxton*, 60 F.4th 252, 256 (5th Cir. 2023) (citing *In re Gee*, 941 F.3d 153, 159 (5th Cir. 2019)). An appropriate jurisdictional challenge like this motion triggers a duty of making further inquiry as to the court's own jurisdiction. *Id.* Because sovereign immunity is an immunity from *suit*, not just from *liability*, a court is not free to proceed to discovery, to grant preliminary injunctive relief, or otherwise to proceed to the merits of a lawsuit without first determining whether it has subject matter jurisdiction of the case. *See Mi Familia Vota v. Ogg*, 105 F.4th 313, 334 (5th Cir. 2024) (district courts "carefully consider. . . jurisdictional challenges before proceeding to the merits"); *Russell v. Jones*, 49 F.4th 507, 514 (5th Cir. 2022) ("[w]here sovereign immunity applies, it applies totally. Plaintiffs stop at the Rule 12(b)(1) stage and don't get discovery. They don't pass go.").

Appx.0079

## II.  Plaintiffs Have Not Carried Their Burden to Show Standing.

To show Article III standing, plaintiffs must allege an injury in fact—*i.e.*, an invasion of a "legally protected interest" that is "concrete and particularized" and "actual or imminent." *Lujan v. Defenders of Wildlife*, 504 U.S. at 555; *Stallworth v. Bryant*, 936 F.3d 224, 229 (5th Cir. 2019). Plaintiffs lack standing here because they neither allege nor can show any injury in fact. According to their own allegations in the Complaint for Declaratory and Injunctive Relief (ECF No. 1), Plaintiffs are non-citizens of the United States who violated federal immigration laws to enter, and later violated federal immigration laws to re-enter, the United States. They did so in violation of 8 U. S. C. §§ 1325 and 1326. Despite their admission to these federal crimes, Plaintiffs ask this federal court to enjoin a Texas State official from enforcing against them certain provisions of S. B. 4, a Texas statute that has not yet gone into effect.

Even more implausibly, Plaintiffs base their argument on a hypothetical conflict that *might* exist between Section 51.03 and federal immigration law because of the possibility that Texas could someday prosecute someone who had permission from the United States Attorney General pursuant to 8 U. S. C. § 1326(a)(2) (A). Motion for TRO and PI at 12. But Plaintiffs admit that they themselves entered the United States illegally *without* the Attorney General's permission. They therefore plainly are not injured by the lack of a permissible entry exception and lack standing to raise that theory on behalf of unknown third parties not before the Court.

In this facial pre-enforcement challenge to S. B. 4, Plaintiffs do *not* allege that Defendant Martin has taken any action whatsoever to enforce S. B. 4 against Plaintiffs or anyone else. Plaintiffs do not allege Defendant Martin has either taken any steps to arrest or prosecute them for violation of S. B. 4 or has threatened them with arrest or prosecution under S. B. 4. Indeed, any such allegations would be implausible in any event because Plaintiffs insist that they are and must remain anonymous.

3

Plaintiffs thus allege no actual or imminent injury to themselves at all, but only a generalized and speculative "fear" that Defendant Martin might possibly, sometime after S. B. 4 goes into effect, somehow learn their identity and seek to enforce certain provisions of S. B. 4 against them.  But that sort of claimed injury is simply "too speculative" to show standing. *Clapper v. Amnesty Int'l USA*, 586 U.S. 398, 409 (2013). Absent allegations and evidence of a "concrete actual or imminent injury" caused by conduct of Defendant Martin, the law is clear that Plaintiffs lack standing and cannot invoke this Court's Article III jurisdiction.

Plaintiffs' challenge to article 5B.002 is especially speculative. Application of this provision depends not only on Plaintiffs' being arrested for a violation of Section 51.03. but also on a probable cause determination, the determination of  by a magistrate or judge to offer the issuance of a return order in lieu of prosecution, and the satisfaction of several conditions such as Plaintiffs not simultaneously being charged with another offense. This is far too speculative to give Plaintiffs standing to challenge this provision.

Defendant Martin notes that standing requirements are sometimes relaxed in First Amendment cases because of the potential chilling effect on free speech that can be caused by state statutes that allegedly infringe on First Amendment freedoms. But this plainly is not such a case. And S. B. 4 is not such a statute.  Plaintiffs allege a single cause of action based on alleged preemption pursuant to the Supremacy Clause of the United States Constitution.

 Plaintiffs allege no First Amendment claims. No relaxation is warranted here of the Plaintiffs' burden to allege and show an invasion of a "legally protected interest" that is "concrete and particularized" and "actual or imminent."

4

A plaintiff's standing is determined based on the facts at the date of filing of the complaint. *E.g., Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U. S. 826, 830 (1989) ("The existence of federal jurisdiction depends on the facts as they exist when the complaint is filed"); *Kitty Hawk Aircargo, Inc. v. Chao*, 418 F.3d 453, 460 (5th Cir, 2005); *Hancock County Bd. of Sups. v. Ruhr*, 487 Appx. 169, 2012 WL 3792129 (5th Cir. 2012). Thus, a plaintiff cannot establish standing by alleging possible future events that have not occurred as of the date the complaint is filed.

And a plaintiff's injury must "affirmatively appear in the record" before the court; it "cannot be 'inferred argumentatively from averments in the pleadings'" *Spencer v. Kemna*, 523 U.S. 1, 10–11 (1998) (quoting *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990)). Indeed, a federal court is "powerless to create its own jurisdiction by embellishing otherwise deficient allegations of standing." *Van Deelen v. Jones*, No. 4:23-CV-03729-AM, 2024 WL 3852349, at *9 (S.D. Tex. Aug. 16, 2024) (quoting *Whitmore*, 495 U.S. at 155–56).

Accordingly, Plaintiffs lack standing and the Court should dismiss this case for lack of subject matter jurisdiction.[1] Any orders other than an order of dismissal would be void. *See John G. and Marie Stella Kenedy v. Mauro*, 21 F.3d 667, 674 (5th Cir. 1994); *Shirley v. Maxicare Texas, Inc.*, 9221 F.2d 565, 568 (5th Cir. 1991).

**III. This Suit is Barred by Sovereign Immunity and the Eleventh Amendment.**

Plaintiffs also fail to surmount the jurisdictional hurdle of sovereign immunity. The Eleventh Amendment and state sovereign immunity bar most private suits against nonconsenting

---

[1]    Plaintiffs especially lack standing to challenge article 5B.003. This provision forbids a court to abate a prosecution for illegal entry or re-entry "on the basis that a federal determination regarding the immigration of the defendant is pending or will be initiated." But Plaintiffs already claim lawful immigration status so this provision does not apply to them. They lack standing to challenge this part of S. B. 4 and would lack that standing even if they were someday arrested or prosecuted under Section 51.03.

Appx.0082

states in federal court. *See Va. Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 253 (2011) ("Sovereign immunity is the privilege of the sovereign not to be sued without its consent."); *see also Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."). Sovereign immunity also bars suits against state officials in their official capacities, because the state is effectively the real party in interest. *See, e.g.*, *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 102 (1984); *Anderton v. Tex. Parks & Wildlife Dept.*, 605 Fed. App'x 339 (5th Cir. 2015).

Because this suit is against Director Martin in his official capacity, it is functionally a suit against the State of Texas. *Raj v. La. State Univ.,* 714 F. 3d 322, 328 (5th Cir. 2013). Accordingly, this action is barred by state sovereign immunity unless the State has consented to suit or waived sovereign immunity, or an exception applies. Here, Plaintiffs do not allege any consent to this suit or applicable waiver of sovereign immunity, and none exists.

The *Ex parte Young* exception to sovereign immunity, which empowers "plaintiffs to sue a state officer in his official capacity for an injunction to stop ongoing violations of federal law[,]" lends Plaintiffs no help here. *See Lewis v. Scott*, 28 F.4th 659, 663 (5th Cir. 2022). Here, Plaintiffs allege no "ongoing violations of federal law" by Director Martin. They could not plausibly do so, because the challenged statute has not taken effect to date. There is no allegation, nor can there be, that Director Martin has taken any step to date to enforce S. B. 4.[2] The *Ex parte Young* exception does not apply in this case.

---

[2]    Director Martin only assumed his current position on December 1, 2024, long after the preliminary injunction against enforcement of S. B. 4 was in effect. See Declaration of Freeman F. Martin.

Appx.0083

Moreover, for that exception to apply, the Plaintiffs were required to allege and show that Director Martin has taken action of some kind that demonstrates his willingness to enforce S. B. 4. But Plaintiffs allege and can show nothing in that regard. The Fifth Circuit in *National Press Photographers v. McCraw*, 90 F.4th 770, 786-87 (5th Cir. 2024), dismissed a facial pre-enforcement challenge to a Texas statute against Director Martin's predecessor because he had sovereign immunity from suit. The Court held that the *Ex parte Young* exception did not apply because, as here, Plaintiffs have not alleged or shown that the Defendant State Official had a "demonstrated willingness" to enforce the statute challenged by Plaintiffs.

Director Martin, sued only in his official capacity, is entitled to and hereby asserts the sovereign immunity of Texas from both suit and liability in this case. The Court should dismiss this action against him for lack of subject matter jurisdiction.

### IV. The Court Lacks Subject Matter Jurisdiction Because This Case Presents Political Questions Not Appropriate for Resolution by the Judiciary and is Non-Justiciable.

The Texas statute at issue, S. B. 4, was enacted by the Texas Legislature with the support and approval of Governor Abbott as part of Texas's response to the extraordinary influx of illegal immigrants into Texas across its southern border in the 2020s and the resulting damage to Texas and its citizens and communities. Governor Abbott publicly declared in November 2022 that Texas was subject to an invasion across its southern border and vigorously implemented Operation Lone Star, pursuant to which Texas devoted over ten billion dollars to protect its citizens and communities against that invasion. Governor Abbott made this declaration of invasion pursuant to Article I, Section 10 of the United States Constitution, which makes it clear that States like Texas are authorized to engage in war in response to invasions.

Appx.0084

Because S. B. 4 is a measure enacted as part of Texas's response to that actual invasion, it is authorized by the United States Constitution and cannot possibly be preempted, as Plaintiffs claim, by a federal statute like the Immigration and Naturalization Act. In *United States v. Abbott*, 690 F. Supp. 3d 708, 727-28 (W. D. Tex. 2003), this Court stated that whether an invasion exists for purposes of the United States Constitution is a non-justiciable political question that cannot be adjudicated by the federal judiciary. However, this Court concluded that the political judgment as to whether a Constitutional invasion exists was required to be made at the federal government rather than by a state Governor. 690 F. Supp. 3d at 728 ("by placing the responsibility to protect against invasion on the federal government, the Constitution commits the question of whether an invasion has occurred to the policy making (or political) branches *of the federal government*") (emphasis in original).

The same judgment as to the existence of an actual invasion that was made for Texas by Governor Abbott has also been made for the United States Government by the President of the United States. President Trump in January 2025 issued his Executive Order declaring that there is and has been an actual invasion of Texas at its southern border. And in United States v. Texas, the United States notified the Fifth Circuit that the President believes "that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States." *United States v. Texas*, Case No. 24-50149, (ECF No. 223, 250) Accordingly, that issue and whether S. B. 4 is an appropriate response to the invasion, are non-justiciable political questions beyond the jurisdiction of federal courts. Since those non-justiciable political questions are central to this case, the Court should dismiss this non-justiciable case for lack of subject matter jurisdiction.

8

Appx.0085

**CONCLUSION**

For all of the reasons set forth above, this Court lacks subject matter jurisdiction of this case. This Court has no power to proceed further, ot make any orders other than to dismiss this action pursuant to Federal Rule of Civil Procedure 12(h).

Appx.0086

Date: May 8, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

Respectfully submitted.

*s/ David Bryant*
DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ALEXIA BAKER
Assistant Attorney General
Texas Bar No.24149596

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
SPECIAL LITIGATION DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

COUNSEL FOR DEFENDANT FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY

### CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 8, 2026 and that all counsel of record were served by CM/ECF.

*/s/ David Bryant*
DAVID BRYANT

Appx.0087

**TAB G: DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

+

|  |  |
|---|---|
| L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED<br>    PLAINTIFFS,<br><br>V.<br><br>FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY<br>    DEFENDANT | CIVIL CASE NO. 1:26-CV-1170 |

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Defendant Freeman F. Martin, in his official capacity as Director of the Texas Department of

Public Safety of Texas ("Director Martin"), files his Response in Opposition to Plaintiffs' Motion for

Class Certification (ECF No. 5). Plaintiffs have failed to permit reasonable requested discovery of the

proposed class representatives, and any consideration of Plaintiffs' Motion for Class Certification

should be deferred or continued until a reasonable time after such discovery is provided. Moreover,

Plaintiffs have failed to meet their burden to demonstrate that certification of a provisional class action

is appropriate in this case.

1

## TABLE OF CONTENTS

Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification ........................1

Table of Contents................................................................................................................. 2

Table of Authorities ..............................................................................................................3

Introduction ........................................................................................................................ 6

Argument ...............................................................................................................................7

    I.    It Would Be Improper to Certify a Class Action in this Case. .............................................7

        A.   Legal Standard ..........................................................................................................7

    II.   Plaintiffs' Proposed Class Is Not Ascertainable.................................................................. 9

    III.   Plaintiffs Have Failed to Satisfy the Requirements of Rule 23 (a)...................................10

        A.   The class representatives' claims are not typical of the class. .......................................10

        B.   Plaintiffs Have Failed to Establish their Ability to Adequately Represent the Class Members or Show That They Can Proceed Anonymously. ....................................................13

    IV.  Plaintiffs Have Not Satisfied the Requirements of Rule 23(b)(2). ....................................16

    V.   "Provisional" Class Certification Is Inappropriate, In Any Event...................................18

Conclusion .........................................................................................................................19

Certificate of Conference ............................................................... **Error! Bookmark not defined.**

Certificate of Service.......................................................................................................... 20

Appx.0090

**TABLE OF AUTHORITIES**

**Cases**

*Amchem Prods. v. Windsor*,

    521 U.S. 591 (1997) ........................................................................................................ 8

*Berger v. Compaq Computer Corp.*,

    257 F.3s 475 (5th Cir. 2001) ........................................................................................14

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,

    70 F.4th 914 (5th Cir. 2023) ........................................................................................ 9

*Brecher v. Republic of Argentina*,

    806 F.3d 22 (2d Cir. 2015) ........................................................................................... 9

*Chavez v. Plan Ben. Servs.*,

    957 F.3d 542 (5th Cir. 2020) ....................................................................................... 8

*Cruson v. Jackson Nat'l Life Ins. Co.*,

    954 F.3d 240 (5th Cir. 2020) ....................................................................................... 8

*DeBremacker v. Short*,

    433 F.2d 733 (5th Cir. 1970) (per curiam) .................................................................. 8

*DeBremaecker v. Short*,

    433 F.2d 733 (5th Cir. 1970) (per curiam) .................................................................. 9

*Deitz v. Comcast Corp.*,

    No. C 06-06352 WHA, 2007 U.S. Dist. LEXIS 53188 (N.D. Cal. July 11, 2007) .....................10

*Doe v. Univ. of Kan. Hosp. Auth.*,

    No. 2:25-CV-02200, 2025 WL 1634958 (D. Kan. June 9, 2025) .................................14

3

*Horton v. Goose Creek Indep. Sch. Dist.*,

    690 F.2d 470 (5th Cir. 1982)..................................................................................14

*In re BankAmerica Corp. Securities Litigation*,

    775 F.3d 1060 (8th Cir. 2015)..............................................................................13

*Johnson v. Kan. City S., Ill. Cent. R.R.*,

    224 F.R.D. 382 (S.D. Miss. 2004)........................................................................10

*Maldonado v. Ochsner Clinic Found.*,

    493 F.3d 521 (5th Cir. 2007)........................................................................ 16, 18

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,

    31 F. 4th 651 (9th Cir. 2022)......................................................................... 8

*Partington v. American Int'l Specialty Lines Co.*,

    443 F.3d 334 (4th Cir. 2006)................................................................................14

*Paxton v. Union Nat. Bank*,

    688 F.2d 552 (8th Cir. 1982)...............................................................................13

*Pfeffer v. HSA Retail, Inc.*,

    Case No. SA-11-CV-959-XR, 2012 U.S. Dist. LEXIS 73083 (W.D. Tex. May 24, 2012)...........10

*Prado-Steiman ex rel. Prado v. Bush*,

    221 F.3d 1266 (11th Cir. 2000) ...........................................................................12

*R.I.L-R v. Johnson*,

    80 F. Supp. 3d 164 (D.D.C. 2015) ......................................................................18

*Rattray v. Woodbury Ct.*,

    *IA*, 614 F.3d 831 (8th Cir. 2010)........................................................................13

4

Appx.0092

*Sherman v. Trinity Teen Sols., Inc.*,

    339 F.R.D. 203 (D. Wyo. 2021) ..................................................................................14

*Stirman v. Exxon Corp.*,

    280 F.3d 554 (5th Cir. 2002) ....................................................................................11

*Trump v. CASA, Inc.*,

    606 U.S. 831 (2025) (Alito, J., concurring) ............................................................19

*Wal-Mart Stores, Inc. v. Dukes*,

    564 U.S. 338 (2011) ....................................................................................... 7, 8, 18

**Statutes**

Tex. Code Crim. Proc. Ann. art. 5B.003. ...................................................................13, 17

Tex. Penal Code §§51.03 (a)(1), (b)(1)(A) ........................................................................17

**Rules**

Fed. R. Civ. P. 23 (b) ........................................................................................................16

Fed. R. Civ. P. 23(b)(2) ............................................................................................. 16, 19

**Treatises**

1 William Rubenstein, Newberg on Class Actions §3:3 (6th ed. 2025)............................ 9

Newberg and Rubenstein on Class Actions § 7:14 (6th ed.).............................................18

Appx.0093

### INTRODUCTION

Plaintiffs have filed the Declarations of two anonymous individuals designated as L. M. L. and K. G. S. Plaintiffs seek to not only maintain the present lawsuit anonymously, but also to act as class representatives for an expansive and practically undefined set of class members. Both declarations, using nearly identical language, were apparently written in English by someone other than the Plaintiffs—since neither Plaintiff purports to be fluent in English.  An unknown third party in New York, and not in Texas where the Plaintiffs purportedly signed the English document, was apparently used to translate the declarations remotely—perhaps over the phone or via a service such as Zoom, though the means used is not disclosed.

Each translator is not identified as a certified translator but only as someone "fluent" in Spanish (no other details are provided). The purported translator then asserts that they read the previously drawn-up English declaration to each Plaintiff in Spanish, who reportedly stated that each agreed. The actual Spanish translation was apparently not supplied to either Plaintiff, so the Plaintiffs apparently never saw a Spanish language document that they could read and understand before signing a purported translation that they could *not* read or understand. Nor is a copy of the Spanish language document that reportedly was actually read to them provided for the Court or Defendant Martin to examine for accuracy. In these declarations, the Plaintiffs refuse to identify themselves.

Defendant Martin objects to each of these declarations as inherently unreliable and inadmissible for any purpose. They are not properly authenticated; they are hearsay. And they are not evidence at all. Because no transcription is provided for what each person actually attested to, there is no way to be sure the translation was accurate.  Furthermore, there is no way to confirm the Plaintiffs fully understood the import and legal consequences of what they were saying or

**6**

Appx.0094

agreeing to; and no information is provided regarding either witnesses' education level or capability. Likewise, the language—especially regarding Plaintiffs' claimed fears justifying their anonymity—is conclusory and vague at best. Defendant Martin moves that each declaration be struck as wholly insufficient.

Furthermore, this Court should deny Plaintiffs' request for class certification and prevent them from proceeding anonymously. Plaintiffs' proposed class is not ascertainable. Nor does it satisfy the threshold requirements under Rule 23(a). Plaintiffs' lawful presence in the United States means their claims are not typical of those of other class members. And without any class-related discovery, neither Defendant Martin nor this Court can properly assess whether these anonymous individuals can adequately represent the class of "noncitizens" whose rights they claim to protect. Plaintiffs cannot hope to sustain a Rule 23(b)(2) class action because they have failed to show typicality or adequacy of representation under Rule 23(a). Nor can they demonstrate that the challenged provisions of S.B. 4 equally harm all putative class members.

**ARGUMENT**

### I.  It Would Be Improper to Certify a Class Action in this Case.

#### A.    Legal Standard

Class actions are an exception to the "usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011). In order to justify a departure from that rule, a class representative must be part of the alleged class and "possess the same interest and suffer the same injury" as the proposed class members. *Id.* at 348-49 (quoting *East Tex. Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 403 (1977)). A party seeking class certification must prove the facts necessary to carry the burden of establishing that all prerequisites of Rule 23 are satisfied by a preponderance of the evidence. *Olean Wholesale Grocery*

**7**

*Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 665 (9th Cir. 2022). "[T]he class sought to be represented must be adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam).

Under Rule 23(a) of the Federal Rules of Civil Procedure, a party seeking class certification must show: "(1) numerosity (a 'class [so large] that joinder of all members is impracticable'); (2) commonality ('questions of law or fact common to the class'); (3) typicality (named parties' claims or defenses 'are typical . . . of the class'); and (4) adequacy of representation (the proposed class representatives 'will fairly and adequately protect the interests of the class')." *Amchem Prods. v. Windsor*, 521 U.S. 591, 613 (1997) (alterations in original). Aside from satisfying these threshold criteria, a party must also demonstrate its proposed class complies with the demands of Rule 23(b)(1), (2), or (3). *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 252 (5th Cir. 2020).

A district court may not certify a class without first conducting the "rigorous analysis" that Rule 23 contemplates. *Chavez v. Plan Ben. Servs.*, 957 F.3d 542, 545 (5th Cir. 2020). "[T]hat 'rigorous analysis' will [often] entail some overlap with the merits of the plaintiff's underlying claims." *Wal-Mart Stores, Inc.*, 564 U.S. at 351. As such, the Court should look beyond the pleadings to "'understand the claims, defenses, relevant facts, and applicable substantive law [.]'" *Chavez*, 957 F.3d at 546 (quoting *Flecha v. Medicredit, Inc.*, 946 F.3d 762, 766 (5th Cir. 2020)).

This Court should deny Plaintiffs' request for provisional class certification. As an initial matter, Plaintiffs' proposed class of "noncitizens" is not ascertainable. Worse still, Plaintiffs have failed to satisfy the typicality and adequate representation requirements of Rule 23(a). And because they have not shown that S.B. 4's challenged provisions "equally harm" all members of their proposed class, Plaintiffs have not established the requirements of Rule 23 (b)(2), either.

8

## II. Plaintiffs' Proposed Class Is Not Ascertainable.

Rule 23 implicitly requires a plaintiff seeking class certification to demonstrate that its proposed class is "adequately defined and clearly ascertainable." *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam). The ascertainably inquiry considers "whether the [proposed] class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015).

Indefinite class definitions requiring the Court to conduct individualized factual analyses are not administratively feasible. 1 William Rubenstein, *Newberg on Class Actions* §3:3 (6th ed. 2025). Ordinarily, courts will not certify "'amorphous' or 'imprecise'" classes. *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 933 n.36 (5th Cir. 2023) (citation omitted). The ascertainability requirement applies to 23(b)(2) classes in this circuit. *Id.*

In this case, Plaintiffs' proposed class is not ascertainable. They seek to certify a class comprising:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

ECF No. 5 at 9. As an initial matter, the Court cannot readily ascertain all the "noncitizens" who now "enter, attempt to enter, or are found in . . . Texas." *Id.* That is particularly true, given the "transitory nature of many individuals subject to S.B. 4." ECF No. 9 at 7. But even placing that aside, it is practically impossible to identify "all noncitizens" who will—at some unknown point in the future—"enter, attempt to enter, or [be] found in . . . Texas." *Id.*

At bottom, class membership under Plaintiffs' sweeping class definition depends on an individual's citizenship status and immigration history. Yet the Court cannot properly assess

**9**

Appx.0097

"whether a particular person even qualifies for class membership[]," without "conduct[ing] individualized review of thousands of [ immigration] documents [.]" *See Johnson v. Kan. City S., Ill. Cent. R.R.*, 224 F.R.D. 382, 389 (S.D. Miss. 2004).

Otherwise, the Court has no way to determine which individuals are in fact (a) "noncitizens" who have (b) "been denied admission[,] . . . excluded, exported, or removed from the United States ," or (c) who "have departed from the United States while an order of exclusion, deportation, or removal was outstanding." ECF No. 5 at 9. That sort of "intensive, individualized factual inquir[y]" weighs against a finding of ascertainability under Rule 23. *Pfeffer v. HSA Retail, Inc.*, Case No. SA-11-CV-959-XR, 2012 U.S. Dist. LEXIS 73083, at *7 (W.D. Tex. May 24, 2012) (quoting *Dumas v. Albers Med., Inc.*, Case No. 03-0640-CV-W-GAF, 2005 U.S. Dist. LEXIS 33482, at *17 (W.D. Mo. Sept. 7, 2005)).

All told, evaluating immigration statuses is neither a judicially manageable nor "administratively feasible" way to identify members of Plaintiffs' proposed class. *See Pfeffer,* 2012 U.S. Dist. LEXIS 73083, at *7 (quoting *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. Jan. 25, 2001)). The herculean task—presuming it is even possible— "would be incredibly time consuming, and quite frankly, a tragic waste of scare judicial resources." *Deitz v. Comcast Corp.*, No. C 06-06352 WHA, 2007 U.S. Dist. LEXIS 53188, at *25 (N.D. Cal. July 11, 2007). Because Plaintiffs' proposed class is not sufficiently definite, the Court should refuse to certify the class.

### III. Plaintiffs Have Failed to Satisfy the Requirements of Rule 23 (a).

### A. The class representatives' claims are not typical of the class.

Plaintiffs dedicate a total of two paragraphs to arguing that their "claims are typical of the proposed class." ECF No. 5 at 9. This perfunctory analysis overlooks material differences between

**10**

Appx.0098

the named plaintiffs, who are lawful residents, and the members of the putative class, whose immigration statuses are unknown. It also ignores a key standing issue: the named plaintiffs do not have standing to present all the legal theories (or to challenge all the provisions) that they purport to present (or challenge) on behalf of the class. As a result of these differences and deficiencies, Plaintiffs' claims are not typical of the class.

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." The test for typicality "focuses on the similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (citation omitted). "[T]he critical inquiry is whether the class representative's claims have the same essential characteristics of those of the putative class." *Id.* (citation omitted).

Here, Plaintiffs' claims do not have the same essential characteristics as those of the putative class. According to the complaint and their affidavits, both L.M.L. and K.G.S. are lawfully in the United States. L.M.L. is a lawful permanent resident, ECF No. 3-1 ¶ 7 ("Decl. of L.M.L."), and K.G.S. has a U-Visa, ECF No. 3-2 ("Decl. of K.G.S.") ¶ 7. The same is not true of the vast majority of putative class members, who have no permission from the federal government to be in the United States.

This difference in immigration status between the named plaintiffs and the other class members is critically important. For example, it is extraordinarily unlikely that the named plaintiffs would be removed from the country because of S.B. 4. The State has previously represented that, when a state judge enters a return order under Article 5B.002, "Texas will take [the alien] to the federal government, and the federal government will then process them, however the federal

**11**

Appx.0099

government so chooses." Oral Argument, *United States v. Texas*, No. 24-50149, 14:24–28 (5th Cir. Jan. 22, 2026). And the federal government is not likely to order the removal of someone who, like L.M.L. and K.G.S., is authorized to be in the United States, as opposed to other class members who have no such authorization or who have a criminal record.

Thus, Plaintiffs' immigration status thus makes their claims materially different from those of the putative class. At the very least, the named plaintiffs do not have the same reason to fear prosecution and removal that other class members who have no lawful status (or have a criminal record) might have. That makes them poor choices for class representatives.

Furthermore, Plaintiffs lack standing to present all of the legal theories they purport to present on behalf of the class, which means that their claims cannot be typical of the class. *See Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1279 (11th Cir. 2000) ("It should be obvious that there cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class.").

For example, one of their central theories is that S.B.4 is conflict preempted because "it criminalizes anyone who is 'found' in Texas after a prior removal even if they had federal permission to reenter the country and reside in the United States" and thus could not be prosecuted for illegal reentry under federal law. ECF No. 3 at 12 (citing 8 U.S.C. § 1326(a)(2)). Yet the named plaintiffs have no basis to assert this purported conflict between S.B. 4 and federal law. Neither of them received federal permission to reenter the United States when they did. Thus, both of them could be prosecuted for illegal reentry under federal law to the same extent they could be prosecuted under S.B. 4. From their perspective, federal and state law is entirely consistent. Only

Appx.0100

someone who received permission to reenter the United States could claim a conflict between S.B. 4 and federal law in this respect, not the named plaintiffs.

A similar standing issue arises with one of the provisions the named plaintiffs have decided to challenge: Texas Code of Criminal Procedure article 5B.003. *See* ECF No. 1 at 12 (seeking a declaration that "Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003 are unlawful"). That provision provides, "A court may not abate the prosecution of an offense under Chapter 51, Penal Code, on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

Because neither of the named plaintiffs has a pending federal determination regarding immigration status or one that will imminently be initiated, this provision simply does not apply to them. It may apply to other class members, but not to the named plaintiffs who purport to represent them. And because Plaintiffs do not have standing to challenge this provision, their claims cannot be typical of the class. *See Prado-Steiman*, 221 F.3d at 1279. Accordingly, the Court should refuse to "provisionally" certify the class because the named plaintiffs' claims are not typical of those of the putative class.

> **B.     Plaintiffs Have Failed to Establish their Ability to Adequately Represent the Class Members or to Show That They Can Proceed Anonymously.**

There are significant differences between the roles of class representative and putative class members. Because class actions determine the rights of absent class members, due process requires the class members be fairly and adequately represented. *See Rattray v. Woodbury Ct., IA*, 614 F.3d 831, 835 (8th Cir. 2010); *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562-63 (8th Cir. 1982). In fact, class representatives have a fiduciary obligation to fairly represent the entire class. *In re BankAmerica Corp. Securities Litigation*, 775 F.3d 1060, 1062 n. 1 (8th Cir. 2015)    Adequacy    of    representation,    in

Appx.0101

relevant part, asks whether the class representatives are willing and able "to take an active role in and control the litigation." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 484 (5th Cir. 1982). To maintain control of the litigation, class representatives should "possess a sufficient level of knowledge and understanding[.]" *Berger v. Compaq Computer Corp.*, 257 F.3s 475, 482 (5th Cir. 2001).

Here, Plaintiffs are especially ill-suited to adequately represent the interests of the class of "noncitizens" they seek to certify. ECF No. 5 at 1-2. To begin with, they brought this action pseudonymously, which frustrates the Court's ability "to ascertain if Plaintiffs . . . can fairly and adequately protect the interests of the class." *Sherman v. Trinity Teen Sols., Inc.*, 339 F.R.D. 203, 206 (D. Wyo. 2021). If Plaintiffs' identities remain concealed, how will Defendants or the Court uncover conflicts between them and other class members? *Doe v. Univ. of Kan. Hosp. Auth.*, No. 2:25-CV-02200, 2025 WL 1634958, at *4 (D. Kan. June 9, 2025). Since a class representative is ultimately responsible for advancing claims on behalf of the entire class, the other class members should—at the very least— "know who is representing them." *Sherman*, 339 F.R.D. at 206. The Rule 23 analysis is specifically designed to protect absent class members whose rights could be affected by the certification. Plaintiffs' declarations fall far short of meeting these requirements. *See, e.g., Partington v. American Int'l Specialty Lines Co.*, 443 F.3d 334, 340 (4th Cir. 2006).

### i. Plaintiffs' claimed legal status fatally impairs their ability to represent the proposed class.

The typicality and adequacy requirements are not met, and class certification is not appropriate, when there are issues and defenses unique to the named plaintiff's circumstances that could "preoccup[y]" the named plaintiff and "skew the focus of the litigation." *Alaska v. Suburban Propane Gas Corp.*, 123 F.3d 1317, 1321 (9th Cir. 1997); *see Hanon*, 976 F.2d at 508.

**14**

That is precisely the situation here. In this case, both plaintiffs claim to have received a "U" Visa after unlawfully entering the United States after previously being subject to a deportation order.  Decl. of L.M.L. ¶¶ 5-7; Decl. of K.G.S ¶ 5-7. Because the Plaintiffs are anonymous, and they have refused to provide timely discovery, it is impossible for Defendant or the Court to confirm whether any of the facts claimed in their declarations are true and accurate. Neither Plaintiff provided Defendant or the Court with a copy of his or her U Visa or prior order. And they did not offer any other evidence of their claimed current lawful immigration status.

In fact, KSR does not even directly testify that she <u>has</u> actually been granted a U Visa but merely states that she "learned" her visa application  had been approved, without any explanation of when or from whom.[2] Putting aside the lack of verification regarding the Visas at issue, Defendant and the Court cannot—since the Plaintiffs  anonymous—determine if the alleged Visas or other lawful status were properly issued based on true and accurate facts or not. If any misrepresentations were made in the procuring of any Visa or other lawful status, the Visas or other lawful status are void or voidable.

Even assuming, for argument's sake, that both Plaintiffs claim current federal lawful status, they cannot act as representatives of the vast number of illegal immigrants in the purported class who *cannot* claim any lawful presence in the United States or Texas.  Put simply, a named plaintiff's motion for class certification should not be granted if there is a danger that absent class members will suffer if their representative is preoccupied with claims or defenses unique to it or when issues or defenses unique to the named plaintiff "threaten to become the focus of the litigation." *E.g.*, *Hanon*, 976 F.2d at 508. Plaintiffs' Complaint itself gives the challenged law's potential applicability to immigrants with such legal status as one important feature of Plaintiffs' case. ECF No. 1 ¶¶ 4,

**15**

31, 38.  Given the potential claimed distinction between Plaintiffs and the much larger portion of the purported class who are illegal immigrants with no such status, the rights of the purported class members cannot be adequately protected.

Moreover, Plaintiffs are particularly unlikely to adequate represent of members of their putative class who may have distinct and fact-bound defenses to the enforcement of S.B.4. Some putative class members, for instance, may have received permission from the United States Attorney General to enter the country pursuant to 8 U.S.C. Section 1326(a)(2). Others may be waiting for a federal determination regarding their immigration status. Plaintiffs' unique and distinct potential defenses are ultimately likely to "skew the focus of the litigation," *Alaska*, 123 F.3d at 1321, at the expense of potential defenses held by other members of their putative class. Accordingly, Plaintiffs fail to show establish Rule 23's adequacy-of-representation requirement.

**IV. Plaintiffs Have Not Satisfied the Requirements of Rule 23(b)(2).**

Because Plaintiffs have failed to demonstrate the threshold requirements of Rule 23(a), they cannot possibly sustain class certification under Rule 23(b)(2). *See* FED. R. CIV. P. 23 (b); *Maldonado v. Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007). Rule 23(b)(2) governs class actions in which "the party opposing the class has acted or refused to act on grounds that apply generally to the class . . . ." FED. R. CIV. P. 23(b)(2). A Rule 23(b)(2) class action provides class-wide injunctive relief, and it is up to plaintiffs seeking the remedy to show that all the "class members . . . have been harmed in essentially the same way." *Maldonado*, 493 F.3d at 524. But Plaintiffs have not shouldered that burden here.

For starters, they have not shown that the challenged provisions of S.B. 4  harm all class members "in essentially the same way." *Maldonado*, 493 F.3d at 524. In their complaint, Plaintiffs

**16**

allege all class members "face the same harms of arrest, detention, and prosecution under S.B. 4" and share a Supremacy Clause claim. ECF No. 1 at 10. Yet S.B. 4's application is much more nuanced. The members of Plaintiffs' punitive class conceivably suffer distinct harms under S.B. 4 depending on their immigration statuses and criminal histories.

As Defendant Martin has noted, Plaintiffs L.M.L. and K.G.S., despite previously entering the United States unlawfully, now maintain lawful presence in the United States. Decl. of L.M.L. ¶ 7; Decl. of K.G.S. ¶ 7. Because of their lawful presence, L.M.L and K.G.S. and other similarly situated members of their punitive class are unlikely to be removed from the United States under S.B. 4. *See supra* part III.A. When a state judge issues a return order under Article 5B.002 of the Code of Criminal Procedure, the State transports the alien who received the removal order to the federal government, which in turn handles the alien's case from there. *Id.* The federal government will not typically remove lawfully present aliens. *Id.* But the same cannot be said of illegal aliens who lack lawful status.

Under S.B. 4, an alien's criminal history matters, too. Section 51.03, entitled "Illegal Reentry by *Certain Aliens*," for instance, criminalizes an alien who "enters, attempts to enter, or is any time found in this state" following "removal from the United States[]" less harshly than an alien who "enters, attempts to enter, or is any time found in this state" following a removal from the United States that "was subsequent to . . . conviction for . . . two or more [of certain] misdemeanors [.]" Tex. Penal Code §§51.03 (a)(1), (b)(1)(A). The statute creates a hierarchy of penalties that turn on the nature of aliens' prior criminal offenses. And the availability of a return order in lieu of prosecution under article 5B.002 similarly turns on an aliens' prior criminal offenses. Tex. Code Crim. Proc. art. 5B.002.

**17**

Aside from failing to show the same harm among all class members, Plaintiffs fail to demonstrate that most of the individuals in their amorphous proposed class are will "face future harm," especially considering the different immigration statutes and criminal histories of the putative class's members. *See Maldonado*, 493 F.3d at 525 (holding that a Rule 23(b)(2) class action is inappropriate "when the majority of the class does not face future harm"). Thus, this Court should decline to certify Plaintiffs' putative class as a Rule 23(b)(2) class action.

## V.  "Provisional" Class Certification Is Inappropriate, In Any Event.

The "provisional" class certification that Plaintiffs seek is not appropriate at this stage of the litigation. Plaintiffs filed their motion for class certification only four days ago; they remain anonymous; and the parties have not engaged in any discovery. Even courts that have granted "provisional" class certification have acknowledged that Rule 23's requirements apply just as they would in the normal class-certification context. *E.g.*, *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 179 (D.D.C. 2015). And Rule 23 requires courts to conduct "a rigorous analysis" before certifying a class. *Wal–Mart Stores, Inc.*, 564 U.S at 350-351. ("Rule 23 does not set forth a mere pleading standard."); *see also Castano v. Am. Tobacco Co.*, 84 F.3d 734, 740 (5th Cir. 1996).

The expedited nature of provisional class certification constrains courts from performing that rigorous analysis. It also, as in this case, prevents defendants from preparing an adequate defense to certification, which typically involves pre-certification discovery. *See* 3 Newberg and Rubenstein on Class Actions § 7:14 (6th ed.) (observing that "the defendant is entitled to utilize th[e] same discovery devices [as plaintiffs] to demonstrate that the facts cut against certification").

As Justice Alito recently warned, "hasty application of [Rule 23] can have drastic consequences, creating 'potential unfairness' for absent class members and confusion (and

18

pressure to settle) for defendants." *Trump v. CASA, Inc.*, 606 U.S. 831, 868 (2025) (Alito, J., concurring). The Court should refuse Plaintiffs' request to hastily perform the Rule 23 analysis in their favor. Whether they can later meet their burden for class certification is a different matter, but bypassing the normal course of events to grant provisional certification now is unwarranted.

It is also unclear whether "provisional" class certification is permissible under Rule 23(b)(2) at all. As far as Defendant Martin is aware, the Fifth Circuit has never endorsed provisionally certifying a class for the purpose of granting preliminary relief under Rule 23.[1] And the text of Rule 23 suggests that the practice is not permissible. Rule 23(b)(2) provides that an injunctive-relief class may be certified only if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that *final* injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2) (emphasis added). In their motion for TRO, plaintiffs seek only temporary injunctive relief, not the "final injunctive relief" that Rule 23 contemplates. Their request for provisional class certification is therefore contrary to Rule 23's text and should be rejected for that additional reason.

### CONCLUSION

For these reasons, Defendant Martin respectfully requests that the Court deny Plaintiffs' Motion for Class Certification.

---

[1] In *A. A. R. P. v. Trump*, 605 U.S. 91, 97 (2025), the Supreme Court granted temporary injunctive relief to a *putative* class but did not "provisionally" certify the class or address whether any of Rule 23's requirements had been satisfied. And unlike this case, that case involved a putative class of detainees who were under imminent threat of removal; they were allegedly "told that they would be removed 'tonight or tomorrow.'" *Id.* at 92.

Appx.0107

Date: May 8, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

Respectfully submitted.

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ALEXIA BAKER
Assistant Attorney General
Texas Bar No. 24149596

OFFICE OF THE ATTORNEY GENERAL OF
TEXAS
SPECIAL LITIGATION DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

COUNSEL FOR DEFENDANT

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 8, 2026 and that all counsel of record were served by CM/ECF.

/s/ *David Bryant*
**DAVID BRYANT**

Appx.0108

**TAB H: DEFENDANT'S AMENDED RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

+

|  |  |
|---|---|
| L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,<br>    PLAINTIFFS,<br><br>V.<br><br>FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,<br>    DEFENDANT. | CIVIL CASE NO. 1:26-CV-1170 |

**DEFENDANT'S AMENDED RESPONSE IN OPPOSITION TO
PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER
AND PRELIMINARY INJUNCTION**

1

Appx.0110

## TABLE OF CONTENTS

Defendant's Response in Opposition to  Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction..................................................................................................1

Table of Contents............................................................................................ 2

Table of Authorities .......................................................................................3

Introduction ..................................................................................................3

Background .............................................................................................. 4

I.     The Court Should Deny Any Request by Plaintiffs for a TRO. ..................................... 8

II.    The Court Should Deny Plaintiffs' Motion for Preliminary Injunction. .................. 9

    A.     Plaintiffs Have Not Shown a Substantial Likelihood of Succes on the Merits .... 9

    B.     Plaintiffs have failed to show a substantial threat of irreparable harm prior to a trial on the merits. ...................................................................................................15

    C.     Plaintiffs Failed to Show that the Balance of Harms Tips in Their Favor.......................16

    D.     A Preliminary Injunction Would Disserve the Public Interest. ................................16

III.   The Court Should Defer Any Consideration of Plaintiffs' Motion for Class Certification or Dismiss that Motion........................................................................................16

Conclusion .............................................................................. **Error! Bookmark not defined.**

Conclusion ...............................................................................................................17

Certificate of Service .......................................................................................18

2

**TABLE OF AUTHORITIES**

**Cases**

*Arizona v. United States*, 567 U. S. 387 (2012) ..............................................................14

*Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024) ...................................................12

*Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011). ...........................12

*Funk v. Stryker Corp.*,

   631 F.3d 777 (5th Cir. 2011)......................................................................................5

*Moody v. NetChoice, LLC*, 603 U. S. 707, 723 (2024) ...................................................14

*Novartis Pharms Corp. v. Fitch*, 2026 WL 963504 (5th Cir. Apr. 9, 2026).................12

*United States v. Texas*,

   719 F. Supp. 3d 640 (W. D. Tex. 2024) ...................................................................7

*Washington State Grange v. Washington State Rep. Party*,

   552 U. S. 442 (2008)..................................................................................................14

*Washington State Grange v. Washington State Rep. Party*, 552 U. S. 442, 449 (2008) .................14

*Woodlands Pride, Inc. v. Paxton,* 168 F.4th 293, 307 (5th Cir. 2025) .........................14

*Zyla Life Sciences, LLC v. Wells Pharma. of Hous., LLC*, 134 F.4thv 326, 333-34 (5th Cir, 2025)

   ...................................................................................................................................12

**Statutes**

8 U. S. C. § 1326...............................................................................................................15

**Rules**

Fed. R. Evid. 201(b)............................................................................................................5

Appx.0112

## INTRODUCTION

Plaintiffs attack and seek to block enforcement of portions[1] of S. B. 4, legislation adopted by the Texas Legislature and signed into law by Texas Governor Abbott in 2023. The Plaintiffs seek to do so anonymously, and seek to do so through a pre-enforcement facial challenge. S. B. 4 has not yet gone into effect.[2] Plaintiffs do not allege that they have been prosecuted under any provisions of S. B. 4 or even have been threatened with any prosecution by Defendant.

## BACKGROUND[3]

On March 6, 2021, Governor Abbott announced Operation Lone Star to enhance the protection of Texas, its citizens, and its communities from illegal immigration and related adverse effects, including increased violent crime, drug smuggling, fentanyl overdoses and deaths, human trafficking.[4] Pursuant to Operation Lone Star, Governor Abbott directed and supported deployment of Texas Department of Public Safety personnel and the Texas Military Department (Texas National Guard) to defend Texas from the high levels of illegal immigration into Texas across its southern border. These personnel worked near the Texas

---

[1]    Plaintiffs moved only for injunctive relief against §§ 51.03 and 51.04 of Texas Penal Code and Tex. Code of Crim. Procedure articles 5B.002 and 5B.003. (ECF No. 3, at page 2).

[2]    The Court entered a preliminary injunction against enforcement of S. B. 4 in early March 2024 in another case, *Las Americas Imm. Ctr., et al. v. Martin*, Case No. 1:23-1537-DAE (W. D. Tex.). That preliminary injunction remains in force today. On April 24, 2026, the Fifth Circuit Court of Appeals en banc directed that the preliminary injunction be vacated. *United States v. Texas*, Case No. 24-50149 (5th Cir. April 24, 2026). However, the Fifth Circuit has not yet issued its mandate in that case.

[3] The sources cited throughout this Background section are public records that are easily verifiable ; this Court may take judicial notice of them. *See* Fed. R. Evid. 201(b); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (approving district court that "took appropriate judicial notice of publicly-available documents … which were matters of public record directly relevant to the issue at hand").

[4] Office of the Texas Governor, Press Release, *Governor Abbott, DPS Launch 'Operation Lone Star' to Address Crisis at Southern Border* (March 6, 2021), https://gov.texas.gov/news/post/governor-abbott-dps-launch-operation-lone-star-to-address-crisis-at-southern-border.

Appx.0113

border with Mexico, but also in many other areas of Texas in which illegal immigrants were found.

Much was accomplished by Operation Lone Star, which was strongly supported by the Texas Legislature and the voters and communities of Texas. But the illegal immigration into Texas, trans-national crime activities in Texas, cartel activities and fentanyl deaths in Texas continued to increase. Governor Abbott repeatedly made demands for federal assistance under Article IV, Section 4 of the U.S. Constitution, which provides that the federal government "shall" protect constituent States from "Invasion" and "domestic Violence."[5] In November 2022, and after repeated demands for assistance went unanswered and "made clear that [the federal government] will not honor that guarantee" in Article IV, Section 4, Governor Abbott publicly declared that the unchecked entry of hostile foreign actors into Texas across its southern border constituted an invasion under Article I, Section 10, Clause 3 of the United States Constitution.[6]

Pursuant to that declaration, Governor Abbott increased the defensive activities of Operation Lone Star. Among other actions, Texas deployed floating barriers in the Rio Grande River near Eagle Pass, Texas in July 2023, and began construction of walls and other physical defenses against unlawful entry into Texas across the southern border by illegal

---

[5] *See* Office of the Texas Governor, Press Release, *Governor Abbott Sends Letter to U.S. Attorney General Merrick Garland Regarding Executive Order GA-37* (July 30, 2021), https://gov.texas.gov/news/post/governor-abbott-sends-letter-to-u.s-attorney-general-merrick-garland-regarding-executive-order-ga-37; Office of the Texas Governor, Press Release, *Governor Abbott Urges President Biden, Vice President Harris to Designate Mexican Drug Cartels as Foreign Terrorist Organizations* (Apr. 15, 2021), https://gov.texas.gov/news/post/governor-abbott-urges-president-biden-vice-president-harris-to-designate-mexican-drug-cartels-as-foreign-terrorist-organizations; Office of the Texas Governor, Press Release, *Governor Abbott Designates Mexican Cartels as Terrorist Organizations* (Sept. 21, 2022), https://gov.texas.gov/news/post/governor-abbott-designates-mexican-cartels-as-terrorist-organizations.

[6] Office of the Texas Governor, Press Release, *Governor Abbott to President Biden: Texas Is Escalating Border Security Efforts* (Nov. 16, 2022), https://gov.texas.gov/news/post/governor-abbott-to-president-biden-texas-is-escalating-border-security-efforts.

Appx.0114

immigrants, cartel agents, drug smugglers, and human traffickers.[7] As part of that defense against invasion, Governor Abbott also supported a variety of proposed legislation in the Texas Legislature, including the law generally known as S. B. 4, parts of which are challenged in this case. S. B. 4 was strongly supported by Governor Abbott when it was before the Texas Legislature in 2023. Governor Greg Abbott signed S. B. 4 into law in December 2023.[8]

Governor Abbott, along with other defendants, was sued immediately thereafter in litigation seeking to block enforcement of that legislation. This Court entered a preliminary injunction against enforcement of S. B. 4 on or about February 29, 2024, shortly before S. B. 4 was scheduled to go into effect. *See United States v. Texas*, 719 F. Supp. 3d 640 (W. D. Tex. 2024) in Case Nos. 1:24-cv-8-DAE and 1:23-cv-1537-DAE. While that litigation played out, and despite the inability to enforce S. B. 4 in 2024, Governor Abbott, the Texas DPS, and the Texas National Guard continued to take historic action throughout that year under Operation Lone Star to secure the border.[9]

In January 2025, a new President of the United States was inaugurated. One of President Trump's first actions on January 20, 2025, was to sign Proclamation 10886.[10] The President thereby declared a National Emergency at the southern border of the United States and stated, "America's sovereignty is under attack." The President then stated clearly: "This invasion has caused widespread chaos and suffering in our country. Over the last 4 years, it has led to the horrific and inexcusable murders of many innocent Americans, including

---

[7] *See, e.g.*, Office of the Texas Governor, Press Release, *Governor Abbott Signs Sweeping Package of Border Security Legislation* (June 8, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-sweeping-package-of-border-security-legislation.

[8] *See* Office of the Texas Governor, Press Release, *Governor Abbott Signs Historic Border Security Measures in Brownsville* (Dec. 18, 2023), https://gov.texas.gov/news/post/governor-abbott-signs-historic-border-security-measures-in-brownsville.

[9] Office of the Texas Governor, Press Release, *Texas Holds the Line Against Border Crisis Throughout 2024* (Dec. 23, 2024), https://gov.texas.gov/news/post/texas-holds-the-line-against-border-crisis-throughout-2024.

[10] *See* 90 FR 8327 (Jan. 29, 2025).

Appx.0115

women and children, at the hands of illegal aliens." President Trump on January 20, 2025, also signed an Executive Order entitled "Protecting the American People Against Invasion." President Trump also signed and issued Proclamation 10888. In it, the President stated in part: "By the power vested in me by the Constitution and the laws of the United States, I have determined that the current situation at the southern border qualifies as an invasion under Article IV, Section 4 of the Constitution of the United States."

Also in January 2025, Governor Abbott signed five Executive Orders directing Texas state agencies to assist the United States in more effectively enforcing the federal immigration laws.[11] Governor Abbott stated: "Today, I issued five Executive Orders directing Texas state agencies to partner with the Trump Administration to enforce the rule of law and help secure the homeland. Just like President Trump and his Administration, Texas will do what is necessary to keep our country safe."

Since January 2025, Texas state agencies have worked cooperatively and successfully with United States Border Patrol and other federal law enforcement personnel to defend the Texas southern border and enforce federal immigration laws. Even greater success can and likely will be achieved if S. B. 4 is allowed to go into effect and is fully implemented. 12. By contrast, the harm to the State of Texas, its citizens, and its communities from injunctive relief that blocks enforcement of S. B. 4, including both preliminary and permanent injunctive relief, would substantially outweigh any possible harm to Plaintiffs (including any harm to putative class members) from denying such injunctive relief.

---

[11] Office of the Texas Governor, Press Release, *Governor Abbott Directs State Agencies to Coordinate with Trump Administration on Border, Homeland Security* (Jan. 29, 2025), https://gov.texas.gov/news/post/governor-abbott-directs-state-agencies-to-coordinate-with-trump-administration-on-border-homeland-security.

7

Appx.0116

Since this Court last faced this issue, it is clear that federal and state actors have been actively collaborating to address the harms posed by illegal and unchecked immigration. A preliminary or permanent injunction sought by Plaintiffs against enforcement of S. B. 4 would not only undermine those collaborative efforts, which make a poor case for preemption, but also substantially deserve the public interest in enforcement of the federal immigration laws, and in protecting the citizens and communities of Texas and the United States from the adverse effects of illegal immigration into Texas and other States. These adverse effects include increased violent crime, cartel activities, drug smuggling, human trafficking, fentanyl deaths, and the wide variety of costs illegal immigration imposes on Texas and its citizens.

## I. The Court Should Deny Any Request by Plaintiffs for a TRO.

Plaintiffs on May 4, 2026, filed this action. They filed an unverified Complaint for Declaratory and Injunctive Relief. (ECF No. 1), alleging only a single claim for "Preemption (In Equity)". *Id.* at ¶¶ 53-56. The Plaintiffs seek only declaratory relief and that the Court "preliminarily and permanently enjoin Defendant from enforcing [S. B. 4]". The Complaint does not seek a temporary restraining order ("TRO"), either in the body of the Complaint or in its prayer. See ECF No. 1 at 11-12.

Plaintiffs nevertheless filed a "Motion for Temporary Restraining Order and Preliminary Injunction" against Defendant Martin on May 4, 2026. (ECF No. 3). Plaintiffs' Motion is unsworn and does not include any allegation that, absent a TRO, any Plaintiff is likely to suffer irreparable harm prior to the time a hearing can be held on the motion for preliminary injunction. Moreover, Plaintiffs in the prayer of that Motion do not seek any TRO. For these reasons, and because the Court has ordered a hearing on May 13 on Plaintiffs'

8

Appx.0117

motion for preliminary injunction, Plaintiffs' motion for a TRO is moot as well as without merit and should be denied.

## II.  The Court Should Deny Plaintiffs' Motion for Preliminary Injunction.

A preliminary injunction is an "extraordinary and drastic remedy, not to be granted routinely, but only when the movant, by a clear showing, carries his burden of persuasion." *White v. Carlucci*, 862 F. 2d 1209, 1211 (5th Cir. 1989). A federal court preliminary injunction that would block a democratically enacted state law from going into effect is especially drastic and extraordinary because it violates principles of federalism and thwarts the rights of a sovereign state to protect its people and communities. Plaintiffs have made no showing that could justify such a remedy.

In order to obtain a preliminary injunction, an applicant is required to show:

> A. A substantial likelihood of success on the merits;
>
> B. A substantial threat of immediate and irreparable harm prior to the time a trial can be had;
>
> C. That the threatened injury if the preliminary injunction is denied outweighs any harms that will result if the preliminary injunction is granted; and
>
> D. That the preliminary injunction will not disserve the public interest.

*See Ladd v. Livingston*, 777 F.3d 286, 288 (5th Cir. 2015); *Anderson v. Jackson*, 558 F.3d 351, 360 (5th Cir. 2009).

### A.    Plaintiffs Have Not Shown a Substantial Likelihood of Succes on the Merits

Plaintiffs fail to show a substantial likelihood of access on the merits for numerous reasons. First, the District Court lacks subject matter jurisdiction of this case. Defendant Martin has filed contemporaneously herewith his Motion to Dismiss for Lack of Subject

9

Matter Jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) herein. Defendant Martin hereby incorporates that Motion by reference, but briefly summarizes why subject matter jurisdiction is absent.

Plaintiffs (and the members of the putative class they seek to represent) lack standing to bring this pre-enforcement facial challenge before S. B. 4 has gone into effect. They have suffered no injury in fact from any actions of Defendant Martin. They have no "concrete and particularized" and "actual or imminent" injury from any enforcement of S. B. 4 by Defendant, but only a speculative fear that such enforcement may someday occur. That is insufficient for standing.

Defendant Martin has sovereign immunity from suit and from Plaintiffs' claims in this case and hereby asserts such sovereign immunity. This action also is barred by the Eleventh Amendment to the United States Constitution. Plaintiffs have failed to allege or show any thing more than pure speculation that Defendant Martin will implement S. B. 4 in a manner that violates the Constitution. Defendant Martin, himself, not yet determined what operational steps DPS will take to enforce S. B. 4. *See* Martin Decl. ¶ 4. *See National Press Phot. Ass'n v. McCraw*, 90 F.4th 770, 786-87 (5th Cir. 2024). Because sovereign immunity deprives a court of subject matter jurisdiction, this action must be dismissed, and Plaintiff cannot show a substantial likelihood of success.

Texas enacted S. B. 4 as part of its defense against actual invasion across Texas's southern border as determined by Texas Governor Abbott and confirmed by the President of the United States. S. B. 4 is therefore consistent with and authorized by the U. S. Constitution, art. 1, Section 10. Thus, any claim that S. B. 4 is preempted by federal statutes both presents a non-justiciable political question and is legally invalid. For this additional reason, this Court

Appx.0119

lacks jurisdiction of this action under Article III and Plaintiffs cannot show a likelihood of success on the merits

Plaintiffs claim int this case also is substantively defective and they cannot show a likelihood of success on the merits for this additional reason. Plaintiffs' only claim is not based on any constitutional or statutory rights they have, but solely on their discredited interpretation of the Supremacy Clause. Courts evaluating preemption claims as to state laws enacted to protect public safety or health or in support of other traditional state police powers must recognize and apply a presumption against preemption. *AbbVie, Inc. v. Murrill*, 166 F.4th 528, 539 (5th Cir. 2026); *Franks Inv. Co., LLC v. Union Pac. R. Co.*, 593 F.3d 404, 407 (5th Cir. 2010) (en banc). S. B. 4 is such a state law enacted to protect the public safety of the citizens and communities of Texas from the extensive adverse effects of illegal immigration. *See* Decl. of Freeman Martin ¶ 7.

The presumption against preemption applicable here can be rebutted, but only by "clear and manifest congressional intent to displace state law." *Novartis Pharms Corp. v. Fitch*, 2026 WL 963504 (5th Cir. Apr. 9, 2026), quoting *Deanda v. Becerra*, 96 F.4th 750, 761 (5th Cir. 2024). "Congressional intent is the ultimate touchstone." *Elam v. Kansas City S. Ry. Co.*, 635 F.3d 796, 803 (5th Cir. 2011). Here, Plaintiffs can point to no "clear and support and manifest congressional intent to displace state laws" like S. B. 4, that supplement and parallel federal laws.

The Fifth Circuit recognized in *Zyla Life Sciences, LLC v. Wells Pharma. of Hous., LLC*, 134 F.4thv 326, 333-34 (5th Cir, 2025). that states may have a legitimate interest in punishing or providing redress for wrongs even if federal law has already done so. Parallel state and federal regulations or prohibitions are familiar and permissible under the Supremacy Clause

11

Appx.0120

unless there is an expression of Constitutional or Congressional intent to the contrary – and that plainly is not present as to S. B. 4.

Neither the Constitution, nor Congress in the Immigration and Nationality Act (INA), forbade sovereign states from helping to enforce federal immigration laws by enacting state criminal laws that parallel their federal counterparts. To the contrary, the federal immigration laws provide for the cooperation of state law enforcement to assist with enforcement of the federal immigration laws. Nowhere do Plaintiffs point to any Congressional language in the INA or elsewhere that forbids States from passing laws like S. B. 4.

The United States and Texas (through the Texas Department of Public Safety (DPS) and other agencies) currently cooperate in the enforcement of federal immigration laws in Texas on a daily basis. *See* Martin Decl. ¶¶ 5-7. Together, the United States and Texas have since the beginning of 2025 achieved the highest level of Texas border security in recorded history through that collaboration. *Id*. ¶7.

These facts belie Plaintiffs' contentions that the field of immigration is one in which federal law preempts the field. For this reason, the United States itself has made it clear that S. B. is *not field-preempted*.

> The regulation of those unlawfully in the United States is not one of those rare cases in which Congress intended to occupy the field to the exclusion of state legislation (like S. B. 4) that supplements and reinforces federal law.

Brief for the United States as *Amicus Curiae* Supporting Appellants, *United States v. Texas*, Case No. 24-50149 (ECF No. 375-1, at 13). The United States specifically disagreed with Plaintiffs'

Appx.0121

central argument here that field preemption of S. B. 4 is supported, if not mandated, by *Arizona v. United States*, 567 U. S. 387 (2012). *Id.* at 14-18.

Moreover, the United States has persuasively argued that S. B. 4 properly construed does not conflict with the federal immigration laws that S. B 4 largely mirrors. "There is no dispute that it is 'possible' for Plaintiffs to comply with both federal law and Senate Bill 4." *Id*. at 19. "At a minimum, S. B. 4 does not conflict with federal law on its face – such that 'no set of circumstances exists under which the Act would be valid' and the law is 'unconstitutional in all its applications.'" *Washington State Grange v. Washington State Rep. Party*, 552 U. S. 442, 449 (2008) (*quoting United States v. Salerno*, 481 U. S. 739, 745 (1987)). The United States concluded: "Texas's law [S. B. 4] is in harmony, not in conflict, with federal law." *Id*. at 19.

Plaintiffs have chosen to mount a facial pre-enforcement challenge to S. B. 4. But the Supreme Court and the Fifth Circuit have cautioned that such challenges are "hard to win." They inevitably require speculation as to how a state law will be enforced and short circuit the democratic process. *See, e. g., Moody v. NetChoice, LLC*, 603 U. S. 707, 723 (2024); *Woodlands Pride, Inc. v. Paxton,* 168 F.4th 293, 307 (5th Cir. 2025). Moreover, a plaintiff cannot carry its burden even in a First Amendment facial challenge without showing that the challenged statute's unconstitutional applications substantially outweigh its constitutional applications. *Id*. But this is *not* a First Amendment facial challenge, so Plaintiffs were required to show that "no set of circumstances exists under which the Act would be valid" and that S. B. 4 is "unconstitutional in all its applications."

Plaintiffs here have not even attempted to meet that heavy burden and could not do so in any event. As one example, consider a previously deported cartel drug smuggler who

13

Appx.0122

surreptitiously enters Texas between ports of entry with a cargo of meth and fentanyl. The drug smuggler (a member of the purported class Plaintiffs seek to certify here) thereby violates both 8 U. S. C. § 1326 and S. B. 4 (as well as various parallel federal and Texas laws against drug smuggling). If a Texas DPS officer were to apprehend the smuggler in Texas pursuant to S. B. 4, that would in no way conflict with federal immigration law and would in fact undeniably advance the goals of 8 U. S. C. § 1326. Federal immigration officials may (but are not required to) file a detainer with Texas authorities to ensure that the drug smuggler can be charged for his federal immigration and drug crimes as well.

The result in this very plausible example would be one less illegal alien on the streets of Texas who has violated (on multiple occasions) federal immigration laws and increased public safety for the citizens and communities of Texas. Plaintiffs have not shown and cannot show why that example represents a violation of the Supremacy Clause of the United States Constitution. The DPS Officer, by enforcing S. B. 4, has not acted in a manner contrary to or in conflict with the letter or spirit of the federal immigration laws, but only in support of the goals of those laws. Accordingly, Plaintiffs cannot meet the requirement that they show the challenged state law "is unconstitutional in all its applications" and that 'no set of circumstances exists under which the Act would be valid'.[12]

This dooms the facial pre-enforcement challenge they chose to bring. Thus, they have not shown the substantial likelihood of success on the merits required for a preliminary injunction for that additional reason.

It is apparent that S. B. 4's provisions regarding arrest of illegal aliens found in Texas and criminal liability of such illegal aliens do not conflict with the parallel federal immigration

---

[12]    As another example, consider an illegal alien who voluntarily agrees to abide by a removal order under S. B. 4 (especially § 52.02); in that instance. there could be no possible conflict with federal immigration laws.

Appx.0123

law provisions that they supplement. Thus, most of the arguments Plaintiffs make pertain to the provisions of S. B. 4 regarding removals from the United States. But neither Plaintiffs nor anyone else will be subject to removal from the United States pursuant to S. B. 4 for a substantial period of time. That is because S. B. 4 provides for such removals only after a person has been charged, tried, and convicted of violating S. B. 4 and has served any sentence for such conviction (or has consented to such removal). Thus, there obviously is no "imminent" threat of removal of Plaintiffs (or any other violators of the laws against illegal re-entry into the United States after deportation) prior to the time a trial can be had in this case. A preliminary injunction thus would be inappropriate. For all these reasons, Plaintiffs have failed to show that they have a substantial likelihood of success on the merits.

**B.      Plaintiffs have failed to show a substantial threat of irreparable harm prior to a trial on the merits.**

Plaintiffs have made no effort whatsoever to show that they are subject to a "substantial" threat of irreparable harm from enforcement of S. B. 4 against them, especially prior to the time a trial of this case can occur. They offer zero evidence that Defendant Martin or the Texas DPS have threatened such enforcement against any Plaintiffs (or purported class members), or that the Department even knows who Plaintiffs are. *See* Martin Decl. ¶ 4.

Instead, Plaintiffs assert only a substantial and speculative "fear" that they might be prosecuted under S.B. 4 by "local law enforcement officials." But it is indisputable that Defendant Martin is *not* a "local law enforcement official." *See* Martin Decl. ¶ 2. Thus, even Plaintiff's speculative fears are directed elsewhere than at Defendant Martin. This failure by Plaintiffs to carry the burden that is theirs on a motion for a preliminary injunction further requires denial of their motion.

15

### C.    Plaintiffs Failed to Show that the Balance of Harms Tips in Their Favor.

Similarly, Plaintiffs have made no attempt to show that the burden to Plaintiffs if a preliminary injunction is denied outweighs the harm to Texas if a preliminary injunction is granted. Had they made any attempt to carry their burden on this element, they could not have done so. Because S. B. 4 is not even in effect and Plaintiffs are unknown to DPS, the harm to Plaintiffs if a preliminary injunction is denied is entirely speculative and unlikely in the short period before a trial can occur. *See* Martin Decl. ¶ 4. But a preliminary injunction would further frustrate the democratic process in Texas and the right of Texas to make and enforce its own laws. Such a preliminary injunction would prevent enforcement of S. B. 4 to protect the citizens of Texas.

### D.    A Preliminary Injunction Would Disserve the Public Interest.

That latter interest is undeniably an important part of the public interest at stake in this case. Texas voters have consistently supported strong enforcement of federal and state laws that would reduce the harms to Texas associated with illegal immigration. The Fifth Circuit recently detailed the damage that Texas and its people have suffered as a result of unchecked illegal immigration. A preliminary injunction further blocking the enforcement of S. B. 4, adopted by the Texas Legislature to combat and deter illegal immigration into Texas, would dramatically disserve the public interest.

### III. The Court Should Defer Any Consideration of Plaintiffs' Motion for Class Certification or Dismiss that Motion.

Defendant Martin timely requested reasonable discovery of Plaintiffs as proposed class representatives. Plaintiffs refused to provide any such discovery in the foreseeable future. This refusal precludes discovery of facts essential to any class certification for the reasons set forth in the Response in Opposition to Motion for Class Certification filed

16

Appx.0125

contemporaneously herewith. Defendant Martin hereby incorporates such Response by reference.

### CONCLUSION

The Court should deny Plaintiffs' motion for a preliminary injunction as well as their motion for a TRO.[13] Because the Court lacks subject matter jurisdiction, the Court should also dismiss this action.

Date: May 8, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

Respectfully submitted.

*s/ David Bryant*
DAVID BRYANT
Senior Special Counsel
Attorney in Charge
Texas Bar No. 03281500

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501

ALEXIA BAKER
Assistant Attorney General
Texas Bar No.24149596

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
SPECIAL LITIGATION DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

COUNSEL FOR DEFENDANT FREEMAN MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY

---

[13] In the event that, despite the foregoing, the Court grants any injunctive relief against enforcement of any portion of S. B. 4, Defendant respectfully requests that the Court stay any such injunctive relief pending appeal by Defendant.

17

Appx.0126

CERTIFICATE OF SERVICE

I certify that on May 8, 2026, a true and accurate copy of the foregoing document was

filed electronically in the above action using the District Court CM/ECF system.

*s/ David Bryant*

David Bryant

Appx.0127

# tab 1: Declaration of Freeman F. Martin

Appx.0128

In the United States District Court
Western District of Texas
Austin Division

L.M.L., K.G.S., ON BEHALF OF THEMSELVES AND ALL
THOSE SIMILARLY SITUATED
          PLAINTIFFS,

V.

CIVIL CASE NO. 1:26-CV-1170

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS
DIRECTOR OF STATE OF TEXAS DEPARTMENT OF
PUBLIC SAFETY
          DEFENDANTS

## DECLARATION OF FREEMAN F. MARTIN

I, Freeman F. Martin, declare under penalty of perjury pursuant to 28 U.S.C. §1746, as

follows:

1.      I am a citizen of the United States, over 18 years of age, and the facts set forth

herein are true and correct to the best of my knowledge.

2.      I am the Director of the Texas Department of Public Safety (DPS). The DPS Director

carries the rank of Colonel. DPS is a law enforcement agency of the State of Texas with

approximately 11,000 employees. I have served in a variety of positions within DPS going back to

1990. Immediately prior to becoming Director of DPS, I served as the Senior Deputy Director over

Homeland Security at DPS, including responsibilities for the Texas Border.

3.      I was not the Director of DPS at the time the legislation generally known as S. B. 4

was under consideration by the Texas Legislature; when S. B. 4 was signed into law by Governor

Greg Abbott; or when the United States District Court for the Western District of Texas entered a

1

Appx.0129

preliminary injunction against enforcement of S. B. 4 on or about February 29, 2024, prior to the time it was scheduled to go into effect. See *United States v. Texas*, 719 F. Supp. 3d 640 (W. D. Tex. 2024). I was not at that time a party in Case Nos. 1:24-cv-8-DAE or 1:23-cv-1537-DAE, the cases in which that preliminary injunction was entered.

4.      I became Director of DPS in December 2024. During the time I have been Director of DPS, the referenced preliminary injunction has been in effect. During that time, neither I nor any other personnel of DPS to my knowledge have taken any actions to enforce any provisions of S. B. 4. If and when S. B. 4 actually goes into effect, my executive command and I will determine the operational steps DPS will take steps to enforce S. B. 4. However, it has not yet been determined  what those operational steps will be.

5.      However, DPS has engaged in extensive efforts in recent years to enforce Texas laws that may be broken by persons who have entered Texas in violation of federal immigration laws. Pursuant to Operation Lone Star initiated by Governor Greg Abbott in 2021, DPS personnel have vigorously defended the southern border of Texas by apprehending persons who have committed acts of trespass or committed other criminal offenses in the State of Texas after unlawfully entering Texas in violation of federal immigration laws. These persons have included many agents of trans-national cartels that are federally designated as transnational criminal organizations; potential terrorists; human traffickers; and persons who have committed violent crimes in Texas or elsewhere. During that period, DPS personnel have on many, many occasions turned over persons found in Texas and suspected of entering Texas in violation of the federal immigration laws to United States Border Patrol Officers and other federal law enforcement

2

personnel for them to determine whether actions by them to enforce federal immigration laws are appropriate and to takes such actions as they deem appropriate under federal law.

6.    Since January 2025, DPS personnel have worked even more closely and cooperatively with United States Border Patrol Officers and other federal law enforcement personnel charged with enforcing the federal immigration laws. Pursuant to requests from the U. S. Department of Homeland Security ("DHS") and formal agreements between DHS and the State of Texas, DPS personnel directly and in cooperation with United States Border Patrol Officers and other federal law enforcement personnel to apprehend, detain, and arrest persons found in Texas who are suspected of violating federal immigration laws, including but not limited to 8 U. S. C. § 1325 (illegal entry into the United States) and 8 U. S. C. § 1326 (illegal re-entry into the United States).

7.    One result of the closer and more cooperative relationship since January 2025 between DPS personnel and United States Border Patrol Officers and other federal law enforcement personnel in enforcing Texas laws and federal immigration laws has been the increasingly successful defense of Texas, its citizens, and its communities from the adverse effects of illegal immigration into Texas, including but not limited to increased violent crime, drug smuggling, and human trafficking. This successful defense is valuable not only in its own right, but also because it deters future attempts at illegal immigration into Texas. As of today, I believe the southern border of Texas is better defended than ever before in my decades in Texas law enforcement.

8.    Based on my experience, I do not see any conflict between the federal immigration laws and the provisions of S. B. 4, especially relating to persons found in Texas who have violated

3

federal laws against illegal entry or re-entry into the United States. Sections 51.02 and 51.02, Texas Penal Code. When enforcement begins, I believe arrests made pursuant to those sections of the Texas Penal Code will be consistent with and supportive of the federal immigration laws and to further the goals of those laws as well.

Signed this 8th day of May 2026. I declare under penalty of perjury that the foregoing is true and correct.

Colonel Freeman F. Martin

## CERTIFICATE OF SERVICE

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 8, 2026 and that all counsel of record were served by CM/ECF.

/s/ David Bryant

**DAVID BRYANT**

4

Appx.0132

**TAB J: PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| L.M.L., *et al.*,<br><br>　　　　　　*Plaintiffs*,<br><br>　　　v.<br><br>FREEMAN F. MARTIN, in his official capacity as the Director of the State of Texas Department of Public Safety,<br><br>　　　　　*Defendant*. | Case No. 1:26-cv-1170-DAE |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

Appx.0134

In Defendant's Response in Opposition to Plaintiffs' Motion for Class Certification, Dkt. # 28 ("Class Opp."), he does not contest Plaintiffs' showing of numerosity or commonality, *see* Pls.' Mot. for Class Certification, Dkt. # 5 ("Class Mot.") 5-9.  He does challenge other class certification factors and the well-established practice of provisionally certifying classes when warranted, but his arguments lack merit.  The Court should provisionally certify the class.

## I.     THE CLASS IS ASCERTAINABLE.

"'[T]he touchstone of ascertainability is whether the class is sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" *Ictech-Bendeck v. Waste Connections Bayou, Inc.*, 349 F.R.D. 106, 120 (E.D. La. 2025) (citation omitted).  "An identifiable class exists if its members can be ascertained by reference to objective criteria . . . ." *Conrad v. Gen. Motors Acceptance Corp.*, 283 F.R.D. 326, 328 (N.D. Tex. 2012).

The proposed class here is readily ascertainable because membership is defined by clear and objective criteria that are set forth in S.B. 4 itself.  The class describes those who may be arrested, charged, and convicted of S.B. 4's reentry crime, because it tracks the language of that crime.  Membership is not "based on the class members' state of mind" nor is it "impermissibly vague in practice." *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 935 (5th Cir. 2023).  "'A[n] [individual] is either subject to [S.B. 4] or [] isn't.'" *Neese v. Becerra*, 342 F.R.D. 399, 411 (N.D. Tex. 2022) (citation omitted); *ODonnell v. Harris County*, No. 16-cv-1414, 2017 WL 1542457, at *4 (S.D. Tex. Apr. 28, 2017) (similar); *see also Rosales v. Dep't of the Army*, No. 23-cv-440, 2025 WL 1502566, at *3-4 (W.D. Tex. May 12, 2025) (citing cases).

There is no requirement that the class "be so ascertainable that every potential member can be identified at the commencement of the action." *Rodriguez v. Flowers Foods, Inc.*, No. 4:16-

1

Appx.0135

CV-245, 2016 WL 7210943, at *4-5 (S.D. Tex. Dec. 13, 2016) (quoting 7A Wright, Miller & Kane, *Federal Practice and Procedure* § 1760 (3d ed.)).   Rather, it is sufficient that a class be "circumscribed by some objective set of criteria." *Id.* (citation modified).   Courts within the Fifth Circuit have thus certified such classes as "[a]ll farmers and ranchers in the United States who are encountering, or will encounter, racial discrimination from" a federal agency due to a specific federal law, *Miller v. Vilsack*, No. 4:21-cv-0595, 2021 WL 11115194, at *3, *6-7 (N.D. Tex. July 1, 2021) (class sufficiently ascertainable), and "[a]ll radar technicians, operators, and/or mechanics" suffering from certain illnesses "as a direct and proximate result of exposure to ionizing radiation . . . who worked with Radar devices designed, manufactured, and/or marketed by Defendants" in a particular time period, *Norwood v. Raytheon Co.*, 237 F.R.D. 581, 586 (W.D. Tex. 2006) (class "adequately precise").   It is not unusual for applicability of a class definition to an individual to have some factual or legal component, and it does not undermine ascertainability. *See Rodriguez*, 2016 WL 7210943, at *4-5.

Defendant suggests that the class is not ascertainable because those subject to prosecution may be transitory, and the class includes future members.   Class Opp. 9.   But "[t]he fact that members will flow in and out of the class . . . does not pose an obstacle to class certification." *ODonnell*, 2017 WL 1542457, at *3.   What matters is whether it can be determined that a particular person is a member of the class when it becomes necessary for the Defendant or the Court to act accordingly. *See Rosales*, 2025 WL 1502566, at *3.   Here, the practical application of this class would be straightforward: If Defendant proposes to enforce S.B. 4 against an individual, then by necessity he believes that individual is subject to the statute, and therefore a class member. Because enforcement and class membership would go hand in hand, no ascertainability problem is presented.

Appx.0136

Defendant's contrary argument, "if accepted, would preclude certification of just about any class of persons alleging injury" from a criminal prohibition.  *In re Rodriguez*, 695 F.3d 360, 370 (5th Cir. 2012).  It would likewise preclude just about any class including future members, or involving members in different immigration statuses.  But such classes are routine.  *See, e.g.*, *Jones v. Diamond*, 519 F.2d 1090, 1093, 1100 (5th Cir. 1975), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S.  478 (1978); *Lackey v. Stinnie*, 604 U.S. 192, 196-97 (2025); *Echavarria v. Pitts*, 641 F.3d 92, 93 (5th Cir. 2011); *Barbara v. Trump*, 790 F. Supp. 3d 80, 91 (D.N.H. 2025), *cert. granted before judgment,* 146 S. Ct. 879 (2025); *Martinez v. Anderson County*, No. 22-cv-171, 2023 WL 2672837, at *3 (E.D. Tex. Mar. 1, 2023); *Vita Nuova, Inc. v. Azar*, No. 4:19-cv-00532, 2020 WL 8271942, at *9 (N.D. Tex. Dec. 2, 2020); *M.D. v. Perry*, 294 F.R.D 7, 30 (S.D. Tex. 2013).

## II.    THE CLASS REPRESENTATIVES' CLAIMS ARE TYPICAL.

As previously explained, Plaintiffs' claims are typical of the class's.  Class Mot. 9.  Indeed, each member of the class advances the same claim: that S.B. 4 is both field and conflict preempted.

Defendant focuses on "differences between the named plaintiffs . . . and the members of the putative class."  Class Opp. 10-11 (citing different immigration statuses).  That asks the wrong question.  "Typicality 'focuses on the similarity between the named plaintiffs' *legal and remedial theories* and the theories of those whom they purport to represent.'"  *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023) (quoting *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)) (emphasis added).  "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality."  *Id*.  Here, the course of conduct is the same: Enforcement of S.B. 4.  And the factual differences Defendant identifies are irrelevant to the theories advanced and the relief sought.  *See* Dkt. # 3 ("TRO Mot."); 1 Newberg and

3

Rubenstein on Class Actions § 3:34 (6th ed.); *see also Postawko v. Mo. Dep't of Corr.*, 910 F.3d 1030, 1039 (8th Cir. 2018) ("[f]actual variations in the individual claims will not normally preclude class certification" where they challenge the same "course of conduct as the class claims" under "the same legal . . . theory") (citation modified).

Defendant contests this, arguing that because of their circumstances, "it is extraordinarily unlikely that the named plaintiffs would be removed from the country because of S.B. 4."  Class Opp. 11.  But whatever representation Defendant may make about his intentions regarding implementation of the state deportation orders, *see id*. at 11-12, S.B. 4 mandates the entry of a state return order upon conviction for the reentry crime, *see* Tex. Code Crim. Proc. art. 5B.002(d), and that order carries with it up to 20 years in prison for noncompliance, *see* Tex. Penal Code § 51.04. Plaintiffs' legal and remedial theories—that this system is preempted and should be enjoined—are shared among the entire class.

As for Defendant's claim that Plaintiffs "lack standing" to point to the inconsistency between S.B. 4 and federal law as to people who reentered the country with federal permission, Class Opp. 12-13, that cannot defeat typicality either.  Such "specific conflicts between state and federal law simply underscore the reason for field preemption." *Arizona v. United States*, 567 U.S. 387, 403 (2012).  And they help illustrate the many ways in which Texas's regime arrogates to state officers the control and discretion Congress vested in federal agents.  TRO Mot. 10-15.  To the extent some class members might emphasize one particular conflict or another, that cannot defeat typicality: "A complete identity of claims is not required; rather, the critical inquiry is whether the named plaintiff's claims have the same essential characteristics of those of the putative class." *Angell*, 67 F.4th at 736 (citation modified).  Here, they do.

4

## III.    THE CLASS REPRESENTATIVES ARE ADEQUATE.

As previously shown, Plaintiffs are adequate class representatives.  Class Mot. 10.

Again, Defendant focuses on factual differences regarding immigration status between Plaintiffs and other class members.  Class Opp. 14-16.  But he has identified no colorable conflicts of interest created by such differences.  *See Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999) ("[d]ifferences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests").  Plaintiffs, like all class members, are subject to prosecution under S.B. 4 and may challenge the law as field and conflict preempted, and the differences Defendant points to make absolutely no difference to the claims raised in this case.  *See, e.g.*, *Barbara*, 790 F. Supp. 3d at 96 (rejecting similar argument based on differences between class representatives and members because "the court has rejected the contention that [these differences] matter for the purposes of the claims raised in this case").  Because there are no "conflicts of interest between [Plaintiffs] and the class they seek to represent," *Anchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997), Plaintiffs are adequate class representatives.

Nor does it matter that Plaintiffs are proceeding anonymously.  *See* Class Opp. 13-14.  Arguing to the contrary, Defendant relies on cases in which plaintiffs were seeking *damages*.  *See Sherman v. Trinity Teen Solutions, Inc.*, 339 F.R.D. 203, 204, 206 (D. Wyo. 2021) (claim brought under Trafficking Victims Protection Reauthorization Act for abuse suffered years ago); *Doe (1) v. Univ. of Kan. Hosp. Auth.*, No. 25-cv-02200, 2025 WL 1634958, at *2, *4 (D. Kan. June 9, 2025) ("Plaintiffs seek damages").  However, in a Rule 23(b)(2) class for *injunctive* relief, "the putative class members have no way to opt in or out of the class, and thus less need for information about class representatives."  *Barbara*, 790 F. Supp. 3d at 96; *Doe v. U.S. Immig. & Customs Enf't*, No.

5

1:23-cv-00971, 2024 WL 4389461, at *4 (D.N.M. Oct. 3, 2024) (similar); *CASA, Inc. v. Trump*, 793 F. Supp. 3d 703, 724 (D. Md. 2025) (rejecting Defendant's argument because "the hallmark of a Rule 23(b)(2) class is that the relief benefits class representatives and class members alike"); *H.C.R. v. Mullin*, --- F. Supp. 3d ---, No. 25-cv-747, 2026 WL 850555, at *13 (M.D. Fla. Mar. 27, 2026) (rejecting Defendant's argument and citing cases), *appeal filed*, No. 26-11197 (11th Cir. 2026).[1] And several courts have provisionally certified Rule 23(b)(2) classes with pseudonymous class representatives in challenges to laws similar to S.B. 4. *See, e.g.*, *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1052 (D. Idaho 2025); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1254, 1270 (S.D. Fla. 2025); *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1354 (W.D. Okla. 2025). Here, "Plaintiffs have publicly filed detailed declarations" with information relevant to the claims, which "is arguably more informative and relevant to conflict analysis than Plaintiffs' actual names." *U.S. Navy SEALS 1-26 v. Austin*, 594 F. Supp. 3d 767, 782-83 (N.D. Tex. 2022).

## IV.    PLAINTIFFS HAVE SATISFIED RULE 23(b)(2).

Certification is warranted under Rule 23(b)(2). Class Mot. 12-13. Enforcement of S.B. 4 represents "grounds that apply generally to the class," and "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2). "Rule 23(b)(2) applies . . . when a single injunction or declaratory judgment would provide relief to each member of the class." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). That is precisely what Plaintiffs have sought: An injunction and declaration that the challenged provisions of S.B.

---

[1] Should the Court have concerns in this regard, the appropriate alternative would not be to deny class certification, as Defendant urges, but rather to provide for a process to provide class members with confidential access to the representatives' identities subject to an appropriate protective order.

Appx.0140

4 are illegal.  Indeed, this kind of civil rights claim is a "prime example[]" of a Rule 23(b)(2) case. *Id*. at 361 (citation modified).

As with the other factors, Defendant again emphasizes factual differences among class members to contest Rule 23(b)(2), including whether they "maintain lawful presence in the United States" and whether they have "criminal history" that could alter the punishments applicable under S.B. 4.  Class Opp. 17.  But such factual differences are not relevant to the Rule 23(b)(2) inquiry. Class members *do* face harm "in essentially the same way"—namely arrest, prosecution, and removal under preempted state laws.  *Id*. at 16 (quoting *Maldonado v. Ochsner Clinic Found*., 493 F.3d 521, 524 (5th Cir. 2007)).  By contrast, in *Maldonado*, on which Defendant relies, "the requested injunctive relief (the provision of 'mutually affordable health care') lacked any meaningful content and provided no guidance."  *Yates v. Collier*, 868 F.3d 354, 368 (5th Cir. 2017). But "an injunction in this case would not require an individualized assessment of the injunctive relief afforded to each class member."  *Morrow v. Washington*, 277 F.R.D. 172, 199 (E.D. Tex. 2011).  Rule 23(b)(2) is satisfied.

V.      **PROVISIONAL CLASS CERTIFICATION IS APPROPRIATE.**

"Courts routinely grant provisional class certification for purposes of entering injunctive relief."  *Idaho Org. of Res. Councils*, 780 F.Supp.3d at 1046; *see also Barbara*, 790 F. Supp. 3d at 90; *Padres Unidos de Tulsa*, 783 F. Supp. 3d at 1349-53 (collecting cases); *Trump v. CASA, Inc.*, 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring) ("[P]laintiffs who challenge the legality of" governmental "action and request preliminary injunctive relief may sometimes seek to proceed by class action under [Rule] 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide . . .").

7

Appx.0141

Defendant asserts that the use of the word "final" in Rule 23(b)(2) means that a class cannot be certified until the plaintiff seeks final injunctive relief. Class Opp. 19. That is wrong. "The plain language of FRCP 23(b)(2) does not restrict class certification to instances when final injunctive relief issues; it only requires that final injunctive relief be appropriate." *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012). Indeed, such a rule would be squarely at odds with the Rule's directive that "[a]t *an early practicable time* after a person sues or is sued as a class representative, the court must determine by order whether to certify the action as a class action." Fed. R. Civ. P. 23(c)(1)(A) (emphasis added).

Nothing warrants delaying provisional class certification here. Defendants have not established any need for pre-certification discovery. *See* Pls.' Opp. to Def.'s Amended Mot. for Expedited Disc. The parties may engage in discovery in due course and before final judgment. And in the unlikely event Defendants can develop facts to undermine provisional class certification, the Court may revisit the issue. Indeed, even nominally final certification "is always provisional" until final judgment. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016); *see* Fed. R. Civ. P. 23(c)(1)(C). But that possibility does not warrant denying or delaying class certification now. *See* David Marcus, *The Class Action After* Trump v. CASA, 72 UCLA L. Rev. Discourse 2, 18-24 (2025) (discussing permissibility of rapid provisional class certification proceedings).

## CONCLUSION

The Court should grant class certification.

8

Dated: May 11, 2026

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)**
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
Daniel Woodward
(TX Bar No. 24138347)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org
danny@texascivilrightsproject.org

Dustin Rynders
Texas Bar No. 24048005
Texas Civil Rights Project
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

/s/ *Cody Wofsy*
Cody Wofsy
Spencer Amdur
Hannah Steinberg*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org

Kathryn Huddleston*** (TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat*
Lee Gelernt
Grace Choi*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
gchoi@aclu.org

*Pro Hac Vice Application Forthcoming
** Admission to Western District of Texas Pending
*** Application for Admission to Western District of Texas Forthcoming; barred in Texas and Arizona, not barred in the District of Columbia, practice supervised by a member of the D.C. Bar

9

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2026, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system.  A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

<u>*/s/ Cody Wofsy*</u>
Cody Wofsy

10

Appx.0144

**TAB K: PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

|  |  |
|---|---|
| L.M.L., *et al.*,<br><br>           *Plaintiffs*,<br><br>                    v.<br><br>FREEMAN F. MARTIN, in his official capacity as the Director of the State of Texas Department of Public Safety,<br><br>           *Defendant*. | Case No. 1:26-cv-1170-DAE |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Appx.0146

This Court previously and correctly held that S.B. 4 is both field and conflict preempted. To avoid the obvious conclusion that it should be enjoined here, Defendant has submitted a flurry of filings and contentions, but all of them lack merit. Ultimately, the reality is inescapable: Texas has enacted its own immigration scheme, and the Supremacy Clause does not permit its enforcement.

Defendant's Amended Response in Opposition, Dkt # 29 ("TRO Opp.") to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction, Dkt # 3 ("TRO Mot."), fails to rebut that conclusion. Plaintiffs have clear standing to challenge S.B. 4. *See* Dkt # 13 (directing parties to include arguments as to standing). Both Plaintiffs are amenable to prosecution under S.B. 4—which Defendant does not contest. Instead, as to both standing and *Ex Parte Young*, Defendant's core argument is that there has been no specific threat of enforcement against these specific individuals. But that has never been required, and, far from disclaiming an intent to enforce S.B. 4, Defendant has now repeatedly indicated he will do so. Plaintiffs need not wait until they are arrested to challenge this unconstitutional scheme.

Defendants' remaining arguments were already rejected by this Court in its thorough prior opinion, which analyzed the merits and equities. *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024), *vacated on other grounds*, No. 24-50149, 2026 WL 1122127 (5th Cir. Apr. 24, 2026) (en banc). The Court should enjoin S.B. 4.

## I.    PLAINTIFFS HAVE STANDING.

Plaintiffs demonstrate an injury-in-fact because (1) they have "an intention to engage in a course of conduct arguably affected with a constitutional interest," (2) their intended future conduct is "arguably . . . proscribed by the statute," and (3) "the threat of future enforcement . . .

1

is substantial." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160-64 (2014) (citation modified).

1. Plaintiffs assert an intent "to engage in a course of conduct arguably affected with a constitutional interest." *Id.* at 160 (citation modified). Indeed, Defendant does not contend otherwise. In preemption cases and others, individuals regularly vindicate their own "constitutional interest" in the Constitution's principles of federalism. *Bond v. United States*, 564 U.S. 211, 220, 225-26 (2011); *see also Kentucky v. Yellen*, 54 F.4th 325, 336 (6th Cir. 2022) ("federalism principles" provided arguable constitutional interest for standing); *United States v. Texas*, 794 F. Supp. 3d 427, 442-44 (W.D. Tex. 2025) ("the structural protection of federalism embodied in the Supremacy Clause" provides an individual constitutional interest); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 914 (8th Cir. 2025) (similar). Accordingly, numerous federal courts have found that individuals challenging laws similar to S.B. 4 on preemption grounds have a constitutional interest. *Iowa Migrant Movement for Just.*, 157 F.4th at 914; *Idaho Org. of Res. Councils v. Labrador*, 780 F. Supp. 3d 1013, 1032-33 (D. Idaho 2025); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235, 1255-56 (S.D. Fla. 2025); *Padres Unidos de Tulsa v. Drummond*, 783 F. Supp. 3d 1324, 1342-43 (W.D. Okla. 2025).

2. Likewise, the Plaintiffs' conduct is at a minimum "arguably . . . proscribed by [the] statute[.]" *Susan B. Anthony List*, 573 U.S. at 162. S.B. 4 makes it a crime for "an alien" to be "at any time found in" Texas "after the person . . . has been denied admission to or excluded, deported, or removed from the United States," or "has departed from the United States while an order of exclusion, deportation, or removal is outstanding." Tex. Penal Code § 51.03(a). Plaintiffs can each be "found in" Texas after reentering the United States without authorization. L.M.L. Decl.

Appx.0148

¶¶ 3, 5-6; K.G.S. Decl. ¶¶ 3, 5-6.  Accordingly, their conduct is "arguably . . . proscribed" by the statute.

While Defendant points to certain aspects of the Plaintiffs' circumstances to contest class certification, he correctly does not contest that the Plaintiffs are amenable to prosecution under S.B. 4.  For example, that Plaintiff L.M.L. is a lawful permanent resident does not immunize him from state prosecution.  L.M.L. is an "alien" under S.B. 4; the statute incorporates the definition of "alien" in 8 U.S.C. § 1101, which includes lawful permanent residents.  *See* Tex. Penal Code § 51.01(1); 8 U.S.C. § 1101(a)(3), (a)(20).  And, unlike S.B. 4's *entry* crime, the *reentry* provision provides no defenses, including for lawful permanent residents.  *Compare* Tex. Penal Code § 51.03 (no affirmative defenses) *with* Tex. Penal Code § 51.02(c) (providing affirmative defenses for, *inter alia*, lawful presence and asylum).  Under the "plain terms" of the statute, *Book People, Inc. v. Wong*, 91 F.4th 318, 330 (5th Cir. 2024), L.M.L. may be prosecuted despite his lawful permanent residence, *see Iowa Migrant Movement for Just.*, 157 F.4th at 913-16 (holding that lawful permanent residents had standing to challenge Iowa's almost identical provision).

Likewise, Plaintiff K.G.S.'s conduct is arguably proscribed by S.B. 4.  She departed the United States, a removal order was subsequently issued, and she then reentered.  K.G.S. Decl. ¶¶ 5-6.  The Fifth Circuit has previously held that an individual in those circumstances may be prosecuted and convicted under 8 U.S.C. § 1326, the federal illegal reentry statute.  *See United States v. Ramirez-Carcamo*, 559 F.3d 384, 389-90 (5th Cir. 2009) (holding that "aliens do not avoid prosecution under Section 1326 by . . . departing in advance of the removal order").  Section 1326 was the model for S.B. 4's reentry crime, as Texas concedes.  *See* TRO Opp. 13-14; Brief for Appellants at 6, *United States v. Texas*, No. 24-50149 (5th Cir. filed Mar. 13, 2024) (asserting that S.B. 4 "track[s] federal immigration crimes prohibiting unlawful entry and reentry");

3

Supplemental Brief for Appellants at 4-5, *United States v. Texas*, No. 24-50149 (5th Cir. filed Oct. 13, 2025) (similar).  Accordingly, it is at least arguable that K.G.S. may be prosecuted under S.B. 4.  *See, e.g.*, *In re Westcap Enters.*, 230 F.3d 717, 726 (5th Cir. 2000) ("Because the Texas Securities Act is so similar to the federal Securities Exchange Act, Texas courts look to decisions of the federal courts to aid in the interpretation of the Texas Act.") (citation modified); *Long v. State*, 535 S.W.3d 511, 523-25 (Tex. Crim. App. 2017) (reviewing cases on federal wiretap statute to interpret state wiretap statute, which "generally follows the provisions of [the federal statute]") (citation modified).

3.  Finally, Plaintiffs face a credible threat of enforcement.  The Texas Department of Public Safety has consistently indicated that it intends to enforce S.B. 4.  Defendant's predecessor stated that enforcement would be on a massive scale, predicting up to 80,000 arrests under the statute. *United States v. Texas*, 144 F.4th 632, 652 (5th Cir.), *reh'g en banc granted, opinion vacated,* 150 F.4th 656 (5th Cir. 2025), and *on reh'g en banc,* No. 24-50149, 2026 WL 1122127 (5th Cir. Apr. 24, 2026); *see also Texas*, 719 F. Supp. 3d at 659 (estimating 8,000 arrests in El Paso County alone).  This Court rightly concluded in earlier litigation that DPS had "demonstrated a clear willingness to enforce SB 4."  *Texas*, 719 F. Supp. 3d at 661.

Defendant contends that his predecessor's statement about massive enforcement does not show a threat of enforcement.  *See* TRO Opp. 15; Def's Priority Mot. to Dismiss for Lack of Subject Matter Jurisdiction, Dkt. # 25 ("MTD") 6 & n.2.  But he does not disclaim enforcement. To the contrary, Defendant has repeatedly indicated his intention to enforce S.B. 4.  For example, in a brief submitted to the Fifth Circuit after he was substituted into the case as a defendant, he emphasized what he perceives to be the benefits of "[e]nforcement of S.B.4," and cited plans for DPS's enforcement of the law.  Supplemental Brief for Appellants at 23-24, 49, *United States v.*

4

*Texas*, No. 24-50149 5th Cir. Oct. 13, 2025). Likewise, he now asserts that "[e]ven greater success" in achieving the State's immigration policy goals "can and likely will be achieved if S.B. 4 is allowed to go into effect and is fully implemented." TRO Opp. 7; *see also id.* at 10 (not disclaiming an intent to "implement S. B. 4"). Indeed, his declaration confirms that "DPS will take steps to enforce S. B. 4." Martin Decl. ¶ 4. That he has "not yet . . . determined what those operational steps will be," *id.*, does not remotely undermine his demonstrated willingness to enforce the law.

That is more than enough to establish standing. Plaintiffs "established they have engaged in (and will continue to engage in) conduct" arguably prohibited by S.B. 4. *La Union Del Pueblo Entero v. Abbott*, 151 F.4th 273, 289 (5th Cir. 2025). And Defendant "has not disavowed" enforcing the statute "for that behavior, so a credible threat of prosecution exists." *Id.*; *see Iowa Migrant Movement for Just.*, 157 F.4th at 915 (similar).[1]

## II.    DEFENDANT IS NOT ENTITLED TO SOVEREIGN IMMUNITY.

For similar reasons, Defendant is not entitled to sovereign immunity. TRO Opp. 10; MTD 5-7. As this Court previously observed, a "'scintilla of enforcement by the relevant state official with respect to the challenged law' will do." *Texas*, 719 F. Supp. 3d at 661 (quoting *City of Austin v. Paxton*, 943 F.3d 993, 1002 (5th Cir. 2019)). As already explained, that is amply satisfied here.

---

[1] In his motion to dismiss, Defendant separately contests Plaintiffs' standing to challenge S.B. 4's removal provision, Tex. Code of Crim. Proc. art. 5B.002. MTD 4. That is baseless. While supposedly voluntary acceptance of a state removal order requires certain "conditions," *id.*, such as lack of other charges, *see* art. 5B.002(c), upon conviction "the judge shall" enter such an order— without any conditions, *see id.* art. 5B.002(d). As for article 5B.003, the abatement provision, *see* MTD 5 n.1, "a federal determination regarding the immigration status of [K.G.S.] is pending." Art. 5B.003. *See* USCIS, Policy Manual, Vol. 3, Part C, Ch. 4, https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-4 (describing the U-visa process). K.G.S. has not yet been granted a visa. Her petition has been prima facie approved; final approval and issuance will await the availability of a visa. *See* USCIS, Policy Manual, Vol. 3, Part C, Ch. 5, https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5.

5

Appx.0151

In response, Texas relies on *National Press Photographers Association v. McCraw*, 90 F.4th 770 (5th Cir. 2024). But that unusual case involved a longstanding statute that had "never" been enforced in the decade that it had been on the books. *Id*. at 786. Here, there is no such statutory "moribundity," nor are there any "persuasive representations of its nonenforcement." *Healthy Vision Ass'n v. Abbott*, 138 F.4th 385, 397 (5th Cir. 2025) (discussing *Nat'l Press Photographers*); *see La Union Del Pueblo Entero*, 151 F.4th at 289 (emphasizing that the defendant "has not disavowed" enforcement). And, as *National Press Photographers* itself recognized, as DPS Director the Defendant has "more than just the general duty to see that the state's laws are implemented—[he is] *directly* responsible for enforcing Texas's criminal laws." 90 F.4th at 786. Sovereign immunity is therefore inapplicable.[2]

## III. THIS COURT HAS ALREADY DECIDED THE MERITS.

On the merits, Defendant recycles arguments this Court already considered and rejected. Defendant invokes the presumption against preemption, TRO Opp. 11, but "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108 (2000). That is undisputably the case here, as several courts have found. *See Iowa Migrant Movement for Just*., 157 F.4th at 919 (explaining "immigration is not a traditional subject of state regulation"); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (no "presumption against preemption applies" to an "attempt to regulate immigration"); *Lozano v. City of Hazleton*, 724 F.3d 297, 314

_____

[2] Defendant suggests that *Ex Parte Young*'s exception to sovereign immunity in not available until "the challenged statute has . . . taken effect." MTD 6. That is incorrect. *See, e.g.*, *Whole Woman's Health v. Jackson*, 595 U.S. 30, 35, 45 (2021) (plurality opinion); *id*. at 59-60 (Roberts, C.J., concurring in the judgment in part) ("As eight Members of the Court agree, petitioners may bring a pre-enforcement suit challenging the Texas law in federal court under *Ex parte Young*") (citation omitted); *see also Healthy Vision Ass'n*, 138 F.4th at 397-98.

Appx.0152

n.23 (3d Cir. 2013) (similar).  By contrast, *AbbVie, Inc. v. Murrill*, on which Defendant relies, involved "[p]ublic health and consumer protection," and merely "touch[ed]" on a federal program. 166 F.4th 528, 539 (5th Cir. 2026).

According to Defendant, states may enact criminal laws that parallel federal law.  TRO Opp. 12.  But as this Court observed, 719 F. Supp. 3d at 667, this is not true where, as here, the state is regulating in a preempted field, since field preemption forecloses even parallel state laws. Likewise, whatever may be permissible in the context of other crimes, here S.B. 4 conflicts with Congress's extensive regulatory regime.  *Iowa Migrant Movement for Just.*, 157 F.4th at 922 (specifically distinguishing *Zyla Life Scis., L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326 (5th Cir. 2025), on which Defendant relies).

Defendant also invokes cooperation between the federal government and Texas, TRO Opp. 12, but as this Court explained, federal-state cooperation in immigration enforcement is governed by 8 U.S.C. § 1357(g), which "retain[s] ultimate monitoring and implementation control for the federal government" due to the "'significant complexities involved in enforcing federal immigration law.'"  719 F. Supp. 3d at 677 (quoting *Arizona v. United States*, 567 U.S. 387, 409 (2012)).  "'[N]o coherent understanding' of 'cooperation' would 'incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government.'"  *Id.* (quoting *Arizona*, 567 U.S. at 410).

Defendant invokes the "burden" required "to mount a facial pre-enforcement challenge," TRO Opp. 13, but ignores the fact that, where, as here, a law is field preempted, every application of that law is preempted.  *See Arizona*, 567 U.S. at 401 ("Where Congress occupies an entire field . . . even complementary state regulation is impermissible.").  Even as to conflict preemption, every time the State enforces S.B. 4, it flouts Congress's direction that executive officials exercise

7

Appx.0153

discretion to decide which tools to use to address irregular entries.[3]  Thus, "every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Iowa Migrant Movement for Just.*, 157 F.4th at 927.[4]

Defendant invokes the views expressed by the Department of Justice in an amicus brief supporting parts of S.B. 4.  TRO Opp. 12-13.  "But the Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers."  *Iowa Migrant Movement for Just.*, 157 F.4th at 924 (rejecting reliance on similar amicus brief) (some internal quotation marks omitted).  "Congress gives discretion to federal officials in enforcing federal immigration law, with limited opportunities for the involvement of states."  *Id.* "Because the Act conflicts with the discretion that Congress gives to federal officials, the Act is preempted, even if federal officials support the Act."  *Id.*[5]

Finally, Defendant reprises the State's claim that S.B. 4 is authorized as a "defense against actual invasion," and that this assertion renders the case non-justiciable.  TRO Opp. 10.  This Court

---

[3] Defendant claims that Plaintiffs "base their argument" on S.B. 4's failure to include the exception under federal law for a person who reenters with the federal government's permission.  MTD 3. That is in fact just one of many conflicts between S.B. 4 and federal law.

[4] Defendant posits a hypothetical enforcement against a "cartel drug smuggler."  TRO Opp. 13-14. Texas may of course enforce its drug crimes; that does not make it lawful for the state to establish and apply its own immigration statutes.  Texas next objects that S.B. 4 is lawful when noncitizens "voluntarily agree[]" to leave the country.  TRO Opp 14 n.12.  But any state deportation orders intrude into an exclusively federal field.  Moreover, it is myopic to suggest Texas's "voluntary" scheme is either truly voluntary or consistent with federal law.  Under S.B.4, noncitizens are faced with criminal prosecution and a sentence, followed by a mandatory state deportation order, and then offered the "opportunity" to instead avoid the punishment and immediately take that same deportation order.  That is, these supposedly "voluntary" choices are predicated on Texas dictating that a person must leave the country either way.  *Texas*, 2026 WL 1122127, at *67 (Richman, J., dissenting).  A starker conflict is hard to imagine.

[5] The "views" of "an Executive Branch agency" do not control the meaning of Congress's statutes. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024).  That is particularly so because the amicus brief submitted by the Department of Justice is an abrupt reversal from the position it took previously in challenges to S.B. 4 and related laws—a fact it never explains.  *See id.* at 386 ("respect" for "consistent" views).

Appx.0154

previously rejected that argument.  719 F. Supp. 3d at 679-95.  Nor can statements from the President immunize S.B. 4 from judicial review.  The Supreme Court has been clear that the political question doctrine is a "narrow exception to" courts' presumptive exercise of jurisdiction. *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012).  Interpreting constitutional provisions is "well within the competence of the Judiciary."  *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458 (1992) (rejecting doctrine's application to interpretation of the apportionment provisions of the Constitution).  Likewise, "evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary."  *Texas*, 144 F.4th at 655 (discussing *Zivotofsky*).  Rejecting Texas's arguments thus represents a "familiar judicial exercise."  *Zivotofsky*, 566 U.S. at 196; *cf. id.* (by contrast, imposing "the courts' own unmoored determination" of policy would be barred).

## IV.    THE EQUITIES SUPPORT AN INJUNCTION.

Plaintiffs, who face arrest, prosecution, and removal under S.B. 4, have shown irreparable harm.  TRO Mot. 16-17.  In response, Defendant again claims that there is no evidence that Defendant will enforce S.B. 4 against Plaintiffs.  But as explained above, Defendant never disclaims enforcement, instead emphasizing that Texas state agencies "have worked  . . . to . . . enforce federal immigration laws" and that "[e]ven greater success can and likely will be achieved if S.B. 4 is allowed to go into effect and is fully implemented."  TRO Opp. 7.[6]  Defendant claims that no one "will be subject to removal from the United States pursuant to S.B. 4 for a substantial period of time."  *Id.* at 15.  But that is not true: The statute is designed to encourage or coerce supposedly voluntary acceptance of state deportation orders as soon as the beginning of the prosecution.  *Texas*, 2026 WL 1122127, at *67 (Richman, J., dissenting).

---

[6] Defendant claims that Plaintiffs fear enforcement by "local" officials, and he is not one.  But the Plaintiffs' declarations invoke fear of enforcement generally.  L.M.L. Decl. ¶ 8; K.G.S. Decl. ¶ 8.

Appx.0155

As Plaintiffs showed, TRO Mot. 17-18, and as this Court has already concluded, the balance of equities and public interest favor enjoining S.B. 4. *Texas*, 719 F. Supp. 3d at 698-99. Defendant invokes its general interest in "enforc[ing] its own laws," TRO Opp. 16, but "[a] state's '[f]rustration of federal statutes and prerogatives [is] not in the public interest.'" *Texas*, 719 F. Supp. 3d. at 698 (quoting *Alabama*, 691 F.3d at 1301). As to the supposed "harms to Texas associated with illegal immigration," TRO Opp. 16, the opportunities Congress provided to cooperate with the federal government "ameliorate[] [Defendant's] concern." *Iowa Migrant Movement for Just.*, 157 F.4th at 929. "Federal officials of course already enforce immigration law—and many [Texas] law-enforcement agencies have entered into agreements with the Department of Homeland Security that allow local police to enforce federal immigration law." *Fla. Immigrant Coal. v. Att'y Gen.*, No. 25-11469, 2025 WL 1625385, at *6 (11th Cir. June 6, 2025).

## V.    A TEMPORARY RESTRAINING ORDER IS WARRANTED.

Defendant claims that because the Complaint does not specifically request a TRO, it should be denied. TRO Opp. 8-9. The Complaint seeks "any other and further relief that this Court may deem fit and proper." Dkt. # 1 Prayer for Relief. And Defendant cites no authority for the proposition that a TRO must be specifically requested in the complaint. In any event, given that the documents were filed the same day, there can be no prejudice to Defendant from lack of notice.

Defendant also suggests that a TRO is not necessary. TRO Opp. 8-9. But he does not contest that, absent injunctive relief, S.B. 4 will go into effect on May 15.[7]

### CONCLUSION

The motion for a TRO and Preliminary Injunction should be granted.

---

[7] A stay pending appeal, TRO Opp. 17 n.13, should be denied.

Appx.0156

Dated: May 11, 2026

David A. Donatti (TX Bar No. 24097612)
Adriana C. Piñon (TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)**
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Kate Gibson Kumar
(TX Bar No. 24137588)
Daniel Woodward
(TX Bar No. 24138347)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
kate@texascivilrightsproject.org
danny@texascivilrightsproject.org

Dustin Rynders
Texas Bar No. 24048005
Texas Civil Rights Project
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

/s/ *Cody Wofsy*

Cody Wofsy
Spencer Amdur
Hannah Steinberg*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
samdur@aclu.org
hsteinberg@aclu.org

Kathryn Huddleston*** (TX Bar No. 24121679)
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
915 15th Street, NW, 7th Floor
Washington, DC 20005
T: (212) 549-2500
khuddleston@aclu.org

Omar Jadwat*
Lee Gelernt
Grace Choi*
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
ojadwat@aclu.org
lgelernt@aclu.org
gchoi@aclu.org

*Pro Hac Vice Application Forthcoming
** Admission to Western District of Texas Pending
*** Application for Admission to Western District of Texas Forthcoming; barred in Texas and Arizona, not barred in the District of Columbia, practice supervised by a member of the D.C. Bar

11

Appx.0157

**CERTIFICATE OF SERVICE**

I hereby certify that on May 11, 2026, I electronically filed the foregoing with the Clerk of Court by using the District Court CM/ECF system.  A true and correct copy of this document has been served via the Court's CM/ECF system on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy

12

Appx.0158

# TAB L: STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA

Appx.0159

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

L.M.L., on behalf of themselves and all those similarly situated,

        Plaintiffs,

  v.

FREEMAN F. MARTIN, in his official capacity as Director of the State of Texas Department of Public Safety,

        Defendant.

Case No. 1:26-cv-01170-DAE

**STATEMENT OF INTEREST OF THE UNITED STATES OF AMERICA**

Appx.0160

**TABLE OF CONTENTS**

INTEREST OF AMICUS CURIAE .......................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ............................................. 1

STATEMENT OF THE CASE.................................................................................. 4

     I.     The Federal Prohibition on Illegal Entry and Reentry.............................. 4

     II.     Senate Bill 4 ............................................................................................ 5

     III.     The Fifth Circuit Rejected The Prior Preemption Challenge to
     Senate Bill 4 ............................................................................................ 7

     IV.     Plaintiffs File This Lawsuit...................................................................... 7

ARGUMENT .......................................................................................................... 8

     I.     Senate Bill 4 is not field preempted. ....................................................... 9

     II.     Senate Bill 4 is not facially conflict preempted. ..................................... 13

CONCLUSION...................................................................................................... 18

Appx.0161

# TABLE OF AUTHORITIES

**Cases:**

*Arizona v. United States*,
   567 U.S. 387 (2012).................................................................. 10, 11, 13, 16, 17

*California v. Zook*,
   336 U.S. 725 (1949)................................................................................... 15

*Chamber of Com. of U.S. v. Whiting*,
   563 U.S. 582 (2011)................................................................................... 13

*DeCanas v. Bica*,
   424 U.S. 351 (1976)............................................................................... 9, 10

*Gamble v. United States*,
   587 U.S. 678 (2019)................................................................................... 14

*Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*,
   267 F.3d 1228 (11th Cir. 2001) .................................................................. 14

*Gilbert v. Minnesota*,
   254 U.S. 325 (1920)................................................................................... 14

*Hines v. Davidowitz*,
   312 U.S. 52 (1941).................................................................................... 10

*Kansas v. Garcia*,
   589 U.S. 191 (2020).................................................. 3, 4, 8, 9, 11, 12, 13, 14, 15, 17

*Las Americas Immigrant Advoc. Ctr. V. Martin, et al.*,
   No. 23-cv-1537 (W.D. Tex.)........................................................................ 7

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)............................................................................. 13, 17

*Nat'l Pork Producers Council v. Ross*,
   598 U.S. 356 (2023)................................................................................... 14

*Plyler v. Doe*,
   457 U.S. 202 (1982)................................................................................... 14

*Puerto Rico Dep't of Consumer Affs. v. Isla Petrol. Corp.*,
   485 U.S. 495 (1988)..................................................................................... 8

*R.J. Reynolds Tobacco Co. v. Durham Cnty.*,
   479 U.S. 130 (1986).................................................................................. 3, 9

Appx.0162

*United States v. Salerno*,
  481 U.S. 739 (1987) ........................................................................................ 13

*United States v. Texas*,
  144 F.4th 632 (5th Cir. 2025) ......................................... 7, 11, 12, 13, 14, 15, 16, 17

*United States v. Texas*,
  719 F. Supp. 3d 640 (W.D. Tex. 2024) .................................................................. 7

*United States v. Texas*,
  ---F.4th---, 2026 WL 1122127 (5th Cir. Apr. 24, 2026) ........................... 1, 2, 3, 5, 6, 7, 14, 16

*United States v. Texas, et al.*,
  No. 24-cv-00008 (W.D. Tex.) ............................................................................... 7

*Va. Uranium, Inc. v. Warren*,
  587 U.S. 761 (2019) ......................................................................... 3, 8, 12, 18

*Wash. State Grange v. Wash. State Republican Party*,
  552 U.S. 442 (2008) ............................................................................ 4, 13, 15, 16

*Wis. Dep't of Industry, Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986) ........................................................................................ 17

**Constitution:**

U.S. Const. art. VI, cl. 2 ...................................................................................... 8

**Statutes:**

8 U.S.C. § 1302 ................................................................................................ 10

8 U.S.C. § 1303(a) ............................................................................................ 10

8 U.S.C. § 1304 ................................................................................................ 10

8 U.S.C. § 1305 ................................................................................................ 10

8 U.S.C. § 1306 ................................................................................................ 10

8 U.S.C. § 1325 ................................................................................................ 12

8 U.S.C. § 1325(a) ..................................................................................... 2, 3, 4, 9

8 U.S.C. § 1325(b) .............................................................................................. 4

8 U.S.C. § 1325(c) ........................................................................................... 4, 9

8 U.S.C. § 1325(d) .............................................................................................. 4

iii

Appx.0163

8 U.S.C. § 1326(a) .................................................................................... 2, 3, 5, 16

8 U.S.C. § 1326(c) .......................................................................................... 5

8 U.S.C. § 1357(g)(10) ................................................................................... 14

Tex. Code Crim. Proc. art. 5B.002(d) .......................................................... 6, 8

Tex. Code Crim. Proc. art. 5B.003 .............................................................. 6, 16

Tex. Penal Code § 51.02 ............................................................................. 5, 8

Tex. Penal Code § 51.02(a) ............................................................................. 5

Tex. Penal Code § 51.02(b) ............................................................................. 6

Tex. Penal Code § 51.02(c) ............................................................................. 6

Tex. Penal Code § 51.03 ........................................................................... 5, 6, 8

Tex. Penal Code § 51.03(b) ............................................................................. 6

Tex. Penal Code § 51.04 ............................................................................. 7, 8

**Other Authority:**

Proclamation 10888, 90. Fed. Reg. 8333 .................................................... 1, 2

iv

Appx.0164

**INTEREST OF AMICUS CURIAE**

The United States is responsible for the enforcement of the Nation's immigration laws. Accordingly, the United States has an interest in ensuring that the doctrines of preemption are applied in a manner that preserves the federal government's primacy over the areas that are within its constitutional authority, including immigration, while preserving the ability of States to adopt complementary legislation that advances the federal policy. The United States submits this brief in support of Senate Bill 4.

**INTRODUCTION AND SUMMARY OF ARGUMENT**

"This case concerns whether the State of Texas, exercising its historic, sovereign police powers, can legislatively protect its citizens from a surge of illegal aliens in response to an unprecedented border crisis and a declared invasion." *United States v. Texas*, ---F.4th---, 2026 WL 1122127, at *1 (5th Cir. Apr. 24, 2026) ("*Texas II*"). That "invasion" inflicted a "jarring … human toll":

> More than 6 million illegal aliens, from over 100 countries, flooded Texas's international border during approximately 2021-2023. In one year alone, about 2.5 million unlawfully crossed, well over 100,000 of whom were unaccompanied minors. And in a three-year period, Border Patrol agents arrested over 15,000 illegal aliens with criminal convictions, apprehended roughly 2,000 gang members, and encountered, at the border, 336 persons on the terrorist watchlist. There, violent transnational cartels became paramilitary forces, whose illicit conduct ranged from pumping "illegal drugs like fentanyl" into the United States to "trafficking humans," all to the tune of billions of dollars.

*Id*.

Upon taking office, the current Presidential Administration took swift and decisive action to redress the invasion at the southwest border. The same day he took office, President Trump issued Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025). As the Proclamation explained, over the last four years, "at least 8 million illegal aliens were encountered along the southern border of the United States, and countless

millions more evaded detection and illegally entered the United States." *Id.* at 8334.  The "sheer number of aliens entering" the country had "overwhelmed the system," leaving "millions of aliens who potentially pose significant threats to health, safety, and national security" throughout the nation.  *Id.* at 8333, 8334.  In addition, the Proclamation recognized that the "current state of the southern border reveal[ed] that the Federal Government ha[d] failed in fulfilling this obligation" to "protect each of the States against Invasion." *Id*. at 8334.  That failure and the "influx of illegal aliens across the southern border" had severely burdened states, including Texas. *Id*.  In particular, states had "collectively spent billions of dollars in providing medical care and related human services" and "spent considerable amounts on increased law enforcement costs associated with the presence of these illegal aliens within their boundaries." *Id*.

Faced with this crisis, the Proclamation "declare[d] that an invasion is ongoing at the southern border," 90 Fed. Reg. at 8334, and took immediate action to secure the border.  Specifically, the Proclamation suspended the entry into the United States of aliens participating in the invasion, and ordered that those who enter in violation of that bar are restricted from accessing provisions of the INA that would permit their continued presence in the United States, including asylum or withholding of removal.  *Id*. at 8334–35.

Prior to January 20, 2025, however, Texas was left to fend for itself, and so it enacted Senate Bill 4 as an exercise of its "historic, sovereign police powers" to "legislatively protect its citizens." *Texas II*, 2026 WL 1122127, at *1.  That law makes it a state crime for an alien to enter, attempt to enter, or be found in Texas after having entered or reentered the United States in violation of the federal Immigration and Nationality Act's (INA) prohibitions on illegal entry and reentry.  *See* 8 U.S.C. §§ 1325(a), 1326(a).  Senate Bill 4 thus complements existing federal

Appx.0166

immigration law by punishing those within, or that come within, Texas's regulatory reach who entered or reentered the country in violation of United States immigration law.

Plaintiffs are two aliens who entered and then re-entered the United States in violation of 8 U.S.C. §§ 1325(a) and 1326(a). Although Senate Bill 4 mirrors the federal prohibitions on illegal entry and reentry, Plaintiffs filed this lawsuit and moved for a temporary restraining order and preliminary injunction to enjoin Senate Bill 4 in *all* its applications on the theory that it is preempted by the federal prohibitions—both as a matter of field preemption and conflict preemption. This Court should deny their pending motion for a temporary restraining order and preliminary injunction.

The Supreme Court has made clear that field preemption arises only in the "rare case[]" where "Congress [has] 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). The federal provisions prohibiting unlawful entry and reentry do not meet that high standard. Ultimately, Senate Bill 4 imposes state-law penalties on those who have entered or reentered the United States in violation of existing federal immigration law. The INA's prohibitions on unauthorized entry and reentry do not foreclose that kind of complementary state legislation and a "brooding federal interest" in the treatment of illegal aliens has no preemptive effect. *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion).

Senate Bill 4 also is not conflict preempted. The Texas statute's prohibitions are largely identical to the federal entry and reentry provisions. As the *en banc* Fifth Circuit recognized, the Texas law's prohibitions on entry and reentry "track[] federal law." *Texas II*, 2026 WL 1122127, at *2. And they *advance* the purposes of federal immigration law. No different from a state

3

Appx.0167

criminal law that borrows from a federal statute to punish the same wrongdoing, Texas's statute

merely adds a state-level punishment for what federal law already proscribes, with respect to

conduct (illegal immigration) that Congress wishes to prevent in full.  Plaintiffs argue that this

supplement to federal law is preempted on the ground that it entrenches on the federal

government's enforcement discretion.  But the mere "possibility that federal enforcement priorities

might be upset is not enough to provide a basis for preemption."  *Kansas*, 589 U.S. at 212.  At a

minimum, Senate Bill 4 does not conflict with federal law "in *all* of its applications," *Wash. State

Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008), which is enough to deny

Plaintiffs' current effort to *facially* enjoin Senate Bill 4.

## STATEMENT OF THE CASE

### I.      The Federal Prohibition on Illegal Entry and Reentry

The Immigration and Nationality Act ("INA") prohibits aliens from unlawfully entering or

reentering the United States.  As to unlawful entry, the INA contains a straightforward provision

that creates a criminal offense applicable to

> [a]ny alien who (1) enters or attempts to enter the United States at any time or place
> other than as designated by immigration officers, or (2) eludes examination or
> inspection by immigration officers, or (3) attempts to enter or obtains entry to the
> United States by a willfully false or misleading representation or the willful
> concealment of a material fact.

8 U.S.C. § 1325(a).  An initial violation of this section is punishable by a fine or imprisonment up

to 6 months (or both), and a subsequent violation may result in a fine and imprisonment for a term

of "not more than 2 years."  *Id*.  Separate civil penalties may be imposed.  *Id*. § 1325(b).[1]

---

[1] Section 1325 contains provisions unrelated to unlawful entry, which prohibit entering into a
marriage or commercial enterprise to "evad[e] any provision of the immigration laws."  8 U.S.C.
§ 1325(c)–(d).

Appx.0168

The INA also prohibits unlawful reentry.  Specifically, it imposes criminal liability on an alien who has "been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter … enters, attempts to enter, or is at any time found in, the United States."  8 U.S.C. § 1326(a).  A violation is punishable by a fine and "not more than 2 years" in prison (or both).  *Id*.  However, a violation does not occur if either:

> (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act.

*Id*. § 1326(a)(2).  The INA imposes a series of escalating sentences of incarceration for violators with prior convictions for certain offenses, *id*. § 1326(b)(1)–(2), or those who were previously removed or excluded from the United States under certain authorities, *id*. § 1326(b)(3)–(4). Finally, an alien who was removed prior to the completion of a term of imprisonment and reenters the country must be "incarcerated for the remainder of the sentence of imprisonment."  *Id*. § 1326(c).

## II.     Senate Bill 4

Governor Abbott signed Senate Bill 4 into law in November 2023.  That law creates two new criminal offenses under Texas law that track federal law's prohibitions on unlawful entry and reentry.  *See* Tex. Penal Code §§ 51.02–51.03.

**A.**     As to unlawful entry, the Texas law provides that an "alien commits an offense" if the alien "enters or attempts to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry."  Tex. Penal Code § 51.02(a).  "This language tracks federal law." *Texas II*, 2026 WL 1122127, at *2.  Further, "[t]he statute includes affirmative defenses to

5

prosecution, all of which defer to federal determinations of admissibility." *Id*.; *see* Tex. Penal Code § 51.02(c).

A violation of the unlawful entry prohibition is a misdemeanor, but "is a state jail felony if it is shown on the trial of the offense that the defendant has been previously convicted of an offense under this section." Tex. Penal Code § 51.02(b). Further, Senate Bill 4 provides that "[a] court may not abate the prosecution of an offense … on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

**B.** Senate Bill 4 also reinforces the federal prohibition on illegal reentry of unauthorized aliens. *See* Tex. Penal Code § 51.03. It provides that an "alien commits an offense if the person enters, attempts to enter, or is at any time found in [Texas] after the person: (1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding." *Id*. § 51.03(a). "This language also tracks federal law." *Texas II*, 2026 WL 1122127, at *2.

This offense is a misdemeanor but may be charged as a felony if the alien's prior exclusion or removal was due to certain offenses or pursuant to certain authorities. *Id*. § 51.03(b). As with the entry provision, "[a] court may not abate the prosecution of an offense … on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code Crim. Proc. art. 5B.003.

**C.** Separately, Senate Bill 4 provides that upon conviction for violation of either the entry or reentry provisions, the state judge "shall enter … an order requiring the person to return to the foreign nation from which the person entered or attempted to enter." Tex. Code Crim. Proc.

6

art. 5B.002(d).  Refusal to comply with such an order is a felony.  Tex. Penal Code § 51.04.  "State officials have consistently represented that they will coordinate with federal immigration authorities if aliens have return orders or pending asylum applications."  *Texas II*, 2026 WL 1122127, at *2.

### III.    The Fifth Circuit Rejected The Prior Preemption Challenge to Senate Bill 4

This is not the first lawsuit challenging Senate Bill 4 as preempted.  Previously, two non-profit organizations and El Paso County filed a lawsuit in federal district court alleging that Senate Bill 4 is both field and conflict preempted.  *Las Americas Immigrant Advoc. Ctr. v. Martin, et al.*, No. 23-cv-1537 (W.D. Tex.).  The United States under the prior administration also brought suit. *United States v. Texas, et al.*, No. 24-cv-00008 (W.D. Tex.).  The district court granted the United States' and the other plaintiffs' motions for preliminary injunctions.  *United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024).

Defendants appealed.  In March 2025, the United States voluntarily dismissed its lawsuit, which mooted its appeal of the preliminary injunction.  Subsequently, a panel of the Fifth Circuit affirmed the preliminary injunction for the non-profit plaintiffs.  *United States v. Texas*, 144 F.4th 632 (5th Cir. 2025) ("*Texas I*").  The panel held that one of the non-profit organizations—Las Americas—had organizational standing, and that Senate Bill 4 is facially invalid as a matter of both field and conflict preemption.

The Fifth Circuit granted rehearing *en banc* and vacated the preliminary injunction, holding that no plaintiff had Article III standing.  *Texas II*, 2026 WL 1122127, at *3–6.

### IV.    Plaintiffs File This Lawsuit

Plaintiffs L.M.L. and K.G.S. are two aliens who previously entered the United States in violation of § 1325(a), were either deported or issued a deportation order, and then re-entered the

7

Appx.0171

United States in violation of § 1326(a). Compl. ¶¶ 8–9.  L.M.L. became a lawful permanent resident in 2023, after having re-entered the country unlawfully in 2006.

Plaintiffs allege that Senate Bill 4 is facially preempted and request an injunction of the law's provisions (a) prohibiting illegal re-entry (Tex. Penal Code § 51.03), (b) authorizing state judges to order aliens to depart from the United States (Tex. Code Crim. Proc. art. 5B.002(d)); and (c) making it a felony to refuse to comply with such an order (Tex. Penal Code § 51.04).  Compl. ¶¶ 53–56 & Prayer for Relief.  Plaintiffs do not request an injunction against Senate Bill 4's prohibition on illegal entry (Tex. Penal Code § 51.02).  *See id*. at 12; *see also* Pls.' Mem. 18.[2]

## ARGUMENT

The Supremacy Clause provides that the Constitution, federal statutes, and treaties constitute "the supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Its command is simple: if a state law and federal law conflict, the federal law wins.  *See Kansas v. Garcia*, 589 U.S. 191, 202 (2020).  Although Congress may preempt state laws by express statutory language, that intent may also be inferred.  *Id*. at 203.  "In all cases," however, "the federal restrictions or rights that are said to conflict with state law must stem from either the Constitution itself or a valid statute enacted by Congress."  *Id*. at 202.  "There is no federal preemption *in vacuo*," *id*. (quoting *Puerto Rico Dep't of Consumer Affs. v. Isla Petrol. Corp.*, 485 U.S. 495, 503 (1988)), and "[i]nvoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law."  *Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion).  Rather, "a litigant must point specifically to 'a constitutional text or a federal statute'

---

[2] Plaintiffs have separately moved for provisional certification of the following class: "All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding."  Compl. ¶ 46.

Appx.0172

that does the displacing or conflicts with state law." *Id*.; *see also Kansas*, 589 U.S. at 208 (implied preemption "must be grounded 'in the text and structure of the statute at issue'").

Plaintiffs do not argue that the INA expressly preempts Senate Bill 4. Rather, they argue that Senate Bill 4's re-entry provision is preempted under two theories of implied preemption: (1) field preemption, and (2) conflict preemption. They are wrong on both scores.[3]

## I.   Senate Bill 4 is not field preempted.

Senate Bill 4 is not field preempted. That theory of preemption applies only in the "rare case[]" where "Congress [has] 'legislated so comprehensively' in a particular field that it 'left no room for supplementary state legislation.'" *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co. v. Durham Cnty.*, 479 U.S. 130, 140 (1986)). "Only a demonstration that complete ouster of state power[,] including state power to promulgate laws not in conflict with federal laws[,] was the clear and manifest purpose of Congress" will justify a finding of field preemption. *DeCanas v. Bica*, 424 U.S. 351, 357 (1976) (quotation marks omitted).

**A.**   The regulation of those unlawfully present in the United States is not one of those rare areas in which Congress intended to occupy the field to the exclusion of state legislation (like Senate Bill 4) that supplements and reinforces federal law. The federal prohibition on reentry is contained in a single statutory subsection—indeed, in a single *sentence* in a single subsection. *See* 8 U.S.C. §§ 1325(a), 1326(a). Its prohibitions are not complex; nor does the provision contain carefully crafted exceptions. *See id.* Such general prohibitions are not the kind of "comprehensive[]" regulatory scheme, *Kansas*, 589 U.S. at 208 (quoting *R.J. Reynolds Tobacco Co.*, 479 U.S. at 140), sufficient to evince a "clear and manifest purpose" by Congress to effect a

---

[3] The United States does not address here the portions of Senate Bill 4 that provide for judicial orders requiring illegal aliens who violate its entry/reentry prohibitions to leave the United States.

Appx.0173

"complete ouster" of complementary state law, *DeCanas*, 424 U.S. at 357 (quotation marks omitted). If they were, then virtually any federal prohibition would give rise to field preemption, and the Supreme Court's directive that field preemption may be found only in the "rare case[]" would be an empty promise.

**B.** The Supreme Court's decision in *Arizona v. United States*, 567 U.S. 387 (2012), does not support field preemption here. There, the Court applied its decades-old precedent in *Hines v. Davidowitz*, 312 U.S. 52 (1941), to an Arizona law that "add[ed] a state-law penalty" for failing to comply with the INA's registration requirement. *Arizona*, 567 U.S. at 400. Following that longstanding precedent, the Court held that the Arizona registration scheme was field preempted. In addition to the registration requirement itself, *see* 8 U.S.C. § 1302, the INA's registration provisions: (1) authorize the Attorney General to "prescribe special regulations and forms" to govern the registration of fingerprinting of aliens holding certain professions, *id*. § 1303(a); (2) specify items that must be included in those forms, provide for the confidentiality of registration forms and fingerprints, impose an oath requirement, provide for the issuance of a "certificate of alien registration" for aliens successfully registered, and require that the card be carried "at all times," *id*. § 1304; (3) govern notification of a change of address, *id*. § 1305; and (4) impose penalties for the failure to comply with the registration requirements and other offenses, *id*. § 1306. Consistent with *Hines*, the Supreme Court concluded that these multiple interlocking provisions "provide a full set of standards governing alien registration" that "occup[y] the field of alien registration," such that "even complementary state regulation is impermissible." *Arizona*, 567 U.S. at 401. The INA's alien registration provisions are far more complex and comprehensive than the straightforward reentry provision.

Appx.0174

**C.**    None of the reasons offered by Plaintiffs alter this conclusion.  Plaintiffs argue that Senate Bill 4 is field preempted on the theory that the federal government has an "unquestionably dominant" interest in regulating entry and removal" and that Congress has enacted a "highly 'pervasive'" scheme regulating entry and removal.  Pl. Mem. 6, 8.  That conception of field preemption is far too expansive.  "There is no field preemption of all immigration law.  If there were, *Arizona* … would have been far easier." *Texas I*, 144 F.4th at 724 (Oldham, J., dissenting).  The Court would have simply declared the entire field of immigration preempted and invalidated the Arizona law on that basis.  It did not.  Instead, the Court analyzed the *specific* "field of alien registration" and determined that "[t]he federal statutory directives provide a full set of standards governing alien registration." *Arizona*, 567 U.S. at 401.

Plaintiffs' definition of the field is thus inconsistent with *Arizona*.  It is also incompatible with the Court's analysis in *Kansas*—which Plaintiffs do not bother to cite.  There, the Court held that a Kansas law making it a crime to commit identify theft was not field preempted as-applied to aliens.  589 U.S. at 195, 208–10.  In conducting the field preemption analysis, the Court recognized that it must "first identify the field" in which the law operates and then analyzed a narrowly defined "field relating to the federal employment verification system." *Id*. at 208.   Plaintiffs approach cannot be squared with the Court's tailored definitions of the fields in *Arizona* and *Kansas*.  Even the now-vacated Fifth Circuit panel majority acknowledged that "the relevant field should be defined narrowly." *Texas I*, 144 F.4th at 667; *see also id*. at 724 (Oldham, J., dissenting) ("Courts must 'narrowly' define the relevant field.").

Here, the field of regulating those who have unlawfully reentered the United States is a distinct subset of the INA's numerous subjects of regulation—like that of alien registration—and it must be evaluated on its own for purposes of the field preemption analysis.  Plaintiffs do not

11

purport to explain how the regulation of unlawful reentry in § 1326(a) is sufficiently comprehensive to trigger field preemption.  They instead argue that "*the immigration statutes*" generally are "comprehensive," while giving § 1326(a) only passing attention in the context of listing numerous *other* statutes that address issues *other* than unlawful entry or reentry.  Pls.' Mem. 8, 9 (citing 8 U.S.C. §§ 1325, 1326, 1323, 1324, 1327, 1328, and 1329).  The now-vacated Fifth Circuit panel decision committed the same fundamental error.  It observed that "[t]he Act makes it unlawful for any alien to enter the United States" and "punishes any alien who unlawfully reenters or remains in the United States."  *Texas I*, 144 F.4th at 669.  But rather than explain how § 1326 itself is sufficiently comprehensive to trigger field preemption, the panel expanded the scope of its analysis to cover the "comprehensive framework" of the INA more broadly.  *Id*. at 668–69.  But again, if the INA's overall comprehensiveness were sufficient for field preemption, then the Supreme Court's focused analysis on the field of alien registration would have been entirely unnecessary.

Separately, Plaintiffs reason that Senate Bill 4's regulation of unlawful reentry is field preempted because the regulation of immigration generally is a federal prerogative and implicates key federal interests.  Pls.' Mem. 6–7.  Implied preemption "must be grounded 'in the text and structure of the statute at issue,'" *Kansas*, 589 U.S. at 208; a "brooding federal interest" is "never … enough to win preemption of a state law." *Va. Uranium, Inc.*, 587 U.S. at 767 (plurality opinion).  Again, if the federal government's "dominant" (Pls.' Mem. 6) interest in immigration or the mere invocation of key federal interests sufficed for field preemption then *Arizona* would have been written differently (and been much shorter).

Appx.0176

## II.    Senate Bill 4 is not facially conflict preempted.

Senate Bill 4 also is not facially unconstitutional as a matter of conflict preemption.  A state law may "conflict with federal law" when "compliance with both federal and state regulations is a physical impossibility," or—in limited circumstances—"where the challenged state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (quotation marks omitted).  As with field preemption, conflict preemption "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" as "such an endeavor would undercut the principle that it is Congress rather than the courts that pre-empts state law." *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (quotation marks omitted).

There is no dispute that it is "possible" for Plaintiffs "to comply" with both federal law and Senate Bill 4.  *Kansas*, 589 U.S. at 210–11.  Even so, Plaintiffs argue that Senate Bill 4 is preempted because it conflicts with federal immigration enforcement priorities.  *See* Pls.' Mem. 10-15.  That is wrong.  And at a minimum, Senate Bill 4 does not conflict with federal law *on its face*—such that "no set of circumstances exists under which the Act would be valid'" and the law is "unconstitutional in all of its applications." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 723 (2024) (reaffirming "no set of circumstances" standard for all non-First Amendment cases). "If there is even *one* hypothetical constitutional application of [Senate Bill 4], a facial challenge fails." *Texas I*, 144 F.4th at 725 (Oldham, J., dissenting).

**A.**    Senate Bill 4 does not conflict with the federal reentry statute.  The Texas law's reentry prohibition does not authorize any conduct forbidden by federal law, but instead uses

Appx.0177

language borrowed nearly verbatim from the INA to prohibit conduct that parallels conduct prohibited by the INA. *Supra*, p. 6. Texas's law is in harmony, not conflict, with federal law. As the Fifth Circuit's *en banc* opinion recognized, Senate Bill 4's reentry prohibition "tracks federal law." *Texas II*, 2026 WL 1122127, at \*2; *see also Texas I*, 144 F.4th at 726 (Oldham, J., dissenting) ("[Senate Bill 4] shares th[e] exact same purpose" as the INA "[a]nd does so by expressly tethering itself to federal law"); *accord* 8 U.S.C. § 1357(g)(10) (authorizing states to "cooperate with the Attorney General" in immigration enforcement).[4]

The mere fact that Senate Bill 4 "overlap[s]" with federal law "does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211–12; *see also id.* at 212 (mere "overlap" between federal and state law provides "no basis for inferring" a preemptive conflict). States generally are free to criminalize conduct also proscribed by Congress, and to attach additional penalties to those offenses. No one would doubt that states may adopt the elements of a federal criminal offense as their own and attach additional penalties for violations—a prohibition on felons possessing firearms, for example. *Cf. Gamble v. United States*, 587 U.S. 678 (2019). Laws targeting illegal immigration are no exception. The Supreme Court has said so explicitly: "Despite the exclusive federal control of this Nation's borders, we cannot conclude that the States are without any power to deter the influx of persons entering the United States against federal law, and whose numbers might have a discernible impact on traditional state concerns." *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982); *accord Gilbert v. Minnesota*, 254 U.S. 325, 331 (1920) ("[T]he

---

[4] It is true that Senate Bill 4 differs from federal law in that it is triggered when an unauthorized alien enters Texas, whereas federal law prohibits unauthorized entry into the United States broadly. That in-state nexus is merely a reflection of the Constitution's limits on a state's ability to regulate outside the state's borders. *See, e.g.*, *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 n.1 (2023); *Gerling Glob. Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236 (11th Cir. 2001). Senate Bill 4 merely punishes persons within its jurisdiction who are unlawfully present under federal law because they illegally entered or reentered the country.

14

Appx.0178

state is not inhibited from making the national purposes its own purposes, to the extent of exerting its police power to prevent its own citizens from obstructing the accomplishment of such purposes." (quotation marks omitted)); *California v. Zook*, 336 U.S. 725, 735 (1949) ("[T]here is no conflict in terms, and no possibility of such conflict, [if] the state statute makes federal law its own….").

**B.**     Plaintiffs fail to identify any conflict between the conduct proscribed by Senate Bill 4 and that prohibited by the INA that justifies a *facial* injunction.  They first argue that Senate Bill 4 is conflict preempted because it "eliminat[es] federal immigration discretion."  Pls.' Mem. 10–12.  That line of reasoning is foreclosed by *Kansas*: "[T]he possibility that federal enforcement priorities might be upset is not enough to provide a basis for preemption."  589 U.S. at 212.  As Judge Oldham noted, "it is not enough [for conflict preemption] that the INA grants extensive enforcement discretion to the Executive Branch."  *Texas I*, 144 F.4th at 727 (Oldham, J., dissenting).  Only federal *law* has preemptive effect—"the criminal law enforcement priorities or preferences of federal officers" do not.  *Kansas*, 589 U.S. at 212.[5]  Even were it otherwise, here the enforcement priorities of the United States and Texas now align—both favor maximum enforcement of the immigration laws to deter illegal immigration.  And even if some disagreement in priorities were to later arise in a particular case or context, that still would not render Senate Bill 4 in conflict with federal enforcement priorities "in *all* of its applications."  *Wash. State Grange*, 552 U.S. at 449 (emphasis added).

---

[5] A different case would be presented if a state sought to regulate on a subject where the federal agency with statutory authority over that subject had exercised its discretion not to promulgate regulations (or had adopted regulations different than the state law).  In that context, conflict preemption may apply.  It does not follow, however, that preemption follows simply because a complementary state law may be in tension with the existing administration's preferred level of enforcement (or non-enforcement).  *See Kansas*, 589 U.S. at 212.

Appx.0179

Plaintiffs also argue that Senate Bill 4 "blatantly overrides federal decisions about who can reenter … the United States."  Pls.' Mem. 12.  In particular, Plaintiffs say Senate Bill 4 conflicts with § 1326(a)'s allowance for reentry if "the Attorney General has expressly consented to such alien's reapplying for admission."  8 U.S.C. § 1326(a)(2)(A); *see* Pls.' Mem. 12.  That is not a proper basis for a *facial* injunction.  After all, "[b]ecause this case arrives as a pre-enforcement challenge, no state court has interpreted" the reentry provision.  *Texas II*, 2026 WL 1122127, at *2 n.8.  "The pre-enforcement challenge comes at a cost: Since '[t]here is a basic uncertainty about what the law means and how it will be enforced ... it would be inappropriate to assume [S.B. 4] will be construed in a way that creates conflict with federal law.'"  *Id*. (quoting *Arizona*, 567 U.S. at 415).  Regardless, any potential conflict between Senate Bill 4 and an exception to § 1326(a) is not a basis for enjoining the Texas law's reentry prohibition "in *all* of its applications."  *Wash. State Grange*, 552 U.S. at 449 (emphasis added).  An alien may be able to bring a successful *as-applied* challenge to the extent his case turns on "exceptions for reentry" in the federal reentry provision, *id.*, but identifying "one possible unconstitutional application here, and another there" falls far short of satisfying the demanding standard for facial invalidity.  *Texas I*, 144 F.4th at 726 (Oldham, J., dissenting).  That is especially true here, as Plaintiffs have not alleged that the "Attorney General … expressly consent to" either of their reentries.  Compl. ¶¶ 8–9.

The same flaw underlies Plaintiffs objections to Senate Bill 4's prohibition on state courts "abat[ing] the prosecution" of an alien on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated."  Tex. Code Crim. Proc. art. 5B.003; *see* Pls.' Mem. 13.  To the extent Senate Bill 4 would seek to punish an alien who is pursuing legal status under the federal immigration laws (*e.g.*, asylum), that alien could bring an as-applied challenge to that enforcement action.  But the mere possibility of some conflict is not

16

sufficient to render Senate Bill 4 *facially* in conflict with federal law, such that there are "*no* set of circumstances under which the law would be valid." *Moody*, 603 U.S. at 723 (quotation marks omitted, emphasis added, and alternation omitted).

Nor does conflict preemption arise because penalties under Senate Bill 4 exceed those under federal law. *See Texas I*, 144 F.4th at 681. Although the Supreme Court has recognized that in some contexts, "[c]onflict is imminent whenever two separate remedies are brought to bear on the same activity," *Arizona*, 567 U.S. at 403 (quoting *Wis. Dep't of Industry, Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986)), the Supreme Court did not, through that language, undermine the general rule that parallel federal and state enforcement are permissible. Rather, the Court in *Arizona* thought that the differing penalties "underscore[d] the reason *for field preemption*," after having concluded that the INA established a "comprehensive scheme" to govern the field of alien registration. 567 U.S. at 400–03 (emphasis added). Where, as here, there is no "careful framework" governing illegal entry and reentry, *id*. at 402—and thus no field preemption, *supra*, pp. 9–12—a mere difference in penalties between Senate Bill 4 and the federal entry and reentry provisions (Sections 1325(a) 1326(a)) does not support conflict preemption. Indeed, far from *conflicting* with the INA's objectives, state-level penalties like those in Senate Bill 4 *advance* those objectives, further combatting and disincentivizing the very conduct that Congress has sought to eliminate in full.

Finally, Plaintiffs object that Senate Bill 4 "injects Texas directly into sensitive foreign policy matters reserved exclusively for the federal government." Pls.' Mem. 14. That is not a basis for conflict preemption. After all, any application of criminal law to illegal aliens may affect "sensitive foreign policy matters" (Pls.' Mem. 14), but "implied preemption "must be grounded 'in the text and structure of the statute at issue.'" *Kansas*, 589 U.S. at 208; a "brooding federal

17

Appx.0181

interest" is "never … enough to win preemption of a state law." *Va. Uranium, Inc.*, 587 U.S. at 767 (plurality opinion).

## CONCLUSION

The Court should deny Plaintiffs' motion for a temporary restraining order and preliminary injunction.

Dated: May 11, 2026                                    Respectfully submitted,

                                                       BRETT A. SHUMATE
                                                         *Assistant Attorney General*

                                                       BENJAMIN HAYES
                                                         *Senior Counsel to the Assistant Attorney*
                                                         *General*

                                                        *s/ Jessica R. Lesnau*
                                                       JESSICA R. LESNAU
                                                         *Attorney, TX Bar No. 24099380*
                                                         *Office of Immigration Litigation*
                                                         *Civil Division, U.S. Department of Justice*
                                                         *P.O. Box 878 Ben Franklin Station*
                                                         *Washington, DC 20044*
                                                         *(202) 616-9346*
                                                         *Jessica.r.lesnau@usdoj.gov*

                                                         *Attorneys for the United States*

18

Appx.0182

# TAB M: PRELIMINARY INJUNCTION DECISION AND ORDER

Appx.0183

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

L.M.L & K.G.S, on behalf of themselves §        No. 1:26-CV-01170-DAE
and all those similarly situated,               §
                                                §
               Plaintiffs,                      §
                                                §
                                                §
vs.                                             §
                                                §
                                                §
FREEMAN F. MARTIN in his official              §
capacity as Director of the State of Texas §
Department of Public Safety,                   §
                                                §
               Defendant.                       §
_____                §

ORDER

Before the Court is Plaintiffs L.M.L and K.G.S.'s ("Plaintiffs")

Motion for Temporary Restraining Order and Preliminary Injunction, filed May 4,

2026. (Dkt. # 3.) Also before the Court are Plaintiff's Motion to Certify Class,

(Dkt. # 5), and Defendant Freeman F. Martin's Motions to Strike, (Dkt. # 16),

Motion to Dismiss, (Dkt. # 25), and Motion to Continue Hearing on Class

Certification, (Dkt. # 30). The Court held a hearing on the motions on May 13,

2026. Having considered the parties' briefing and relevant law, the Court will

preliminarily enjoin Defendant from enforcing certain provisions of SB 4.

Specifically, Defendant is enjoined from enforcing Texas Penal Code §§ 51.03 and

1

Appx.0184

51.04, and Texas Code of Criminal Procedure articles 5B.002 and 5B.003 on behalf of the named Plaintiffs and the provisional class.

BACKGROUND

This case concerns a law passed by Texas that makes it a crime under state law for a noncitizen to commit certain immigration offenses.  Senate Bill 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)) ("SB 4").  The Court will first describe the Parties and SB 4 before turning to the appellate history of this law, then to the merits of the case.

## I.    **The Parties**

Plaintiffs filed suit on behalf of themselves and all those similarly situated on May 4, 2026, to enjoin certain provisions of SB 4 on preemption grounds.  (Dkt. # 1.)  Both named Plaintiffs are noncitizens residing in Austin, Texas, and they wish to proceed anonymously for fear of retaliation by law enforcement that could lead to their arrest, deportation, and family separation.  (Dkt. # 9 at 3.)  Plaintiffs also cite fears about stigma and harassment given the heightened political atmosphere surrounding immigration enforcement.  (Id. at 2–3.)

Plaintiff L.M.L. is a 56-year-old lawful permanent resident and citizen of Honduras.  (Dkt. # 1 at 3.)  His first entry to the United States was in 1997, and he was deported after spending one month in immigration detention.  (Id.; Dkt. # 3-

2

Appx.0185

1 at 1.)[1]  He re-entered the United States without inspection in 2006.  (Dkt. # 3 at 3.)  He has thus lived in the United States for twenty years, and now has a lawful permanent resident wife, a 21-year-old lawful permanent resident daughter, and an 11-year-old United States citizen son.  (Id.)  In 2023, his application to become a lawful permanent resident was approved, and he currently holds lawful permanent resident status.  (Id.)

Plaintiff K.G.S. is a 29-year-old citizen of Honduras.  (Id.)  K.G.S. entered without inspection as a minor in 2014.  (Id.)  She voluntarily left the United States in 2015.  (Dkt. # 3-2 at 1.)  After leaving the country, a deportation order was issued against her for failure to appear at an immigration hearing.  (Id.)  She re-entered the United States in 2021 and has now lived here for approximately five years.  (Id.)  She has two children—one of whom is a United States citizen— ages seven and three.  (Id.)  Her seven-year-old child has a special immigrant juvenile visa. (Dkt. # 3-2 at 1.)  Approximately one year ago, K.G.S. received a prima facie approval on her petition for a U-Visa which she received as a result of domestic violence.  (Id. at 2; Dkt. # 36 at 6 n.1.)

---

[1] The Court has considered Defendant's Motion to Strike the declarations accompanying Plaintiffs' Motion for Preliminary Injunction but finds it should be **DENIED**.  (Dkt. # 16.)  Defendant's contentions that the declarations were improperly authenticated because they were translated is not persuasive, especially in light of Defendant's recent deposition of both Plaintiffs to test the assertions in their declarations against their own testimony.  Upon review of the deposition transcripts, the Court finds Defendant's Motion to be without merit.

Appx.0186

Both plaintiffs are the primary breadwinners and caretakers for their families.  (Dkt. # 3 at 3.)  They justifiably fear they will be arrested, detained, and deported under S.B. 4's reentry provision, and have attached affidavits to that effect.  (Id.; Dkt. ## 3-1, 3-2.)[2]

L.M.L. and K.G.S. sue one defendant: Freeman F. Martin, in his official capacity as the Director of the Texas Department of Public Safety ("DPS").  (Dkt. # 1 at 4.)  He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has cited plans for DPS's enforcement of SB 4.  (Id.) (citing Tex. Gov't Code § 411.006(a)(1)–(2)).

## II.   SB 4[3]

At a broad level, SB 4 criminalizes at the state level unauthorized

_____

[2] As the many thousands of Habeas Corpus Petitions filed by undocumented immigrants within the borders of the Fifth Circuit attest, the government has been aggressively arresting and detaining immigrants with a significant number of these arrests having been made with the assistance of state and local law enforcement.
[3] Many of the issues presented by this case overlap substantially with those considered in depth in this Court's prior decision granting a preliminary injunction in United States v. Texas, 719 F. Supp. 3d 640 (W.D. Tex. 2024).  Because the Fifth Circuit's recent en banc decision considering this order was clearly limited to the standing of the organizational plaintiffs who sued in that case, the merits of this Court's prior order remain untouched.  See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc) ("Because the Plaintiffs that are challenging the new statute lack standing, we vacate the preliminary injunction without addressing the merits of the preemption claim.").  Accordingly, to the extent certain passages of background and analysis remain relevant to the present case, such analyses are repeated herein.

Appx.0187

entry or re-entry of noncitizens into Texas from outside the country, authorizes

noncitizen removals to Mexico, and instructs state court judges not to abate

proceedings on the basis of a pending federal determination of admissibility.  Tex.

Penal Code §§ 51.02–03; Tex. Code of Crim. Proc. arts. 5(B).002–003.  In greater

detail, SB 4 first makes it a crime for a noncitizen to "enter[] or attempt[] to enter

[Texas] directly from a foreign nation at any location other than a lawful port of

entry."  Tex. Penal Code § 51.02(a) (the "entry provision").  It is an affirmative

defense to violations of § 51.02 if "the federal government has granted the

defendant . . . lawful presence in the United States or asylum . . . ."  Id. § 51.02(c).

SB 4 does not define "lawful presence."  Id.  Individuals approved under the

Deferred Action for Childhood Arrivals ("DACA") program have an affirmative

defense, while those approved under the Deferred Action for Parents of Americans

("DAPA") and Lawful Permanent Residents program do not have an affirmative

defense.  Id. §§ 51.02(c)–(d).

Violations of § 51.02 are Class B misdemeanors under Texas law,

punishable by up to $2,000 in fines and 180 days of imprisonment. Id. § 51.02(b);

§ 12.22.  However, if a noncitizen has previously been convicted under § 51.02, a

subsequent violation is a felony, punishable by fines up to $10,000 and

imprisonment between 180 days and two years.  Id. § 12.35.  However, unlike in

the last challenge to SB 4, Plaintiffs do not challenge the entry provision,

Appx.0188

as Plaintiffs acknowledged at the hearing and according to the requested relief in their complaint and motion.

Rather, Plaintiffs first challenge the SB 4's "reentry provision", which makes it a crime for noncitizens to "enter[], attempt to enter," or be found in Texas after they have "been denied admission to" or removed from the United States or departed the United States while an order of "removal is outstanding." Id. § 51.03.[4]  The section, in contrast to the entry provision of SB 4, has no affirmative defenses.  Violations of § 51.03 are Class A misdemeanors, punishable by fines up to $4,000 and imprisonment for up to one year.  Id. § 51.03(b); § 12.21.  Certain prior offenses may either elevate violations of § 51.03 to third-degree felonies, punishable by fines up to $10,000 and imprisonment between two and ten years, or second-degree felonies, punishable by fines up to $10,000 and imprisonment between two and twenty years.  Id. § 12.21–23.

Next, Plaintiffs challenge SB 4's provisions which permit state judges to request or order the removal of noncitizens under certain circumstances.  Tex. Code of Crim. Proc. art. 5(B).002 ("removal provision").  When an individual is

---

[4] Section 51.02 criminalizes entry directly into Texas, so a noncitizen who enters directly into New Mexico and then crosses the state border into Texas does not violate the law.  Tex. Penal Code § 51.02(a).  Section 51.03, however, criminalizes a noncitizen who "is at any time found in" Texas after a removal order—regardless of whether they crossed directly back into Texas or through another state.  Id. § 51.03(a).

6

charged with offenses under § 51.02 or § 51.03—but not yet convicted—a

magistrate or state judge may "discharge the person and require the

person to return to the foreign nation from which the person entered or attempted

to enter" if "the person agrees to the order" and has not "previously been" charged

with or convicted of specific crimes.  Id. art. 5(B).002(a)–(c).  If a noncitizen is

convicted under SB 4, the judge "shall enter" an "order requiring the person to

return to the foreign nation from which the person entered or attempted to enter"

after serving their prison sentence.  Id. art. 5(B).002(d).  Texas law enforcement

must monitor the noncitizen's compliance with the state removal order.  Id. art.

5(B).002(e).  Failure to comply with the removal order is an additional second-

degree felony.  Tex. Penal Code § 51.04.

Fourth and finally, SB 4 states that a "court may not abate the

prosecution" of one of these offenses "on the basis that a federal determination

regarding the immigration status of the defendant is pending or will be initiated."

Tex. Code of Crim. Proc. art. 5(B).003.[5]

---

[5] SB 4 contains other miscellaneous provisions.  It prohibits enforcement in certain buildings, such as primary schools and places of worship.  Tex. Code of Crim. Proc. art. 5(B).001.  SB 4 also instructs that violations of the law should be added to criminal record databases.  Id. art. 42A.059.  Finally, it indemnifies officers enforcing the law. Tex. Civ. Prac. & Rem. Code § 117.002.  The remaining provisions of SB 4 are not before the Court in this matter, as Plaintiffs challenge only Tex. Penal Code §§ 51.03 and 51.03, and Tex. Code of Crim. P. arts. 5B.002 and 5B.003.

Appx.0190

### III.   Procedural and Appellate History Concerning SB 4

In early 2024, the United States of America and several organizational plaintiffs sued separately to enjoin Texas's implementation of SB4.  United States v. Texas, 719 F. Supp. 3d 640 (W.D. Tex. 2024), vacated by United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc).  Organizational Plaintiffs included two nonprofit legal organizations providing legal services to meet the needs of noncitizens in Texas, New Mexico, and Ciudad Juarez, Mexico: Las Americas and American Gateways.  Id. at 652.  The third organizational Plaintiff was El Paso County, which alleged it would suffer losses in tax revenue, interference with its programs designed for immigrants, and strains on its jail system if SB4 went into effect.  Id. at 652–53.  These cases were consolidated and assigned to the undersigned, and after a hearing and careful consideration of the issued presented, this Court issued a preliminary injunction in Plaintiffs' favor on February 29, 2024, enjoining SB4 from going into effect.  Id. at 702.

In the order granting the preliminary injunction, this Court concluded that the case was justiciable, all plaintiffs had standing to sue, and plaintiffs were likely to succeed challenging SB 4 on field preemption, conflict preemption, and foreign commerce clause grounds.  See generally id.

8

Appx.0191

The preliminary injunction was immediately appealed to the Court of Appeals for the Fifth Circuit, where Texas Defendants filed a motion to stay the injunction pending appeal.  A motions panel granted an administrative stay of the injunction on March 2, 2024, but on March 4, 2024, the United States Supreme Court stayed the order of the motions panel.  No. 23A814, 2024 WL 909451 (U.S. Mar. 4, 2024).  The Supreme Court later vacated its stay on March 19, 2024.  No. 23A814, 2024 WL 1163923 (U.S. Mar. 19, 2024).  The same day the Supreme Court's stay was vacated, the Fifth Circuit panel assigned to hear the case vacated the court's earlier administrative stay and subsequently heard oral arguments on March 20, 2024.  United States v. Texas, 144 F.4th 632 (5th Cir. 2025), vacated by United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *5 (5th Cir. 2026) (en banc).  Texas's motion to stay the injunction pending appeal was ultimately denied on March 27, 2024.  United States v. Texas, 97 F.4th 268 (5th Cir. 2024).

In the following year, the United States of America voluntarily dismissed its case, mooting its appeal before the Fifth Circuit.  Thus, at the time of the Fifth Circuit Panel's decision, only the organizational plaintiffs remained.  The Panel issued its decision affirming this Court's preliminary injunction on July 3, 2025.  United States v. Texas, 144 F.4th 632 (5th Cir. 2025), vacated by 150 F.4th 656 (5th Cir. 2025).  On August 29, 2025, the Fifth Circuit voted to rehear the case

9

Appx.0192

en banc, vacating the earlier Panel decision.  United States v. Texas, 150 F.4th 656 (5th Cir. 2025) (per curiam).

Recently, on April 24, 2026, the full court issued its en banc decision and vacated this Court's preliminary injunction.  United States v. Texas, --- F.4th --, 2026 WL 1122127, at *5 (5th Cir. 2026) (en banc).  The majority opinion decided the case solely on standing grounds, finding the remaining organizational plaintiffs lacked standing to challenge SB 4.  Id. at *1, *6.  Although the majority did not address the merits of plaintiffs' preemption claims, a dissenting opinion authored by Judge Priscilla Richman and joined in relevant part by Judges Stewart, Southwick, Higginson, and Ramirez concluded that plaintiffs were likely to succeed on the merits of their claims.  Id. (Richman, J., dissenting).  A separate concurrence, written by Judge Oldham and joined by Judges Elrod, Jones, Willett, Ho, Duncan, and Engelhardt, similarly addressed the merits of conflict preemption as to the entry provision of SB 4, § 51.02.  Id. at *12 (Oldham, J., concurring).  This case concerns, among other issues, the re-entry provision.

With SB 4 set to take effect on May 15, 2026, a new group of plaintiffs filed suit in this case on May 4, 2026.  (Dkt. # 1.)  They seek a preliminary injunction preventing Defendant Martin and his officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with him, from enforcing the reentry and removal provisions of SB 4.  (Dkt. # 3 at

10

28.)  On the same day as their case opening, Plaintiffs filed a Motion to Proceed

Anonymously.  (Dkt. # 9.)  Finally, Plaintiffs seek provisional class certification of

a class of individuals represented by the two named Plaintiffs, defined as:

> All noncitizens who now or in the future enter, attempt to enter, or are found
> in the state of Texas after they have been denied admission to or excluded,
> deported, or removed from the United States, or after they have departed
> from the United States while an order of exclusion, deportation, or removal
> was outstanding."

(Dkt. # 5 at 9.)

On May 8, 2026, Defendant Martin filed a Motion to Dismiss,

challenging this Court's subject matter jurisdiction over Plaintiffs' claims.  (Dkt. #

26.)  Defendant additionally filed a Motion to Strike the declarations

accompanying Plaintiffs' Motion for a Preliminary Injunction, (Dkt. # 16), a

Motion for Expedited Discovery, (Dkt. # 23), and Motion to Continue the Hearing

for Class Certification.  (Dkt. # 30.)  The evening before the hearing, on May 12,

2026, Defendant filed a second Motion to Strike directed at the declaration of Talia

Roma and its accompanying exhibits, all of which also accompanied Plaintiffs'

Motion for injunctive relief.  (Dkt. # 47.)

Upon considering the expedited motions, the Court granted Plaintiffs'

Motion to Proceed Anonymously, (Dkt. # 9), and granted in part and denied in part

Defendant's Motion for Expedited Discovery, (Dkt. # 23).  (Dkt. # 37).  A

11

Appx.0194

protective order was subsequently entered after the parties failed to come to a joint stipulated protective order.  (Dkt. # 44.)

LEGAL STANDARD

## I.    Motion to Dismiss under 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction.  See Fed. R. Civ. P. 12(b)(1).  Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim.  Home Builders Assoc. of Mississippi, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted).

## II.    Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule.  Valley v.

Appx.0195

Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

Plaintiffs have met this high burden and have shown that a preliminary injunction is warranted. Before reaching the merits of their motions, however, the Court must first address the threshold issue of justiciability.

## JUSTICIABILITY

Martin challenges the justiciability of this action both in his response to Plaintiff's Motion for Preliminary Injunction and by separately filing a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendant contends that his Motion to Dismiss must be considered and resolved before the Court proceeds to the merits of this case. (Dkt. # 25 at 2.)

However, the Court is unaware of any case, and Defendant cites none, which requires full disposition of a motion to dismiss before preliminary injunctive relief is granted. Indeed, "[j]urisdiction comes first." In re GenOn Mid-Atl. Dev. LLC, 42 F.4th 523, 533 (5th Cir. 2022) (citing Steel Co. v. Citizens for a Better

13

Appx.0196

Env't, 523 U.S. 83, 94 (1998)).  Even had Defendant not separately filed a motion to dismiss, the Court would have been obligated to first address its jurisdiction over the matter before proceeding to the merits of Plaintiffs' request for preliminary injunctive relief.  But the basic tenet that a court must first find jurisdiction does not impose an affirmative requirement that a *motion to dismiss* be addressed with the "priority" Defendant seeks, particularly where the asserted bases for dismissal align with arguments already made in Defendant's response in opposition to Plaintiffs' preliminary injunction motion.[6]

However, at the hearing, Plaintiffs indicated that they have substantively responded to the issues raised by the Motion to Dismiss.  Because the issues in Defendant's Motion to Dismiss are closely intertwined with the jurisdictional questions raised in their response in opposition to Plaintiffs' Motion for a Preliminary Injunction, the Court will address them together below.  Accordingly, we now turn to the justiciability issues at hand: standing, sovereign immunity, and the political question doctrine.

---

[6] Such a rule would produce absurd results and defeat the purpose of emergency injunctive relief.  For instance, a defendant could file a motion to dismiss on the eve of a preliminary injunction hearing, or even after a hearing and before the Court issued its decision.  Under Defendant's theory, this would halt the proceedings and force a court to address that motion before granting even preliminary injunctive relief.  That interpretation risks the deployment of an abusive motion practice designed to further stall emergency relief, and the Court declines to credit this argument in any context beyond the circumstances of this case.

Appx.0197

## I.     <u>Standing</u>

Martin first challenges the standing of the two named Plaintiffs in this action.  At the preliminary-injunction stage, a plaintiff must make a "clear showing" that they have standing.  <u>Barber v. Bryant</u>, 860 F.3d 345, 352 (5th Cir. 2017).  In particular, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision.  <u>See, e.g.</u>, <u>El Paso Cnty. v. Trump</u>, 982 F.3d 332, 337 (5th Cir. 2020).  Here, the Parties do not contest causation or redressability; rather the core of the standing dispute concerns whether Plaintiffs have asserted an injury sufficient to support a pre-enforcement facial challenge.

In cases where plaintiffs challenge a criminal statute but have not yet suffered an injury, they need not wait to "expose [themselves] to actual arrest or prosecution."  <u>Babbitt v. United Farm Workers Nat. Union</u>, 442 U.S. 289, 298 (1979) (quoting <u>Steffel v. Thompson</u>, 415 U.S. 452, 459 (1974)).  Rather, in a pre-enforcement challenge, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder."  <u>Susan B. Anthony List v. Driehaus</u>, 573 U.S. 149, 160 (2014) (quoting <u>Babbitt v. United Farm</u>

Appx.0198

Workers Nat. Union, 442 U.S. 289, 298 (1979)).  Each provision will be discussed below.

   *A. Plaintiffs' intended conduct is arguably proscribed by SB 4's provisions.*

   Both Plaintiffs allege that they are already engaging in conduct that will be proscribed by SB 4's reentry provisions.  (See Dkt. # 1 at 3.)  Section 51.03 makes it a crime for a noncitizen who was previously removed or who departed while an order of removal is outstanding to enter, attempt to enter, or be found anywhere in Texas.  § 51.03 ("A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state after the person (1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding.").  Plaintiff L.M.L. was previously deported in 1997, and later re-entered in 2006 without inspection, placing him squarely within the ambit of SB 4's reentry provision.  (Dkt. # 1 at 3); see § 51.03.  L.M.L.'s reentry, and now his mere continued presence in Texas, is proscribed by § 51.03.  See § 51.03 (additionally criminalizing being "found in this state" after reentry).

   K.G.S.'s continued presence is also arguably proscribed by SB 4's reentry provision.  K.G.S. falls less squarely within the text of 51.03 because she departed the United States before the removal order was entered against her.  See §

16

Appx.0199

51.03 (applying to individuals who have "departed from the United States *while* an order of exclusion, deportation, or removal is outstanding") (emphasis added).  In their reply, Plaintiffs argue that the analogous law after which the reentry provision of SB 4 was modeled, 8 U.S.C. § 1326, has a similar text but still applies in situations where noncitizens depart the United States *before* a removal order is entered.  (Dkt. # 36 at 3–4); U.S. v. Ramirez-Carcamo, 559 F.3d 384, 390 (5th Cir. 2009) ("We conclude, based on our analysis of the statutory language, that aliens do not avoid prosecution under Section 1326 by refusing to comply with their obligation to appear at removal proceedings and instead departing in advance of the removal order.").  Thus, the Court finds that Plaintiff, as a noncitizen who reentered the country and now remains in Texas, is engaging in conduct that would be at a minimum, "arguably" proscribed by SB 4's reentry provision.  See Driehaus, 573 U.S. at 162.

   *B. The conduct is arguably affected with a constitutional interest.*

          Defendant argues that Plaintiffs do not assert any claim based on a constitutional interest that they have individually because the sole claim in their complaint is a preemption claim under the Supremacy Clause.  (Dkt. # 29 at 11). ("Plaintiffs' only claim is not based on any constitutional or statutory rights they

17

Appx.0200

have, but solely on their discredited interpretation of the Supremacy Clause.").[7]

But this argument views the test in Driehaus too narrowly.  Driehaus does not

require a plaintiff to allege a violation of a constitutionally protected right; it only

requires that a plaintiff state "an intention to engage in a course of conduct

*arguably affected with a constitutional interest*."  Driehaus, 573 U.S. at 159

(quoting Babbitt, 442 U.S. at 298) (emphasis added).

      Plaintiffs here have done so by showing they could be arrested under

SB 4 and arguing that SB 4 was enacted in violation of field preemption.  (See Dkt.

# 3 at 14, 24–25.)  Other courts have found this suffices for plaintiffs to assert

standing in this context.  Iowa Migrant Movement for Just. v. Bird, 157 F.4th 904,

914 (8th Cir. 2025) ("This conduct is 'arguably affected with a constitutional

interest' because the Act criminalizing their presence in Iowa is arguably

preempted by federal law, under the Supremacy Clause."); Idaho Org. of Res.

Councils v. Labrador, 780 F. Supp. 3d 1013, 1033 (D. Idaho 2025) ("Plaintiffs

have adequately alleged a 'constitutional interest' in not being prosecuted under an

allegedly federally preempted law."); Fla. Immigrant Coal. V. Uthmeier, 780 F.

---

[7] Defendant fails to cite authority for their assertion that Plaintiffs' interpretation of the Supremacy Clause is "discredited."  The Court respectfully disagrees for the reasons noted *infra* but also notes that this interpretation remains an open question given the Fifth Circuit's limitation of its recent decision in United States v. Texas to issues of standing.  --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc).

18

Appx.0201

Supp. 3d 1235, 1255 (S.D. Fla. 2025) ("Plaintiffs simply wish not to be arrested and prosecuted under a law that violates constitutional principles of federalism. Numerous other federal courts have recognized this right as a legally protected interest.").

The Court in Hobby Distillers Ass'n v. Alcohol & Tobacco & Trade Bureau broached a similar question when analyzing the standing of plaintiffs bringing a pre-enforcement challenge.  740 F. Supp. 3d 509, 520–21 (N.D. Tex. 2024), aff'd as modified, McNutt v. U.S. Dep't of Just., 173 F.4th 204 (2026).  In that case, individual plaintiffs who wished to distill spirits at home for personal consumption challenged a federal statute which made it a felony to distill spirits in any dwelling house, shed, yard, or enclosure connected to a house.  Id. at 516–17.  Plaintiffs challenged the law as exceeding Congress's enumerated powers, seeking an injunction to prevent enforcement of the law against them.  Id. at 517.  In response to the Government's argument that the proscribed behavior—distilling liquor on one's personal property—was not "affected by a constitutional interest" to confer pre-enforcement standing under Driehaus, the district court found that "a plaintiff need not allege the violation of an articulated right to keep Congress in its lane. . . . [Plaintiff] has demonstrated a legal interest that could be lost if he is prosecuted for engaging in conduct that he believes Congress has no power to prohibit."  Id. at 521.  This decision was affirmed recently in McNutt, with the

19

Panel finding that "[e]ach of the individuals here has satisfied these elements." 173 F.4th at 213 (referring to the three <u>Driehaus</u> elements necessary to satisfy the injury-in-fact requirement).

Although this case involves a state rather than a federal statute, the Court follows the same line of reasoning. The constitutional interest implicated in Plaintiffs' claim is not an individual constitutional right. <u>See</u> <u>Armstrong v. Exceptional Child Care Ctr.</u>, 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not 'the source of any federal rights,' and certainly does not create a cause of action." (internal citations omitted)). Rather the constitutional interest with which Plaintiffs' conduct is "arguably affected" is Plaintiffs' legal interest in not being prosecuted under a state law which is arguably preempted. Thus, Plaintiffs have "demonstrated a legal interest that could be lost if [they are] prosecuted for engaging in conduct [they] believe[] [Texas] has no power to prohibit." <u>See</u> <u>Hobby Distillers Ass'n</u>, 740 F. Supp. 3d at 521.

   C. *Threat of future enforcement is substantial.*

Finally, Plaintiffs must demonstrate that "the threat of future enforcement of [SB 4] is substantial." <u>Nat'l Press Photographers Ass'n v. McCraw</u>, 90 F.4th 770, 782 (5th Cir. 2024). Although this element is presumed to be met in cases involving free speech, this case enjoys no such presumption. <u>Id.</u> ("Unlike in other constitutional contexts, in the speech context, we 'may *assume* a

20

Appx.0203

substantial threat of future enforcement absent compelling contrary evidence.'")

(quoting Barilla v. City of Houston, Texas, 13 F.4th 427, 432 (5th Cir. 2021)

(emphasis in original); see also Wang v. Paxton, 161 F.4th 357, 363 (5th Cir. 2025)

("Plaintiffs enjoy a presumption of enforcement only in the First Amendment

context."). Thus, Plaintiffs bear the burden of establishing this element. The Court

finds they have done so.

First, Director Crawford, the Director of DPS before Martin, testified

to a Texas legislative committee that SB 4 could lead to an additional 75,000 to

80,000 arrests per year. United States v. Texas, --- F.4th ---, 2026 WL 1122127, at

*28 (5th Cir. 2026) (Richman, J., dissenting) (citing Texas Senate Committee on

Border Security, at 49:19–50:45 (Nov. 1, 2023),

https://senate.texas.gov/videoplayer.php?vid=18888&lang=en (statement of Steve

McCraw, Director, Tex. Dep't of Pub. Safety)). Although a new Director is now

defending the present action, his failure to disavow enforcement weighs on this

Court's decision. (See Martin Decl., Dkt. # 29-1.)

Instead, Defendant asserts that "it has not yet been determined what . .

. operational steps" will be taken to enforce SB 4. (Id. at ¶ 4.) When pressed at the

hearing on the question, Defendant's counsel reiterated this response. Defendant's

silence on this matter speaks volumes. After all, his statement that "[i]f and when

SB 4 actually goes into effect, my executive command and I will determine the

21

operational steps DPS will take steps [sic] to enforce SB 4" suggests that Martin intends to enforce the law. (Id.) Indeed, Director Martin has a particular *duty* to enforce state law. Nat'l Press Photographers Ass'n, 90 F.4th at 786.

As to these particular Plaintiffs and whether the threat of future enforcement against them is substantial enough to justify the pre-enforcement injunctive relief they seek, the Court need only look further within Director Martin's statement, which describes the actions that DPS personnel have taken to "vigorously defend[] the southern border of Texas." (Id. at ¶ 5.) That they do so in assisting federal law enforcement in enforcing *federal* laws is not contested by the State. But DPS's current relationship with United States Border Patrol Officers, which Martin describes as "close[] and cooperative[] in enforcing federal immigration laws," suggests that DPS's existing procedures in assisting enforcement of federal immigration laws could be easily transformed to begin imminent enforcement of analogous state-law crimes under SB 4. A credible threat of future enforcement is one that is not "imaginary or wholly speculative," Babbitt, 442 U.S. at 302, "chimerical," Steffel, 415 U.S. at 459, or "wholly conjectural." Golden v. Zwickler, 394 U.S. 103, 109 (1969). This theory rises to the level of a credible threat. There is no reason to doubt that DPS would employ the same "vigorous" enforcement of its own state immigration laws.

22

Appx.0205

Defendant argues that Plaintiffs' allegations of fear of arrest are merely speculative, since "do not allege that they have been prosecuted under any provisions of S.B. 4 or even have been threatened with any prosecution by Defendant." (Dkt. # 29 at 4.) Of course, they have not been prosecuted under SB 4 because the law has only ever been in effect for mere hours and has otherwise been enjoined. Further, although courts may consider an affirmative, individual threat of enforcement on this element, there is no such requirement to lodge a pre-enforcement challenge. Cf. Driehaus, 573 U.S. at 158 ("[A]n actual . . . enforcement action is not a prerequisite to challenging the law."). Nor would such a threat be expected under these facts, where SB 4 has not yet taken effect.

Defendant additionally contends that Plaintiffs' fears of arrest are speculative and unlikely because "S.B. 4 is not even in effect and Plaintiffs are unknown to DPS." (Dkt. # 29 at 16.) His first argument quickly loses its impact as the effective date looms. Further, it is irrelevant that the specific identities of Plaintiffs are unknown to DPS. Plaintiffs' risk of arrest is not only because of their participation as lead plaintiffs in this suit; rather it stems from their very presence in the state of Texas and their status.

Finally, Defendant takes the position that any threat of removal cannot be "imminent" enough for Plaintiffs' standing purposes because "neither Plaintiffs nor anyone will be subject to removal from the United States . . . for a substantial

23

Appx.0206

period of time" given that such removals occur "only after a person has been charged, tried, and convicted of violating SB 4 and has served any sentence for such conviction (or has consented to such removal)." (Dkt. # 29 at 15.) However, the Court agrees with Plaintiffs' arguments at the hearing and in their briefs that "[t]he statute is designed to encourage or coerce supposedly voluntary acceptance of state deportation orders as soon as the beginning of prosecution." (Dkt. # 36 at 10) (citing United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting)). Thus, the removal provision is still sufficiently imminent for the purposes of standing.

Thus, the Court concludes that Plaintiffs have demonstrated a substantial threat of enforcement here, and consequently an injury sufficient to confer standing. Any suggestion that injury to individuals in Plaintiffs' situation is speculative ignores that the state's police officers are now actively looking for possible noncitizens and stopping them on a regular basis. At present, they turn them over to federal immigration officers, but under SB 4, they would be in the position of charging them under state law. This is all uncontested.

D. *The injury is fairly traceable to Defendant and redressable.*

Defendant Martin does not challenge either of the remaining elements of standing. However, upon review, the Court finds that the elements of causation and redressability are satisfied.

24

Appx.0207

On causation, the injury in fact is fairly traceable to Defendant Martin. As the Director of DPS, he has a duty to enforce the challenged provisions of SB 4 once the law takes effect.  DPS would be tasked with making arrests for the reentry crime Plaintiffs challenge, triggering the remaining challenged provisions of SB 4. Plaintiffs' injury is, therefore, fairly traceable to the conduct of Martin and the office over which he presides.

Finally, Plaintiffs' injury is likely redressable by a favorable judicial decision, where granting the injunctive relief they seek would enjoin the enforcement of the challenged provisions, eliminating their risk of arrest, detention, and removal under the law.  See Food and Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury.").  Thus, the redressability prong is met.

## II.   Sovereign Immunity

Director Martin argues that he is entitled to sovereign immunity. (Dkt. # 25 at 5–7.)  "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity."  Whole Woman's Health v. Jackson, 595 U.S. 30, 39 (2021).  This prohibition extends to suits against state officials "that are effectively suits against a state."  City of Austin v.

Appx.0208

Paxton, 943 F.3d 993, 997 (5th Cir. 2019).  However, this immunity is not without exception.

The relevant question here is whether the exception articulated in <u>Ex parte Young</u> applies.  <u>See</u> 209 U.S. 123 (1908).  "<u>Ex parte Young</u> allows suits for injunctive or declaratory relief against state officials, provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law."  <u>In re Abbott</u>, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), <u>cert. granted, judgment vacated as moot sub nom</u>, <u>Planned Parenthood Ctr. for Choice v. Abbott</u>, 141 S. Ct. 1261 (2021).  To have the requisite connection, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty."  <u>Tex. Democratic Party v. Abbott</u>, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

Director Martin satisfies both requirements.  Martin's enforcement as head of DPS is sufficient to give him the particular duty to enforce the state's criminal laws:

> [The Director of DPS has] more than just the general duty to see that the state's laws are implemented—[he is] directly responsible for enforcing Texas's criminal laws . . . . DPS [] officers arrest people for violating Texas law, exercising "compulsion or constraint" in service of the law.

<u>Nat'l Press Photographers</u>, 90 F.4th at 786.

Moreover, his predecessors in the same office have demonstrated a clear willingness to enforce SB 4 and Director Martin has not disavowed this

Appx.0209

intention.  Again, Martin's predecessor testified that SB 4 could lead to an additional 75,000 to 80,000 arrests per year.  United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting) (citing Texas Senate Committee on Border Security, at 49:19–50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)).  Although Martin argues that Plaintiffs have not adequately shown a "demonstrated willingness" to enforce the statute, (Dkt. # 25 at 7), where even a "scintilla of enforcement by the relevant state official with respect to the challenged law" will do, Director Martin easily meets that threshold.  City of Austin v. Paxton, 943 F.3d 993, 1002 (5th Cir. 2019).

Defendant argues that the Ex parte Young exception does not apply because there is no "ongoing" violation of federal law, and that Plaintiffs "could not plausibly" allege any "because the challenged statute has not taken effect to date."  (Dkt. # 25 at 6.)  They assert that "there is no allegation, nor can there be, that Director Martin has taken any step to date to enforce S.B. 4."  (Id.)  To accept this argument would be to accept the notion that Ex parte Young could never apply in pre-enforcement challenges.  That simply does not comport with the current state of the law.  See Mi Familia Vota v. Ogg, 105 F.4th 313, 329 (5th Cir. 2024) ("If the plaintiffs bring a pre-enforcement action, as has occurred here, prior enforcement obviously will be lacking.").

Appx.0210

Finding Plaintiffs have demonstrated Director Martin satisfies the prerequisites of the Ex parte Young exception, the Court concludes Martin is not entitled to sovereign immunity.

## III.   Political Question Doctrine

The final jurisdictional issue Director Martin raises is non-justiciability under the political question doctrine.  The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch."  Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).

Martin contends that SB 4 was enacted pursuant to Article I, Section 10 of the United States Constitution, and that because of this authority, Texas had the power to enact the law as part of its response to an "invasion across [Texas's] southern border . . . to protect its citizens and communities." (Dkt. # 25 at 7.)  For support, Defendant points to Governor Abbott's declaration in November, 2022, that Texas was subject to an "invasion" within the meaning of the Constitution because of the ongoing influx of immigration.  (Id.)  Defendant also now cites to executive orders from the current Presidential Administration which declare that Texas is experiencing an actual invasion at its southern border.  (Id. at 8.)  As a result of these determinations, Defendant contends, the Court lacks jurisdiction

Appx.0211

over this matter because the issues of whether such an "invasion" exists and whether SB 4 is an appropriate response to that "invasion" are nonjusticiable political questions. (Id.)

Plaintiff responds by characterizing Defendant's argument as a repackaged reprise of its "invasion defense" theory that his predecessor asserted in related litigation surrounding SB 4. (Dkt. # 36 at 9–10.) This Court agrees. To the extent Defendant wishes to assert an invasion defense theory, the Court has already discussed this theory at length and rejected it. United States v. Texas, 719 F. Supp. 3d 640, 679–698 (W.D. Tex. 2024), vacated by United States v. Texas, --- F. 4th ---, 2026 WL 1122127 (5th Cir. 2026). The Court thus incorporates its prior thorough analysis of the history and meaning of the State War Clause to the extent it remains relevant to Defendant's current arguments. Id.

In his briefing and at the hearing, Defendant cited the current administration's approval of SB 4 to support his contention that the law is not field preempted and that the issue of whether there is an invasion is a nonjusticiable political question. Indeed, the Court has accepted and reviewed the Statement of Interest filed by the United States on May 11, 2026, for the detailed reasoning and arguments in its brief. (Dkt. # 39.) However, to the extent Defendant uses the fact the United States has expressed an opinion on the constitutionality of SB 4 to argue

29

the Court is barred from addressing the issues underlying this case, such arguments are unpersuasive.

Defendant misidentifies the issues presented.  This case does not require the Court to make a determination on whether there is an ongoing "invasion," or whether the federal response, or SB 4, is adequate in addressing such an "invasion" if one exists.  The issue presented by Plaintiffs relates to neither of those questions but rather is limited in scope to whether certain provisions of SB 4 are constitutional.  And "evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary, even if an unreviewable political determination exists somewhere in the case." United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting) (citing Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 197–98).

Zivotofsky clarifies this Court's jurisdiction in circumstances such as this. 566 U.S. 189.  In that case, the Supreme Court found a case which presented a plaintiff's challenge to a federal statute and the executive's refusal to follow the letter of the statute was not a nonjusticiable political question. Id. at 194.  The Court explained this was not a case where the federal courts were "being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of" foreign policy. Id. at 196.  Rather, the court was only

Appx.0213

being asked to "decide if [plaintiff's] interpretation of the statute is correct, and whether the statute is constitutional.  This is a familiar judicial exercise."  Id.

This is the properly framed inquiry here: whether the provisions of SB 4 that Plaintiffs challenge may be constitutionally enforced against them pursuant to the State War Clause, as Defendant contends, or whether they are preempted by federal law, as Plaintiffs argue.  This is not a political question and falls well within the purview of this Court's jurisdiction.  See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  Moreover, the Executive's agreement or disagreement with the Court's interpretation of SB 4 does not have a bearing on the political question analysis.  Indeed, SB 4 has been under review by the courts for several years, spanning two different presidential administrations with vastly differing views on the constitutionality of Texas's law.  That Defendant now finds support from the Executive branch does not persuade the Court that it is relieved of its duty to interpret this law.[8]

---

[8] The Court notes that at oral argument, Defendant Martin argued that SB 4 must be constitutional because the current administration supports SB 4 and forty-five members of the House of Representatives also support the law.  See Amicus Brief, 1:24-cv-8-DAE, Dkt. # 31-1. Of course, Congress is comprised of 435 members, so the majority did not sign on to the letter.  More importantly, however, this Court does not make decisions predicated on politics. Further, the mere fact the Attorney General may support SB 4 does not make it constitutional any more than the Attorney General's support of the administration's tariffs made them constitutional.  See, e.g., Learning Resources, Inc. v. Trump, 607 U.S. ---, 146 S.

31

<u>LIKELIHOOD OF SUCCESS ON THE MERITS</u>

**I.      <u>Field Preemption</u>**

Next, the Court turns to the merits, beginning with field preemption. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." <u>Arizona</u>, 567 U.S. at 394. The U.S. Constitution empowers the federal government to "regulate commerce with foreign nations" and "establish a uniform Rule of naturalization." U.S. Const. art. I, § 8; <u>id.</u> art. II, § 2. Pursuant to this authority, Congress has created a complex and expansive system to regulate entry into and removal from the United States. <u>See, e.g.</u>, <u>De Canas v. Bica</u>, 424 U.S. 351, 353 (1976); <u>Toll v. Moreno</u>, 458 U.S. 1 (1982); <u>Padilla v. Kentucky</u>, 559 U.S. 356 (2010).

SB 4 directly challenges the federal government's long-held power to control immigration, naturalization, and removal.[9] SB 4 extends federal

---

Ct. 628 (2026) (concluding the International Emergency Economic Powers Act did not support the executive's expansive reading to grant the "extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope."). In addition it must be noted that President Trump issued Executive Orders authorizing state officials to "cooperate" and "assist" federal officials in the enforcement of immigration law. However, as acknowledged by counsel for Defendant, President Trump did *not* issue an Executive Order purporting to authorize the state of Texas to engage in the deportation of individuals or the supplantation of federal immigration law.

[9] Despite Texas's argument that SB 4 does nothing more than "supplement and parallel" federal law, (Dkt. #29 at 11), Governor Greg Abbott himself declared that SB 4 was an exercise of constitutional authority *superseding* federal immigration laws. <u>See</u> Press Release, Greg Abbott, Governor of Texas, Statement on Texas's

Appx.0215

immigration penalties by authorizing Texas state officials to detain, arrest, prosecute, and remove noncitizens without federal supervision.  Supreme Court precedent squarely holds that SB 4's attempt to regulate the unlawful entry of noncitizens is field preempted.  Arizona, 567 U.S. at 399.  Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it."  Id.  Applied to the field of immigration, the federal government has both a dominant interest and a pervasive regulatory framework that preclude state regulation in the area.

*A. The United States has a dominant interest in regulating immigration.*

As over a century of Supreme Court cases hold, "The authority to control immigration—to admit or exclude [noncitizens]—is vested *solely* in the Federal Government."  Truax v. Raich, 239 U.S. 33, 42 (1915) (emphasis added) (citing Fong Yue Ting v. United States, 149 U.S. 698 (1893)).  The Supreme Court has repeatedly stressed that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that

---

Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf. (noting that "Texas's constitutional authority to defend and protect itself . . . is the supreme law of the land and supersedes any federal statutes to the contrary.").

33

Appx.0216

where it acts, and the [S]tate also acts on the same subject," the state law must give way.  Hines v. Davidowitz, 312 U.S. 52, 62 (1941); see also Hillsborough Cnty. v. Automated Med. Lab'ys., Inc., 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the paradigmatic example of field preemption); Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of [noncitizens] in the United States or the several states"); United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."); Chy Lung v. Freeman, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); De Canas, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); Arizona, 567 U.S. at 409 ("[T]he removal process is entrusted to the discretion of the Federal Government.").

　　　　Beyond the federal government's interest in the admission and removal of noncitizens, the field of immigration is also deeply intertwined with the United States' foreign relations.  First, "[i]mmigration policy can affect trade,

34

Appx.0217

investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." Arizona, 567 U.S. at 395.  It is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." Id.  In the 250th year of our great nation, will we cease to engage with the rest of the world as the United States and instead be viewed as some form of confederation of independent states?  These global perceptions have real impacts: "[P]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." Id.  "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." Hines, 312 U.S. at 63.

Second, "discretionary decisions" on how to enforce the nation's immigration laws "involve policy choices that bear on this Nation's international relations" and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." Id. at 396–97.  That is particularly true for removal decisions.  Such decisions include "the selection of a removed [noncitizen]'s

35

Appx.0218

destination" which "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 348 (2005) (citation omitted).  The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." Arizona, 567 U.S. at 409.

Third, the federal government must be entrusted with the power to control the country's international borders.  "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," Hernandez v. Mesa, 885 F.3d 811, 819 (5th Cir. 2018) (quoting United States v. Delgado-Garcia, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), aff'd, 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," Ziglar v. Abbasi, 582 U.S. 120, 142 (2017).  Determination of which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power."  De Canas, 424 U.S. at 354.

In short, it is undisputed that the federal government has a dominant and supreme interest in the field of immigration.  Texas's own state courts acknowledge "the matter of entry into the United States" is "wholly preempted by federal law," Hernandez v. State, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as

36

Appx.0219

are "matters involving deportation."  Gutierrez v. State, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012).  By regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause.  Indeed, it is implausible to imagine each of the fifty United States having their own state immigration policy superseding the powers inherent in the United States as a Nation.

   B.  *Congress has enacted a pervasive regulatory framework.*

In regulating immigration, and specifically the reentry and removal of noncitizens, the federal government has also enacted a "framework of regulation so pervasive that Congress left no room for the States to supplement it."  Arizona, 567 U.S. at 399 (internal quotations omitted); see also Texas v. United States, 50 F.4th 498, 516 (5th Cir. 2022) ("[B]ecause policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted.") (cleaned up).  Congress has created a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. Ga. Latino All. for Hum. Rts. v. Governor of Ga., 691 F.3d 1250, 1264 (11th Cir. 2012) ("GLAHR").

Congress regulates immigration through countless statutes and

37

Appx.0220

treaties,[10] far too numerous to list in full.  Congress has "authorized criminal penalties for individuals who bring [noncitizens] into the United States," GLAHR, 691 F.3d at 1264 (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," id. (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and re-entry, id. (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an inadmissible [noncitizen]," id. (citing 8 U.S.C. § 1327), and has banned the "import [of] [a noncitizen] for an immoral purpose," id. (citing 8 U.S.C. § 1328). As one circuit court has held, the country's immigration laws have "been described as second only to the Internal Revenue Code in complexity."  Singh v. Gonzales, 499 F.3d 969, 980 (9th Cir. 2007) (cleaned up).  Another has noted the striking resemblance between immigration law and "King Minos's labyrinth in ancient Crete."  Lok v. INS, 548 F.2d 37, 37 (2d Cir. 1977).  The country's immigration

---

[10] See, e.g., Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (codified in scattered sections of 8 U.S.C.); Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214, 28 U.S.C. § 2254 et. seq.; REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 3028 (codified in scattered sections of 8 U.S.C.); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (codified in scattered sections of 6 U.S.C); USA Patriot Act, Pub. L. 107-56, 115 Stat. 272 (codified as amended in scattered sections of 8 U.S.C. 12 U.SC., 15 U.S.C., 18 U.S.C., 31 U.S.C., and 42 U.S.C); Illegal Immigration Reform and Immigrant Responsibility Act of 1986, Pub. L. 99-603, 100 Stat. 3445 (codified as amended in scattered sections of 8 U.S.C. and 42 U.S.C.).

Appx.0221

laws are massive, sprawling, detailed, complex, and pervasive.

Congress has vested DHS and other executive agencies with substantial enforcement power and duties. DHS has "the power and duty to control and guard the boundaries and borders of the United States." 8 U.S.C. § 1103(a)(5). DHS and its subagencies retain the sole responsibility for "enforc[ing] and administer[ing] all immigration laws," especially "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8).[11]

Director Martin argues that the state is entitled to a presumption against preemption when courts analyze state laws enacted to protect public safety or health. (Dkt. # 27 at 11.) When courts apply this standard, "the assumption [is] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." AbbVie, Inc. v. Murrill, 166 F.4th 528, 539 (5th Cir. 2026) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). However, this assumption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." U.S. v. Locke, 529 U.S. 89, 108 (2000).

---

[11] State authorities may assist in this enforcement under federal supervision. E.g., 8 U.S.C. § 1357(g).

Appx.0222

Accordingly, the Court is not persuaded that this presumption applies to this situation, where SB 4 was enacted not within the realm of Texas's police powers, but rather within the federal government's sphere of enforcing the regulatory framework governing its own immigration laws.  See Iowa Migrant Movement for Just., 157 F.4th at 919 ("[T]he presumption against preemption 'has greatest force when Congress legislates in an area traditionally governed by the States' police powers.'  But immigration is not a traditional subject of state regulation.").

Even assuming the presumption against preemption should apply in this context, this presumption can be rebutted by an adequate showing of "clear and manifest purpose of Congress" to occupy the field.  AbbVie, Inc., 166 F.4th at 539.  Here, Congress has done so. Under the Immigration and Nationality Act ("INA"), a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States."  8 U.S.C. § 1229a(a)(3).[12]  The federal government alone is vested "with the powers of external sovereignty" and "the power to expel" noncitizens. United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936). The power of removal is "inherently inseparable from the conception of nationality."  Id.

---

[12] Subject to certain other federal provisions.

40

Appx.0223

In sum, there is no genuine question that the federal government occupies the field of immigration detention and removal.  Accordingly, the Court will next turn to whether SB 4 unlawfully intrudes upon the federal government's immigration authority.

### C. SB 4's criminalization of unlawful entry and re-entry intrudes into the federal government's field.

Beginning with Texas's prohibitions on unlawful entry and re-entry, Arizona expressly forbids the sort of "concurrent" criminalization that Texas seeks to impose.  567 U.S. at 400; Tex. Penal Code § 51.02–51.03.  There, in response to surging numbers of immigrants crossing its southern border, Arizona passed SB 1070 to "discourage and deter the unlawful entry and presence of" noncitizens in the country.  Id. at 392–93.  SB 1070 had four separate provisions: Section 3, which made it a state crime to comply with federal registration requirements; Section 5(c), which made it a state crime for an unauthorized noncitizen to seek or engage in work in Arizona; Section 6, which authorized officers to arrest a person without a warrant if there was probable cause to believe they were removable; and Section 2(B), which allowed officers conducting stops or arrests to verify a person's immigration status. Id. at 393–94. The Court found that all provisions were preempted, except for Section 2(B), which the Court believed would be better suited to resolution after the law took effect.  Id. at 415–16.

Appx.0224

SB 4 and SB 1070 contain striking similarities. As SB 1070 did previously, SB 4 attempts to "add[] a state-law penalty for conduct proscribed by federal law." Arizona, 567 U.S. at 400; see Tex. Penal Code §§ 51.02–51.03 (criminalizing under Texas law violations that mostly match 8 U.S.C. § 1325(a) and 8 U.S.C. § 1326(a)).  As the Supreme Court found in Arizona, these federal provisions already act as "a full set of standards" "designed as a harmonious whole." Arizona, 567 U.S. at 401.

Even accepting for purposes of argument that SB 4 merely imposes state law penalties for existing federal crimes, ""[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with the careful framework Congress adopted." Id. at 402.  SB 4 allows the state to "bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." Id. at 402.  For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, even complementary state regulation is impermissible." Id. at 401.  "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Id. (citing Silkwood v. Kerr–McGee Corp., 464 U.S. 238, 249 (1984)).

Appx.0225

For these same reasons, the Court similarly finds Defendant's arguments under Zyla Life Scis., LLC v. Wells Pharma. of Hous., LLC, 134 F.4th 326 (5th Cir. 2025) ("Zyla") unpersuasive.  Martin argues that the Fifth Circuit recognized in Zyla that "states may have a legitimate interest in punishing or providing redress for wrongs even if federal law has already done so."  (Dkt. # 27 at 11.)  However, Zyla relied on California v. Zook, 336 U.S. 725 (1949), a case in which the Supreme Court found that a California law was not preempted because there was "no conflict in terms, and no possibility of such conflict, for the state statute ma[de] federal law its own."  Zook, 336 U.S. at 735.  The Panel in Zyla reasoned that "[b]ecause the States' laws 'recognize[] the supremacy of the national law,' it would be anomalous to conclude the Supremacy Clause some-how preempts them."  Zyla, 134 F.4th at 332.

However, this is not the case here, where SB 4 specifically states that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003.  This statement does not show the state's recognition of the supremacy of national law; rather it demonstrates the disregard for the existing federal regulatory framework, flipping the Supremacy Clause on its head and placing state law above all else.

Appx.0226

Although this Court identifies *infra* several glaring conflicts between SB 4 and the federal regulatory framework governing immigration, the very determination that SB 4 is field preempted also forecloses Defendant's argument that enacting parallel laws would be permissible.  The Supreme Court made clear in Arizona that "even complementary state regulation is impermissible" when Congress occupies the entire field, and this includes laws which are "parallel to federal standards."

For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, even complementary state regulation is impermissible."  Id. at 401.  "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards."  Arizona, 567 U.S. at 401 (citing Silkwood, 464 U.S. at 249).  Defendant's arguments to the contrary are, thus, unavailing.

In sum, Section 51.03 of SB 4 cannot be differentiated from Section 3 of SB 1070.  Tex. Penal Code § 51.03.  Both laws attempt to vest a state with the power to punish federal immigration offenses.  But the "basic premise of field preemption," reaffirmed in Arizona, is that "[s]tates may not enter, in any respect, an area the Federal Government has reserved for itself[.]"  Id. at 402.  Under the holding of Arizona, the challenged provisions of SB 4 must be preempted.

44

Appx.0227

*D. SB 4's removal authorization is patently unconstitutional.*

Texas's criminalization of unauthorized entry and re-entry is preempted under Arizona and the federal government's dominant interest in regulating immigration enforcement. Article 5(B).002 of SB 4, however, is an especially problematic intrusion on federal prerogatives. Tex. Code of Crim. Proc. art. 5(B).002. Article 5(B).002 goes even further than Arizona's SB 1070 by authorizing Texas state or magistrate judges to remove noncitizens from the United States without notice or consent from the federal government. Id. Before conviction, a judge may only order removal if a noncitizen consents, but after conviction, a state judge "*shall* enter" a removal order. Id. art. 5(B).002(a)–(d) (emphasis added).

This exceeds even what the dissenting Justices in Arizona believed to be constitutional. Arizona, 567 U.S. at 427 (Scalia, J., dissenting in part) (arguing that SB 1070 was constitutional because it only allowed detention and "does not represent commencement of the removal process unless the Federal Government makes it so"); id. at 438 (Thomas, J., dissenting in part) (suggesting states have power to make arrests but not discussing power of removals); id. at 457 (Alito, J., dissenting in part) ("State and local officers do not frustrate the removal process by arresting criminal [noncitizens]. The Executive retains complete discretion over whether those [noncitizens] are ultimately removed.").

45

Removal touches upon some of the most sensitive foreign affairs considerations of federal immigration policy.  Id. at 409 (majority opinion) ("A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States.  Decisions of this nature touch on foreign relations and must be made with one voice."); Jama, 543 U.S. at 348 ("Removal decisions, including the selection of a removed [noncitizen's] destination, may implicate [the United States'] relations with foreign powers and require consideration of changing political and economic circumstances.") (internal quotation marks omitted).  To that end, the INA vests removal authority exclusively with the federal government. 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether a [noncitizen] may be admitted [or] removed from the United States."). To allow Article 5(B).002 to take effect would allow states and state-court judges to shape a key aspect of American foreign policy and intrude upon a field explicitly entrusted to federal control by Congress.  The federal government's domain over removal prohibits concurrent state regulation.  By authorizing state officials to conduct removals, Article 5(B).002 of SB 4 intrudes into a particularly sensitive area of foreign affairs and is field preempted.

E.  *Arguments Against Field Preemption*

Given that SB 4 goes even further to regulate immigration than SB

46

1070, the law is likely field preempted. Martin's arguments against field preemption are wholly unavailing.

Martin advances application of the Salerno "no set of circumstances" test to Plaintiffs' pre-enforcement facial preemption challenge. (Dkt. # 29 at 13) (citing United States v. Salerno, 481 U.S. 739 (1987)). This approach mirrors that taken in one of the concurring opinions in the recent en banc decision. See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *12 (5th Cir. 2026) (Oldham, J., concurring). The Supreme Court has applied Salerno to cases involving facial challenges outside of the First Amendment. Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024). As explained there, in all other cases, "a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" Id. (quoting Salerno, 481 U.S. at 745).

However, the en banc dissenting opinion raised interesting questions regarding the applicability of this demanding standard in the preemption context. See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *37 (5th Cir. 2026) (Richman, J., dissenting). As that opinion explained, the cases relied on for support in the concurring opinion were not in the preemption context Id. And preemption presents a unique circumstance where "[i]f a state law is preempted by federal law because Congress has occupied the field, it follows that no set of

47

Appx.0230

circumstances exists under which the state law would be valid." Id.  The Court agrees with Judge Richman's well-reasoned analysis on this issue.

At the hearing, Defendant echoed an argument advanced in the United States's Statement of Interest.  They quote Virginia Uranium, Inc. v. Warren, 587 U.S. 761 (2019), discussing preemption and writing: "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law."  Id. at 767 (citing Puerto Rico Dep't of Consumer Aff. v. ISLA Petroleum Corp., 485 U.S. 495, 503 (1988)).  As previously discussed, the INA contains such a comprehensive provision in 8 U.S.C. § 1229a(a)(3).  Id. ("Unless otherwise specified in this chapter, a proceeding under this section shall be the *sole and exclusive procedure* for determining whether a [noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." (emphasis added)).  The interest of the federal government in the field of entry, reentry, and removal, is more than a "brooding federal interest."  See Virginia Uranium, Inc., 587 U.S. at 767.  Rather, it garners textual support from the Immigration and Nationality Act itself.

48

Appx.0231

Accordingly, finding Defendant's arguments unconvincing, the Court concludes Plaintiffs are likely to succeed on the merits of their field preemption claim.[13]

## II.    Conflict Preemption

Beyond field preemption, the challenged provisions of SB 4 are also conflict preempted. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67.  To show conflict preemption, Plaintiffs need not show that the laws achieve different ends. Rather, a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy."  Motor Coach Employees v. Lockridge, 403 U.S. 274, 287 (1971).

Arizona is again instructive.  There, Section 5(c) of SB 1070 made it a state misdemeanor for "an unauthorized [noncitizen] to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor."  Arizona, 567 U.S. at 403.[14]  The Court found that "Congress enacted . . . a comprehensive framework for combatting the employment of illegal

---

[13] Accepting the Defendant's theories in a case such as this—where the state statute so clearly is field preempted—risks opening the door to additional state laws in Texas or beyond which intrude into areas once thought to be exclusively federal realms.  The consequences of such a decision would be wide-reaching and extend far beyond the subject of immigration law.

[14] In a brief discussion, the Supreme Court also found Section 3 to be conflict preempted.  See Arizona, 567 U.S. at 402–03.

Appx.0232

[noncitizens]." Id.  Namely, Congress combatted this by regulating domestic employers under the INA, whereas SB 1070 punished noncitizen employees.  Id. Although federal law and SB 1070 both generally punished the employment of noncitizens, the Court found that SB 1070's differing enforcement mechanism "would interfere with the careful balance struck by Congress with respect to unauthorized employment of [noncitizens]."  Id. at 406.

Arizona shows that state restrictions on immigration that exceed or differ in enforcement mechanisms from federal regulations are preempted.  The question for SB 4 is whether its operative provisions conflict with federal law, stand as an obstacle to the objectives of Congress, or employ disruptive or conflicting techniques.  See id. at 405–06.

At the broadest level, SB 4 conflicts with federal immigration law because it provides state officials the power to enforce federal law without federal supervision.  See Farmers Branch, 726 F.3d at 531–32 (ordinance preempted where it gives "state officials authority to act as immigration officers outside the limited circumstances specified by federal law"); Arizona, 567 U.S. at 408 (noting that federal law specifies only "limited circumstances in which state officers may perform the functions of an immigration officer").  Congress has enacted a statutory scheme to ensure that federal immigration law is conducted under the

50

Appx.0233

watch of federal officials in a uniform way across all fifty states, and SB 4 interferes with that goal.  See 8 U.S.C. § 1057(g).

SB 4 also divests federal immigration authorities of the discretion of the enforcement of immigration laws, which touches on delicate considerations of foreign affairs. Several circuit courts have held similar laws to be conflict preempted for this reason.  See GLAHR, 691 F.3d at 1265 ("The [state laws], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); Valle del Sol, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); United States v. Alabama, 691 F.3d 1269, 1287 (11th Cir. 2012) ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); United States v. South Carolina, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs").

SB 4's removal orders will also "prevent noncitizens from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, see 8 U.S.C. § 1158(a)(1), withholding of removal, see id. § 1231(b)(3), or protections under the Convention Against Torture, see 8 C.F.R. § 1208.16(c)(2).  SB 4 specifies that "a court may not abate the prosecution" on

51

Appx.0234

"the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003. By expressly disallowing the consideration of federal admissibility determinations, SB 4 conflicts with federal law.

In <u>Iowa Migrant Movement for Just. v. Bird</u>, 157 F.4th 904 (8th Cir. 2025), the Eighth Circuit upheld a district court's order preliminarily enjoining an Iowa state statute similar to SB 4.[15] The Eighth Circuit concluded that the plaintiff in that case was likely to succeed on the merits of its *facial* challenge to the law, finding the Act was likely conflict preempted. <u>Id.</u> at 927. The Panel concluded that even if there was a degree of uncertainty about how the law might be enforced, the face of the statute conflicted with the federal law: "Any enforcement of the Act would likely conflict with federal law by interfering with the enforcement discretion that federal law gives to federal officers." <u>Id.</u>

Asylum, withholding, and protection against torture are all federal

---

[15] The Court also notes that the Eleventh Circuit has a similar case pending before it and recently denied a stay of a district court's injunction pending appeal. In <u>Florida Immigrant Coal v. Att'y General</u>, 780 F. Supp. 3d 1235 (S.D. Fla. 2025), a district court enjoined enforcement of a Florida state statute creating state law offenses similar to the entry and reentry provisions of SB 4. On appeal, the Eleventh Circuit declined to stay the injunction pending appeal, finding the individual plaintiffs likely had standing, that the case likely fell within the <u>Ex parte Young</u> exception, and that the appellant had not shown that he had a "strong showing" of succeeding on the merits sufficient to justify the stay. <u>Florida Immigrant Coal. v. Att'y General</u>, No. 25-11469, 2025 WL 1625385, at *2–3 (11th Cir. June 6, 2025).

Appx.0235

methods of determining a noncitizen's immigration status.  See 8 U.S.C. §

1158(a)(1), id. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2).  Refusal to abate removal

pending these determinations clearly and unequivocally undermines federal law.

See 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the

United States or who arrives in the United States (whether or not at a designated

port of arrival . . .), irrespective of such [noncitizen's] status, may apply for

asylum."); id. § 1158(c)(3) (authorizing removal upon determination of

inadmissibility).  A noncitizen cannot readily avail themselves of these defenses if

the state court cannot abate removal pending its determination.  Because a state

court cannot follow both SB 4 and federal immigration defenses, they conflict.

Like SB 1070, SB 4's removal provision "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress."

Arizona, 567 U.S. at 399.

Returning to the Salerno test, Defendant sets forth a hypothetical in an

attempt to demonstrate there is at least one application of SB 4 that does not

conflict with federal immigration laws.  (Dkt. # 29 at 13.)  They provide the

example of a "previously deported cartel drug smuggler" who enters the United

States between ports of entry with a cargo of drugs.  (Id. at 14.)  However, the

conflict between state and federal law was laid out in Arizona, which said that state

laws such as SB 4 which "authoriz[e] state and local officers to engage in . . .

53

Appx.0236

enforcement activities as a general matter . . . create[] an obstacle to the full purposes and objectives of Congress." 567 U.S. at 410.  In the words of the en banc dissent: "all of the actions purportedly taken under state law by state officers or judges were unilateral, not at the request or approval of the federal government." United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *38 (5th Cir. 2026) (Richman, J., dissenting).  This is basis enough for the conflict to take hold.

SB 4 also conflicts with federal law because it appears that noncitizens will be removed to Mexico, regardless of their country of origin and in contrast to federal law on removal destinations.

Federal law sets out the circumstances for where the federal government may remove a noncitizen, and the United States regularly engages in diplomatic discussions with foreign governments to determine whether they will accept noncitizens.  See 8 U.S.C. § 1231(b).  SB 4 states a judge may order a person "to the foreign nation from which the person entered or attempted to enter . . . ."  Tex. Code of Crim. Proc. art. 5(B).002.  It appears that these removals will all be to Mexico.  (See Escalon Decl., Dkt. # 25-3 at 124–26).  That policy decision conflicts with federal law, which requires officials to remove a noncitizen to their designated country of removal, subject only to certain exceptions.  See 8 U.S.C. §§ 231(b)(2)(A), (C).  Texas's decision to remove all noncitizens detained under SB 4 to Mexico will cause the federal government to

Appx.0237

lose the ability to speak "with one voice" on removals.  Arizona, 567 U.S. at 409; Jama, 543 U.S. at 348.

Mexico's objection to SB 4 shows why SB 4's choice-of-country removal is a serious problem.  SB 4 will directly harm the United States's relationship with Mexico.  Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory."  Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR.  Mexico later filed an amicus brief in United States v. Texas reinforcing this position, stating that SB 4 would frustrate its ability to engage in diplomatic relations with the United States "by requiring Mexico to engage with not only the U.S. government, but also several levels of state and local law enforcement in Texas to address individual apprehensions, detentions, and removals pursuant to SB 4."  Amicus Curiae Brief of the United Mexican States in Support of Plaintiffs-Appellees, in United States v. Texas, No. 24-50149 (Mar. 21, 2024).  The Supreme Court agreed with a similar argument in Biden v. Texas, explained that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico[.]"  597 U.S. 785, 806 (2022).

SB 4 conflicts with federal immigration law in other ways, too.

55

Appx.0238

SB 4 lacks consent exceptions for re-entry into the United States, even though federal immigration law will allow it.  See 8 U.S.C. § 1326.  Penalties under SB 4 also exceed those under federal law.  For example, failure to comply with a federal removal order generally includes a sentence of up to four years, see 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), but the penalty up to 20 years for violating a state removal order under SB 4.  See Tex. Penal Code § 51.04.

Finally, 8 U.S.C. § 1357(g) specifies how and when a state may cooperate with federal law enforcement to assist with immigration enforcement. Section 1357(g) serves a dual role, allowing the federal government to utilize state and local personnel to assist with enforcement while retaining ultimate monitoring and implementation control for the federal government. Arizona, 567 U.S. at 409; see also 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox) (noting the purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while ensuring "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards.").  SB 4 and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority.

Given the "significant complexities involved in enforcing federal

56

Appx.0239

immigration law," Congress delegated enforcement authority to state officials only under the supervision of DHS.  Arizona, 567 U.S. at 409; 8 U.S.C. § 1357(g). "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government."  Arizona, 567 U.S. at 410.  SB 4 frustrates key aspects of federal immigration law and is conflict preempted.

## III.    Texas's Invasion Defense

In Governor Abbott's own words, these federal laws do not apply because "Texas's constitutional authority to defend and protect itself" against an invasion "is the supreme law of the land and supersedes any federal statutes to the contrary."  Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf.  In a dissenting opinion in a separate but related case, several judges on the Fifth Circuit expressed the importance of analyzing Texas's invasion claim.  See United States v. Abbott, No. 23-50632, 2024 WL 551412, at *7–8 (5th Cir. Feb. 9, 2024) (dissenting opinion).  Further, at least one Fifth Circuit judge wrote separately in the recent en banc decision to note his agreement with Texas's state war power theory.  United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *6

Appx.0240

(5th Cir. 2026) (Ho, J., concurring).  That discussion, even if non-binding, weighs on this case.  Accordingly, the Court will discuss—but ultimately reject— Texas's invasion defense.

Article I, Section 10 of the U.S. Constitution limits the states' power to undertake certain activities.  U.S. Const. art. 1, § 10.  Apart from the final few words, Section 10 describes what a state may *not* do, specifying that a state may not coin money, pass a bill of attainder or an ex post facto law, impose duties, keep troops, enter into foreign agreements, or "engage in war."  Id. Clause 3 (the "State War Clause") says in full:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

Id. art. 1, § 10, cl. 3.

In short, the State War Clause provides that a state shall *not* engage in war, with a narrow exception of when it is "actually invaded[.]"  When a state— and by extension the United States—is invaded, the federal government must protect from the invasion.  As Article IV, Section 4 (the "Guarantee Clause") states:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the

Appx.0241

> Executive (when the Legislature cannot be convened) against domestic Violence.

Id. art. IV, § 4.

Together, these provisions, along with the broad, interrelated provisions of the federal government's authority to wage war, lay out a structure where the state may respond to immediate military threats until "resources of the federal government can reach the invasion." United States v. Abbott, No. 1:23-CV-863, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023); Torres v. Tex. Dep't of Pub. Safety, 597 U.S. 580, 590 (2022) (detailing federal government's authority over war).

But the State War Clause is not an unlimited grant of power in times of invasion. Rather, it grants states only the power to "engage in War[.]" U.S. Const. art. 1, § 10, cl. 3. Regardless of whether immigration is an invasion, SB 4 would still not be constitutional because it does not authorize or relate to any "engage[ment] in war." Id.

Again, SB 4 generally has three operating provisions. Officers may arrest noncitizens for unauthorized entry into the state, Tex. Penal Code § 51.02(a), noncitizens may be arrested for entering or attempting to enter after previous removals, id. § 51.03, and noncitizens may be removed if they agree to removal or are convicted of an offense under SB 4. Tex. Code of Crim. Proc. Art. 5(B).002.

59

Appx.0242

None of these provisions are operations of war.  Rather, they are standard operations of criminal enforcement by state civil authorities.  SB 4 is a "war" inasmuch as the "War on Drugs" is a war—a metaphorical invocation of the term "war" to denote a serious effort.  Nothing more.  SB 4 does not require use of a military, nor will the State send the National Guard into Mexico to wage war on cartels, call upon NATO allies for aid, or hold unauthorized immigrants as prisoners of war as a result of SB 4.  In the most basic sense, SB 4 is not an act of war.

Further, the power to "engage in war" does not grant unlimited legislative or immigration authority.  See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 642–45 (1952) (Jackson, J., concurring).[16]  If this is true for the federal government, then it is most certainly the case for the temporary and narrow exception given to states under the State War Clause.  Engaging in war is one function of government; controlling immigration is another.  Madison's Report of 1800 specifically rejected the idea that control of immigration is incident to the

---

[16] See also id. at 649–50. ("[The Forefathers] knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation.  We may also suspect that they suspected that emergency powers would tend to kindle emergencies.  Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it, they made no express provision for exercise of extraordinary authority because of a crisis.").

Appx.0243

power of war.  James Madison, The Report of 1800, (Jan. 7, 1800), founders.archives.gov/documents/Madison/01-17-02-0202.

The state's limited and temporary authority to engage in war to repel invasions of organized hostile forces does not amount to a wider authority to regulate in fields preempted by the federal government.  The State War Clause itself makes this clear.  Even when under invasion, the Clause forbids states from, *inter alia*, entering into treaties, granting letters of marque, laying duties, or keeping troops.  The State War Clause authorizes a state only to "engage in war [if] actually invaded," it does not suspend any other restrictions contained in Section 10.  U.S. Const. art. 1 § 10 cl. 3.  The "actually invaded" clause affects only the power to engage in war and delegates no other powers to the state.  Just as Texas cannot unilaterally enter treaties or lay duties in wartime, the State War Clause does not grant it the power to violate the Supremacy Clause.

Moreover, the provisions of SB 4 that Plaintiffs challenge are not limited to times of invasion.  The law does not require the Governor's declaration of an invasion or war.  Nor does SB 4 halt when immigration flows are reduced or when a new administration takes power or when the federal government increases border security measures.  Indeed, the federal government's response to the purported invasion, or lack thereof, appears to be irrelevant in Defendant's analysis given he maintains the same invasion defense in spite of drastically changed

Appx.0244

immigration enforcement circumstances since this Court's prior injunction.  As Defendant acknowledges, Texas now works "cooperatively and successfully with United States Border Patrol and other federal law enforcement personnel." (Dkt. # 27 at 7.)  Defendant Martin praises the current Presidential administration's enforcement efforts in his declaration, stating, "As of today, I believe the southern border of Texas is better defended than ever before in my decades in Texas law enforcement." (Dkt. # 29-1 at ¶ 7.)

Even accepting for argument that SB 4 is a wartime response to an invasion, that would not make SB 4 constitutional. The law would remain preempted and unenforceable after the end of any "invasion" because the State War Clause affirmatively forbids enforcement of wartime acts once the invasion has ended.  See U.S. Const. art. 1, § 10, cl. 3.  If the state, by arresting removable noncitizens, is "engaging in war," then the state cannot continue to pursue a wartime measure once the invasion has ended.[17]  The result, then, is that SB 4 must expire when immigration flows ebb to levels below those at the time of the governor's declaration.  SB 4 contains no such clause.

SB 4 does not begin when an invasion begins or end when an invasion ends.  It has no characteristics of a wartime measure, nor does it support other

---

[17] The absurd result of determining that routine criminal prosecutions are "engaging in war" is that the State War Clause would then forbid all state criminal enforcement except in times of invasion.

Appx.0245

operations of war.  Under any rational sense of the phrase, Texas is not "engaging in war" by enforcing SB 4, and thus Defendant's invasion defense fails.

## IRREPARABLE HARM

Plaintiffs here have shown that absent an injunction, they face irreparable harm.  As described above, Plaintiffs have adequately demonstrated a substantial threat of enforcement of the challenged SB 4 provisions against them. Enforcement of this law would place Plaintiffs at risk of arrest, prosecution, detention, and ultimately, removal.  See § 51.03.  "A party may be irreparably injured in the face of the threatened enforcement of a preempted law."  Villas at Parkside Partners v. City of Farmers Branch, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008).  The Court finds this threatened enforcement and the severity of the harm imposed to Plaintiffs in the event the likely preempted law is enforced against them constitutes irreparable harm.

## EQUITIES AND PUBLIC INTEREST

Defendant contends that the harm to Texas if a preliminary injunction is granted far outweighs any speculative harm to Plaintiffs, and that a preliminary injunction would "frustrate the democratic process in Texas and the right of Texas to make and enforce its own laws." (Dkt. # 27 at 16.)  However, the Court must balance this against the countervailing public interest concerns, including the risk of "friction with foreign countries and weakening the effective diplomacy of the

63

Executive Branch."  Iowa Migrant Movement for Just., 157 F.4th at 929.  Further,

a state's "[f]rustration of federal statutes and prerogatives [is] not in the public

interest."  United States v. Alabama, 691 F.3d at 1301.  That is particularly true as

to SB 4, which strips away an asylum applicant's option to raise credible fears or

torture or persecution in a state hearing.  See Nken v. Holder, 556 U.S. 418, 436

(2009) ("[T]here is a public interest in preventing [noncitizens] from

being wrongfully removed, particularly to countries where they are likely to face

substantial harm.").  Plaintiffs' exhibits make clear that removing noncitizens into

Mexico risks subjecting them to death, torture, and rape.  (See Dkt. # 3-3.)[18]

PROVISIONAL CLASS CERTIFICATION

Plaintiffs seek provisional certification of a class concurrently with

the decision on the preliminary injunction.  (Dkt. # 5 at 7.)  Plaintiffs advance the

following class definition:

---

[18] The Court also acknowledges Defendant's Motion to Strike this declaration and accompanying exhibits for lack of relevance and improper hearsay.  First, the Court finds the exhibits are relevant because they go to the conditions of Mexico for migrants who are returned, which is relevant in the equities analysis in weighing the risk of harm to individuals.  Second, the Court may consider hearsay in deciding a preliminary injunction motion, so Defendant's argument is unsuccessful.  See Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence.").  Thus, Defendant's second Motion to Strike is, likewise, **DENIED**.  (Dkt. # 47.)

64

Appx.0247

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

(Id. at 9.)

A court may certify a class if the proposed class meets the four requirements in Rule 23(a) and one of the three additional requirements in Rule 23(b). See Fed. R. Civ. P. 23; see also Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 623 (5th Cir. 1999). Rule 23(a) has four prerequisites to certify a class: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Plaintiffs have made an adequate showing at this stage of the litigation to warrant at least a provisional class certification.

## I.     Rule 23(a) Requirements

The proposed class is certainly sufficiently numerous; Plaintiffs estimate the number of putative class members in the tens of thousands of individuals. (Dkt. # 5 at 11.) A class of this size is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); see Mullen, 186 F.3d at 624. The proposed class is also geographically dispersed throughout Texas. See Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1038 (5th Cir., Unit A, 1981). As Plaintiffs argue, "[j]oinder is further complicated by the geographic dispersion of class members across Texas and the transitory nature of many

65

Appx.0248

individuals subject to S.B. 4—who may be incarcerated, deported, or forced to leave the state." (Dkt. # 5 at 12.)  Defendant also does not contest the numerosity requirement.  (Dkt. # 28.)  Plaintiffs have shown the numerosity requirement is met.

The commonality element is also uncontested by Defendant.  (Dkt. # 28.)  Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  On this requirement, Plaintiffs argue that whether the challenged provisions of SB 4 are field and conflict preempted is a question of law common to all plaintiffs.  (Dkt. # 5 at 13.)  Further, the threatened injuries asserted are common to the class, where all class members face arrest, prosecution, and removal under SB 4.  (Id.)  The Court is persuaded that the putative class satisfies the commonality requirement.

Typicality is contested.  Rule 23(a)(3) mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This requirement is met when the members' claims arise from similar conduct and have similarities in legal and remedial theories.  Angell v. Geico Advantage Ins. Co., 67 F.4th 727, 736 (5th Cir. 2023) ("'[A] complete identity of claims is not required; '[r]ather, the critical inquiry is whether the [named plaintiff's] claims have the same essential characteristics of those of the putative class.  If the claims arise from a similar course of conduct and

Appx.0249

share the same legal theory, factual differences will not defeat typicality.'" (quoting Stirman v. Exxon Corp., 280 F.3d 554, 562 (5th Cir. 2002)).

Defendant argues that Plaintiffs' analysis overlooks "material differences between the named plaintiffs, who are lawful residents, and the members of the putative class, whose immigration statuses are unknown." (Dkt. # 28 at 10–11.) However, the standard articulated in Angell appears to be met here, where putative class members share the same legal theory—that the challenged provisions of SB 4 are preempted—and whose shared claims arise out of the same course of conduct: the implementation of SB 4. See 67 F.4th at 736. These factual differences do not make the claims and conduct any less "typical" across the class.

Finally, the parties disagree on adequacy of representation. (Dkt. ## 5, 28.) Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The target of this requirement is to "uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). Defendant first asserts that Plaintiffs' decision to proceed anonymously is unfair to other class members and risks conflicts. (Dkt. # 28 at 14) ("If Plaintiffs' identities remain concealed, how will Defendants or the Court uncover conflicts between them and other class members?"). However, as pointed out by Plaintiffs' counsel during the hearing, the risk of conflict in this particular

67

Appx.0250

case is low where Plaintiffs do not seek monetary damages and only injunctive relief. Defendant's additional concerns regarding differing facts related to L.M.L's lawful status and K.G.S.'s pending U-visa do not change the adequacy of representation analysis. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." Mullen, 186 F.3d at 625–26.

Accordingly, each of the Rule 23(a) requirements are met.

## II.     Rule 23(b)(2)

The requirements of Rule 23(b)(2) are also met, which authorizes class certification in circumstances where "the party opposing the class has acted or refused to act on grounds that apply generally to the class," such that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendant suggests that Plaintiff has not shown that SB 4 would harm all members "in essentially the same way." (Dkt. # 28 at 16–17) (citing Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 524 (5th Cir. 2007)). However, the Supreme Court emphasized in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), that:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can

68

be enjoined or declared unlawful only as to all of the class members or as to none of them." In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

Id. at 360 (emphasis in original) (internal citations omitted). Reframing the inquiry in this way to look at whether the injunctive relief Plaintiffs request is indivisible and would cover the entirety of the putative class reveals that this requirement is met. Here, even if there may be factual differences between some class members, their ultimate harm—enforcement of SB 4, a state law which is likely preempted—would be resolved through a single injunction. Thus, the requirements of Rule 23(b)(2) appear to be met here.

## III. Ascertainability

Defendant further argues that setting aside the remaining 23(b)(2) requirements, Plaintiffs have failed to show that their proposed class is ascertainable. This requirement comes from an implicit reading of Rule 23 which requires a demonstration that the proposed class is "adequately defined and clearly ascertainable." DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam). The touchstone of this requirement is "whether the [proposed] class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015).

69

Appx.0252

Defendant argues that the Court is unable to ascertain all members of the class, and doing so would involve conducting an individualized review of thousands of immigration documents—a "herculean task." Indeed, such an individualized review of *all* putative class members would be unduly burdensome. But this is not what Defendant's cited standard requires. See Brecher, 806 F.3d at 24 (requiring feasibility on determinations of whether *a* particular individual, but not *all* individuals at once at the beginning of the case); see also Rodriguez v. Flower Foods, Inc., No. 4:16-cv-245, 2016 WL 7210943, at *4 (S.D. Tex. Dec. 13, 2016) ("Courts have held that a class is sufficiently ascertainable if it is circumscribed by 'some objective set of criteria.'"). There are objective criteria here for the proposed class. To the extent Defendant argues the proposed class is not ascertainable because it is broad, the Court notes that the class is only as broad as the SB 4 provisions which Plaintiffs challenge.

## IV.    **Appointment of Class Counsel**

Pursuant to Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). The rule proceeds to state factors the court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and

Appx.0253

(iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g). Plaintiffs ask for appointment of Plaintiffs' counsel as class

counsel, to include the American Civil Liberties Union ("ACLU") Immigrants'

Rights Project, the ACLU of Texas, and the Texas Civil Rights Project.

Although this particular action is new, the litigation around SB 4 is

not. Plaintiffs' counsel has worked on challenges to SB 4's validity for the last

several years and therefore has become intimately acquainted with the potential

claims in this action and highly knowledgeable about the applicable law. (Dkt. # 5

at 16.) They have experience litigating similar class actions in other jurisdictions,

making them familiar with complex litigation. (Id.) Finally, as counsel are large

organizations focusing on civil rights litigation, they "possess the experience and

institutional resources necessary to effectively litigate this case through discovery,

motion practice, class-wife relief, and any future enforcement proceedings." (Id.)

The Court finds that appointment of class counsel is appropriate at

this stage only as to the provisionally certified class, and shall consist of: the

ACLU Immigrants' Rights Project, the ACLU of Texas, and the Texas Civil

Rights Project.

## V.    **Provisional Class Certification**

Defendant's final challenge to Plaintiffs' motion is on the issue of

provisional class certification more broadly. He urges the Court to deny the

71

Appx.0254

request for provisional class certification until a more rigorous analysis can be undertaken with the benefit of discovery.  (Dkt. # 28 at 18.)

However, at this stage of the litigation, and given the pendency of the motion for preliminary injunction and imminent enforcement of provisions of SB 4 that this Court has determined are likely preempted, Plaintiffs have presented a strong case as to provisionally certifying the class.  This is not an uncommon practice in cases like these which challenge the facial constitutionality of a state law, which necessarily bears on individuals who otherwise would not be parties to the action.  See Idaho Org. of Res. Councils v. Labrador, 7780 F. Supp. 3d 1013, 1046 (D. Idaho 2025) ("Courts routinely grant provisional class certification for purposes of entering injunctive relief."); Padres Unidos de Tulsa v. Drummond, 783 F. Supp. 3d 1324, 1349 (W.D. Ok. 2025); see also Barbara v. Trump, 790 F. Supp. 3d 80 (D. N.H. 2025).

In fact, this particular case has already had the benefit of limited, expedited discovery, in part on the issue of class certification.  Thus, in deciding to provisionally certify the class, the Court additionally has reviewed and fully considered the contents of Plaintiffs' responses to Defendant's interrogatories and the deposition transcripts of both Plaintiffs.  (Dkt. ## 48, 53.)  The Court additionally had the benefit of detailed, full briefing on class certification from both parties before making its decision.

Appx.0255

However, the Court wishes to make clear that this certification is for provisional purposes only for the purposes of injunctive relief, and further inquiry into the appropriateness of formally certifying the class should be conducted. Thus, Plaintiffs' Motion to Certify Class is **GRANTED IN PART**.  (Dkt. # 5.)  It is specifically granted as to Plaintiffs' request to provisionally certify the class for the purposes of injunctive relief.  The remainder of Plaintiffs' motion, including the request to certify the class more broadly, is **HELD IN ABEYANCE** pending additional discovery.

<u>SCOPE OF THE INJUNCTION</u>

Plaintiffs' Complaint, (Dkt. # 1), and Motion for Temporary Restraining Order and Preliminary Injunction, (Dkt. # 3), limit the request relief to an injunction of certain provisions of SB 4 rather than the statute in its entirety. Specifically, Plaintiffs narrow their challenge to the reentry and removal provisions of SB 4, as found in Texas Penal Code §§ 51.03 and 51.04, and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003.  Accordingly, the Court will preliminarily enjoin the enforcement of these provisions of SB 4 only, by Defendant Martin and his officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, against members of the provisional class, defined as:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded,

73

Appx.0256

deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

### WAIVER OF BOND REQUIREMENT

Because the Court will issue the preliminary injunction, it must determine whether Plaintiffs must post bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court . . . .'" Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (quoting Corrigan Dispatch Co. v. Casa Guzman, 569 F.2d 300, 303 (5th Cir. 1978)).

"Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." Id. Likewise, the Fifth Circuit has ruled that "the court 'may elect to require no security at all.'" Id. at 628 (quoting Corrigan Dispatch, 569 F.2d at 303). The lack of monetary loss to the Defendant in this case and lack of asserted costs and damages sustained by the state from being able to enforce an unconstitutional law weigh in favor of a nominal or waived bond. Accordingly, the Court will waive the bond requirement.

74

Appx.0257

<u>STAY PENDING APPEAL</u>

In a footnote at the end of his Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendant requests that if the Court enter an injunction, that it also be stayed pending an interlocutory appeal.  For largely the same reasons stated in its last order granting a preliminary injunction as to enforcement of SB 4, the Court similarly denies Defendant's request here.

The Fifth Circuit "consider[s] four factors in deciding whether to grant a stay pending appeal: (1) whether [Texas] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [Texas] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." <u>SEC v. Barton</u>, 79 F.4th 573, 581 (5th Cir. 2023) (quoting <u>Nken v. Holder</u>, 556 U.S. 418, 434 (2009)).  Applying the Fifth Circuit's framework, the Court finds that a stay is not warranted.

First, given the discussion herein, Texas is not likely to succeed on the merits.  Its arguments rest upon a narrow and untenable reading of <u>Arizona</u> and the many immigration preemption cases that preceded it.  SB 4 intrudes onto especially dominant federal interests, such as the removal of noncitizens, and conflicts with federal law by disallowing consideration of pending asylum or withholding determinations.  Texas is unlikely to succeed on the merits.

75

Appx.0258

Second, Texas will not suffer sufficient irreparable injury to warrant a stay.  Although an injunction generally automatically results in a form of irreparable injury to the state, several factors mitigate that injury here.  See Vote.Org v. Callanen, 39 F.4th 297, 308 (5th Cir. 2022).  Unauthorized immigration is not new to the Texas border, and Texas has relied for decades on the existing federal regime to regulate immigration.  See Wireless Agents, L.L.C. v. T–Mobile USA, Inc., 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction.") (cleaned up).  Additionally, federal law already provides for state officers to conduct immigration enforcement measures. See 8 U.S.C. § 1357(g).  The state's true harm, then, is not that it cannot enforce immigration laws, but that it cannot do so free of federal supervision.  Finally, the Court does not doubt the risk that cartels and drug trafficking pose to many people in Texas. But Texas can (and does) already criminalize those activities. Nothing in this Order stops those enforcement efforts.

The third and fourth Nken factors largely merge as applied to SB 4. If SB 4 takes effect, the law would immediately impose criminal liability on thousands of noncitizens who re-entered the state.  The removal of noncitizens cannot be undone, even if a stay on this injunction is ultimately lifted.  Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution

76

of SB 4's constitutionality.

If allowed to proceed, SB 4 could open the door to each state passing its own version of immigration laws.  The effect would moot the uniform regulation of immigration throughout the country and force the federal government to navigate a patchwork of inconsistent regulations.  SB 4 threatens the fundamental notion that the United States must regulate immigration with one voice.

In the final analysis, it is clear that the Plaintiffs and provisional class members are at risk of suffering grave, irreparable harm were SB 4 to take effect in the form of arrests, prosecutions, and removals under a likely unlawful statute. The balance of equities thus unequivocally weighs in favor of denying the stay pending appeal.

CONCLUSION

**IT IS ORDERED** that Defendant's Motion to Dismiss, (Dkt. # 25), is **DENIED**.  Plaintiffs' motion for preliminary injunction (Dkt. # 3) is **GRANTED** and Defendant is preliminarily **ENJOINED** from enforcing Texas Penal Code §§ 51.03 and 51.04 and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003.  **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Certify Class, (Dkt. # 5), is **GRANTED IN PART** and **HELD IN ABEYANCE IN PART**, and thus Defendant's Motion to Continue Hearing on Class Certification, (Dkt. # 30), is

77

Appx.0260

**DENIED AS MOOT. IT IS FINALLY ORDERED** that Defendant's Motions to

Strike are **DENIED.** (Dkt. # 16, 47.)

**IT IS SO ORDERED.**

**SIGNED:** May 14, 2026, Austin, Texas.

David A. Ezra
Senior United States District Judge

Appx.0261

**tab n: Transcript of May 13, 2026 Preliminary Injunction Hearing**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| L.M.L., *on behalf of themselves and all those similarly situated*, K.G.S., *on behalf of themselves and all those similarly situated*, | )1:26-CV-01170-DAE )<br>)<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | )Austin, Texas<br>) |
| Freeman F. Martin, *in his official capacity as Director of the State of Texas Department of Public Safety,* | )<br>)<br>)<br>) |
| Defendant. | )May 13, 2026 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PRELIMINARY INJUNCTION HEARING

BEFORE THE HONORABLE JUDGE DAVID ALAN EZRA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

APPEARANCES

For Plaintiffs:      Mr. Cody Wofsy
                     Ms. Hannah Schoen Steinberg
                     American Civil Liberties Union
                     Foundation Immigrants' Rights Project
                     425 California Street, Suite 7th Floor
                     San Francisco, California 94104
                     cwofsy@aclu.org
                     hsteinberg@aclu.org


and

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Appx.0263

APPEARANCES CONTINUED

For Plaintiffs:     Mr. Daniel Woodward
                    Ms. Kate Gibson Kumar
                    Texas Civil Rights Project
                    Post Office Box 17757
                    Austin, Texas 78760
                    danny@texascivilrightsproject.org
                    kate@texascivilrightsproject.org
and
                    Ms. Carolina Rivera Nelson
                    ACLU Foundation of Texas
                    Post Office Box 8306
                    Houston, TX 77288
                    criveranelson@aclutx.org

For Defendant:      Mr. Monroe David Bryant, Jr
                    Texas Attorney General's Office
                    Special Litigation Division
                    Post Office Box 12548 (MC-009)
                    Austin, Texas 78711-2548
                    david.bryant@oag.texas.gov
and
                    Ms. Alexia Kristin Baker
                    Texas Attorney General's Office
                    Special Litigation Division
                    209 West 14th Street
                    Austin, Texas 78711
                    alexia.baker@oag.texas.gov


Court Reporter:     Ms. April Balcombe, CSR, CRR, CRC
                    501 West 5th Street, Suite 4150
                    Austin, Texas 78701
                    (512) 391-8795
                    April_Balcombe@txwd.uscourts.gov

Proceedings recorded by computerized stenography, transcript produced by computer.

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Appx.0264

P-R-O-C-E-E-D-I-N-G-S

THE COURT: All right. Please be seated.

DEPUTY CLERK: Good morning, Your Honor. Court calls *Austin:26-CV-1170, L.M.L., K.G.S. versus Freeman F. Martin* for a Preliminary Injunction Hearing.

THE COURT: All right. Can we please have appearances of counsel, starting with the State?

MR. BRYANT: Your Honor, I'm David Bryant with the Office of the Attorney General of Texas on behalf of Freeman F. Martin, Director of the Texas Department of Public Safety, along with Alexia Baker.

THE COURT: All right. Good morning.

MR. WOFSY: Good morning, Your Honor. Cody Wofsy, ACLU for the Plaintiffs. I'll ask my colleagues to introduce themselves.

MS. STEINBERG: Good morning. Hannah Steinberg for the Plaintiffs.

MS. KUMAR: Good morning. Kate Gibson Kumar for the Plaintiffs.

MR. WOODWARD: Good morning. Daniel Woodward for the Plaintiffs.

MS. RIVERA-NELSON: Good Morning. Carolina Rivera-Nelson for the Plaintiffs.

THE COURT: All right. I'd like to be able to say that this is a new subject for me, but we all know

that it isn't, and that's true for many of you.

I think we need to turn up the mic. Okay.

Now it's a little loud, and we're getting feedback.

Let's turn it down a bit.

(Deputy Clerk complies.)

THE COURT: Okay. I think we're all right.

All right. This is your motion.

MR. BRYANT: Your Honor, the State would ask that prior to, or at least today, that we address the State's Motion to Dismiss for Lack of Subject Matter Jurisdiction because that is a determination of Subject Matter Jurisdiction --

THE COURT: We'll get to it.

MR. BRYANT: It should come before any merits determinations.

THE COURT: Well, I'm going to hear from the Plaintiffs first.

Go ahead. I assume you'll address those issues?

MR. WOFSY: Yes. Thank you, Your Honor. Cody Wofsy, ACLU, for the Plaintiff.

As Your Honor is well aware, SB 4 is an illegal attempt to create a State immigration arrest, detention, and deportation regime. That's, obviously,

what this Court determined in finding it field and conflict preemption. And since then, a number of other Courts have joined in exactly that determination. I won't belabor that point, but it includes a unanimous panel of the Eighth Circuit as well as in a unanimous panel of the Eleventh Circuit in denying a stay.

I do want to start --

THE COURT: But we have -- we do have -- we had a panel of the Fifth Circuit that agreed with my ruling. Then it went en banc, and then they never reached the merits. They said that the Plaintiffs did not have standing under their view of standing jurisprudence, which, again, was not agreed to by other courts.

But it doesn't matter because this is the court that counts.

MR. WOFSY: That's right, Your Honor. And, obviously, the Fifth Circuit en banc standing determination has no bearing on this case. It has to do with organizational standing.

THE COURT: Right. I do.

MR. WOFSY: I would like to start --

THE COURT: Although, they do challenge the standing of your clients as individuals, which is quite different than organizational standing.

MR. WOFSY: Right. Right.

I'd like to start with the procedural and kind of threshold issues, and I'm happy to address the Motion to Dismiss in due course.

So I want to start just with an update on the discovery that Your Honor ordered that was completed yesterday. This morning we submitted the interrogatory responses on the record. We are all still waiting for the transcripts from the deposition, but we're prepared to submit those to the Court once they are available.

THE COURT: All right. I should say that what I did, actually, was grant the Government's request for discovery in -- in part. I narrowed the scope somewhat.

MR. WOFSY: Yes, absolutely, Your Honor.

Just on that subject, very briefly, if I may, I'll just make a record in case the Government does want to contest the scope of the discovery, et cetera. As we had indicated, it was indeed significantly burdensome for our clients. They both had to miss work; there were childcare difficulties.

We were prepared to get started in the morning at 11:00 when the first deposition was noticed. It ended up being that the State had not actually arranged for a court reporter or interpreter, so it pushed into the afternoon. That's partly why the

transcripts are not yet available. We did get it done. We worked collaboratively with the Defendant.

THE COURT: Well, the issues that were going to be addressed by discovery were quite narrow, and there was plenty of time to do that.

MR. WOFSY: Okay. So moving on to the substantive issues, Your Honor, I'll start with standing because that is the issue that the Court, specifically, noted in its Scheduling Order in setting this hearing.

THE COURT: That's right.

MR. WOFSY: Your Honor, it's clear from the declarations that our clients have standing in this case. That was reinforced by the discovery that was engaged in yesterday as I mentioned. The Court has some of it. It will have the rest of it as soon as possible.

Both of our clients are subject to arrest under SB 4. I don't understand Texas to have contested that in any way. And there's been no effort here to disavow arrests, disavow enforcements, suggests that DPS is not going to be making arrests under --

THE COURT: Well, one of the things I'm going to have to address with Defense Counsel is the ever-changing position of the State with respect to SB 4.

I mean, they have changed their position on

this law multiple times, and I -- I think it's only fair that we try to figure out exactly what the State's position is on some of these provisions of the law, because -- and I'm not saying this in a pejorative way. I mean, I don't know.

When they first -- when they first appeared before me, they were going to vigorously enforce every single provision, and the State was going to be deporting people directly across the border.

Now they take a different position, I think. So I'm not exactly sure what their position is, and I'm not sure how counsels just simply telling me what their position is, how -- how firm that is.

I mean, I had a case -- and I believe it was a published opinion; I'm not sure -- where I was -- where I had an order vacated.

Judge Ho wrote the opinion where State Deputy Attorney General -- I had ruled for the State in a school case. The State Deputy Attorney General stood up in front of me in court and said the State did not have -- the school had no intention of enforcing the provision that was the subject matter of the lawsuit, flat out, speaking on behalf of the State.

Judge Ho -- and I found the matter to be moot because the State -- I mean, when a governmental

representative, a member -- a member of the Court's bar, an officer of the court stands up in front of me and says, "I've consulted with my clients, and they have absolutely no intention whatsoever of ever enforcing this."

And Judge Ho disagreed in his ruling and said that they can always change their mind, and there wasn't an affidavit filed by the -- by the teacher in the case saying they wouldn't do it. So, therefore, it didn't count.

I've always found that to be an interesting ruling. It doesn't say a lot for what the -- at least, what one judge thinks of the view that a Deputy Attorney General can make a representation on behalf of their client, but that is -- it is what it is. That's what he said. So...

MR. WOFSY: Absolutely, Your Honor. I guess I'd say a couple of things.

One is, I agree that the position has changed over time. I think it is about what the Government will do -- what the State will do in effectuating those State removal orders.

You know, we can argue about that, and, obviously, we have our own views on it, but I, ultimately, don't think it doesn't really matter, at

least at this point, because the bare terms of the law are: You shall be issued a removal order, and then once it's issued, if you don't leave, you are subject to 20 years in prison.

And so to some extent, you know, what exactly DPS is going to do at that point may not --

THE COURT: Well, it impacts the standing issue because the injury has to be imminent. I mean, it has to be substantial. And if the State says, "Well, we're not enforcing this. All we're going to do is turn people over to the Federal Government, and we're not actually going to actually take people to jail. We're not going to take them to court. We're not going to do any of that," a very troublesome part of the law -- and several judges, both myself and Circuit judges, have found troublesome, and the Fifth Circuit has yet to address, other than that, in any type of a binding way. We don't know. I mean, I don't know.

MR. WOFSY: If I may, Your Honor. You know, I think that what's clearly imminent is the arrests under the re-entry provision. I think from our perspective --

THE COURT: You're not challenging their ability to arrest when they come into the state. All you're challenging is re-arrests.

MR. WOFSY: Right, re-entry provision, not the

entry provision.

THE COURT: Yeah. You're not challenging the entry provision.

MR. WOFSY: That's right, Your Honor.

THE COURT: You're only challenging the re-entry position?

MR. WOFSY: That's right, Your Honor. That is what these --

THE COURT: So why don't you address your first Plaintiff's situation. She was the one that was down in Mexico, and then how does that roll into this?

MR. WOFSY: Are you referring to K.G.S., Your Honor?

THE COURT: Yes, that's the one. Her situation is different than your other Plaintiff.

MR. WOFSY: That's right, in a couple of ways. But yeah, I'm happy to address K.G.S.'s standing.

THE COURT: I think you should, because, obviously, the Fifth Circuit -- for good reason, because, you know, Federal courts are courts of limited jurisdiction, and we have to have a case for controversy And if somebody doesn't have standing, then we don't have a case for controversy. So that's something -- that's a threshold issue.

MR. WOFSY: Right. So --

Appx.0273

THE COURT: It's also part of their Motion to Dismiss.

MR. WOFSY: So K.G.S. is a noncitizen, an alien in the terms of the statute. She's found in Texas, and she was under the terms of the Fifth Circuit's interpretation of the parallel Federal statute 8 U.S.C. 1326. She was previously deported.

Now, she left the country before that deportation order was entered. That's exactly what the Fifth Circuit has said is, that qualifies as having been previously deported under 1326. I don't understand the State to have argued otherwise that she is not subject to it.

Obviously, for standing purposes, the question is: Is the person arguably subject to the criminal statute? And so I think there is no question that she -- she is arguably subject to the law, if that answers Your Honor's question.

THE COURT: Yes, it does.

MR. WOFSY: Okay. Thank you.

And as to L.M.L., the other Plaintiff, there's no, I think, dispute at all about whether he is subject to SB 4.

THE COURT: Now, he has lawful status here in the United States?

MR. WOFSY: That's correct. He's a Green Card holder, a lawful, permanent resident.

THE COURT: So under SB 4, you're saying he is still subject to arrest and deportation?

MR. WOFSY: Absolutely, Your Honor. There's no exception in the re-entry provision for somebody who has any kind of a status as long as you're a noncitizen.

And I'll just point out in the Iowa case in the Eight Circuit, this was front and center as a dispute because Iowa was saying that Green Card holders who had permission to re-enter the country were exempt even though the statute didn't say it. And what the Court said is, "No, we read statutes according to what they say."

I think it's particularly notable that there are exceptions for folks like that with status under the entry provision but not under the re-entry provision. And so you're applying the canon of, if you say it in one place, you know, and it's absent in another place, *expressio unius,* it would only be natural to understand the statute to apply to somebody with a Green Card.

Just a couple of other points on standing, Your Honor. In terms of, you know, the imminence point that you were talking about, I do think both of them are imminently in danger of being arrested for this,

certainly sufficient under Fifth Circuit precedent.

If Your Honor takes a look at the Interrogatories that we filed this morning that were completed yesterday as ordered, L.M.L., for example, drives every day. He sees DPS agents pulling people driving trucks like the truck that he drives with construction equipment.

And, you know, to the extent the idea is that maybe he won't be charged because he's a Green Card holder, I think that could actually cut the other direction because he cannot be removed under Federal law, but he can be issued a State deportation order under SB 4. So that might be a reason for State officials to -- to charge him under this statute.

K.G.S., similarly, drives all the time. They both live in immigrant neighborhoods, neighborhoods with lots of immigrant neighbors. She sees DPS regularly. Those are all in the Responses to Interrogatory Number 3.

In terms of sort of the question Your Honor raised about, you know willingness to enforce -- obviously, it's not just that the Defendant has not disclaimed enforcement. There's a whole history here of DPS being very clear. "We're going to enforce this in a very broad way," a number of statements all the way

through this litigation about the intent to enforce.

Even now in the papers Defendant Martin, you know, it's clear that DPS will enforce this law, just not -- just that the specific steps that DPS will take maybe have not been determined yet, but that's not enough to defeat either standing or Ex parte Young applicability.

Unless the Court has other questions on those issues, I'll move on to class certification.

THE COURT:  No.  Go ahead.

MR. WOFSY:  We satisfied all requirements for class certification.  Some of those aren't contested. In terms of typicality and Rule 23(b)(2), I think it's the problem with both of those with Texas' arguments. You know, they point to sort of factual differences among the class, but that's not good enough to defeat either of those.

It's the same claims as to the entire class, and it's the same relief.  It's a unified injunction and declaratory judgment that's being sought here.  This is a classic 1252 -- excuse me, Rule 23(b)(2) case.  This is exactly the kind of Civil Rights litigation that Rule (b)(2) was drafted to provide for.

In terms of ascertainability, you know, the class here is far more definite and concrete than the

kinds of cases that Texas is pointing to. You know, you may be in kind of a class that's all good people, all bad people, or something like that. But here the class definition is drawn from the very terms of the statute that Texas has enacted.

Obviously, Texas can't be taking the position that those terms are so vague that nobody knows what they would mean; otherwise, there would be a due process violation in having that be a crime.

The question is practical under ascertainability. It's not whether you can line up all of the people in the class right now. It's whether, when you need to know if somebody's in the class, the Court can reasonably determine whether that person is in a class. And I think this class definition easily satisfies that.

And I want to point out the arguments that they're making, that, you know, we don't necessarily know everybody who's in the class right now. That would defeat all future classes, classes with future class members. Those are absolutely routine as we lay out our papers.

The Supreme Court has ruled on future classes. For example, in the litigation about presentment within 48 hours, County of Riverside and so

forth, those are all future classes.

THE COURT: We don't have a Supreme Court issue of a nationwide injunction here in any event because this is a State law that we're talking about. We're not talking about something that would apply outside of the corridors of Texas.

MR. WOFSY: That's absolutely right, Your Honor. This is a State law.

And nationwide classes have been specifically approved by the Supreme Court. Statewide classes are entirely permissible. There's no problem with either of those issues.

And you know I think Justice Kavanaugh's concurrence in the *CASA* case points this out exactly, that, you know, classes can be certified on a statewide basis, on a nationwide basis, and can be certified in conjunction with a Preliminary Injunction Motion which, is, obviously, exactly what we're asking for.

THE COURT: One of the things I teach in my complex litigation class and I've taught for 38 years is that -- and I've always been wary of these overbroad injunctions issued by District Judges. And I've always been leery of that kind of thing, and I really don't issue them.

I think District Judges and, quite frankly,

even Court of Appeals Judges have to be circumspect when it comes to these things. We have one national court. It's called the Supreme Court of the United States, and they have the jurisdiction and the right to issue national law. That doesn't mean that under certain circumstances, both district courts and, certainly, court of appeals -- more so, the court of appeals have that -- can play that role. But I don't see that as a major problem here in this case, one way or the other. Now, there may be other issues, but I don't see that as a major issue here.

MR. WOFSY: I agree, Your Honor.

Moving on to adequacy, as I understand it, Texas is only challenging the adequacy of the class representatives themselves.

THE COURT: Right.

MR. WOFSY: I'd like to touch on those points. I have a couple of points there.

Number one, there is no conflict of interest here. There is no colorable conflict of interest. It's the same claims, and there's nothing, you know, financial in this case which is very frequently kind of the basis for there being some kind of conflict.

THE COURT: There is no money damages here.

MR. WOFSY: Exactly. Exactly.

And I think that there's -- as we've explained, this Court has already granted this Motion to Proceed Under Pseudonym.  That's no problem for adequacy.

Again, that may be an issue in cases where, for example, there's fights over money, or there is an opportunity to opt out of, say, a Rule 23(b)(3) class, and, therefore, class members need to decide, am I going to file my own lawsuit, or am I going to stay a part of this class?  Maybe the identity of the class representatives would inform the decision.  That's just not the situation here.

And, you know, I think case after case says, what makes sense?  Which is, in fact, a class member can monitor the litigation, know what's going on, get in contact with Class Counsel if they have questions, and the particular identity of the class representative is really of no import.

And in, in some situations, it worked to become a problem.  Class members were interested in learning the names of the class representatives.  Well, cases have recognized -- you know the Court can set up a confidential process where they can learn that subject to a Protective Order.  That's not a reason to deny class cert in this case.

Finally --

THE COURT: I don't think there is any -- unless somebody's been living under a rock in the United States for the last few years, or at least the last year and half, I don't think anybody would seriously suggest that individuals who are here in some sort of undocumented status are not subject to being arrested.

I mean, we -- I mean, Immigration and Customs Enforcement has a program where they go to the places where people, who are following the law and check in, they get arrested when they show up to check in.

We've got hundreds of cases that has been decided by District Courts throughout the country and certainly here in Texas where individuals with absolutely no criminal record -- in fact, the vast, vast majority of them have no criminal record whatsoever. There is a few that have a DWI and even a minuscule amount who have a more serious crime, but they're regularly picked up and detained and/or deported.

So I don't think that anybody would suggest that if you don't have some sort -- if you're not an American citizen, you have a real chance of being picked up. I'm not criticizing that one way or the other.

I'm just saying that it's certainly

something that I don't think the State could argue. They kind of argue it, but it's absolutely without merit, that individuals cannot be arrested by ICE or by State officials. I mean, we see it every day.

MR. WOFSY: I completely agree, Your Honor.

THE COURT: Again, I'm not taking a position on that. You know, immigration laws have to be enforced. I'm just saying that these people have something to worry about.

MR. WOFSY: In terms of adequacy, the one other point I'd like to make is, you know, somewhere in the paper, somewhere in discovery, it seems like Texas is suggesting the class representatives need to have some sophisticated command of legal concepts, like the ins and outs of Rule 23 and what's, you know, typicality for purposes of Rule 23 or Ex parte Young; what are the contours --

THE COURT: That's not for them. That's why we have lawyers. I don't think we would expect any litigant who comes before this Court to know the ins and outs of the Federal Rules of Civil Procedure or the -- I mean, I teach -- as I just said, I teach a class to third-year law students on this very issue. And it's not an easy class. Believe me, it's not an easy class to teach or to take.

And anybody who would suggest that a litigant -- I don't care how sophisticated -- you could be a Ph.D. and born in Vermont, and you wouldn't know the -- unless -- well, I can't imagine that you would know the ins and outs of Rule 23.

I have to refresh myself on it every time I teach my class because the law changes so rapidly.

MR. WOFSY: Absolutely, Your Honor. And so I think what is clear in the declaration and what's confirmed by discovery, these representatives are entirely appropriate as class representatives once the --

THE COURT: You've mentioned the declarations. Now, they challenge the declaration because the -- they don't speak English, or at least not fluently, and the declarations that they signed were in English, but they originally were in Spanish.

Do you have the original Spanish versions?

MR. WOFSY: So, Your Honor, I think what discovery has shown -- obviously, the depositions are not in front of you, but they will be.

THE COURT: No, I have no knowledge of that position.

MR. WOFSY: What discovery has shown is the information was orally communicated, was reduced to an

English-language document, and then that was orally translated.

THE COURT: There is contention that the Plaintiffs wouldn't know what they were signing.

MR. WOFSY: And that's simply incorrect, and we now have testimony under oath at the depositions that they understood what they were signing, that it was translated to them.

THE COURT: All right. That, I didn't know because I was --

MR. WOFSY: Yeah, of course. I'm updating Your Honor on that.

I think that, in general, the Motion to Strike the Plaintiffs' declarations is now essentially water under the bridge and should be denied, both for the reasons we said, but also because now they've had an opportunity to talk to the Plaintiffs about it. And the Plaintiffs were clear, "Yes, I signed this. Yes, it was translated for me. Yes, I understood."

THE COURT: Okay.

MR. WOFSY: So all of those questions about that have been --

THE COURT: I could not have been aware of that.

MR. WOFSY: Of course.

And I apologize again, Your Honor, that we were not able to get you the transcripts before the hearing.

THE COURT: No apologies necessary.

MR. WOFSY: In terms of provisional class certification, I'll just say courts do this regularly. We cite a number of cases that said it. As I said, Justice Kavanaugh, essentially, said, "Yes, this is an appropriate thing to do in some situations."

And I just encourage the Court to the extent, if there's any questions about it, take a look at the David Marcus article that we cite, which is a very recent article by a prominent scholar of class-action law. He surveyed decades of (b)(2) class actions and goes through and explains why a number of the arguments that Texas is making here are incorrect across the board in collects cases.

To the extent the Court has any questions about any of the class issues that have been raised, I think it's a helpful resource.

THE COURT: All right. Thank you.

MR. WOFSY: Unless the Court has other questions on class, I'll move on to the other motion.

THE COURT: Yes.

MR. WOFSY: We've already talked about the

Motion to Strike the clients' declarations.

On the Motion to Dismiss, I basically have two things to say about it. On the substance of it, we have responded to their arguments. They argue standing. They argue Ex parte Young, and they argue the State War Clause. And so we responded to all three of those in our TRO --

THE COURT: One of the things that Counsel should prepare himself to answer for me is whether the State is still suggesting that there is an imminent invasion across the border and that there has been an imminent invasion that is taking place now in light of the border being essentially closed.

It was closed in the last if -- the very last period of the Biden administration and, of course, President Trump, when he came in, he maintained that closure and then amplified it. And the administration has been quite vocal in their announcement that they, basically, have stopped illegal -- essentially, stopped illegal immigration across the border in any numbers.

And I think the numbers bear that out, so there are certainly not people coming across -- there's certainly no cartel army coming across the border either. That has never been the case, and it isn't now.

So it's a fanciful argument.

MR. WOFSY: I think Your Honor has already fully addressed the State War Clause arguments. Just one procedural note on the Motion to Dismiss. As I understand Texas' argument is that we filed a Motion to Dismiss, therefore, nothing else can happen until that motion is resolved. That's not correct. There's no case that says that. Obviously, the Court needs jurisdiction.

THE COURT: No. I do have an unfailing obligation, and the Texas -- the Fifth Circuit Court of Appeals said -- not in my case. There was a case that came out where a District Judge had before him or her -- I can't remember -- a Motion for Summary Judgment and a Motion to Dismiss, and the judge decided that they were not going to address the Motion to Dismiss. They were going to address the Motion for Summary Judgment. And the Fifth Circuit said, no, Circuit, no, you've got to address the Motion to Dismiss.

MR. WOFSY: Your Honor, I'm not sure if you're referring to the *Paxton* case that's cited by Texas. I actually think it's a little bit different and even more different than this case. So I'll just say a word about it.

In that case, what the Court did was allowed a deposition to go forward of the attorney general, a

high-ranking State officer, without addressing the sovereign immunity argument at all.

THE COURT: In the Motion to Dismiss?

MR. WOFSY: And so it was, essentially, a Motion to Quash the deposition that was denied, and they issued a mandamus.

I think that the reasons that's different here is the Court obviously is going to address any and all jurisdictional arguments, including *Ex parte Young* in deciding the Preliminary Injunction Motion. That's routine to decide it --

THE COURT: It is my intention to put out an order -- a reasoned order, as I always do, that will address the Motion to Dismiss and the Motion for Preliminary Injunction, both.

MR. WOFSY: Absolutely, Your Honor.

I would just say --

THE COURT: The State wants the Motion to Dismiss for sure.

MR. WOFSY: Yes.

THE COURT: Actually, this -- are we here -- the TRO -- you've got a TRO actually, also.

MR. WOFSY: That's right, Your Honor.

I believe most recently this hearing was set both for the TRO and the Preliminary Injunction. I

think it's all --

THE COURT: But when it was first set, I think there was a question about -- because TRO technically is not immediately appealable. It can be appealable if the -- if the Court -- if the Fifth Circuit makes the determination that has the effect of a Motion -- of a ruling of a Preliminary Injunction, then they will take it up, but, technically, it isn't.

So by sticking in a Motion to Dismiss, then the State knows that they're in a position to appeal. I mean, that's where we are.

MR. BRYANT: That's fine, Your Honor.

THE COURT: I mean, the State strategy here is not -- I mean, it's very transparent.

MR. WOFSY: We have responded to --

THE COURT: I don't think that's a bad strategy from their perspective.

MR. WOFSY: We have responded substantively to the Motion to Dismiss as part of our TRO and PI.

Obviously if the Court wants us to put in something, you know, specifically on the Motion to Dismiss, but I'd just ask that the Court treat our responsive filing as an opposition to the Motion to Dismiss if it's inclined to rule on it at this stage.

THE COURT: I think that I need to rule on it

as soon as I rule on a Motion for Preliminary Injunction. I don't, you know -- whether one goes before the other one in the order or not, I don't think it makes a big difference.

MR. WOFSY: Understood.

THE COURT: We have a very short timeline here.

MR. WOFSY: Yes, yes.

Lastly, last night the State filed another Motion to Strike the Roma Declaration --

THE COURT: Yes, right.

MR. WOFSY: -- which is a declaration -- you know, authentication/declaration with a number of reports, news articles, and so forth.

THE COURT: It's got 400 pages of news articles.

MR. WOFSY: I will say two quick things about that.

Number one, I think it's untimely. They, obviously, filed a bunch of things on Friday. I'm not sure why this is being filed on the eve of the hearing.

But, in any event, it's meritless. All of the information is clearly relevant because the orders -- the State deportation orders under SB 4, say you have to go back to Mexico. Those are all about

conditions in Mexico. So it's relevant in that sense.

As for it being hearsay, hearsay is perfectly permissible to consider at a Preliminary Injunction stage. And, in fact, Texas is relying on a bunch of hearsay itself, and so I don't really understand why that would be a basis to strike either.

Unless the Court has further questions, I will just ask to respond, and I'll have an opportunity to respond to Texas --

THE COURT: You'll have an opportunity to respond.

MR. WOFSY: Thank you.

THE COURT: Yes. So let me hear from the Government, please. I say "the Government." The State of Texas, Mr. Martin. And I have a number of questions for you. You and I have been in this case long enough so that you had, I think, very rich, dark black hair when we started this. And I had more hair. This case has been going on for a while.

The first thing that I need to know, quite frankly, in light of Judge Ho's ruling in that school case I had, I'm not sure what weight I can give your statement. But the State has kind of been a little bit like Jiminy Cricket in this. And I don't say that in a -- in a disparaging way, because things change over

time.

Let me lay out something here. After I issued my injunction, it had come to my attention that there were a number of State law enforcement officers, mostly rural sheriffs, I think, who were concerned that by assisting the Federal Government under Governor Abbott's order or declaration -- I'm not sure what you call it -- that they would somehow find themselves in contempt of my injunction.

And I issued a Clarification Order, which I labeled "Modification." That was a mistake on my part. I didn't modify anything. It was just a Clarification Order, and I made that clear in a filing; that there is and intended to be nothing in my injunction that sought to prevent peace officers within the State of Texas at any level from assisting Federal law enforcement officers in their duties.

So, for instance, a situation, let's say where a State patrol officer were to stop a vehicle because they were speeding and then asked for the driver's license, and the person says, "Well, you know, I don't have a driver's license," well -- and then it becomes clear that those people are here illegally, there would be nothing in my injunction -- and I'm not making any comment on the appropriateness of that or the

Appx.0293

lack thereof, but there's -- I only can talk about what I do.

There was nothing in my injunction that was ever intended to stop that sheriff from turning the individual over to Immigration and Customs Enforcement or Border Patrol or whoever.

There was nothing in my injunction that was ever intended to prevent the Texas National Guard from assisting the State of Texas in their efforts -- not assisting the State of Texas -- assisting the Federal Government in their efforts to enforce immigration law, to the extent that they were not themselves enforcing immigration law.

And this was bolstered by the fact that President Trump actually issued his own order permitting them to do so. So under -- under those circumstances, we're really not arguing about that.

We don't need to spend a lot of time on whether State law enforcement can assist. To the extent that SB 4 does encompass that, it doesn't violate Federal law in my view, and I made it clear that that was the case.

It's the other part of it that's the problem. And I don't think that in that I am saying something that is -- I think the State does have some

Appx.0294

concern about the other part of it because what I want to know is, in your papers -- see, as I said, initially, Counsel, you will remember this because you were there, I think. I don't know that you argued it, but you were there.

The State was taking the position that this was all going to be enforced exactly as written. Here is what the text of 5B.002(d) says: On a person -- I'm sorry.

It says: On a person's conviction for a defense under Chapter 51 Penal Code -- that is before a State Judge, not a Federal Judge -- the Judge shall enter the judgment in the case and order, shall, requiring the person to return to the foreign nation from which the person entered or attempted to enter. An order issued under this subsection takes effect on completion of the term of confinement or imprisonment.

And I think, as Counsel pointed out, if the alien refuses to voluntarily comply, the idea was, as I was told in my -- by the State, is that the DPS officers or somebody would take these people to the border and say, "Cross. We've got an order here. Cross." And if they refuse to cross, then they would be charged under 51.004, which says -- -3 -- which says the person who refuses to comply with the order, it is a felony in the

Appx.0295

second degree.

Now, in your latest round of filings here, the State said, "Well, we're not exactly sure how this is going to be implemented." And does the State still intend to have DPS agents or officers turn people over to or submit people to State District Attorneys so that they can be indicted under SB 4, or under some other state statute, having to do solely and only with their immigration status, and have them prosecuted in State Court and then pursuant to 5B.002(d) ordered removed?

Does the State intend to still follow that procedure? Because, I don't know from your filings whether that's true or not. I think the State's been quite ambivalent about it, saying, oh, this is the provision that is likely not to survive Supreme Court review.

I don't know whether it will get past the Fifth Circuit, but I don't think the Supreme Court is going to say the State of Texas is going to be permitted to take over the powers of the Federal Government when it comes to immigration.

Governor Abbott is the sovereign Governor of Texas. He is not the President of the United States. Maybe he will be some day. I don't know. But he isn't now. And State DPS officers are not ICE agents and

State Judges are not Federal Judges or immigration judges.

We have a whole scheme set up for this, and that was part of why the Civil War was fought, because the -- and I'm a history buff, and I studied the Civil War. They wanted their own rights to control immigration, the Southern states did, and President Lincoln said, no. And we had a Civil War and -- over many things, of course, slavery and other issues, but State sovereignty was a big one.

And I think the State of Texas has a tremendous amount of sovereignty, a tremendous amount of sovereignty, no question about it, and I don't in the least bit deny that or suggest otherwise.

My concern is, only with respect to those areas of SB 4 -- and I think SB 4 is severable. I've said that before. You know that. The State argued it. The Plaintiff said, no, it can't be severed. I do think it is severable.

Not these lawyers, they weren't there. But I -- I just don't know what the State's position is, and I'm trying to decide this case, and I don't have an idea.

Do you? You may not know.

MR. BRYANT: Your Honor, David Bryant for

Appx.0297

Director Martin. I'd like to cover a few general things, and then I will answer your questions as best I can.

THE COURT: Thank you.

MR. BRYANT: We're here only today on a Motion for Preliminary Injunction. Not here on a Motion for Class Certification. That's not what this hearing's about.

However, the Court directed that we both brief and be prepared to argue today on --

THE COURT: Well, we're here on TRO and a Preliminary Injunction, both. That's one of the things I wanted to discuss with Counsel because I've got a very short timeline here, and one of the -- one of the -- one of the purposes of a temporary restraining order is to give the Court the opportunity to address the issues in a way that's fair to both parties to put out, one would hope, a reasoned order and to then have a solid record upon which the matter can be taken up by the Court of Appeals.

And this came so soon that this law takes effect on the 15th. Today is the 13th. There we are.

MR. BRYANT: And so, Your Honor, Ms. Baker, with the Court's permission, will address issues related

Appx.0298

to the class certification, and I'll address the other issues here.

THE COURT:  All right.  Why don't you go forward?  I'm sorry, I didn't mean to interrupt you.

MR. BRYANT:  No problem.

And I also wanted to inform the Court that I was an attorney of record in the 2024 cases.

THE COURT:  Oh, I remember well.

MR. BRYANT:  I was not present for that hearing --

THE COURT:  Right.

MR. BRYANT:  -- on the Preliminary Injunction, so I don't actually know what specifically --

THE COURT:  But you know who was?  Justice Sullivan in the back, now Supreme Court Justice Sullivan.  I just attended his swearing-in.

MR. BRYANT:  And Ryan Walters, I believe, argued that for the State.

THE COURT:  That's correct.  He did a good job, I thought.

MR. BRYANT:  Yes, he's a very good lawyer.

With respect to the TRO matter, we're not here on a TRO request either.

THE COURT:  Well, it was both a Motion for Preliminary Injunction and TRO.

MR. BRYANT: Let me explain why I say that.

The Complaint does not request a TRO.

THE COURT: No.

MR. BRYANT: It requests a Preliminary Injunction.

The Motion for TRO, which is entitled "Motion for TRO" does not in the prayer request a TRO, and certainly there is not shown, in my opinion, the level of urgency required for a TRO. The complaint was not verified.

THE COURT: Well --

MR. BRYANT: I don't think we're properly here on a TRO motion here today.

THE COURT: Well, one of the reasons why I want to know what the State's position is, is so that I know about whether there is an imminent, you know, situation here or whether there isn't.

I mean, if the State hasn't decided, it has no idea of how they're going to proceed or whether they're going to actually enforce this State version of the Federal immigration laws, then -- you know, this whole law has been to a degree subsumed.

When the Legislature rushed to pass this thing a few years ago, things were very different, and the border was very different and the actions that were

being taken by State officials were quite different.

And now we are in a totally different landscape. So I can understand why the State would say, "Well, you know, President Trump is cooperating" -- I mean, I should say "Governor Abbott is cooperating with President Trump. The State is cooperating with the Federal Government."

We really don't need to have State judges trying to be Federal judges for purposes of immigration enforcement because all we have to do is have the DPS people turn the individuals over to ICE, and ICE will do whatever they're going to do, which is exactly what's happening.

MR. BRYANT: Your Honor, I totally agree that today is different from, I believe, two-and-a-half years ago tomorrow, when the Texas Legislature took its final vote to pass SB 4 for all of the reasons the Court stated and several others that I'll address today.

But the issue today is not what has changed, but whether the -- whether the provisions of SB 4 that Plaintiffs challenge are preempted by the U.S. Constitution, and I want to -- I want to talk about that.

THE COURT: I will be candid with you. And I don't think my prior decisions say otherwise, and the

last -- the last written decision, although, it was vacated out of the Fifth Circuit, written by one of the finest Federal Judges in the country, in my view, Judge Priscilla Richman, agreed with my view on this, that that portion of the law is unconstitutional.

To the extent that Texas is attempting to subsume the powers of the United States Government in regulating the borders of this country, that is not within Texas' power.

Judge Richman said it better than I did. But that having been said, that having been said, there are many other provisions in SB 4 that I think are Constitutional.

MR. BRYANT: Well, Your Honor, you know, we talk about whether SB 4 will go into effect finally after two-and-a-half years, and I think the answer is, there's no dispute that it will go into effect on Friday as to Section 5201 because that's not even involved in this case, as Plaintiffs have made clear.

THE COURT: Right.

MR. BRYANT: So the SB 4 provisions will go into effect.

THE COURT: There's no way that I would enjoy that. It's not an issue.

MR. BRYANT: Exactly.

THE COURT: There's a lot of other provisions in this law that I -- I can tell you are not -- you know, normally, I would not be as forthcoming at a hearing about what my views are, but my views are well-known.

MR. BRYANT: Your Honor, I had the pleasure of rereading the Court's February 29th, 2024 decision last night, and the Court made its views very clear in a very thorough opinion.

THE COURT: Yes, and I have read the opinions out of the Fifth Circuit very, very carefully, Judge Richman's opinion, Judge Oldham's opinion.

By the way, Judge Oldham is a friend of mine, a very fine judge, Judge Ho's opinion and others that were written in the last decision that they issued.

But the majority opinion is what counts, of course, and that's on standing -- organizational standing, which is not an issue here because these are not organizations, so -- although generally, I mean, standing principles are standing principles, regardless of whether you have organizations or individuals. So some of those concepts are gleaned over, obviously.

But I mean, I wouldn't be honest if I didn't say what my view is of the State of Texas' ability to subsume the powers of the United States of America of

which it is a part.

The State of Texas is not its own country. I mean, there are people who would like it to be. There is a movement to that effect. But I don't think Governor Abbott ascribes to that for sure.

MR. BRYANT: And I don't believe Director Martin does either. So that's really not an issue for us today.

THE COURT: It isn't an issue.

MR. BRYANT: To me the question is simply whether or not the particular provisions that the Plaintiffs are challenging, as a facial pre-enforcement challenge, are preempted by the U.S. Constitution --

THE COURT: Right.

MR. BRYANT: -- or by the Federal immigration laws, in particular, the Immigration and Naturalization Act.

THE COURT: I think they are challenging 5104 and 5B.002(d). They're challenging those.

MR. BRYANT: Yes, Your Honor.

THE COURT: We know that.

MR. BRYANT: So with the Court's permission, first, I owe the Court an answer to its original question about the intention of the State with respect to enforcement of -- particularly, I believe, the

removal provision.

THE COURT: Right.

MR. BRYANT: Of course, we're nowhere near any removal of anybody under SB 4. It's not even in effect yet. If it were in effect -- when it is in effect, there will be a whole legal process that leads to a State Judge proceeding with a case after finding probable cause, and under the law, under SB 4, an individual may voluntarily agree to a removal order, which would not be in any way contrary to the INA or the Federal immigration law.

THE COURT: It would still -- well, I agree with you. If somebody is arrested -- or I shouldn't say arrested because the state officers can't really arrest somebody for violating -- well, they can detain them, okay, which is about -- tantamount to arrest.

If they detain them and turn them over to Federal authorities for processing, assuming they didn't commit a State crime, we're not talking about some individuals who've committed an independent State crime. If they've committed an independent State crime, that's a whole other ball of wax. That's not encompassed here.

But assuming -- like if somebody were to be arrested for burglary, well, of course, they can be arrested, of course, they can be indicted, and of

course, they can go to jail. That's -- that's a totally different thing.

We're talking about somebody who is, let's say, is sitting on a bench, and some police officer comes by and sees them there and thinks they look like they are not here legally and then detains them and calls ICE.

I'm not saying whether that's an appropriate thing. You know, we normally in this country don't stop people like that. But let's assume that it's okay. That's not a violation of the -- at least, this provision of the United States Constitution. Normally, people won't get arrested without probable cause, but that's a whole other story.

MR. BRYANT: Yes, Your Honor. And none of us can know how this law actually will be enforced. That's one of the points in court --

THE COURT: That's my problem.

MR. BRYANT: Courts dealing with facial challenges have said again and again, they should be very hard to win because we have to speculate about the future and how a law may or may not be enforced in practice.

That's why it's very important. This is a facial challenge. It's not an as-applied challenge.

THE COURT: Right.

MR. BRYANT: No one has --

THE COURT: Maybe --

MR. BRYANT: -- arrested anybody under SB 4. If and when that ever occurs, anybody arrested has opportunity to argue that as applied to them, the -- is the law consistent with the Constitution? It's not this case.

THE COURT: Okay. You said you were going to answer my question.

MR. BRYANT: I will, Your Honor. Thank you.

And so Director Freeman was not the director of the DPS at the time of the Court's prior decision in 2024.

THE COURT: Right.

MR. BRYANT: He became director of DPS later this year. And so at all times, when he has been director of DPS, the law has been enjoined from enforcement, and it still is today. The Court --

THE COURT: No, I don't think so. Well, it's not enjoined from enforcement. Well, I guess it is.

MR. BRYANT: Yes.

THE COURT: The Fifth Circuit --

MR. BRYANT: Until the Fifth Circuit mandate comes down --

THE COURT: You're right.

MR. BRYANT: -- I believe that it is still technically --

THE COURT: Technically.

MR. BRYANT: -- under injunction. And it certainly --

THE COURT: Not from me. It's not my injunction.

MR. BRYANT: And it certainly has not been enforced.

We filed a declaration of Director Martin with our response that I would encourage the Court to look at.

THE COURT: I have. That's why I'm concerned because I don't know what he is saying.

MR. BRYANT: I will paraphrase it. But it, basically, says we haven't made any decisions about how this will be enforced. If and when it goes into effect, partially, wholly, not at all, he will confer with his management, make those decisions.

But at this point, there is no imminent enforcement of that law and particularly no imminent enforcement of the law against these Plaintiffs. So that really is the answer.

Let me give you a fuller answer as well, and

that is, the Court is correct, that throughout the other litigation, various Courts inquired or were interested in how specifically the removal provision would be enforced if the law went into effect.

In the record on appeal in the case that was just decided by the Fifth Circuit en banc, the State argued and cited in the record -- if the Court has any need, I am happy to provide the Court specific cites.

THE COURT: I don't have that deposition, obviously.

MR. BRYANT: -- that the State's intentions were to -- if there were ever a removal order after prosecution under SB 4, that the State would deliver the person to be removed to Federal officers at the border, and presumably the Federal officers would then carry out that order but only presumably. It's not the State saying, "We will force Federal officers to do that."

THE COURT: Yes, I think the -- the concern here isn't so much the physical aspect of how they're getting to the border. It's whether State judges under the law have the authority to order somebody removed, and the law says that they do. SB 4 says that they do. And I don't believe the Constitution supports that. And that's where Judge Richman's powerful opinion, in my view -- and it wasn't a dissenting opinion. It was the

majority opinion at that time.

Now, obviously, it's not -- it's not in effect because when the case went en banc, it was vacated, as is always the case. But her reasoning remains, in my view, extremely persuasive.

And I don't think that any -- I could be absolutely wrong, but I'm a pretty good court-watcher. I would find it very difficult to believe that the Supreme Court would say that -- any State judge, whether it be a Texas judge or an Iowa judge or any other State judge.

By the way, I have a tremendous respect and regard for State judges. I have many, many close friends who are State judges. And I don't think any State judge is looking forward to this, by the way. They don't need any more work. But that's just my surmise.

MR. BRYANT: Your Honor, there may be a case some day where that issue is presented, and it can be determined at that point after a trial and a sentence has been served under SB 4 and there's a removal at the end, it would not apply, in my judgment, in the situation where a person voluntarily agrees to removal.

THE COURT: I think we have the obligation -- the Supreme Court has said this; the Fifth Circuit has

said this. We have the obligation to take a statute at its word.

I mean, it's not my -- I don't have the prerogative to say, "Well, it says, that the State judge shall do this, this, and this." But I don't personally think that State judges will do that. I mean, that's not my prerogative. The statute says what it says.

And what the Plaintiffs in this case is saying is they are in imminent danger of being subjected to that State process. And I mean, if that isn't the case, then why did the State Legislature pass SB 4 in the first place? I would hope it wasn't for publicity or to show that they were doing something. Maybe it was. I don't know.

MR. BRYANT: Well, Your Honor, I think the record shows that SB 4 is a response to a tremendously difficult and dangerous situation with respect to illegal immigration and cross-border crime that the Legislature perceived and certainly Governor Abbott perceived. The SB 4 is part of Governor Abbott's efforts to deal with what Governor Abbott determined in November of 2022 was an invasion of Texas.

THE COURT: Well, you know --

MR. BRYANT: President Trump has since agreed that it was an invasion.

THE COURT: Let me tell you something.

MR. BRYANT: And -- and we'll talk about --

THE COURT: Governor --

MR. BRYANT: -- justifiability of that issue.

THE COURT: Governor Abbott was a good lawyer. Governor Abbott was a Justice of the Texas Supreme Court. Governor Abbott knows the law.

If they would have stopped at SB 4 in those provisions, which talk about law enforcement cooperating, and arrest -- you know, taking into custody illegal people and, you know, just entered the State illegally -- I mean, even the Plaintiffs aren't challenging that, because I believe I made it clear in my Clarification Order that my ruling didn't prevent that. That isn't the issue. That isn't the issue. That isn't the issue.

The issue is, what do I do with these provisions that, in my view and in the majority of Judges who have actually ruled on its' view, it's just not Constitutional on its face, facially unconstitutional.

MR. BRYANT: Your Honor, the one that we've talked about is the removal of power.

THE COURT: Right.

MR. BRYANT: I also want to talk to the Court

about the fact that 5103, as well as 5102, essentially, mirror Federal law and make illegal as a matter of Texas law what has long been illegal as a matter of Federal law.

And those are in my judgment and in the judgment -- which is extraordinary in a case nine days' old -- expressed to this Court by the United States, that these are not --

THE COURT: I don't know what the United States --

MR. BRYANT: -- field preempted and not conflict preempted.

THE COURT: I don't know what the United States is doing. First, they brought the case. Then they dropped out of the case. Then they were silent in the case. Then they are filing Amicus briefs, and now they are filing Amicus again.

MR. BRYANT: Your Honor, they're expressing their considered view of the law. I agree that it's different than the view that existed in the previous administration. But it's still the view of the United States that I think the Court is entitled to and should at least consider as a part of this process.

THE COURT: Yeah, well, of course, I'll consider it.

Appx.0313

MR. BRYANT: They are the executive branch of the U.S., and they are saying SB 4 does not conflict with the Constitution or the Federal immigration laws.

THE COURT: Well, to the -- to the extent the acting Attorney General of the United States takes the position that the State of Texas can subsume the sovereign powers of the United States with respect to immigration, I would disagree.

MR. BRYANT: I would disagree too if the United States had said that, but I think if the Court reads that Statement of Interest, it will find nothing about subsuming the powers of the United States, and I don't think that's what SB 4 does. So --

THE COURT: Okay.

MR. BRYANT: I know the Court disagrees with me on that, and I hope the Court will just hear me out on it.

THE COURT: I'm not the only Federal Judge who did -- there are higher.

MR. BRYANT: I understand.

THE COURT: -- Federal Judges than me.

MR. BRYANT: Obviously, there's substantial disagreement on the Fifth Circuit, and, hopefully, we'll find out, with time, what the majority view is on that. We do know that the Panel opinions have been vacated.

It's no longer in effect.

THE COURT: That's right. But you know, the dissents written in cases from 80 years ago are frequently quoted in Majority Opinions today.

MR. BRYANT: And sometimes less than 80 years.

But, Your Honor, what is important here is that we are here on -- not for a final decision in this case, but on a Motion for a Preliminary Injunction.

THE COURT: Right.

MR. BRYANT: And, therefore, it was the burden of the Plaintiffs to show that they were imminently threatened with irreparable harm prior to the time a trial of this action could be had.

They've made no showing in that regard. We haven't even talked about when a trial of this case can be had, and certainly I'll tell the Court that the State would be prepared to try this case on any kind of reasonable, quick schedule.

So we're not talking about a long period of time before this case could go to a final trial, but there is no showing of imminent -- imminent threat of irreparable harm to the Plaintiffs.

THE COURT: I will -- I certainly -- regardless of what happens in this motion, this case is still likely to continue, and --

MR. BRYANT: It is, Your Honor.

THE COURT: And as a result of that, I will do my best to expedite it as much as I can. But I have 550 cases plus on my docket. We're one of the busiest courts in the United States, and --

MR. BRYANT: Your Honor, since we were working very hard last night to file a briefing, one of them, I'm aware of that.

THE COURT: So I'll do the best I can. I broke a trial. I'm in trial right now. I broke a trial because of the importance of this, in order to give you folks an opportunity.

All right. I want to hear some -- I'm going to give you an opportunity to step back. I know you haven't finished. You will get your chance.

MR. BRYANT: I haven't, Your Honor.

THE COURT: You'll get your chance, I promise.

MR. BRYANT: Okay.

THE COURT: All right. There are a couple of issues that you raised I want to hear from him on --

MR. BRYANT: Thank you, Your Honor.

THE COURT: -- before it slips. Okay?

MR. BRYANT: Okay.

THE COURT: Now, Counsel, I think that Counsel for the State has made a point that is worth

Appx.0316

considering.

Now, there is no question that in my view that that provision of SB 4, which gives the State the authority to order people removed from the United States, is a power that rests solely with the United States.

And regardless of what the United States says in its -- trying to be helpful to the State of Texas, I don't think, for instance, if a -- you know, the State -- in United States has been going around to certain states that they feel are not cooperative in immigration efforts and saying, Wait a minute; they're acting in a way that is not consistent with Federal law. And we control immigration. The State of California doesn't control immigration. The State of Washington doesn't control immigration. We control immigration, the United States.

And then they come down here and say, Well, Wait a minute. It's okay for Texas.

I don't think so. I don't think that it's okay for any State to interpose itself in the role of guaranteeing the sovereignty of the borders of the United States in a way that takes control of that process away from the United States and gives it to the States. They can't -- can't do that. That's the

hallmark of a country.  It's the very foundation of a country.

A country is defined by its borders.  No ifs, ands, or buts about it.  And to the extent that we suggest that Texas has the authority to control the deportation of individuals, would California have the right to pass a law that allowed people to come in if they chose to do so in derogation of Federal law?  Could they pass a statute?

Who knows what it is -- that says -- and I'm not picking on California.  But let's just say California decided, "Well, we're" -- or Arizona or some other state:  "We're on the border here, and we like to have immigrants come in.  We need these people to work on the farms, and we need people.  So we're going to pass a statute that says it is okay for individuals -- despite what the Federal Government says, it's okay for individuals who don't have legal status to come in here, and they can live here.  And as long as they don't commit any crimes, they can work in our fields, and they can pick tomatoes or do whatever they're going to do, and it is okay because we have sovereignty over this, and we can do that."

See, we keep talking about the reverse side of the mirror on this, which is kicking people out.

Well, what about letting people in? I don't think California would have the authority to do that at all. That would be a -- facially unconstitutional. And because it's a power that belongs to the United States.

I can't even imagine what some people would say if the powers in California started saying, "Well, going to start letting people in because our Legislature passed a law that said we could do that."

They'd say, "What are you talking about?"

Go ahead.

MR. WOFSY: Your Honor, if I may, I think what would be helpful maybe is to take a step back and talk about the provisions and what they do. And I want to also talk about another Texas law because I think it's clarifying as a comparison.

So you're absolutely right, there's the removal provisions, clearly unconstitutional. We can talk about that if you'd like.

THE COURT: No, we don't need to talk about it.

MR. WOFSY: Then there are the substantive crimes, Texas saying we're going to criminalize entry and re-entry. Re-entry is the only one at issue in this case because that's what our clients are subject to, but both of them suffer from the same Constitutional

Appx.0319

defects.

Both of them are, as Your Honor says, efforts to take control of the Federal Government's inherent and sovereign power to control the borders and external relations and all the rest of it.

That's exactly what Judge Richman's opinion said in the Fifth Circuit. It's exactly what, for example, the Eighth Circuit has said and the Eleventh Circuit; that case does not even involve a removal provision. It is only, you know, the entry and re-entry type provisions. And again, the Supreme Court went and denied that stay. There was no noted dissents. And that said this is a field preempted.

Now there's a separate question which Your Honor raised, which I want to clarify in kind of a distinguished way, which is what about State officers cooperating with the Federal Government in the Federal Government's exercise of the Federal Government's immigration powers and so forth?

That's a separate issue, and it's an issue that's addressed by confusingly another law called SB 4 -- an earlier SB 4.

THE COURT: Yeah, that's the other SB 4.

MR. WOFSY: It's addressed --

THE COURT: Why would you name two statutes

the same number?  I don't understand.

MR. WOFSY:  I agree.  It is confusing.

So that's addressing the *El Cenizo* decision which upholds that provision, as you say, as consistent with preemption principles.

THE COURT:  Right.

MR. BRYANT:  And that was all before Judge Richman.  And you know, it's clear that that's a different issue.

This SB 4 does not address cooperation in -- with the Federal Government in effectuating the Federal Government's power.  It is about setting up a State process for State arrests, for State crimes, State prosecutions, and State removals.  And that --

THE COURT:  Let me stop you right there.

MR. WOFSY:  Yes, sir.

THE COURT:  The reason I said in my Clarifying Order that what I did in no way --

MR. WOFSY:  Yes.

THE COURT:  -- shape, or form was meant to enjoin any State law enforcement officer from cooperating with the United States immigration authorities was because that's not what it was about.

MR. WOFSY:  Exactly.  Exactly.  And I -- I don't need to tell Your Honor this.  You said it all in

your earlier opinion, but I'll just reiterate because I think there has been a little bit of confusion in some of the discussion.

Let's set aside the removal provision. Let's just look at the re-entry substantive crime. It is arresting people unilaterally for immigration which is precisely what the Supreme Court said was preempted as to Section 6.

The fact that it parallels a Federal criminal provision, that's exactly the argument that was before the Supreme Court in Arizona. As to Section 3, the registration provision, it is the same arguments that were made and rejected in the Arizona case.

So the re-entry provision is unconstitutional, preempted in all of its applications. It is field preempted, and that is exactly every other Court -- to take a look at these, with or without the removal provision.

The Eighth Circuit did address a removal provision, but addressed them separately and said, yes, the entry provision is illegal for all the reasons we're talking about, and the removal provision is also illegal for all of the reasons we're talking about.

So I want to sort of clarify that, that as Your Honor said, SB 4 does not address cooperation

with -- between the State officers and --

THE COURT: Unfortunately, none of these cases -- nobody got certs in any of these.

MR. WOFSY: Iowa has indicated it's planning to seek cert in the Eight Circuit by this summer.

THE COURT: Well, I hope so because it would be nice to have a Supreme Court decision on this and, you know, decide it one way or the other.

MR. WOFSY: I'd like to address -- to clarify a little bit another point that Defendant made, which is about the removal provision.

The suggestion was, well, if you decide to accept the removal order, then that's just your choice. I think this misrepresents how this system works.

You're a Defendant in one of these prosecutions. You're offered a choice; either you accept the removal provision now, and you avoid conviction and jail time, or you sit pretrial, you go through trial, you get convicted, you get jail time, and you get the same removal order later.

It is set up to pressure and coerce people into accepting those removal orders immediately. That's why the assurances the State is trying to offer, that this is all going to take so long, actually, the whole system is set up to try to get people to take these

voluntary, quote/unquote, removal orders.

THE COURT: You know, you've asked for a preliminary injunction on a part of the law that -- you know, you're making a facial challenge on the law. Obviously, your clients have not been subjected to this process yet.

And Counsel's argument is -- well, the law is going to take effect in a couple of days, at least part of it -- because you haven't challenged part of it -- and maybe all of it; we'll see -- is going to take effect.

And if and when the State starts actually enforcing those provisions that are so problematic -- and believe me when I tell you -- I'm not suggesting that there aren't some lawyers or maybe even judges who are so committed to the idea of State's rights that they think that argument subsumes the United States Constitution, and they think this is okay for the State to take over the -- take control over the borders of the United States. There likely are some people who believe that, but most people don't, including most good lawyers.

I think that there's all kinds of ways to finesse this around, you know, to try to finesse it in a way -- well, actually, this is what the United States is

attempting to do in its amicus. Actually, we're just -- State of Texas is just helping us, actually. They're just kind of helping us.

Well, indicting somebody and putting them before a State Judge who then orders their removal, no, that -- maybe that does help them. It doesn't give them the authority to do that. It doesn't mean that it's unconstitutional. Anything you can do could help somebody theoretically.

MR. WOFSY: That's right, Your Honor. And I think the fundamental point is, it's Congress who gets to decide what roles State officers can and can't have. And Arizona teaches us that there are specific, discrete powers that State officers can exercise subject to Federal supervision, subject to Federal control.

And the fact that the current occupant of Federal offices may not like that, that doesn't entitle anyone to rewrite the statutes that Congress has enacted.

Preemption is a question of congressional intent, not the views of the executive, particularly when the views of the executive, I think, are not going to shed much persuasion given that they've altered in the last couple of years and hasn't been explained. You know, Texas may prefer this particular set of views from

the executive; that doesn't make them definitive in terms of --

THE COURT: Look, the overbroad suggestion that just because something might be in someone's current view helpful, it doesn't mean anything in and of itself.

To the extent, for instance, that without exigent circumstances and without a warrant, law enforcement officers can bust the door down and go in and search your house may make it helpful to law enforcement in the short run, but it's unconstitutional.

MR. WOFSY: Absolutely, Your Honor.

I do want to refocus us on the re-entry provision, because the reality is, this law will go into effect in two days and our clients who drive every day, who are passing DPS entrance, could be pulled over at any time, could be arrested and charged under that provision. That provision itself is unconstitutional, it is preempted. That's exactly what Judge Richman's opinion said and all the Courts have said.

That is an imminent injury sufficient for injunctive relief. The class as a whole faces that injury, that they will be picked up and arrested and charged.

They also face imminent harms under the

other provisions we've challenged, but I don't think that just because some provisions may be exceptionally unconstitutional, you know, or an even clearer case maybe than others, that doesn't remotely establish that the re-entry provision itself does not need to be enjoined and enjoined now.

Again, I would refer the Court to the Eleventh Circuit in the Florida litigation; there is no removal provision there. And, you know, that's a case about people being arrested and charged under entry and re-entry State crimes.

And that's the -- the Eleventh Circuit had no problems saying, yeah, obviously this is irreparable -- you know, the threat of this happening is irreparable injury sufficient for a preliminary injunction and refused to stay the State of Florida's -- if injunction against the State of Florida officers and, like I said, in the Supreme Court, again, in that same case, which does not involve a removal provision, did the same, declined to stay the injunction.

So I think that there's a little bit of a danger of maybe overfocusing on one aspect of it. We think that the way to think about SB 4 is, it is one set of provisions that work together, all of which show the various ways in which the State is doing exactly what

Your Honor said, which is setting up its own immigration system, but that's not just the removal provision. It's not just the "We're going to refuse to abase proceedings just because the Federal Government might be doing something" --

THE COURT: Well, Counsel, let's -- I don't think the practical aspects of this necessarily can be set aside entirely. Right now your clients are driving back and forth with these trucks.

Look, the United States District Judges throughout the United States, particularly along the border, in the border states, have had to decide hundreds of these habeas corpus cases. A large number of them are individuals who are detained while driving cars, you know, and they're never charged by the State for violating anything. They are just stopped.

And, you know, your headlight is dimmed, but they never get charged with having a dim headlight, something like that. I had a case like that, that very case, actually.

I had one guy, who was a passenger, and the driver, actually, was -- who was alleged to not have not turned the turn signal on soon enough before they turned, but they detained the passenger who wasn't even driving.

Under those circumstances -- and that's not based on SB 4. So these -- these stops that your clients are concerned about have and are and will continue to occur unless and until the Supreme Court of the United States says otherwise. They haven't been inclined to do that so far.

So I'm wondering what the practical impact is of SB 4 in this area given the -- you know, the exigencies of the circumstances. So it really isn't the stopping that is so -- that is so concerning because they're getting stopped anyway.

What is it? Are they being turned over to the State authorities to face a State judge to then be ordered deported? And that hasn't happened yet.

MR. WOFSY: Well, Your Honor, it's: Are they going to be charged with a State immigration crime and then potentially deported?

THE COURT: We know that that's what is going to happen.

MR. WOFSY: That's the entirety of what SB 4 is.

THE COURT: Well, it is. That's the crux of SB 4. They have a lot of dressing in SB 4 that covers other issues that are already covered by other provisions of State law.

68

MR. WOFSY: Your Honor, you're right, there's other provisions. There's things about money for localities and all that. We're, obviously -- we're not challenging those --

THE COURT: No.

MR. WOFSY: -- those provisions, I agree. I think that's beside the point.

But let's, specifically, look at the Plaintiff L.M.L., for example, because I think it will help you answer your question.

So he's driving down the street today. He's stopped, say, for a broken headlight. He could, you know, be given a "fix it" ticket or whatever for the headlight; maybe he would be handed over to ICE, but he has a Green Card so he's -- nothing's going to happen to him.

THE COURT: Having a Green Card doesn't matter. They still turn them over to ICE.

MR. WOFSY: Sure. But once this goes into effect, now Texas has a new tool that it can deploy against him. It can charge him with an immigration crime that's created by State law even though immigration is an exclusively Federal field and the State has no business legislating in that area.

And part of that State crime includes, not

just the possibility, but the requirement that upon a conviction, a removal order requiring him to leave the country, despite his Green Card, and carrying 20 years' penalty if he does so. He entered --

THE COURT: Let me stop you for a second.

MR. WOFSY: Okay.

THE COURT: One of the main problems is that, under Federal law, over the years, there's an entire -- there's an entire panoply of provisions that an immigrant -- an illegal immigrant, who is seeking -- for instance, seeking asylum, the convention against torture, CAT protections.

There are a whole panoply of rights that Federal -- that the United States Congress has given, that Federal law gives to individuals, but those don't apply in SB 4.

MR. WOFSY: That's exactly right. And I would say -- I would go even further than that. It's not just there's rights that apply in our defenses in SB 4; it's that the Congress has given this wide range of tools to Federal agents.

It's recognized that there's a bunch of different considerations that come into play when you're talking about immigration violations, people crossing the border. Some of them are, you want to seek to deter

Appx.0331

that, in some cases, punish it. Obviously, it's a Federal crime. But also there's humanitarian concerns. There's protections for victims. There's foreign policy considerations.

And that's why Congress made this judgment that these decisions need to be made by Federal agents with all of these tools. They can decide, in this particular case, am I going to criminally prosecute them? Am I gonna use this or that, civil removal provision? Am I gonna provide relief? Am I just going to not enforce, period, which the Supreme Court has specifically said is entirely within the Executive's power, subject to Congressional statutes.

And so the point is, this is Texas saying, "We're going to decide what is going to happen. We're going to decide that these people are going to be criminally prosecuted," which is the most punitive of the various tools that Congress has given to the Executive Branch. And so that's one of the reasons why this is fundamentally a conflict with or without the removal provision.

The re-entry provision itself is both field preempted because it's entering into this field of entry and presence and so forth and conflict preempted because it is ultimately taking away the power that the Congress

vested in the executive branch.

THE COURT: Well, you know, look, one of the reasons that South Carolina State authorities in 1860 fired on Fort Sumter, the Federal authorities there, because they wanted to control the State -- the Federal Government had that part parceled. They controlled the traffic in and out. And they wanted to control that. They wanted to control that border, and they couldn't. So they got rid of the Federal presence there.

Now, that isn't the whole State's rights argument. I mean, I've read the whole State's rights argument. I've read it in some great detail in my own studies of the Civil War and the causes of it.

But the fact of the matter is, that a hallmark of a country is its ability and its right to control its own borders, and you can't have individual states deciding for themselves what laws they will enforce and won't enforce, what laws they will employ in their control of their borders. It's just not what can happen.

You know, during -- during the Great Depression, California was getting flooded by individuals coming from other states, particularly states in the Dust Bowl, coming to California.

So do you know what they did? They passed a

Appx.0333

law, and they had State Troopers at the California border turning Americans away who wanted to cross the border into California.

Do you know what the Supreme Court said? That's unconstitutional. Why is it unconstitutional? Because California has no right to control the borders between the states.

Well, if they don't have the right to control the borders between the states, can you imagine, how do they have the right to control the borders between the United States and another country? It just doesn't make any sense to me unless one totally ignores the Constitution.

MR. WOFSY: I agree, Your Honor. I want to be mindful of time, unless you have further questions.

THE COURT: No, no. I need to hear from Counsel. You got preempted.

He and I have been friends for a long time, so he knows me.

MR. BRYANT: I have been preempted before, Your Honor. So it's all right.

THE COURT: By better judges than me, I'm sure.

MR. BRYANT: Well, I don't know if there are any, but I would certainly not say that.

I agree with much of what the Court has said on this recently, but I think we're getting a long way from the actual SB 4 provisions that we're talking about. Let me put aside removal. I understand --

THE COURT: Can I -- can I do something here that might --

MR. BRYANT: Sure.

THE COURT: And this way, you can correct me if I'm wrong. We might be able to maybe shorten this a bit.

My understanding of your argument, which I've read and which I've heard, is that, you know, these provisions, Judge, may or may not -- we don't think they're problematic, but they may be problematic, okay, certain provisions. Others are not, but certain provisions may be.

But we don't -- we're not in a position yet where, under the circumstances that the Court is faced with in a facial challenge, any of the Plaintiffs, either of the Plaintiffs -- and that's what I'm confined to here at the moment because there is no class that has been certified -- have been subjected to any of SB 4's enforcement provisions and, therefore, a preliminary injunction, temporary restraining order, anything of that kind is premature.

Is that essentially what you're arguing?

MR. BRYANT: Your Honor, that, essentially, is a small part of our argument. It's not by any means all of our argument.

THE COURT: I thought it was the most important part of your argument.

MR. BRYANT: So, Your Honor, one issue is standing. And Counsel --

THE COURT: Well, you have to remember now at this stage, there is a certain deference given to standing that we don't give later.

MR. BRYANT: Your Honor, I take the Article III, jurisprudence of the courts as stated, and my understanding of it is that the Plaintiffs have the burden of showing an injury in fact.

THE COURT: Right.

MR. BRYANT: There's no injury in fact.

THE COURT: No question about that.

MR. BRYANT: It doesn't exist today. All that is in their declarations and in the Complaint and in the motion is, we are afraid. We have a totally speculative fear that we may be arrested under these provisions when -- when and if the law ever comes into effect --

THE COURT: Well, the law --

MR. BRYANT: They have not been threatened by

anyone.

THE COURT: Well, the law is going to go into effect in two days unless I enjoin it.

MR. BRYANT: Yes.

THE COURT: So -- or at least -- I'm certainly not going to enjoin it all; that's for sure. But those problematic provisions, it's not uncommon -- in fact, it's quite common -- and the Federal courts have said so; the Supreme Court has said so repeatedly, that injury, in fact, can be shown where an individual has the requisite level of fear, and the law itself as written would provide for them to be put in imminent jeopardy.

And this law says what it says, and I'm not going to repeat it. We've talked about it enough. So that's your biggest problem here.

MR. BRYANT: Well, Your Honor, this is not a First Amendment case where there are expanded standing provisions.

THE COURT: No, no.

MR. BRYANT: It is not talking about a chilling effect or any of that.

THE COURT: No, no.

MR. BRYANT: No First Amendment claims here.

THE COURT: I agree.

MR. BRYANT: And the Plaintiffs are apparently law-abiding citizens. They're two of probably hundreds and hundreds of thousands of persons who are in Texas illegally. And neither the Plaintiffs -- and the Court's order confirms, the State of Texas has no idea who they are, so it would be an extraordinary coincidence if anytime in the foreseeable future either of Plaintiffs is subjected to any arrest or prosecution under SB 4.

Is it a real, although minute, possibility? I would agree with that.

THE COURT: Now, Counsel, the difference here is that today -- today, right now, with the law enjoined, they may be in violation of Federal law. One of them isn't, I don't think, at the moment. But the other one is. So they may be in violation of Federal law.

In two days, if this takes effect, if they get stopped by a DPS officer, they won't need to turn them over to ICE because they will be in violation of State law. And the DPS officer then has the authority to arrest them and turn them over for prosecution to the relevant district attorney, whoever that may be, and then that process starts.

So these people are put under an imminent,

additional threat that they wouldn't have been put under before because right now they're in violation of Federal law, in two days, violation of State law.

MR. BRYANT: Your Honor, I think what our dialogue comes down to is whether imminent does or does not require a showing of some kind of -- something that is likely to occur in the near future. This is not likely -- the arrest of these folks is not likely to occur in the near future and certainly not by the time of trial of this case.

THE COURT: With all due respect, Counsel, I think I can take judicial notice, having been the recipient like all of my colleagues of these hundreds of -- I haven't gotten hundreds but a lot of habeas corpus cases. State -- City police officers, State police officers of all stripe, Sheriffs, Deputy Sheriffs stop people every single hour of the day every day in Texas, right outside the door here, basically, here in Austin. It happens every day.

And the first person that gets stopped when this thing goes into effect, they can -- they're -- they don't have to turn them over to ICE. They're going to be told, "Hey, now we can prosecute them." So -- and the Plaintiffs know that.

MR. BRYANT: I agree with that, Your Honor.

Someone could get stopped for a violation of SB 4 when SB 4 goes into effect.

THE COURT: Yes.

MR. BRYANT: The chances that it is one of the two Plaintiffs here are -- I won't say infinitesimal but very, very tiny.

THE COURT: Well, you can't -- how do you know --

MR. BRYANT: Because the State doesn't know who they are. The State has not threatened them, and the cases say that there either has to be an injury in fact, which obviously does not exist, or an imminent threat of injury, and, Your Honor, we would submit that that does not exist.

THE COURT: You see, that's what I've got to look at because your opponent suggests that these are people who drive trucks every day. They're, obviously, Hispanic-looking people, and they are -- unfortunately, or fortunately, depending on your view of things -- the target of these stops -- these random stops that have been occurring.

MR. BRYANT: Your Honor, I think that the Court's assuming they're Spanish-looking people. There is no evidence of that.

THE COURT: Oh, I don't know.

MR. BRYANT: There is evidence that they don't speak English, or at least fluently.

THE COURT: Well, they speak --

MR. BRYANT: That's all there is.

THE COURT: They're from Mexico.

MR. BRYANT: Almost -- almost everybody in Texas drives cars.

THE COURT: I would assume that they're Hispanic maybe. Am I wrong?

MR. WOFSY: (Shakes head.)

THE COURT: No. Counsel acknowledges that they are Hispanic.

MR. BRYANT: It's not in the record, Your Honor.

THE COURT: Oh, okay. I don't think they're part of the British royalty; let me put it that way.

MR. BRYANT: Okay. Your Honor, I want to get back to the showing that's required on a facial challenge that does not involve the First Amendment.

THE COURT: Yes, sir.

MR. BRYANT: And the showing that's required on a facial challenge that does not involve the First Amendment is that the Plaintiff must show that the challenged statutes cannot be enforced against anyone in any circumstances consistently with the Federal

Constitution or laws. And Plaintiffs have not attempted to satisfy that burden, and they -- I believe they could not do so had they attempted to.

In our response to the Motion for Preliminary Injunction, we cited an example of an instance in which we believe there's no question that SB 4 provisions that are challenged here can be enforced consistent with the Constitution and laws of the United States.

Essentially, consider a cartel drug smuggler, who comes across the Texas border between ports of entries after having been deported previously, and who is here to deliver drugs, maybe stay a few days, go back to Mexico.

Such a person is not a resident of Texas, has made no effort to obtain any kind of legal status or lawful presence or right to be here and, obviously, is violating the same law that Plaintiffs violated, 8 U.S.C. 1326. And would be in violation of SB 4, Section 103, if it goes into effect.

THE COURT: Yes, I agree wholeheartedly they're in violation of 1326. There's no question about it. They could be subject to State arrest for their narcotics activity that violates State law. There's certainly a lot of State laws that they have violated.

And they would also likely be subject to prosecution for violating Federal narcotics law and Federal immigration law, but the State doesn't have the authority to indict them for violation of Federal immigration law.

MR. BRYANT: Your Honor, I guess the issue is whether if SB 4 goes into effect, the State -- I don't think there's any dispute that such a person would be in violation of SB 4 --

THE COURT: No, I don't --

MR. BRYANT: -- specifically 5103.

THE COURT: Yes, yes.

MR. BRYANT: And arresting and prosecuting that person would be in no way inconsistent with the U.S. Constitution or the INA or any other Federal immigration law.

THE COURT: I would agree with you. Arresting them for State violations of State crimes, arresting them for violating the Immigration and Nationality Act is a whole 'nother story.

I'm not in the least bit suggesting under any circumstances that the State should tolerate cartel members coming into the state to perform illegal activities.

Listen, I preside over those trials all the

time, and I don't think any cartel person necessarily wants to be in my court when it comes time to sentencing if, after a fair trial, they have been found guilty of having engaged in cartel activities.  That's another story for another day.

But suffice it to say, SB 4 to the -- and this is the real shame of SB -- these provisions of SB 4; they're superfluous.  They are -- you've argued to me that they, basically, mirror the Federal law.  Then why do we have them?  We don't really need them.

MR. BRYANT:  Your Honor, there are provisions of State law all over the country, certainly in Texas, that mirror trade law -- mirror Federal law.

THE COURT:  In areas where the Government -- the Federal Government has not subsumed and has not occupied the field.  This is field preemption.

There's no question, nobody is going to suggest for a moment that drug-dealing can't be a Federal crime and a State crime.  And, in fact, you can get convicted -- you can get acquitted in the State court and get convicted in Federal court of exactly the same crime because of the Separate Sovereigns Doctrine.

I had it in my court one time, where the State prosecutor didn't do a very good job and the Federal prosecutor attorney did.  Yes, that happens.

There is no question about it.

But we're not talking the dozens and dozens and dozens of areas where the Federal Government hasn't occupied the field to the extent -- to the exclusion of the State governments.

MR. BRYANT: Your Honor, if there were a field preemption, I would agree with you, but I don't believe there is.

THE COURT: Okay. Well, I understand you don't. That's your job.

MR. BRYANT: And let's start with express preemption. Had Congress in the INA wanted to say there's not going to be any State laws relating to illegal entry into the country, it could have done so, but it doesn't -- it didn't do so.

THE COURT: It didn't need to because the Constitution covers it.

MR. BRYANT: The Constitution only says that Congress can create a system of immigration. It doesn't say a state can't arrest somebody who's illegally in their state pursuant to the immigration policy that the Federal Government has set.

The Federal Government in INA set a very clear policy. It said if you wanted to come into the United States legally, you come to the ports of entry.

If you enter between the ports of entry, you're committing a Federal crime under 1325 or 1326.

THE COURT: Counsel, you have made this argument in your papers. You are not going to convince me sitting here today anymore than you're going to convince Judge Richman or any of the other judges or the Eighth Circuit or the other Circuit that have ruled on this -- remember the Fifth Circuit hasn't ruled on it yet -- that the State of Texas has the right to have its own immigration law. It just doesn't.

MR. BRYANT: Well, Your Honor, I don't think SB 4 is its own immigration law, but I do want to -- and I understand I've got a challenge on this. I reread the Court's opinion last night. It's very thorough. The Court thought about all of the issues and came up with its view on that. But I want to state that a lot of things have changed since then.

THE COURT: Yes, which have made it even less important for the State of Texas to do what it's doing, not more important because there are -- there are -- I don't know.

MR. BRYANT: But, Your Honor, it's not a Federal court's function to decide whether it thinks the law is important or not. The only issue is whether --

THE COURT: I have --

Appx.0346

MR. BRYANT: -- whether Federal law preempts it.

THE COURT: I have not said that I don't think that this law or any other law is unimportant. I've expressly said that it is less of -- in practical terms -- in practical terms -- and you've acknowledged that; the circumstances have changed.

MR. BRYANT: Absolutely, Your Honor. I'd like to talk about the circumstances.

THE COURT: I'm not ruling on whether the circumstances have changed. I'm ruling on the black letter of SB 4.

MR. BRYANT: I understand, Your Honor.

I won't cover the fact, again, that obviously the position of the United States has changed dramatically, and the United States states clearly here in this court as it did in the Fifth Circuit last October in *24-50149* that there is no field preemption involved and there is no conflict preemption with SB 4.

THE COURT: You know, if this case goes on long enough and it winds its way up to the Supreme Court and, in the meantime, there is an election and there's a change of administrations, the Federal Government's position in this case could change yet again.

MR. BRYANT: No question. Things do change.

THE COURT:  It isn't my job to -- I'm certainly not going to say that, well, because the current administration takes the position, that this is all perfectly fine, that it's perfectly fine.

MR. BRYANT:  Your Honor, another thing that has changed since 2024 is that there is now extensive cooperation between the State of Texas and the Federal authorities in Federal immigration law enforcement.

THE COURT:  No question about it.

MR. BRYANT:  President Trump issued an Executive Order encouraging and strongly suggesting such cooperation.  Governor Abbott has issued five Executive Orders.

There are many agreements in effect between State political subdivisions and the Attorney General's Office of Texas under Federal law, 8 U.S.C. Section 1537(g) pursuant to which there is formal cooperation and authorization of State officers to enforce Federal immigration law by arresting people who are in violation of the Federal immigration statutes.

So today DPS officers are actively enforcing the immigration and nationality act in cooperation with the border patrol and other Federal authorities.  That's they are lawfully arresting aliens who have done exactly what the Plaintiffs have done under --

THE COURT: Let me ask you.

MR. BRYANT: -- under Section 1326.

THE COURT: I took the time to read President Trump's order -- I'm sure you did too -- very carefully. He did authorize the State authorities to cooperate with Federal authorities.

Is there anywhere in President Trump's order that it says that State judges and State authorities could deport illegal aliens?

MR. BRYANT: I don't believe there is, Your Honor.

THE COURT: It's absolutely not there.

MR. BRYANT: I don't think the Executive Order dealt with --

THE COURT: It dealt with a lot. It had to do with all kinds of cooperation and the National Guard.

MR. BRYANT: Yes.

THE COURT: If President Trump had decided -- and I'm sure he got advice from counsel on this as to the Constitutionality of it -- if President Trump decided that he was going to support SB 4 in its full glory, he could have easily said, because he's not shy about issuing, you know, orders, right -- Executive Orders.

He could have issued -- easily said in his

Executive Order -- easily said that SB 4 is, you know, okay, I mean, in a different language, obviously; or he could have easily said that State Judges are hereby authorized to -- I think that would have been unconstitutional if he would have done it, but he's issued other Executive Orders that the Supreme Court has found unconstitutional, this -- and other Cities that they have found Constitutional as well.

In this case, he didn't say that State authorities have the authority to do more than assist Federal authorities. That's exactly what he said in there, not to themselves deport anyone. People have overlooked this.

President Trump never said in any Executive Order -- nor do I think he would -- that Federal authorities -- I mean State authorities have the right under his Executive Order to deport people or to engage in the kind of activity that SB 4 provides in 5B.002(d) or 51.004. Doesn't say that.

MR. BRYANT: Your Honor, I agree. And I'm not aware of any Executive Orders by President Trump that speak to what State judges can do.

THE COURT: Or any President in the history of this great nation.

MR. BRYANT: But we're talking now -- or I'm

talking at least about the -- about Section 5103.

THE COURT: Which is? Remind me.

MR. BRYANT: Which is the provision to SB 4 that makes it a State crime to illegally re-enter Texas or be found in Texas --

THE COURT: Oh, yeah, right. Yes.

MR. BRYANT: -- after illegally re-entering the country.

THE COURT: Yes, thank you.

MR. BRYANT: And under -- or pursuant to President Trump's Executive Orders and Governor Abbott's Executive Orders and Federal immigration law, 8 U.S.C. 1537, State officers are authorized to and are enforcing prohibitions against the same conduct that is violative of 5103, if it is allowed to go into effect. So it is a theoretical difference only. I would like to go ahead --

THE COURT: We're running out of time.

MR. BRYANT: I understand that. And that's what I'd like to do, is move to the fact to the -- some other things that are important that have changed are the *Zyla Life Sciences* case that are cited in our briefs.

THE COURT: Yes, I'm familiar with the case.

MR. BRYANT: And it relies heavily on *Kansas*

*versus Garcia* in 2020 and *Virginia Uranium versus Warren* in 2019. Additional cases that rely on *Kansas versus Garcia* that have been decided just this year in the Fifth Circuit are *AbbVie versus Murrill* and *AbbVie versus Fitch*.

And those cases establish very clearly the law in the United States, especially the Fifth Circuit, that you have to find preemption in the Constitution -- the text of the Constitution -- there's no text here that would do that -- or the text of a specific statute. And there is nothing in the Immigration and Nationality Act that says states cannot help enforce the policies of Federal immigration law.

THE COURT: I have not said that the States couldn't help enforce Federal immigration law. I didn't say that. In fact, the opposite is true.

MR. BRYANT: Well, I'm not arguing about what the Courts found.

THE COURT: No, I never made that argument. I wouldn't make that argument.

I think the State of Texas has every right to assist the Federal Government in its activities in enforcing immigration law. There is a difference between assisting and taking over. And that is a totally different ballgame.

MR. BRYANT: Your Honor, those cases also make to me a very important point --

THE COURT: Let me say something here.

MR. BRYANT: All right.

THE COURT: So we have currently an attorney -- acting attorney general, I guess, who might be right on all fours with your position. I don't know. I don't know. But let us assume for just a moment that we have a different Attorney General under a different administration. We may or may not down the road.

And Texas decides if this law is, ultimately, upheld in the Fifth Circuit -- and we hear it in the Fifth Circuit -- to start enforcing these deportation orders and, under its State law, starts to deport people, right?

Let's assume the Attorney General decides that's just not right; they shouldn't be doing that. This is a Federal prerogative, and we don't think it's consistent with our treaty obligations with Mexico or Canada or any other country or -- and we have specific rules and laws and so forth in place. This doesn't meet our national interest.

Well, guess what? Under the interpretation that some take of the expansive powers of the State of Texas on SB 4, too bad for the Attorney General, and too

bad for the President of the United States because Texas is totally sovereign in this area, and they have the right to control what they do with deportation and the United States' interest in that regard, including any treaties they might have or any other obligation or any other situation that they might have that might impact this are irrelevant.

MR. BRYANT: Your Honor, Defendant does not take that position, and I'm not aware of any State of Texas officers that do.

THE COURT: But you do --

MR. BRYANT: That was a very extreme position.

THE COURT: No, sir. No, sir. You do whether you think you do or not because what you're telling me is that Texas has the right to pass this law which gives Texas control over the Texas/Mexico border primarily, and -- although, people could come in from other places, and they do. But mostly we're talking about the Texas/Mexico border. And there is nothing in the law that I've read that says that it is subservient to the United States? No.

The whole purpose of this law is to give Texas its own sovereign right to arrest, charge, jail, and deport individuals for violation of the Texas crime of entering Texas illegally. That's it.

And if that's the case -- I mean, look, there is a difference between the Federal power and State power. We all know that. An individual can get convicted of a State crime, and the President of the United States who has pardon power has the right to do absolutely nothing about it.

The President cannot pardon someone who is convicted of a State crime. Why? Because that is a sovereign power of the state. The President can't interfere with that.

So if somebody were to be convicted of this crime here under State law, SB 4, and some future administration, thought that was unconstitutional, well, they can challenge the law again, I guess.

But in the meantime, the President couldn't say, "Well, I don't think this law comports with the Constitution, and, therefore, I am going to pardon this person." No, can't do it any more than Governor Abbott can pardon somebody for a Federal crime.

MR. BRYANT: Your Honor, I agree completely. But if that day came that you envision and any time -- could have happened in the last two-and-a-half years, but it didn't --

THE COURT: Well, the law --

MR. BRYANT: Anytime Congress wishes to

Appx.0355

preempt SB 4, it can do so and the State of Texas will not have any argument about that because had there been the will of Congress to preempt SB 4 that it expressed in any bill, we wouldn't be here.

In fact, I don't know whether the Court remembers, there were 46 congressmen who filed an Amicus Brief back in 2024, including most of the Texas Congressmen, on behalf of the Constitutionality and legality of SB 4.

So certainly the Federal Government is in charge in terms of, if it wants to preempt SB 4, it can do so. It has not done that.

THE COURT: You made a statement here that I think is -- and I say this with all respect -- not correct. You said that Congress has not rule that a law like SB 4 -- I mean the Supreme Court has not ruled that a law like SB 4 is unconstitutional, but they actually have. And --

MR. BRYANT: Well, Your Honor --

THE COURT: Specifically, the -- specifically --

MR. BRYANT: Which statute?

THE COURT: Specifically, in the Arizona case in a different context but in a different way.

There are a number of United States Supreme

Court decisions on field preemption, and they cover a wide range of areas. This falls right in the heartland of field preemption, and that has been ruled on by the United States Supreme Court.

And Congress, you know, can change that if they want to, but they have to affirmatively change it. They don't -- you have it backwards. You say if Congress wants to preempt Texas from doing this, they have to say so.

No. If Congress doesn't want this preempted, they would have to say so because field preemption applies.

MR. BRYANT: Your Honor --

THE COURT: A portion --

MR. BRYANT: -- I respectfully disagree, but I understand the Court's view.

THE COURT: Of course, of course. I understand that. But to portions of SB 4, not all of it.

MR. BRYANT: I agree.

THE COURT: All right.

MR. BRYANT: But, Your Honor, I want to --

THE COURT: Last point. I will give you a minute.

MR. BRYANT: The Supreme Court cases and Fifth

Circuit cases say that you can't find preemption in some brooding Federal interest or in judicial policy preferences, and I understand that that is, essentially, what the Plaintiffs are arguing because they have not pointed to, and they can't point to, a specific portion of the Federal immigration laws that forbid the challenged provisions of SB 4.

The *Zyla Life Sciences*' opinion establishes -- in the Fifth Circuit, at least, quote, "States may generally regulate the same conduct the Federal Government does.  That is especially so when State standards mimic Federal standards."

Here, SB 4 does not just merely mimic the Federal standard in 8 U.S.C. 1326, it mirrors or adopts that standard.  The possibility that Federal enforcement priorities might be upset is not enough to provide a basis for preemption.

And our discussion about, well, the policy -- the priorities in the Biden administration are different than the Trump administration, which is certainly true -- cannot provide analysis for protection.

THE COURT:  I don't rule on priorities of the Biden administration or the Trump administration or any -- I've been a Federal Judge for, what, 38 years,

going on 39.

I have been through a lot of administrations, from the Reagan administration until now. I've never issued a decision predicated on the preferences of one administration over another.

MR. BRYANT: I agree. I hope the Court never will, and I don't think it will.

THE COURT: I certainly do not -- and anybody who knows me -- have any type of animus toward the State of Texas.

I -- listen, I'm in trial right now in a case in which I ruled for the State of Texas, and I got partially -- partially, my decision was vacated, and so we were trying that part which was vacated. I was affirmed in another part of it.

But I rule for the State of Texas all the time, and I rule against the State of Texas.

MR. BRYANT: And, Your Honor, may I urge you to continue to rule for the State of Texas all the time.

But, finally, the final point I want to make is the *Zyla Life Sciences* case says it is irrelevant when the State and Federal Governments have regulated the same conduct. It is irrelevant that the states have provided remedial provisions that differ from those of federal law.

And our argument even about the removal power, that's a remedial provision. The Federal Government said it's a Federal crime to re-enter the United States between ports of entry without prior authorization of the government. And Texas is, through SB 4, regulating that conduct, providing the same substantive command in enforcing it.

And that's why, Your Honor, we believe that the SB 4 provisions challenged here are not preempted, and we would certainly ask that the Court not grant preliminary injunction or any other injunctive relief as requested by Plaintiffs.

THE COURT: You know, we have field preemption in all kinds of areas, Counsel. I mean, we have field preemption in air traffic. We have field preemption in train travel -- trains, you know. I just had a big case over it where both sides agreed the area was preempted.

MR. BRYANT: And, Your Honor, I agree there are many areas where that's so.

THE COURT: Although, the State did argue that it had -- in that case, the State was fighting preemption -- I mean -- I mean arguing preemption. The State was arguing preemption and the private party was not.

So it's exactly the opposite. I mean, I get

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Appx.0360

these different arguments depending on the case.

MR. BRYANT: Your Honor, Director Martin asked that this injunctive relief request be denied. But in the event that the Court chooses to issue any injunctive relief, the State would conditionally ask that the Court stay its order until -- for -- allow us to make an interlocutory appeal and seek a stay in the Fifth Circuit.

THE COURT: The chances are pretty good, given the time frame, that SB 4 may well go into effect on the 15th before I have a chance to actually rule. I'm not going to rush a ruling on it.

I think to a degree you're correct, to a degree, that it's unlikely that the particular Plaintiffs in this case will be arrested in the next two or three days. All right.

I disagree with you on the suggestion that they don't have any imminent threat of being arrested on a State crime, because as soon as it goes into effect, State officers can immediately -- immediately charge them with a State crime.

So we know that that is the case, and Texas has not been hesitant in employing its own laws, and I don't think they should be, to the extent that they are lawful laws.

And I think it's -- so it's possible that -- but, you know, the original SB 4 was originally to go into effect and then there was an administrative stay and then the administrative stay went away, and then Justice Alito stayed it. And then justice Alito re-stayed it. And then justice Alito dissolved his stay, and then the Fifth Circuit put the stay back on.

So the original SB 4 -- I mean, SB 4 itself -- it's the same law -- has been through these, you know, stays and un-stays and stays and un-stays as things pass.

MR. BRYANT: Your Honor, I really appreciate the Court hearing us out on this and approaching this with an open mind as --

THE COURT: We agree --

MR. BRYANT: -- which is difficult given the history, but I would ask the Court to be as -- approach this as opened-minded as it can.

THE COURT: Let me say this. There is a difference between my view of what I believe is Constitutional and what I believe may not be Constitutional.

But, on the other hand -- and so I'm not going to suggest for a moment -- because I think if I said this, I would look the fool and not be in the least

bit credible -- that I did not have a view on the Constitutionality of certain provisions of SB 4.

I mean, I've written extensively about it. The Fifth Circuit has written extensively about it. This is not a new law.

On the other hand, the issues that are presented to me today are not necessarily on the ultimate Constitutionality of SB 4 but whether a preliminary injunction should be issued in this case, and that is a different issue.

MR. BRYANT: Agree, Your Honor.

THE COURT: It flows from the same tree, but it's a different branch, and that I have an absolutely open mind on.

MR. BRYANT: And, Your Honor, the -- since 2024, we do have the *Zyla* case and other cases, and the Fifth Circuit --

THE COURT: The circumstances --

MR. BRYANT: -- have sharpened --

THE COURT: The circumstances of that case are totally different. The facts are very different.

MR. BRYANT: I know they are, but the principles -- that's why I just quoted the principles. I didn't get into all the facts.

THE COURT: I will look into all of that.

MR. BRYANT: But the principles that I argued about, I hope the Court will consider. Thank you very much.

THE COURT: Of course I will. Of course I will.

Listen, you are a respected member of this Court. I have always enjoyed having you in this Court. Your colleague did not get a chance to argue, but I have her papers, and Counsel is not going to get a chance to speak again either. That would be unfair.

But there is absolutely -- and you know this -- you know this -- there is no prejudice on my part against either the State of Texas or your position and certainly not Counsel who is here. I hold Counsel in the absolute highest regard.

And you have made -- every lawyer that appears in this court has an obligation -- not, let's do it; maybe we should do it -- an obligation to zealously represent the interests of their client. And you have done that today.

MR. BRYANT: Thank you, Your Honor.

THE COURT: Counsel for the Plaintiff has done it today.

And that's the most I can expect from any lawyer. Thank you very much.

MR. BRYANT: Appreciate it.

THE COURT: Thank you both. Thank all of you. Court will stand in recess. The matter will be taken under submission.

*(Proceedings concluded at 12:25 p.m.)*

APRIL C. BALCOMBE, CERTIFIED REALTIME REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

Appx.0365

REPORTER'S CERTIFICATE

I, APRIL C. BALCOMBE, DO HEREBY CERTIFY THAT THE FOREGOING WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES, ON THIS 18th DAY OF MAY, 2026.

/S/April C. Balcombe
APRIL C. BALCOMBE, CSR, CRR
Official Court Reporter
United States District Court
Austin Division
501 West 5th Street, Suite 4150
Austin, Texas 78701
(512) 391-8795
SOT Certification No. 5752
Expires: 7-31-26