No. 26-50418 cons. with No. 26-50469

# In the United States Court of Appeals for the Fifth Circuit

L.M.L. and K.G.S., on behalf of themselves and all those similarly situated,

*Plaintiffs-Appellees*,

*v.*

Freeman F. Martin, in his official capacity as Director of the State of Texas Department of Public Safety,

*Defendant–Appellant*.

On Appeal from the United States District Court for the Western District of Texas, Austin Division

## APPELLANT'S RECORD EXCERPTS


Ken Paxton
Attorney General of Texas

Brent Webster
First Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-1700

William R. Peterson
Solicitor General

Daniel M. Ortner
Assistant Solicitor General
Daniel.Ortner@oag.texas.gov

D. Bowie Duncan
Assistant Solicitor General

*Counsel for Defendant–Appellant*

# Table of Contents

Docket Sheet, No. 1:26-CV-1170 (ROA.1-10) ........................................ Tab 1
Notice of Appeal (ROA.1272-1273)........................................................ Tab 2
Preliminary Injunction Order (ROA.1194-1271) ...................................... Tab 3

# Tab 1: Docket Sheet, No. 1:26-cv-1170 (ROA.1-10)

INTAPP,SH,STAYED

# U.S. District Court [LIVE]
# Western District of Texas (Austin)
# CIVIL DOCKET FOR CASE #: 1:26-cv-01170-DAE

L.M.L et al v. Martin
Assigned to: Judge David A. Ezra
Related Case: 1:23-cv-01537-DAE
Case in other court: Fifth Circuit, 26-50418
Cause: 08:1101 - Immigration and Nationality

Date Filed: 05/04/2026
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**L.M.L**
*on behalf of themselves and all those similarly situated*

represented by

**Cody Wofsy**
American Civil Liberties Union Foundation
Immigrants' Rights Project
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415-343-0785
Email: cwofsy@aclu.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adriana Cecilia Pinon**
American Civil Liberties Union of Texas
P.O. Box 8306
Houston, TX 77288
713-942-8146
Email: apinon@aclutx.org
*ATTORNEY TO BE NOTICED*

**Carolina Rivera Nelson**
ACLU Foundation of Texas
P.O. Box 8306
Houston, TX 77288
713-942-8146
Email: criveranelson@aclutx.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
Texas Civil Rights Project
Beyond Borders
PO Box 219
Alamo, TX 78516
956-787-8171
Email: daniel@texascivilrightsproject.org
*ATTORNEY TO BE NOTICED*

**Daniel Woodward**

Texas Civil Rights Project
1405 Montopolis Dr
Austin, TX 78741
802-560-8401
Email: danny@texascivilrightsproject.org
*ATTORNEY TO BE NOTICED*

**David A. Donatti**
ACLU of Texas
PO Box 8306
Houston, TX 77288
3462996817
Email: ddonatti@aclutx.org
*ATTORNEY TO BE NOTICED*

**Dustin Rynders**
Texas Civil Rights Project
P. O. Box 1108
Houston, TX 77251
832-971-8984
Email: dustin@texascivilrightsproject.org
*ATTORNEY TO BE NOTICED*

**Hannah Schoen Steinberg**
ACLU Immigrants' Rights Project
425 California Street
San Francisco, CA 94104
415-343-0770
Fax: 332-220-1702
Email: hsteinberg@aclu.org
*ATTORNEY TO BE NOTICED*

**Kate Gibson Kumar**
Texas Civil Rights Project
P.O. Box 17757
Austin, TX 78760
512-474-5073
Email: kate@texascivilrightsproject.org
*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
American Civil Liberties Union
125 Broad St., 18th Floor
New York, NY 10004
212-549-2616
Fax: 212-549-2654
Email: lgelernt@aclu.org
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
American Civil Liberties Union Foundation
125 Broad Street, 18th Floor
New York, NY 10004

(212) 549-2660
Fax: (212) 549-2654
Email: ojadwat@aclu.org
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Amdur**
American Civil Liberties Union Foundation
Immigrant Rights Project
425 California Street
Ste 7th Floor
San Francisco, CA 94104
415-343-0770
Email: samdur@aclu.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**K.G.S.**
*on behalf of themselves and all those similarly situated*

represented by

**Cody Wofsy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adriana Cecilia Pinon**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Carolina Rivera Nelson**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Hatoum**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Daniel Woodward**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Donatti**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dustin Rynders**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hannah Schoen Steinberg**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kate Gibson Kumar**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Lee Gelernt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Omar C. Jadwat**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Spencer Amdur**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Freeman F. Martin**
*in his official capacity as Director of the State of Texas Department of Public Safety*

represented by **Monroe David Bryant , Jr**
Texas Attorney General's Office
Special Litigation Division
P.O Box 12548
(MC-009)
Austin, TX 78711-2548
512-936-2266
Fax: 512-457-4110
Email: david.bryant@oag.texas.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Alexia Kristin Baker**
Texas Attorney General's Office
Special Litigation Division
209 W. 14th Street
Austin, TX 78711
904-303-2872
Email: alexia.baker@oag.texas.gov
*TERMINATED: 08/03/2026*
*ATTORNEY TO BE NOTICED*

**Munera Al-Fuhaid**
Texas Attorney General's Office
PO Box 12548, Capitol Station
Austin, TX 78711-2548
512-472-2700
Email: munera.al-fuhaid@oag.texas.gov
*TERMINATED: 06/22/2026*
*ATTORNEY TO BE NOTICED*

**Amicus**

**UNITED STATES OF AMERICA**

represented by **Jessica R. Lesnau**
DOJ-Civ

Office of Immigration Litigation
Ben Franklin Station
P.O. Box 878
Washington, DC 20044
202-616-9346
Email: jessica.r.lesnau@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/04/2026 | 1 (p.11) | COMPLAINT ( Filing fee $ 405 receipt number ATXWDC-21876909). No Summons requested at this time, filed by L.M.L, K.G.S.. (Attachments: # 1 (p.11) Civil Cover Sheet)(Wofsy, Cody) (Entered: 05/04/2026) |
| 05/04/2026 | 2 (p.28) | REQUEST FOR ISSUANCE OF SUMMONS by K.G.S., L.M.L. (Wofsy, Cody) (Entered: 05/04/2026) |
| 05/04/2026 | 3 (p.30) | MOTION for Temporary Restraining Order *and Preliminary Injunction* by K.G.S., L.M.L. (Attachments: # 1 (p.11) Exhibit Declaration of L.M.L., # 2 (p.28) Exhibit Declaration of K.G.S., # 3 (p.30) Exhibit Declaration of Talia Roma)(Wofsy, Cody) (Entered: 05/04/2026) |
| 05/04/2026 | 4 (p.451) | NOTICE of Attorney Appearance by Cody Wofsy on behalf of K.G.S., L.M.L (Wofsy, Cody) (Entered: 05/04/2026) |
| 05/04/2026 | 5 (p.453) | MOTION to Certify Class by K.G.S., L.M.L. (Attachments: # 1 (p.11) Exhibit Declaration of Cody Wofsy, # 2 (p.28) Exhibit Declaration of Dustin Rynders)(Wofsy, Cody) (Entered: 05/04/2026) |
| 05/04/2026 | | Case assigned to Judge David A. Ezra. CM WILL NOW REFLECT THE JUDGE INITIALS AS PART OF THE CASE NUMBER. PLEASE APPEND THESE JUDGE INITIALS TO THE CASE NUMBER ON EACH DOCUMENT THAT YOU FILE IN THIS CASE. (lme) (Entered: 05/04/2026) |
| 05/04/2026 | | If ordered by the court, all referrals and consents in this case will be assigned to Magistrate Judge Hightower. (lme) (Entered: 05/04/2026) |
| 05/04/2026 | 6 (p.493) | Summons Issued as to Freeman F. Martin. (lme) (Entered: 05/04/2026) |
| 05/04/2026 | 7 (p.495) | NOTICE of Attorney Appearance by Spencer Amdur on behalf of K.G.S., L.M.L (Amdur, Spencer) (Entered: 05/04/2026) |
| 05/04/2026 | 8 (p.497) | NOTICE of Attorney Appearance by Lee Gelernt on behalf of K.G.S., L.M.L (Gelernt, Lee) (Entered: 05/04/2026) |
| 05/04/2026 | 9 (p.499) | MOTION *FOR LEAVE TO PROCEED ANONYMOUSLY* by K.G.S., L.M.L. (Wofsy, Cody) (Entered: 05/04/2026) |
| 05/05/2026 | 10 (p.511) | ORDER SETTING BRIEFING SCHEDULE re 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by K.G.S., L.M.L. Signed by Judge David A. Ezra. (pg) (Entered: 05/05/2026) |
| 05/05/2026 | | DEFICIENCY NOTICE: re 9 (p.499) MOTION *FOR LEAVE TO PROCEED ANONYMOUSLY*. A Proposed Order is required when a non-dispositive Motion is filed. DO NOT RE-FILE the entire document. Please file ONLY the Proposed |

| | | |
|---|---|---|
| | | Order. Use the "PROPOSED ORDER" event from the Other Documents/Other Filings menu/submenu and LINK the Proposed Order to your Motion. Thank you. (pg) (Entered: 05/05/2026) |
| 05/05/2026 | 11 (p.513) | Proposed Order to 9 (p.499) MOTION *FOR LEAVE TO PROCEED ANONYMOUSLY* by K.G.S., L.M.L. (Wofsy, Cody) (Entered: 05/05/2026) |
| 05/05/2026 | 12 (p.514) | CERTIFICATE OF SERVICE by K.G.S., L.M.L 10 (p.511) Order Setting Briefing Schedule (Wofsy, Cody) (Entered: 05/05/2026) |
| 05/05/2026 | 13 (p.515) | ORDER SETTING BRIEFING SCHEDULE AND HEARING ( Motion Hearing set for 5/13/2026 10:00 AM before Judge David A. Ezra ). Signed by Judge David A. Ezra. (pg) (Entered: 05/05/2026) |
| 05/05/2026 | 14 (p.517) | CERTIFICATE OF SERVICE by K.G.S., L.M.L 13 (p.515) Order Setting Briefing Schedule, Set Motion Hearings (Wofsy, Cody) (Entered: 05/05/2026) |
| 05/05/2026 | 15 (p.518) | SUMMONS Returned Executed by L.M.L, K.G.S.. Freeman F. Martin served on 5/5/2026, answer due 5/26/2026. (Wofsy, Cody) (Entered: 05/05/2026) |
| 05/08/2026 | 16 (p.519) | Opposed MOTION to Strike 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction Declarations of L.M.L and K.G.S* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Al-Fuhaid, Munera) (Entered: 05/08/2026) |
| 05/08/2026 | 17 (p.524) | NOTICE of Attorney Appearance by Munera Al-Fuhaid on behalf of Freeman F. Martin. Attorney Munera Al-Fuhaid added to party Freeman F. Martin(pty:dft) (Al-Fuhaid, Munera) (Entered: 05/08/2026) |
| 05/08/2026 | 18 (p.526) | NOTICE of Attorney Appearance by Monroe David Bryant, Jr on behalf of Freeman F. Martin. Attorney Monroe David Bryant, Jr added to party Freeman F. Martin(pty:dft) (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 19 (p.528) | Opposed MOTION to Expedite *Discovery* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 20 (p.533) | Response in Opposition to Motion, filed by Freeman F. Martin, re 9 (p.499) MOTION *FOR LEAVE TO PROCEED ANONYMOUSLY* filed by Plaintiff K.G.S., Plaintiff L.M.L (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 21 (p.539) | NOTICE *of Deposition of Plaintiff K.G.S.* by Freeman F. Martin (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 22 (p.541) | NOTICE *of Deposition of Plaintiff L.M.L* by Freeman F. Martin (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 23 (p.543) | Amended MOTION to Expedite *Discovery* by Freeman F. Martin. (Attachments: # 1 (p.11) Exhibit of Deposition of Plaintiff L.M.L, # 2 (p.28) Exhibit of Deposition of Plaintiff KGS, # 3 (p.30) Proposed Order)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 24 (p.552) | ORDER FOR RESPONSE. Signed by Judge David A. Ezra. (pg) (Entered: 05/08/2026) |
| 05/08/2026 | 25 (p.554) | MOTION to Dismiss for Lack of Jurisdiction *(Subject Matter Jurisdiction)* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | | |

| | | |
|---|---|---|
| | 26 (p.565) | Opposed MOTION to Continue *or Deferral of Determination of Motion for Class Certification* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | | Text Order MOOTING 19 (p.528) Motion to Expedite in light of 23 (p.543) Amended Motion to Expedite. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (LDlc) (Entered: 05/08/2026) |
| 05/08/2026 | 27 (p.569) | Response in Opposition to Motion, filed by Freeman F. Martin, re 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff K.G.S., Plaintiff L.M.L (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 28 (p.587) | Response in Opposition to Motion, filed by Freeman F. Martin, re 5 (p.453) MOTION to Certify Class filed by Plaintiff K.G.S., Plaintiff L.M.L (Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 29 (p.607) | Response in Opposition to Motion, filed by Freeman F. Martin, re 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff K.G.S., Plaintiff L.M.L *Amended* (Attachments: # 1 (p.11) Appendix Declaration of Freeman Martin, # 2 (p.28) Appendix Declaration of David Bryant)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | 30 (p.848) | Amended MOTION to Continue *or Deferral on Hearing for Class Cert* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Bryant, Monroe) (Entered: 05/08/2026) |
| 05/08/2026 | | Text Order MOOTING 26 (p.565) Motion to Continue in light of 30 (p.848) Amended Motion to Continue. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (LDlc) (Entered: 05/08/2026) |
| 05/11/2026 | 31 (p.854) | REPLY to Response to Motion, filed by K.G.S., L.M.L, re 5 (p.453) MOTION to Certify Class filed by Plaintiff K.G.S., Plaintiff L.M.L (Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 32 (p.865) | REPLY to Response to Motion, filed by K.G.S., L.M.L, re 9 (p.499) MOTION *FOR LEAVE TO PROCEED ANONYMOUSLY* filed by Plaintiff K.G.S., Plaintiff L.M.L (Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 33 (p.872) | Response in Opposition to Motion, filed by K.G.S., L.M.L, re 19 (p.528) Opposed MOTION to Expedite *Discovery* filed by Defendant Freeman F. Martin (Attachments: # 1 (p.11) Proposed Order)(Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 34 (p.882) | Response in Opposition to Motion, filed by K.G.S., L.M.L, re 16 (p.519) Opposed MOTION to Strike 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction Declarations of L.M.L and K.G.S* filed by Defendant Freeman F. Martin (Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 35 (p.887) | Response in Opposition to Motion, filed by K.G.S., L.M.L, re 30 (p.848) Amended MOTION to Continue *or Deferral on Hearing for Class Cert* filed by Defendant Freeman F. Martin (Attachments: # 1 (p.11) Proposed Order)(Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 36 (p.892) | REPLY to Response to Motion, filed by K.G.S., L.M.L, re 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by Plaintiff K.G.S., |

| | | |
|---|---|---|
| | | Plaintiff L.M.L (Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 37 (p.905) | ORDER GRANTING 9 (p.499) Motion to Proceed Anonymously and GRANTING IN PART AND DENYING IN PART 23 (p.543) Motion to Expedite Discovery. Signed by Judge David A. Ezra. (cc3) (Entered: 05/11/2026) |
| 05/11/2026 | 38 (p.917) | NOTICE of Attorney Appearance by Alexia Kristin Baker on behalf of Freeman F. Martin. Attorney Alexia Kristin Baker added to party Freeman F. Martin(pty:dft) (Baker, Alexia) (Entered: 05/11/2026) |
| 05/11/2026 | 39 (p.919) | STATEMENT OF ISSUES *STATEMENT OF INTEREST* by UNITED STATES OF AMERICA. (Lesnau, Jessica) (Entered: 05/11/2026) |
| 05/11/2026 | 40 (p.942) | MOTION to Appear Pro Hac Vice by Carolina Rivera Nelson ( Filing fee $ 100 receipt number ATXWDC-21924418) by on behalf of K.G.S., L.M.L. (Rivera Nelson, Carolina) (Entered: 05/11/2026) |
| 05/11/2026 | 41 (p.947) | NOTICE *REGARDING PROTECTIVE ORDER* by K.G.S., L.M.L (Attachments: # 1 (p.11) Exhibit A, # 2 (p.28) Exhibit B, # 3 (p.30) Exhibit C, # 4 (p.451) Exhibit D, # 5 (p.453) Exhibit E)(Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 42 (p.1030) | NOTICE *of Corrected Exhibit C* by K.G.S., L.M.L re 41 (p.947) Notice (Other) (Wofsy, Cody) (Entered: 05/11/2026) |
| 05/11/2026 | 43 (p.1051) | ORDER GRANTING 40 (p.942) Motion to Appear Pro Hac Vice as to CAROLINA RIVERA NELSON. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge David A. Ezra. (cc3) (Entered: 05/12/2026) |
| 05/12/2026 | 44 (p.1052) | PROTECTIVE ORDER GOVERNING THE HANDLING OF CONFIDENTIAL INFORMATION. Signed by Judge David A. Ezra. (cc3) (Entered: 05/12/2026) |
| 05/12/2026 | 45 (p.1066) | MOTION to Appear Pro Hac Vice by Cody Wofsy *for Attorney Hannah Schoen Steinberg* ( Filing fee $ 100 receipt number ATXWDC-21930649) by on behalf of K.G.S., L.M.L. (Wofsy, Cody) (Entered: 05/12/2026) |
| 05/12/2026 | 46 (p.1072) | MOTION to Appear Pro Hac Vice by Cody Wofsy *for Attorney Omar Jadwat* ( Filing fee $ 100 receipt number ATXWDC-21931270) by on behalf of K.G.S., L.M.L. (Wofsy, Cody) (Entered: 05/12/2026) |
| 05/12/2026 | 47 (p.1078) | MOTION to Strike *Declaration of Talia Romo and Exhibits Thereto* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order)(Bryant, Monroe) (Entered: 05/12/2026) |
| 05/13/2026 | 48 (p.1082) | SUPPLEMENT *Regarding Class Certification* by K.G.S., L.M.L. (Attachments: # 1 (p.11) Exhibit Defendant's First Set of Interrogatories, # 2 (p.28) Exhibit Plaintiff L.M.L.'s Response to Interrogatories, # 3 (p.30) Exhibit Plaintiff K.G.S.'s Response to Interrogatories)(Gibson Kumar, Kate) (Entered: 05/13/2026) |
| 05/13/2026 | 49 (p.1113) | ORDER GRANTING 45 (p.1066) Motion to Appear Pro Hac Vice as to HANNAH SCHOEN STEINBERG. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge David A. Ezra. (cc3) (Entered: 05/13/2026) |

| | | |
|---|---|---|
| 05/13/2026 | 50 (p.1114) | ORDER GRANTING 46 (p.1072) Motion to Appear Pro Hac Vice as to OMAR JADWAT. Pursuant to our Administrative Policies and Procedures for Electronic Filing, the attorney hereby granted to practice pro hac vice in this case must register for electronic filing with our court within 10 days of this order. Registration is managed by the PACER Service Center Signed by Judge David A. Ezra. (cc3) (Entered: 05/13/2026) |
| 05/13/2026 | 51 | Minute Entry for proceedings held before Judge David A. Ezra: Motion Hearing held on 5/13/2026 re 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction* filed by K.G.S., L.M.L. Written order forthcoming. (Minute entry documents are not available electronically) (Court Reporter April Balcombe.)(cc3) (Entered: 05/13/2026) |
| 05/13/2026 | 52 (p.1115) | TRANSCRIPT REQUEST *for Hearing on Motion for Preliminary Injunction* by Freeman F. Martin for proceedings held on 5/13/2026. Proceedings Transcribed: Motion for Preliminary Injunction.. (Bryant, Monroe) (Entered: 05/13/2026) |
| 05/13/2026 | 53 (p.1116) | SUPPLEMENT *Regarding Depositions* by K.G.S., L.M.L. (Attachments: # 1 (p.11) Exhibit Deposition of L.M.L., # 2 (p.28) Exhibit Deposition of K.G.S.)(Gibson Kumar, Kate) (Entered: 05/13/2026) |
| 05/14/2026 | 54 (p.1186) | RESPONSE in Support, filed by Freeman F. Martin, re 16 (p.519) Opposed MOTION to Strike 3 (p.30) MOTION for Temporary Restraining Order *and Preliminary Injunction Declarations of L.M.L and K.G.S* filed by Defendant Freeman F. Martin (Bryant, Monroe) (Entered: 05/14/2026) |
| 05/14/2026 | 55 (p.1194) | ORDER MOOTING 30 (p.848) Motion to Continue; GRANTING 3 (p.30) Motion for Preliminary Injunction; DENYING 47 (p.1078) Motion to Strike ; GRANTING IN PART AND HELD IN ABEYANCE IN PART 5 (p.453) Motion to Certify Class; DENYING 16 (p.519) Motion to Strike ; DENYING 25 (p.554) Motion to Dismiss for Lack of Jurisdiction. Signed by Judge David A. Ezra. (dm) (Entered: 05/14/2026) |
| 05/18/2026 | 56 (p.1272) | Appeal of Order entered by District Judge 55 (p.1194) by Freeman F. Martin. ( Filing fee $ 605 receipt number CTXWDC-21968718) (Bryant, Monroe) (Entered: 05/18/2026) |
| 05/18/2026 | | NOTICE OF INTERLOCUTORY APPEAL as to 55 (p.1194) Order on Motion to Continue,, Order on Motion for TRO, Order on Motion to Strike, Order on Motion to Certify Class, Order on Motion to Dismiss/Lack of Jurisdiction by Freeman F. Martin. Filing fee $605. Per 5th Circuit rules, the appellant has 14 days, from the filing of the Notice of Appeal, to order the transcript. To order a transcript, the appellant should fill out (Transcript Order) and follow the instructions set out on the form. This form is available in the Clerk's Office or by clicking the hyperlink above. (cc3) (Entered: 05/20/2026) |
| 05/22/2026 | 57 | Transcript filed of Proceedings held on 5/13/2026, Proceedings Transcribed: Preliminary Injunction Hearing. Court Reporter/Transcriber: April Balcombe, Telephone number: 5129256810. Parties are notified of their duty to review the transcript to ensure compliance with the FRCP 5.2(a)/FRCrP 49.1(a). A copy may be purchased from the court reporter or viewed at the clerk's office public terminal. If redaction is necessary, a Notice of Redaction Request must be filed within 21 days. If no such Notice is filed, the transcript will be made available via PACER without redaction after 90 calendar days. The clerk will mail a copy of this notice to parties not electronically noticed Redaction Request due 6/12/2026, Redacted |

| | | |
|---|---|---|
| | | Transcript Deadline set for 6/22/2026, Release of Transcript Restriction set for 8/20/2026, Appeal Record due by 6/8/2026, (Balcombe, April) (Entered: 05/22/2026) |
| 05/28/2026 | 58 (p.1274) | ANSWER to 1 (p.11) Complaint by Freeman F. Martin.(Bryant, Monroe) (Entered: 05/28/2026) |
| 06/04/2026 | 59 (p.1282) | TRANSCRIPT REQUEST by Freeman F. Martin Court Reporter: April Balcombe.. (Bryant, Monroe) (Entered: 06/04/2026) |
| 06/11/2026 | 60 (p.1284) | Unopposed MOTION to Stay Case *Pending Appeal* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order Granting Motion to Stay)(Bryant, Monroe) (Entered: 06/11/2026) |
| 06/12/2026 | 61 (p.1289) | ORDER GRANTING 60 (p.1284) Motion to Stay Case Pending Appeal. Signed by Judge David A. Ezra. (cc3) (Entered: 06/12/2026) |
| 06/18/2026 | 62 (p.1290) | Unopposed MOTION to Withdraw as Attorney *Munera Al-Fuhaid* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order Granting Motion to Withdraw)(Bryant, Monroe) (Entered: 06/18/2026) |
| 06/22/2026 | | Text Order GRANTING 62 (p.1290) Uonpposed Motion to Withdraw as Attorney. Munera Al-Fuhaid is hereby withdrawn as counsel of record for Defendant Martin. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (LDlc) (Entered: 06/22/2026) |
| 06/22/2026 | 63 (p.1293) | Filing fee received in the amount of $605, receipt number 3567 (cc3) (Entered: 06/22/2026) |
| 07/31/2026 | 64 (p.1294) | Unopposed MOTION to Withdraw as Attorney *Alexia K. Baker* by Freeman F. Martin. (Attachments: # 1 (p.11) Proposed Order Granting Motion to Withdraw)(Baker, Alexia) (Entered: 07/31/2026) |
| 08/03/2026 | | Text Order GRANTING 64 (p.1294) Unopposed Motion to Withdraw as Attorney. IT IS ORDERED that Alexia K. Baker is hereby withdrawn as counsel of record for Defendant Martin. Entered by Judge David A. Ezra. (This is a text-only entry generated by the court. There is no document associated with this entry.) (LDlc) (Entered: 08/03/2026) |

# Tab 2: Notice of Appeal
# (ROA.1272-1273)

**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | |
|---|---|
| L.M.L. AND K.G.S., on behalf of themselves and all those similarly situated,<br>*Plaintiffs,*<br>v.<br>FREEMAN F. MARTIN, in his official capacity as Director of the Texas Department of Public Safety,<br>*Defendant.* | CIVIL CASE NO. 1:26-CV-1170 |

**DEFENDANT MARTIN'S NOTICE OF INTERLOCUTORY APPEAL**

PLEASE TAKE NOTICE that Defendant Freeman F. Martin, in his official capacity as Director of the Texas Department of Public Safety, hereby files his Notice of Interlocutory Appeal to the United States Court of Appeals for the Fifth Circuit, pursuant to 28 U. S. C. § 1292(a), from the Order of the District Court in the above-referenced action dated May 14, 2026 (ECF No. 55), denying Defendants' Priority Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 25); Granting Plaintiffs' Motion for Preliminary Injunction (ECF No. 3); Granting in part Plaintiffs' Motion to Certify Class (ECF No. 5); Denying as Moot Defendant's Motion to Continue Hearing on Class Certification (ECF No. 30); and Denying Defendants' Motions to Strike (ECF Nos. 16, 47).

Date: May 18, 2026

KEN PAXTON
Attorney General

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

ROB FARQUHARSON
Deputy Attorney General for Legal Strategy

RYAN G. KERCHER
Chief, Special Litigation Division
Texas Bar No. 24060998

Respectfully submitted.

DAVID BRYANT
Senior Special Counsel
Texas Bar No. 03281500

ALEXIA BAKER
Assistant Attorney General
Texas Bar No. 24149596

OFFICE OF THE ATTORNEY GENERAL OF TEXAS
SPECIAL LITIGATION DIVISION
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Tel.: (512) 463-2100

COUNSEL FOR DEFENDANT FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE TEXAS DEPARTMENT OF PUBLIC SAFETY

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on May 18, 2026 and that all counsel of record were served by CM/ECF.

/s/ *David Bryant*
**DAVID BRYANT**

# TAB 3: PRELIMINARY INJUNCTION ORDER (ROA.1194-1271)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| L.M.L & K.G.S, on behalf of themselves and all those similarly situated, | § | No. 1:26-CV-01170-DAE |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | |
| | § | |
| FREEMAN F. MARTIN in his official capacity as Director of the State of Texas Department of Public Safety, | § | |
| | § | |
| Defendant. | § | |

ORDER

Before the Court is Plaintiffs L.M.L and K.G.S.'s ("Plaintiffs") Motion for Temporary Restraining Order and Preliminary Injunction, filed May 4, 2026. (Dkt. # 3.) Also before the Court are Plaintiff's Motion to Certify Class, (Dkt. # 5), and Defendant Freeman F. Martin's Motions to Strike, (Dkt. # 16), Motion to Dismiss, (Dkt. # 25), and Motion to Continue Hearing on Class Certification, (Dkt. # 30). The Court held a hearing on the motions on May 13, 2026. Having considered the parties' briefing and relevant law, the Court will preliminarily enjoin Defendant from enforcing certain provisions of SB 4. Specifically, Defendant is enjoined from enforcing Texas Penal Code §§ 51.03 and

51.04, and Texas Code of Criminal Procedure articles 5B.002 and 5B.003 on behalf of the named Plaintiffs and the provisional class.

## BACKGROUND

This case concerns a law passed by Texas that makes it a crime under state law for a noncitizen to commit certain immigration offenses. Senate Bill 4, § 2, 88th Legis., 4th Spec. Sess. (Tex. 2023) (codified at Tex. Penal Code § 51.02(a)) ("SB 4"). The Court will first describe the Parties and SB 4 before turning to the appellate history of this law, then to the merits of the case.

### I. The Parties

Plaintiffs filed suit on behalf of themselves and all those similarly situated on May 4, 2026, to enjoin certain provisions of SB 4 on preemption grounds. (Dkt. # 1.) Both named Plaintiffs are noncitizens residing in Austin, Texas, and they wish to proceed anonymously for fear of retaliation by law enforcement that could lead to their arrest, deportation, and family separation. (Dkt. # 9 at 3.) Plaintiffs also cite fears about stigma and harassment given the heightened political atmosphere surrounding immigration enforcement. (Id. at 2–3.)

Plaintiff L.M.L. is a 56-year-old lawful permanent resident and citizen of Honduras. (Dkt. # 1 at 3.) His first entry to the United States was in 1997, and he was deported after spending one month in immigration detention. (Id.; Dkt. # 3-

1 at 1.)[1] He re-entered the United States without inspection in 2006. (Dkt. # 3 at 3.) He has thus lived in the United States for twenty years, and now has a lawful permanent resident wife, a 21-year-old lawful permanent resident daughter, and an 11-year-old United States citizen son. (Id.) In 2023, his application to become a lawful permanent resident was approved, and he currently holds lawful permanent resident status. (Id.)

Plaintiff K.G.S. is a 29-year-old citizen of Honduras. (Id.) K.G.S. entered without inspection as a minor in 2014. (Id.) She voluntarily left the United States in 2015. (Dkt. # 3-2 at 1.) After leaving the country, a deportation order was issued against her for failure to appear at an immigration hearing. (Id.) She re-entered the United States in 2021 and has now lived here for approximately five years. (Id.) She has two children—one of whom is a United States citizen—ages seven and three. (Id.) Her seven-year-old child has a special immigrant juvenile visa. (Dkt. # 3-2 at 1.) Approximately one year ago, K.G.S. received a prima facie approval on her petition for a U-Visa which she received as a result of domestic violence. (Id. at 2; Dkt. # 36 at 6 n.1.)

[1] The Court has considered Defendant's Motion to Strike the declarations accompanying Plaintiffs' Motion for Preliminary Injunction but finds it should be **DENIED**. (Dkt. # 16.) Defendant's contentions that the declarations were improperly authenticated because they were translated is not persuasive, especially in light of Defendant's recent deposition of both Plaintiffs to test the assertions in their declarations against their own testimony. Upon review of the deposition transcripts, the Court finds Defendant's Motion to be without merit.

Both plaintiffs are the primary breadwinners and caretakers for their families. (Dkt. # 3 at 3.) They justifiably fear they will be arrested, detained, and deported under S.B. 4's reentry provision, and have attached affidavits to that effect. (Id.; Dkt. ## 3-1, 3-2.)[2]

L.M.L. and K.G.S. sue one defendant: Freeman F. Martin, in his official capacity as the Director of the Texas Department of Public Safety ("DPS"). (Dkt. # 1 at 4.) He is "directly responsible . . . for the conduct of the department's affairs" and serves as "executive director of the department," among other duties and responsibilities, and has cited plans for DPS's enforcement of SB 4. (Id.) (citing Tex. Gov't Code § 411.006(a)(1)–(2)).

## II. SB 4[3]

At a broad level, SB 4 criminalizes at the state level unauthorized

[2] As the many thousands of Habeas Corpus Petitions filed by undocumented immigrants within the borders of the Fifth Circuit attest, the government has been aggressively arresting and detaining immigrants with a significant number of these arrests having been made with the assistance of state and local law enforcement.

[3] Many of the issues presented by this case overlap substantially with those considered in depth in this Court's prior decision granting a preliminary injunction in United States v. Texas, 719 F. Supp. 3d 640 (W.D. Tex. 2024). Because the Fifth Circuit's recent en banc decision considering this order was clearly limited to the standing of the organizational plaintiffs who sued in that case, the merits of this Court's prior order remain untouched. See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc) ("Because the Plaintiffs that are challenging the new statute lack standing, we vacate the preliminary injunction without addressing the merits of the preemption claim."). Accordingly, to the extent certain passages of background and analysis remain relevant to the present case, such analyses are repeated herein.

entry or re-entry of noncitizens into Texas from outside the country, authorizes noncitizen removals to Mexico, and instructs state court judges not to abate proceedings on the basis of a pending federal determination of admissibility. Tex. Penal Code §§ 51.02–03; Tex. Code of Crim. Proc. arts. 5(B).002–003. In greater detail, SB 4 first makes it a crime for a noncitizen to "enter[] or attempt[] to enter [Texas] directly from a foreign nation at any location other than a lawful port of entry." Tex. Penal Code § 51.02(a) (the "entry provision"). It is an affirmative defense to violations of § 51.02 if "the federal government has granted the defendant . . . lawful presence in the United States or asylum . . . ." Id. § 51.02(c). SB 4 does not define "lawful presence." Id. Individuals approved under the Deferred Action for Childhood Arrivals ("DACA") program have an affirmative defense, while those approved under the Deferred Action for Parents of Americans ("DAPA") and Lawful Permanent Residents program do not have an affirmative defense. Id. §§ 51.02(c)–(d).

Violations of § 51.02 are Class B misdemeanors under Texas law, punishable by up to $2,000 in fines and 180 days of imprisonment. Id. § 51.02(b); § 12.22. However, if a noncitizen has previously been convicted under § 51.02, a subsequent violation is a felony, punishable by fines up to $10,000 and imprisonment between 180 days and two years. Id. § 12.35. However, unlike in the last challenge to SB 4, Plaintiffs do not challenge the entry provision,

as Plaintiffs acknowledged at the hearing and according to the requested relief in their complaint and motion.

Rather, Plaintiffs first challenge the SB 4's "reentry provision", which makes it a crime for noncitizens to "enter[], attempt to enter," or be found in Texas after they have "been denied admission to" or removed from the United States or departed the United States while an order of "removal is outstanding." Id. § 51.03.[4] The section, in contrast to the entry provision of SB 4, has no affirmative defenses. Violations of § 51.03 are Class A misdemeanors, punishable by fines up to $4,000 and imprisonment for up to one year. Id. § 51.03(b); § 12.21. Certain prior offenses may either elevate violations of § 51.03 to third-degree felonies, punishable by fines up to $10,000 and imprisonment between two and ten years, or second-degree felonies, punishable by fines up to $10,000 and imprisonment between two and twenty years. Id. § 12.21–23.

Next, Plaintiffs challenge SB 4's provisions which permit state judges to request or order the removal of noncitizens under certain circumstances. Tex. Code of Crim. Proc. art. 5(B).002 ("removal provision"). When an individual is

[4] Section 51.02 criminalizes entry directly into Texas, so a noncitizen who enters directly into New Mexico and then crosses the state border into Texas does not violate the law. Tex. Penal Code § 51.02(a). Section 51.03, however, criminalizes a noncitizen who "is at any time found in" Texas after a removal order—regardless of whether they crossed directly back into Texas or through another state. Id. § 51.03(a).

charged with offenses under § 51.02 or § 51.03—but not yet convicted—a magistrate or state judge may "discharge the person and require the person to return to the foreign nation from which the person entered or attempted to enter" if "the person agrees to the order" and has not "previously been" charged with or convicted of specific crimes. Id. art. 5(B).002(a)–(c). If a noncitizen is convicted under SB 4, the judge "shall enter" an "order requiring the person to return to the foreign nation from which the person entered or attempted to enter" after serving their prison sentence. Id. art. 5(B).002(d). Texas law enforcement must monitor the noncitizen's compliance with the state removal order. Id. art. 5(B).002(e). Failure to comply with the removal order is an additional second-degree felony. Tex. Penal Code § 51.04.

Fourth and finally, SB 4 states that a "court may not abate the prosecution" of one of these offenses "on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5(B).003.[5]

[5] SB 4 contains other miscellaneous provisions. It prohibits enforcement in certain buildings, such as primary schools and places of worship. Tex. Code of Crim. Proc. art. 5(B).001. SB 4 also instructs that violations of the law should be added to criminal record databases. Id. art. 42A.059. Finally, it indemnifies officers enforcing the law. Tex. Civ. Prac. & Rem. Code § 117.002. The remaining provisions of SB 4 are not before the Court in this matter, as Plaintiffs challenge only Tex. Penal Code §§ 51.03 and 51.03, and Tex. Code of Crim. P. arts. 5B.002 and 5B.003.

## III. Procedural and Appellate History Concerning SB 4

In early 2024, the United States of America and several organizational plaintiffs sued separately to enjoin Texas's implementation of SB4. United States v. Texas, 719 F. Supp. 3d 640 (W.D. Tex. 2024), vacated by United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc). Organizational Plaintiffs included two nonprofit legal organizations providing legal services to meet the needs of noncitizens in Texas, New Mexico, and Ciudad Juarez, Mexico: Las Americas and American Gateways. Id. at 652. The third organizational Plaintiff was El Paso County, which alleged it would suffer losses in tax revenue, interference with its programs designed for immigrants, and strains on its jail system if SB4 went into effect. Id. at 652–53. These cases were consolidated and assigned to the undersigned, and after a hearing and careful consideration of the issued presented, this Court issued a preliminary injunction in Plaintiffs' favor on February 29, 2024, enjoining SB4 from going into effect. Id. at 702.

In the order granting the preliminary injunction, this Court concluded that the case was justiciable, all plaintiffs had standing to sue, and plaintiffs were likely to succeed challenging SB 4 on field preemption, conflict preemption, and foreign commerce clause grounds. See generally id.

The preliminary injunction was immediately appealed to the Court of Appeals for the Fifth Circuit, where Texas Defendants filed a motion to stay the injunction pending appeal. A motions panel granted an administrative stay of the injunction on March 2, 2024, but on March 4, 2024, the United States Supreme Court stayed the order of the motions panel. No. 23A814, 2024 WL 909451 (U.S. Mar. 4, 2024). The Supreme Court later vacated its stay on March 19, 2024. No. 23A814, 2024 WL 1163923 (U.S. Mar. 19, 2024). The same day the Supreme Court's stay was vacated, the Fifth Circuit panel assigned to hear the case vacated the court's earlier administrative stay and subsequently heard oral arguments on March 20, 2024. United States v. Texas, 144 F.4th 632 (5th Cir. 2025), vacated by United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *5 (5th Cir. 2026) (en banc). Texas's motion to stay the injunction pending appeal was ultimately denied on March 27, 2024. United States v. Texas, 97 F.4th 268 (5th Cir. 2024).

In the following year, the United States of America voluntarily dismissed its case, mooting its appeal before the Fifth Circuit. Thus, at the time of the Fifth Circuit Panel's decision, only the organizational plaintiffs remained. The Panel issued its decision affirming this Court's preliminary injunction on July 3, 2025. United States v. Texas, 144 F.4th 632 (5th Cir. 2025), vacated by 150 F.4th 656 (5th Cir. 2025). On August 29, 2025, the Fifth Circuit voted to rehear the case

en banc, vacating the earlier Panel decision. United States v. Texas, 150 F.4th 656 (5th Cir. 2025) (per curiam).

Recently, on April 24, 2026, the full court issued its en banc decision and vacated this Court's preliminary injunction. United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *5 (5th Cir. 2026) (en banc). The majority opinion decided the case solely on standing grounds, finding the remaining organizational plaintiffs lacked standing to challenge SB 4. Id. at *1, *6. Although the majority did not address the merits of plaintiffs' preemption claims, a dissenting opinion authored by Judge Priscilla Richman and joined in relevant part by Judges Stewart, Southwick, Higginson, and Ramirez concluded that plaintiffs were likely to succeed on the merits of their claims. Id. (Richman, J., dissenting). A separate concurrence, written by Judge Oldham and joined by Judges Elrod, Jones, Willett, Ho, Duncan, and Engelhardt, similarly addressed the merits of conflict preemption as to the entry provision of SB 4, § 51.02. Id. at *12 (Oldham, J., concurring). This case concerns, among other issues, the re-entry provision.

With SB 4 set to take effect on May 15, 2026, a new group of plaintiffs filed suit in this case on May 4, 2026. (Dkt. # 1.) They seek a preliminary injunction preventing Defendant Martin and his officers, agents, servants, employees, attorneys, and all persons acting in concert or participation with him, from enforcing the reentry and removal provisions of SB 4. (Dkt. # 3 at

28.) On the same day as their case opening, Plaintiffs filed a Motion to Proceed Anonymously. (Dkt. # 9.) Finally, Plaintiffs seek provisional class certification of a class of individuals represented by the two named Plaintiffs, defined as:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding."

(Dkt. # 5 at 9.)

On May 8, 2026, Defendant Martin filed a Motion to Dismiss, challenging this Court's subject matter jurisdiction over Plaintiffs' claims. (Dkt. # 26.) Defendant additionally filed a Motion to Strike the declarations accompanying Plaintiffs' Motion for a Preliminary Injunction, (Dkt. # 16), a Motion for Expedited Discovery, (Dkt. # 23), and Motion to Continue the Hearing for Class Certification. (Dkt. # 30.) The evening before the hearing, on May 12, 2026, Defendant filed a second Motion to Strike directed at the declaration of Talia Roma and its accompanying exhibits, all of which also accompanied Plaintiffs' Motion for injunctive relief. (Dkt. # 47.)

Upon considering the expedited motions, the Court granted Plaintiffs' Motion to Proceed Anonymously, (Dkt. # 9), and granted in part and denied in part Defendant's Motion for Expedited Discovery, (Dkt. # 23). (Dkt. # 37). A

protective order was subsequently entered after the parties failed to come to a joint stipulated protective order. (Dkt. # 44.)

LEGAL STANDARD

## I. Motion to Dismiss under 12(b)(1)

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure challenges a federal court's subject matter jurisdiction. See Fed. R. Civ. P. 12(b)(1). Under Rule 12(b)(1), a claim is properly dismissed for lack of subject matter jurisdiction when a court lacks statutory or constitutional authority to adjudicate the claim. Home Builders Assoc. of Mississippi, Inc. v. City of Madison, 143 F.3d 1006, 1010 (5th Cir. 1998).

In considering a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, "a court may evaluate (1) the complaint alone, (2) the complaint supplemented by undisputed facts evidenced in the record, or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." Den Norske Stats Oljeselskap As v. HeereMac Vof, 241 F.3d 420, 424 (5th Cir. 2001) (citation omitted).

## II. Preliminary Injunction

A preliminary injunction is an extraordinary remedy, and the decision to grant such relief is to be treated as the exception rather than the rule. Valley v.

Rapides Par. Sch. Bd., 118 F.3d 1047, 1050 (5th Cir. 1997). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). The party seeking injunctive relief carries the burden of persuasion on all four requirements. PCI Transp. Inc. v. W. R.R. Co., 418 F.3d 535, 545 (5th Cir. 2005).

Plaintiffs have met this high burden and have shown that a preliminary injunction is warranted. Before reaching the merits of their motions, however, the Court must first address the threshold issue of justiciability.

JUSTICIABILITY

Martin challenges the justiciability of this action both in his response to Plaintiff's Motion for Preliminary Injunction and by separately filing a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). Defendant contends that his Motion to Dismiss must be considered and resolved before the Court proceeds to the merits of this case. (Dkt. # 25 at 2.)

However, the Court is unaware of any case, and Defendant cites none, which requires full disposition of a motion to dismiss before preliminary injunctive relief is granted. Indeed, "[j]urisdiction comes first." In re GenOn Mid-Atl. Dev. LLC, 42 F.4th 523, 533 (5th Cir. 2022) (citing Steel Co. v. Citizens for a Better

Env't, 523 U.S. 83, 94 (1998)). Even had Defendant not separately filed a motion to dismiss, the Court would have been obligated to first address its jurisdiction over the matter before proceeding to the merits of Plaintiffs' request for preliminary injunctive relief. But the basic tenet that a court must first find jurisdiction does not impose an affirmative requirement that a *motion to dismiss* be addressed with the "priority" Defendant seeks, particularly where the asserted bases for dismissal align with arguments already made in Defendant's response in opposition to Plaintiffs' preliminary injunction motion.[6]

However, at the hearing, Plaintiffs indicated that they have substantively responded to the issues raised by the Motion to Dismiss. Because the issues in Defendant's Motion to Dismiss are closely intertwined with the jurisdictional questions raised in their response in opposition to Plaintiffs' Motion for a Preliminary Injunction, the Court will address them together below. Accordingly, we now turn to the justiciability issues at hand: standing, sovereign immunity, and the political question doctrine.

[6] Such a rule would produce absurd results and defeat the purpose of emergency injunctive relief. For instance, a defendant could file a motion to dismiss on the eve of a preliminary injunction hearing, or even after a hearing and before the Court issued its decision. Under Defendant's theory, this would halt the proceedings and force a court to address that motion before granting even preliminary injunctive relief. That interpretation risks the deployment of an abusive motion practice designed to further stall emergency relief, and the Court declines to credit this argument in any context beyond the circumstances of this case.

## I. Standing

Martin first challenges the standing of the two named Plaintiffs in this action. At the preliminary-injunction stage, a plaintiff must make a "clear showing" that they have standing. Barber v. Bryant, 860 F.3d 345, 352 (5th Cir. 2017). In particular, a plaintiff must show: (1) an actual or imminent, concrete and particularized "injury-in-fact"; (2) that is fairly traceable to the challenged action of the defendant; and (3) that is likely to be redressed by a favorable decision. See, e.g., El Paso Cnty. v. Trump, 982 F.3d 332, 337 (5th Cir. 2020). Here, the Parties do not contest causation or redressability; rather the core of the standing dispute concerns whether Plaintiffs have asserted an injury sufficient to support a pre-enforcement facial challenge.

In cases where plaintiffs challenge a criminal statute but have not yet suffered an injury, they need not wait to "expose [themselves] to actual arrest or prosecution." Babbitt v. United Farm Workers Nat. Union, 442 U.S. 289, 298 (1979) (quoting Steffel v. Thompson, 415 U.S. 452, 459 (1974)). Rather, in a pre-enforcement challenge, a plaintiff must show "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." Susan B. Anthony List v. Driehaus, 573 U.S. 149, 160 (2014) (quoting Babbitt v. United Farm

Workers Nat. Union, 442 U.S. 289, 298 (1979)). Each provision will be discussed below.

*A. Plaintiffs' intended conduct is arguably proscribed by SB 4's provisions.*

Both Plaintiffs allege that they are already engaging in conduct that will be proscribed by SB 4's reentry provisions. (See Dkt. # 1 at 3.) Section 51.03 makes it a crime for a noncitizen who was previously removed or who departed while an order of removal is outstanding to enter, attempt to enter, or be found anywhere in Texas. § 51.03 ("A person who is an alien commits an offense if the person enters, attempts to enter, or is at any time found in this state after the person (1) has been denied admission to or excluded, deported, or removed from the United States; or (2) has departed from the United States while an order of exclusion, deportation, or removal is outstanding."). Plaintiff L.M.L. was previously deported in 1997, and later re-entered in 2006 without inspection, placing him squarely within the ambit of SB 4's reentry provision. (Dkt. # 1 at 3); see § 51.03. L.M.L.'s reentry, and now his mere continued presence in Texas, is proscribed by § 51.03. See § 51.03 (additionally criminalizing being "found in this state" after reentry).

K.G.S.'s continued presence is also arguably proscribed by SB 4's reentry provision. K.G.S. falls less squarely within the text of 51.03 because she departed the United States before the removal order was entered against her. See §

51.03 (applying to individuals who have "departed from the United States *while* an order of exclusion, deportation, or removal is outstanding") (emphasis added). In their reply, Plaintiffs argue that the analogous law after which the reentry provision of SB 4 was modeled, 8 U.S.C. § 1326, has a similar text but still applies in situations where noncitizens depart the United States *before* a removal order is entered. (Dkt. # 36 at 3–4); U.S. v. Ramirez-Carcamo, 559 F.3d 384, 390 (5th Cir. 2009) ("We conclude, based on our analysis of the statutory language, that aliens do not avoid prosecution under Section 1326 by refusing to comply with their obligation to appear at removal proceedings and instead departing in advance of the removal order."). Thus, the Court finds that Plaintiff, as a noncitizen who reentered the country and now remains in Texas, is engaging in conduct that would be at a minimum, "arguably" proscribed by SB 4's reentry provision. See Driehaus, 573 U.S. at 162.

*B. The conduct is arguably affected with a constitutional interest.*

Defendant argues that Plaintiffs do not assert any claim based on a constitutional interest that they have individually because the sole claim in their complaint is a preemption claim under the Supremacy Clause. (Dkt. # 29 at 11). ("Plaintiffs' only claim is not based on any constitutional or statutory rights they

have, but solely on their discredited interpretation of the Supremacy Clause.”).[7] But this argument views the test in Driehaus too narrowly. Driehaus does not require a plaintiff to allege a violation of a constitutionally protected right; it only requires that a plaintiff state “an intention to engage in a course of conduct *arguably affected with a constitutional interest*.” Driehaus, 573 U.S. at 159 (quoting Babbitt, 442 U.S. at 298) (emphasis added).

Plaintiffs here have done so by showing they could be arrested under SB 4 and arguing that SB 4 was enacted in violation of field preemption. (See Dkt. # 3 at 14, 24–25.) Other courts have found this suffices for plaintiffs to assert standing in this context. Iowa Migrant Movement for Just. v. Bird, 157 F.4th 904, 914 (8th Cir. 2025) (“This conduct is ‘arguably affected with a constitutional interest’ because the Act criminalizing their presence in Iowa is arguably preempted by federal law, under the Supremacy Clause.”); Idaho Org. of Res. Councils v. Labrador, 780 F. Supp. 3d 1013, 1033 (D. Idaho 2025) (“Plaintiffs have adequately alleged a ‘constitutional interest’ in not being prosecuted under an allegedly federally preempted law.”); Fla. Immigrant Coal. V. Uthmeier, 780 F.

[7] Defendant fails to cite authority for their assertion that Plaintiffs’ interpretation of the Supremacy Clause is “discredited.” The Court respectfully disagrees for the reasons noted *infra* but also notes that this interpretation remains an open question given the Fifth Circuit’s limitation of its recent decision in United States v. Texas to issues of standing. --- F.4th ---, 2026 WL 1122127, at *1 (5th Cir. 2026) (en banc).

Supp. 3d 1235, 1255 (S.D. Fla. 2025) ("Plaintiffs simply wish not to be arrested and prosecuted under a law that violates constitutional principles of federalism. Numerous other federal courts have recognized this right as a legally protected interest.").

The Court in Hobby Distillers Ass'n v. Alcohol & Tobacco & Trade Bureau broached a similar question when analyzing the standing of plaintiffs bringing a pre-enforcement challenge. 740 F. Supp. 3d 509, 520–21 (N.D. Tex. 2024), aff'd as modified, McNutt v. U.S. Dep't of Just., 173 F.4th 204 (2026). In that case, individual plaintiffs who wished to distill spirits at home for personal consumption challenged a federal statute which made it a felony to distill spirits in any dwelling house, shed, yard, or enclosure connected to a house. Id. at 516–17. Plaintiffs challenged the law as exceeding Congress's enumerated powers, seeking an injunction to prevent enforcement of the law against them. Id. at 517. In response to the Government's argument that the proscribed behavior—distilling liquor on one's personal property—was not "affected by a constitutional interest" to confer pre-enforcement standing under Driehaus, the district court found that "a plaintiff need not allege the violation of an articulated right to keep Congress in its lane. . . . [Plaintiff] has demonstrated a legal interest that could be lost if he is prosecuted for engaging in conduct that he believes Congress has no power to prohibit." Id. at 521. This decision was affirmed recently in McNutt, with the

Panel finding that "[e]ach of the individuals here has satisfied these elements." 173 F.4th at 213 (referring to the three Driehaus elements necessary to satisfy the injury-in-fact requirement).

Although this case involves a state rather than a federal statute, the Court follows the same line of reasoning. The constitutional interest implicated in Plaintiffs' claim is not an individual constitutional right. See Armstrong v. Exceptional Child Care Ctr., 575 U.S. 320, 324 (2015) ("[T]he Supremacy Clause is not 'the source of any federal rights,' and certainly does not create a cause of action." (internal citations omitted)). Rather the constitutional interest with which Plaintiffs' conduct is "arguably affected" is Plaintiffs' legal interest in not being prosecuted under a state law which is arguably preempted. Thus, Plaintiffs have "demonstrated a legal interest that could be lost if [they are] prosecuted for engaging in conduct [they] believe[] [Texas] has no power to prohibit." See Hobby Distillers Ass'n, 740 F. Supp. 3d at 521.

*C. Threat of future enforcement is substantial.*

Finally, Plaintiffs must demonstrate that "the threat of future enforcement of [SB 4] is substantial." Nat'l Press Photographers Ass'n v. McCraw, 90 F.4th 770, 782 (5th Cir. 2024). Although this element is presumed to be met in cases involving free speech, this case enjoys no such presumption. Id. ("Unlike in other constitutional contexts, in the speech context, we 'may *assume* a

substantial threat of future enforcement absent compelling contrary evidence.'") (quoting Barilla v. City of Houston, Texas, 13 F.4th 427, 432 (5th Cir. 2021) (emphasis in original); see also Wang v. Paxton, 161 F.4th 357, 363 (5th Cir. 2025) ("Plaintiffs enjoy a presumption of enforcement only in the First Amendment context."). Thus, Plaintiffs bear the burden of establishing this element. The Court finds they have done so.

First, Director Crawford, the Director of DPS before Martin, testified to a Texas legislative committee that SB 4 could lead to an additional 75,000 to 80,000 arrests per year. United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting) (citing Texas Senate Committee on Border Security, at 49:19–50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)). Although a new Director is now defending the present action, his failure to disavow enforcement weighs on this Court's decision. (See Martin Decl., Dkt. # 29-1.)

Instead, Defendant asserts that "it has not yet been determined what . . . operational steps" will be taken to enforce SB 4. (Id. at ¶ 4.) When pressed at the hearing on the question, Defendant's counsel reiterated this response. Defendant's silence on this matter speaks volumes. After all, his statement that "[i]f and when SB 4 actually goes into effect, my executive command and I will determine the

operational steps DPS will take steps [sic] to enforce SB 4" suggests that Martin intends to enforce the law. (Id.) Indeed, Director Martin has a particular *duty* to enforce state law. Nat'l Press Photographers Ass'n, 90 F.4th at 786.

As to these particular Plaintiffs and whether the threat of future enforcement against them is substantial enough to justify the pre-enforcement injunctive relief they seek, the Court need only look further within Director Martin's statement, which describes the actions that DPS personnel have taken to "vigorously defend[] the southern border of Texas." (Id. at ¶ 5.) That they do so in assisting federal law enforcement in enforcing *federal* laws is not contested by the State. But DPS's current relationship with United States Border Patrol Officers, which Martin describes as "close[] and cooperative[] in enforcing federal immigration laws," suggests that DPS's existing procedures in assisting enforcement of federal immigration laws could be easily transformed to begin imminent enforcement of analogous state-law crimes under SB 4. A credible threat of future enforcement is one that is not "imaginary or wholly speculative," Babbitt, 442 U.S. at 302, "chimerical," Steffel, 415 U.S. at 459, or "wholly conjectural." Golden v. Zwickler, 394 U.S. 103, 109 (1969). This theory rises to the level of a credible threat. There is no reason to doubt that DPS would employ the same "vigorous" enforcement of its own state immigration laws.

Defendant argues that Plaintiffs' allegations of fear of arrest are merely speculative, since "do not allege that they have been prosecuted under any provisions of S.B. 4 or even have been threatened with any prosecution by Defendant." (Dkt. # 29 at 4.) Of course, they have not been prosecuted under SB 4 because the law has only ever been in effect for mere hours and has otherwise been enjoined. Further, although courts may consider an affirmative, individual threat of enforcement on this element, there is no such requirement to lodge a pre-enforcement challenge. Cf. Driehaus, 573 U.S. at 158 ("[A]n actual . . . enforcement action is not a prerequisite to challenging the law."). Nor would such a threat be expected under these facts, where SB 4 has not yet taken effect.

Defendant additionally contends that Plaintiffs' fears of arrest are speculative and unlikely because "S.B. 4 is not even in effect and Plaintiffs are unknown to DPS." (Dkt. # 29 at 16.) His first argument quickly loses its impact as the effective date looms. Further, it is irrelevant that the specific identities of Plaintiffs are unknown to DPS. Plaintiffs' risk of arrest is not only because of their participation as lead plaintiffs in this suit; rather it stems from their very presence in the state of Texas and their status.

Finally, Defendant takes the position that any threat of removal cannot be "imminent" enough for Plaintiffs' standing purposes because "neither Plaintiffs nor anyone will be subject to removal from the United States . . . for a substantial

period of time" given that such removals occur "only after a person has been charged, tried, and convicted of violating SB 4 and has served any sentence for such conviction (or has consented to such removal)." (Dkt. # 29 at 15.) However, the Court agrees with Plaintiffs' arguments at the hearing and in their briefs that "[t]he statute is designed to encourage or coerce supposedly voluntary acceptance of state deportation orders as soon as the beginning of prosecution." (Dkt. # 36 at 10) (citing United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting)). Thus, the removal provision is still sufficiently imminent for the purposes of standing.

Thus, the Court concludes that Plaintiffs have demonstrated a substantial threat of enforcement here, and consequently an injury sufficient to confer standing. Any suggestion that injury to individuals in Plaintiffs' situation is speculative ignores that the state's police officers are now actively looking for possible noncitizens and stopping them on a regular basis. At present, they turn them over to federal immigration officers, but under SB 4, they would be in the position of charging them under state law. This is all uncontested.

*D. The injury is fairly traceable to Defendant and redressable.*

Defendant Martin does not challenge either of the remaining elements of standing. However, upon review, the Court finds that the elements of causation and redressability are satisfied.

On causation, the injury in fact is fairly traceable to Defendant Martin. As the Director of DPS, he has a duty to enforce the challenged provisions of SB 4 once the law takes effect. DPS would be tasked with making arrests for the reentry crime Plaintiffs challenge, triggering the remaining challenged provisions of SB 4. Plaintiffs' injury is, therefore, fairly traceable to the conduct of Martin and the office over which he presides.

Finally, Plaintiffs' injury is likely redressable by a favorable judicial decision, where granting the injunctive relief they seek would enjoin the enforcement of the challenged provisions, eliminating their risk of arrest, detention, and removal under the law. See Food and Drug Admin. v. Alliance for Hippocratic Med., 602 U.S. 367, 381 (2024) ("If a defendant's action causes an injury, enjoining the action . . . will typically redress that injury."). Thus, the redressability prong is met.

## II. Sovereign Immunity

Director Martin argues that he is entitled to sovereign immunity. (Dkt. # 25 at 5–7.) "Generally, States are immune from suit under the terms of the Eleventh Amendment and the doctrine of sovereign immunity." Whole Woman's Health v. Jackson, 595 U.S. 30, 39 (2021). This prohibition extends to suits against state officials "that are effectively suits against a state." City of Austin v.

Paxton, 943 F.3d 993, 997 (5th Cir. 2019). However, this immunity is not without exception.

The relevant question here is whether the exception articulated in Ex parte Young applies. See 209 U.S. 123 (1908). "Ex parte Young allows suits for injunctive or declaratory relief against state officials, provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law." In re Abbott, 956 F.3d 696, 708 (5th Cir. 2020) (citations omitted), cert. granted, judgment vacated as moot sub nom, Planned Parenthood Ctr. for Choice v. Abbott, 141 S. Ct. 1261 (2021). To have the requisite connection, the official must have "the particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (citation omitted).

Director Martin satisfies both requirements. Martin's enforcement as head of DPS is sufficient to give him the particular duty to enforce the state's criminal laws:

> [The Director of DPS has] more than just the general duty to see that the state's laws are implemented—[he is] directly responsible for enforcing Texas's criminal laws . . . . DPS [] officers arrest people for violating Texas law, exercising "compulsion or constraint" in service of the law.

Nat'l Press Photographers, 90 F.4th at 786.

Moreover, his predecessors in the same office have demonstrated a clear willingness to enforce SB 4 and Director Martin has not disavowed this

intention. Again, Martin's predecessor testified that SB 4 could lead to an additional 75,000 to 80,000 arrests per year. United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting) (citing Texas Senate Committee on Border Security, at 49:19–50:45 (Nov. 1, 2023), https://senate.texas.gov/videoplayer.php?vid=18888&lang=en (statement of Steve McCraw, Director, Tex. Dep't of Pub. Safety)). Although Martin argues that Plaintiffs have not adequately shown a "demonstrated willingness" to enforce the statute, (Dkt. # 25 at 7), where even a "scintilla of enforcement by the relevant state official with respect to the challenged law" will do, Director Martin easily meets that threshold. City of Austin v. Paxton, 943 F.3d 993, 1002 (5th Cir. 2019).

Defendant argues that the Ex parte Young exception does not apply because there is no "ongoing" violation of federal law, and that Plaintiffs "could not plausibly" allege any "because the challenged statute has not taken effect to date." (Dkt. # 25 at 6.) They assert that "there is no allegation, nor can there be, that Director Martin has taken any step to date to enforce S.B. 4." (Id.) To accept this argument would be to accept the notion that Ex parte Young could never apply in pre-enforcement challenges. That simply does not comport with the current state of the law. See Mi Familia Vota v. Ogg, 105 F.4th 313, 329 (5th Cir. 2024) ("If the plaintiffs bring a pre-enforcement action, as has occurred here, prior enforcement obviously will be lacking.").

Finding Plaintiffs have demonstrated Director Martin satisfies the prerequisites of the Ex parte Young exception, the Court concludes Martin is not entitled to sovereign immunity.

## III. Political Question Doctrine

The final jurisdictional issue Director Martin raises is non-justiciability under the political question doctrine. The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. Am. Cetacean Soc., 478 U.S. 221, 230 (1986).

Martin contends that SB 4 was enacted pursuant to Article I, Section 10 of the United States Constitution, and that because of this authority, Texas had the power to enact the law as part of its response to an "invasion across [Texas's] southern border . . . to protect its citizens and communities." (Dkt. # 25 at 7.) For support, Defendant points to Governor Abbott's declaration in November, 2022, that Texas was subject to an "invasion" within the meaning of the Constitution because of the ongoing influx of immigration. (Id.) Defendant also now cites to executive orders from the current Presidential Administration which declare that Texas is experiencing an actual invasion at its southern border. (Id. at 8.) As a result of these determinations, Defendant contends, the Court lacks jurisdiction

over this matter because the issues of whether such an "invasion" exists and whether SB 4 is an appropriate response to that "invasion" are nonjusticiable political questions. (Id.)

Plaintiff responds by characterizing Defendant's argument as a repackaged reprise of its "invasion defense" theory that his predecessor asserted in related litigation surrounding SB 4. (Dkt. # 36 at 9–10.) This Court agrees. To the extent Defendant wishes to assert an invasion defense theory, the Court has already discussed this theory at length and rejected it. United States v. Texas, 719 F. Supp. 3d 640, 679–698 (W.D. Tex. 2024), vacated by United States v. Texas, --- F. 4th ---, 2026 WL 1122127 (5th Cir. 2026). The Court thus incorporates its prior thorough analysis of the history and meaning of the State War Clause to the extent it remains relevant to Defendant's current arguments. Id.

In his briefing and at the hearing, Defendant cited the current administration's approval of SB 4 to support his contention that the law is not field preempted and that the issue of whether there is an invasion is a nonjusticiable political question. Indeed, the Court has accepted and reviewed the Statement of Interest filed by the United States on May 11, 2026, for the detailed reasoning and arguments in its brief. (Dkt. # 39.) However, to the extent Defendant uses the fact the United States has expressed an opinion on the constitutionality of SB 4 to argue

the Court is barred from addressing the issues underlying this case, such arguments are unpersuasive.

Defendant misidentifies the issues presented. This case does not require the Court to make a determination on whether there is an ongoing "invasion," or whether the federal response, or SB 4, is adequate in addressing such an "invasion" if one exists. The issue presented by Plaintiffs relates to neither of those questions but rather is limited in scope to whether certain provisions of SB 4 are constitutional. And "evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary, even if an unreviewable political determination exists somewhere in the case." United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *28 (5th Cir. 2026) (Richman, J., dissenting) (citing Zivotofsky ex rel. Zivotofsky v. Clinton, 566 U.S. 189, 197–98).

Zivotofsky clarifies this Court's jurisdiction in circumstances such as this. 566 U.S. 189. In that case, the Supreme Court found a case which presented a plaintiff's challenge to a federal statute and the executive's refusal to follow the letter of the statute was not a nonjusticiable political question. Id. at 194. The Court explained this was not a case where the federal courts were "being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of" foreign policy. Id. at 196. Rather, the court was only

being asked to "decide if [plaintiff's] interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise." Id.

This is the properly framed inquiry here: whether the provisions of SB 4 that Plaintiffs challenge may be constitutionally enforced against them pursuant to the State War Clause, as Defendant contends, or whether they are preempted by federal law, as Plaintiffs argue. This is not a political question and falls well within the purview of this Court's jurisdiction. See Marbury v. Madison, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is."). Moreover, the Executive's agreement or disagreement with the Court's interpretation of SB 4 does not have a bearing on the political question analysis. Indeed, SB 4 has been under review by the courts for several years, spanning two different presidential administrations with vastly differing views on the constitutionality of Texas's law. That Defendant now finds support from the Executive branch does not persuade the Court that it is relieved of its duty to interpret this law.[8]

[8] The Court notes that at oral argument, Defendant Martin argued that SB 4 must be constitutional because the current administration supports SB 4 and forty-five members of the House of Representatives also support the law. See Amicus Brief, 1:24-cv-8-DAE, Dkt. # 31-1. Of course, Congress is comprised of 435 members, so the majority did not sign on to the letter. More importantly, however, this Court does not make decisions predicated on politics. Further, the mere fact the Attorney General may support SB 4 does not make it constitutional any more than the Attorney General's support of the administration's tariffs made them constitutional. See, e.g., Learning Resources, Inc. v. Trump, 607 U.S. ---, 146 S.

LIKELIHOOD OF SUCCESS ON THE MERITS

## I. Field Preemption

Next, the Court turns to the merits, beginning with field preemption. "The Government of the United States has broad, undoubted power over the subject of immigration and the status of [noncitizens]." Arizona, 567 U.S. at 394. The U.S. Constitution empowers the federal government to "regulate commerce with foreign nations" and "establish a uniform Rule of naturalization." U.S. Const. art. I, § 8; id. art. II, § 2. Pursuant to this authority, Congress has created a complex and expansive system to regulate entry into and removal from the United States. See, e.g., De Canas v. Bica, 424 U.S. 351, 353 (1976); Toll v. Moreno, 458 U.S. 1 (1982); Padilla v. Kentucky, 559 U.S. 356 (2010).

SB 4 directly challenges the federal government's long-held power to control immigration, naturalization, and removal.[9] SB 4 extends federal

---

Ct. 628 (2026) (concluding the International Emergency Economic Powers Act did not support the executive's expansive reading to grant the "extraordinary power to unilaterally impose tariffs of unlimited amount, duration, and scope."). In addition it must be noted that President Trump issued Executive Orders authorizing state officials to "cooperate" and "assist" federal officials in the enforcement of immigration law. However, as acknowledged by counsel for Defendant, President Trump did *not* issue an Executive Order purporting to authorize the state of Texas to engage in the deportation of individuals or the supplantation of federal immigration law.

[9] Despite Texas's argument that SB 4 does nothing more than "supplement and parallel" federal law, (Dkt. #29 at 11), Governor Greg Abbott himself declared that SB 4 was an exercise of constitutional authority *superseding* federal immigration laws. See Press Release, Greg Abbott, Governor of Texas, Statement on Texas's

immigration penalties by authorizing Texas state officials to detain, arrest, prosecute, and remove noncitizens without federal supervision. Supreme Court precedent squarely holds that SB 4's attempt to regulate the unlawful entry of noncitizens is field preempted. Arizona, 567 U.S. at 399. Field preemption "can be inferred" both from "a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject" and from "a framework of regulation so pervasive that Congress left no room for the States to supplement it." Id. Applied to the field of immigration, the federal government has both a dominant interest and a pervasive regulatory framework that preclude state regulation in the area.

*A. The United States has a dominant interest in regulating immigration.*

As over a century of Supreme Court cases hold, "The authority to control immigration—to admit or exclude [noncitizens]—is vested *solely* in the Federal Government." Truax v. Raich, 239 U.S. 33, 42 (1915) (emphasis added) (citing Fong Yue Ting v. United States, 149 U.S. 698 (1893)). The Supreme Court has repeatedly stressed that "the regulation of [noncitizens] is so intimately blended and intertwined with responsibilities of the national government that

Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf. (noting that "Texas's constitutional authority to defend and protect itself . . . is the supreme law of the land and supersedes any federal statutes to the contrary.").

where it acts, and the [S]tate also acts on the same subject," the state law must give way. Hines v. Davidowitz, 312 U.S. 52, 62 (1941); see also Hillsborough Cnty. v. Automated Med. Lab'ys., Inc., 471 U.S. 707, 719 (1985) (recognizing "the dominance of the federal interest" in immigration and foreign affairs as the paradigmatic example of field preemption); Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948) (acknowledging that States "can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of [noncitizens] in the United States or the several states"); United States v. Valenzuela-Bernal, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."); Chy Lung v. Freeman, 92 U.S. 275, 280 (1875) ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States."); De Canas, 424 U.S. at 354 ("Power to regulate immigration is unquestionably exclusively a federal power."); Arizona, 567 U.S. at 409 ("[T]he removal process is entrusted to the discretion of the Federal Government.").

Beyond the federal government's interest in the admission and removal of noncitizens, the field of immigration is also deeply intertwined with the United States' foreign relations. First, "[i]mmigration policy can affect trade,

investment, tourism, and diplomatic relations for the entire Nation, as well as the perceptions and expectations of [noncitizens] in this country who seek the full protection of its laws." Arizona, 567 U.S. at 395. It is "fundamental" that "foreign countries concerned about the status, safety, and security of their nationals in the United States must be able to confer and communicate on this subject with one national sovereign, not the 50 separate States." Id. In the 250th year of our great nation, will we cease to engage with the rest of the world as the United States and instead be viewed as some form of confederation of independent states? These global perceptions have real impacts: "[P]erceived mistreatment of [noncitizens] in the United States may lead to harmful reciprocal treatment of American citizens abroad." Id. "Our system of government is such that the interest of the cities, counties and states, no less than the interest of the people of the whole nation, imperatively requires that federal power in the field affecting foreign relations be left entirely free from local interference." Hines, 312 U.S. at 63.

Second, "discretionary decisions" on how to enforce the nation's immigration laws "involve policy choices that bear on this Nation's international relations" and the "dynamic nature of relations with other countries requires the Executive Branch to ensure that enforcement policies are consistent with this Nation's foreign policy." Id. at 396–97. That is particularly true for removal decisions. Such decisions include "the selection of a removed [noncitizen]'s

destination" which "may implicate our relations with foreign powers," requiring "consideration of changing political and economic circumstances." Jama v. Immigr. & Customs Enf't, 543 U.S. 335, 348 (2005) (citation omitted). The "removal process" must be "entrusted to the discretion of the Federal Government" because it touches "on foreign relations and must be made with one voice." Arizona, 567 U.S. at 409.

Third, the federal government must be entrusted with the power to control the country's international borders. "[T]his country's border-control policies are of crucial importance to the national security and foreign policy of the United States," Hernandez v. Mesa, 885 F.3d 811, 819 (5th Cir. 2018) (quoting United States v. Delgado-Garcia, 374 F.3d 1337, 1345 (D.C. Cir. 2004)), aff'd, 140 S. Ct. 735 (2020), and "[n]ational-security policy" and foreign policy are "the prerogative of the Congress and President," Ziglar v. Abbasi, 582 U.S. 120, 142 (2017). Determination of which noncitizens may enter and remain in the United States "is unquestionably exclusively a federal power." De Canas, 424 U.S. at 354.

In short, it is undisputed that the federal government has a dominant and supreme interest in the field of immigration. Texas's own state courts acknowledge "the matter of entry into the United States" is "wholly preempted by federal law," Hernandez v. State, 613 S.W.2d 287, 290 (Tex. Crim. App. 1980), as

are "matters involving deportation." Gutierrez v. State, 380 S.W.3d 167, 173, 176 (Tex. Crim. App. 2012). By regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause. Indeed, it is implausible to imagine each of the fifty United States having their own state immigration policy superseding the powers inherent in the United States as a Nation.

*B. Congress has enacted a pervasive regulatory framework.*

In regulating immigration, and specifically the reentry and removal of noncitizens, the federal government has also enacted a "framework of regulation so pervasive that Congress left no room for the States to supplement it." Arizona, 567 U.S. at 399 (internal quotations omitted); see also Texas v. United States, 50 F.4th 498, 516 (5th Cir. 2022) ("[B]ecause policies pertaining to the entry of [noncitizens] and their right to remain here are entrusted exclusively to Congress[,] [a]n attempt by Texas to establish an alternative classification system . . . would be preempted.") (cleaned up). Congress has created a comprehensive framework "of federal statutes criminalizing the acts undertaken by [noncitizens] and those who assist them in coming to" the United States. Ga. Latino All. for Hum. Rts. v. Governor of Ga., 691 F.3d 1250, 1264 (11th Cir. 2012) ("GLAHR").

Congress regulates immigration through countless statutes and

treaties,[10] far too numerous to list in full. Congress has "authorized criminal penalties for individuals who bring [noncitizens] into the United States," GLAHR, 691 F.3d at 1264 (citing 8 U.S.C. § 1323), has "penalize[d] the transportation, concealment, and inducement of unlawfully present [noncitizens]," id. (citing 8 U.S.C. § 1324), has "impose[d] civil and criminal penalties for unlawful entry" and re-entry, id. (citing 8 U.S.C. § 1325–26), has prohibited "aid[ing] the entry of an inadmissible [noncitizen]," id. (citing 8 U.S.C. § 1327), and has banned the "import [of] [a noncitizen] for an immoral purpose," id. (citing 8 U.S.C. § 1328). As one circuit court has held, the country's immigration laws have "been described as second only to the Internal Revenue Code in complexity." Singh v. Gonzales, 499 F.3d 969, 980 (9th Cir. 2007) (cleaned up). Another has noted the striking resemblance between immigration law and "King Minos's labyrinth in ancient Crete." Lok v. INS, 548 F.2d 37, 37 (2d Cir. 1977). The country's immigration

[10] See, e.g., Immigration and Nationality Act of 1952, Pub. L. 82-414, 66 Stat. 163 (codified as amended in scattered sections of 8 U.S.C.); Refugee Act of 1980, Pub. L. 96-212, 94 Stat. 102 (codified as amended in scattered sections of 8 U.S.C.), Immigration Act of 1990, Pub. L. 101–649, 104 Stat. 4978 (codified in scattered sections of 8 U.S.C.); Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub. L. 104–132, 110 Stat. 1214, 28 U.S.C. § 2254 et. seq.; REAL ID Act of 2005, Pub. L. 109-13, 119 Stat. 3028 (codified in scattered sections of 8 U.S.C.); Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135 (codified in scattered sections of 6 U.S.C); USA Patriot Act, Pub. L. 107-56, 115 Stat. 272 (codified as amended in scattered sections of 8 U.S.C. 12 U.SC., 15 U.S.C., 18 U.S.C., 31 U.S.C., and 42 U.S.C); Illegal Immigration Reform and Immigrant Responsibility Act of 1986, Pub. L. 99-603, 100 Stat. 3445 (codified as amended in scattered sections of 8 U.S.C. and 42 U.S.C.).

laws are massive, sprawling, detailed, complex, and pervasive.

Congress has vested DHS and other executive agencies with substantial enforcement power and duties. DHS has "the power and duty to control and guard the boundaries and borders of the United States." 8 U.S.C. § 1103(a)(5). DHS and its subagencies retain the sole responsibility for "enforc[ing] and administer[ing] all immigration laws," especially "the inspection, processing, and admission of persons who seek to enter" the United States and "the detection, interdiction, removal, [and] departure from the United States" of those here unlawfully. 6 U.S.C. § 211(c)(8).[11]

Director Martin argues that the state is entitled to a presumption against preemption when courts analyze state laws enacted to protect public safety or health. (Dkt. # 27 at 11.) When courts apply this standard, "the assumption [is] that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." AbbVie, Inc. v. Murrill, 166 F.4th 528, 539 (5th Cir. 2026) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). However, this assumption is "not triggered when the State regulates in an area where there has been a history of significant federal presence." U.S. v. Locke, 529 U.S. 89, 108 (2000).

[11] State authorities may assist in this enforcement under federal supervision. E.g., 8 U.S.C. § 1357(g).

Accordingly, the Court is not persuaded that this presumption applies to this situation, where SB 4 was enacted not within the realm of Texas's police powers, but rather within the federal government's sphere of enforcing the regulatory framework governing its own immigration laws. See Iowa Migrant Movement for Just., 157 F.4th at 919 ("[T]he presumption against preemption 'has greatest force when Congress legislates in an area traditionally governed by the States' police powers.' But immigration is not a traditional subject of state regulation.").

Even assuming the presumption against preemption should apply in this context, this presumption can be rebutted by an adequate showing of "clear and manifest purpose of Congress" to occupy the field. AbbVie, Inc., 166 F.4th at 539. Here, Congress has done so. Under the Immigration and Nationality Act ("INA"), a removal proceeding shall be "the sole and exclusive procedure for determining whether [a noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." 8 U.S.C. § 1229a(a)(3).[12] The federal government alone is vested "with the powers of external sovereignty" and "the power to expel" noncitizens. United States v. Curtiss-Wright Exp. Corp., 299 U.S. 304, 318 (1936). The power of removal is "inherently inseparable from the conception of nationality." Id.

[12] Subject to certain other federal provisions.

In sum, there is no genuine question that the federal government occupies the field of immigration detention and removal. Accordingly, the Court will next turn to whether SB 4 unlawfully intrudes upon the federal government's immigration authority.

*C. SB 4's criminalization of unlawful entry and re-entry intrudes into the federal government's field.*

Beginning with Texas's prohibitions on unlawful entry and re-entry, Arizona expressly forbids the sort of "concurrent" criminalization that Texas seeks to impose. 567 U.S. at 400; Tex. Penal Code § 51.02–51.03. There, in response to surging numbers of immigrants crossing its southern border, Arizona passed SB 1070 to "discourage and deter the unlawful entry and presence of" noncitizens in the country. Id. at 392–93. SB 1070 had four separate provisions: Section 3, which made it a state crime to comply with federal registration requirements; Section 5(c), which made it a state crime for an unauthorized noncitizen to seek or engage in work in Arizona; Section 6, which authorized officers to arrest a person without a warrant if there was probable cause to believe they were removable; and Section 2(B), which allowed officers conducting stops or arrests to verify a person's immigration status. Id. at 393–94. The Court found that all provisions were preempted, except for Section 2(B), which the Court believed would be better suited to resolution after the law took effect. Id. at 415–16.

SB 4 and SB 1070 contain striking similarities. As SB 1070 did previously, SB 4 attempts to "add[] a state-law penalty for conduct proscribed by federal law." Arizona, 567 U.S. at 400; see Tex. Penal Code §§ 51.02–51.03 (criminalizing under Texas law violations that mostly match 8 U.S.C. § 1325(a) and 8 U.S.C. § 1326(a)). As the Supreme Court found in Arizona, these federal provisions already act as "a full set of standards" "designed as a harmonious whole." Arizona, 567 U.S. at 401.

Even accepting for purposes of argument that SB 4 merely imposes state law penalties for existing federal crimes, ""[p]ermitting the State to impose its own penalties for the federal offenses [] would conflict with the careful framework Congress adopted." Id. at 402. SB 4 allows the state to "bring criminal charges against individuals for violating a federal law even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." Id. at 402. For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, even complementary state regulation is impermissible." Id. at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Id. (citing Silkwood v. Kerr–McGee Corp., 464 U.S. 238, 249 (1984)).

For these same reasons, the Court similarly finds Defendant's arguments under Zyla Life Scis., LLC v. Wells Pharma. of Hous., LLC, 134 F.4th 326 (5th Cir. 2025) ("Zyla") unpersuasive. Martin argues that the Fifth Circuit recognized in Zyla that "states may have a legitimate interest in punishing or providing redress for wrongs even if federal law has already done so." (Dkt. # 27 at 11.) However, Zyla relied on California v. Zook, 336 U.S. 725 (1949), a case in which the Supreme Court found that a California law was not preempted because there was "no conflict in terms, and no possibility of such conflict, for the state statute ma[de] federal law its own." Zook, 336 U.S. at 735. The Panel in Zyla reasoned that "[b]ecause the States' laws 'recognize[] the supremacy of the national law,' it would be anomalous to conclude the Supremacy Clause some-how preempts them." Zyla, 134 F.4th at 332.

However, this is not the case here, where SB 4 specifically states that "a court may not abate the prosecution" on "the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003. This statement does not show the state's recognition of the supremacy of national law; rather it demonstrates the disregard for the existing federal regulatory framework, flipping the Supremacy Clause on its head and placing state law above all else.

Although this Court identifies *infra* several glaring conflicts between SB 4 and the federal regulatory framework governing immigration, the very determination that SB 4 is field preempted also forecloses Defendant's argument that enacting parallel laws would be permissible. The Supreme Court made clear in Arizona that "even complementary state regulation is impermissible" when Congress occupies the entire field, and this includes laws which are "parallel to federal standards."

For that reason, "[w]here Congress occupies an entire field, as it has in the field of [noncitizen] registration, even complementary state regulation is impermissible." Id. at 401. "Field preemption reflects a congressional decision to foreclose any state regulation in the area, even if it is parallel to federal standards." Arizona, 567 U.S. at 401 (citing Silkwood, 464 U.S. at 249). Defendant's arguments to the contrary are, thus, unavailing.

In sum, Section 51.03 of SB 4 cannot be differentiated from Section 3 of SB 1070. Tex. Penal Code § 51.03. Both laws attempt to vest a state with the power to punish federal immigration offenses. But the "basic premise of field preemption," reaffirmed in Arizona, is that "[s]tates may not enter, in any respect, an area the Federal Government has reserved for itself[.]" Id. at 402. Under the holding of Arizona, the challenged provisions of SB 4 must be pre-empted.

*D. SB 4's removal authorization is patently unconstitutional.*

Texas's criminalization of unauthorized entry and re-entry is preempted under Arizona and the federal government's dominant interest in regulating immigration enforcement. Article 5(B).002 of SB 4, however, is an especially problematic intrusion on federal prerogatives. Tex. Code of Crim. Proc. art. 5(B).002. Article 5(B).002 goes even further than Arizona's SB 1070 by authorizing Texas state or magistrate judges to remove noncitizens from the United States without notice or consent from the federal government. Id. Before conviction, a judge may only order removal if a noncitizen consents, but after conviction, a state judge "*shall* enter" a removal order. Id. art. 5(B).002(a)–(d) (emphasis added).

This exceeds even what the dissenting Justices in Arizona believed to be constitutional. Arizona, 567 U.S. at 427 (Scalia, J., dissenting in part) (arguing that SB 1070 was constitutional because it only allowed detention and "does not represent commencement of the removal process unless the Federal Government makes it so"); id. at 438 (Thomas, J., dissenting in part) (suggesting states have power to make arrests but not discussing power of removals); id. at 457 (Alito, J., dissenting in part) ("State and local officers do not frustrate the removal process by arresting criminal [noncitizens]. The Executive retains complete discretion over whether those [noncitizens] are ultimately removed.").

Removal touches upon some of the most sensitive foreign affairs considerations of federal immigration policy. Id. at 409 (majority opinion) ("A decision on removability requires a determination whether it is appropriate to allow a foreign national to continue living in the United States. Decisions of this nature touch on foreign relations and must be made with one voice."); Jama, 543 U.S. at 348 ("Removal decisions, including the selection of a removed [noncitizen's] destination, may implicate [the United States'] relations with foreign powers and require consideration of changing political and economic circumstances.") (internal quotation marks omitted). To that end, the INA vests removal authority exclusively with the federal government. 8 U.S.C. § 1229a(a)(3) ("[A] proceeding under this section shall be the sole and exclusive procedure for determining whether a [noncitizen] may be admitted [or] removed from the United States."). To allow Article 5(B).002 to take effect would allow states and state-court judges to shape a key aspect of American foreign policy and intrude upon a field explicitly entrusted to federal control by Congress. The federal government's domain over removal prohibits concurrent state regulation. By authorizing state officials to conduct removals, Article 5(B).002 of SB 4 intrudes into a particularly sensitive area of foreign affairs and is field preempted.

### *E. Arguments Against Field Preemption*

Given that SB 4 goes even further to regulate immigration than SB

1070, the law is likely field preempted. Martin's arguments against field preemption are wholly unavailing.

Martin advances application of the Salerno "no set of circumstances" test to Plaintiffs' pre-enforcement facial preemption challenge. (Dkt. # 29 at 13) (citing United States v. Salerno, 481 U.S. 739 (1987)). This approach mirrors that taken in one of the concurring opinions in the recent en banc decision. See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *12 (5th Cir. 2026) (Oldham, J., concurring). The Supreme Court has applied Salerno to cases involving facial challenges outside of the First Amendment. Moody v. NetChoice, LLC, 603 U.S. 707, 723 (2024). As explained there, in all other cases, "a plaintiff cannot succeed on a facial challenge unless he 'establish[es] that no set of circumstances exists under which the [law] would be valid,' or he shows that the law lacks a 'plainly legitimate sweep.'" Id. (quoting Salerno, 481 U.S. at 745).

However, the en banc dissenting opinion raised interesting questions regarding the applicability of this demanding standard in the preemption context. See United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *37 (5th Cir. 2026) (Richman, J., dissenting). As that opinion explained, the cases relied on for support in the concurring opinion were not in the preemption context Id. And preemption presents a unique circumstance where "[i]f a state law is preempted by federal law because Congress has occupied the field, it follows that no set of

circumstances exists under which the state law would be valid." Id. The Court agrees with Judge Richman's well-reasoned analysis on this issue.

At the hearing, Defendant echoed an argument advanced in the United States's Statement of Interest. They quote Virginia Uranium, Inc. v. Warren, 587 U.S. 761 (2019), discussing preemption and writing: "Invoking some brooding federal interest or appealing to a judicial policy preference should never be enough to win preemption of a state law; a litigant must point specifically to 'a constitutional text or a federal statute' that does the displacing or conflicts with state law." Id. at 767 (citing Puerto Rico Dep't of Consumer Aff. v. ISLA Petroleum Corp., 485 U.S. 495, 503 (1988)). As previously discussed, the INA contains such a comprehensive provision in 8 U.S.C. § 1229a(a)(3). Id. ("Unless otherwise specified in this chapter, a proceeding under this section shall be the *sole and exclusive procedure* for determining whether a [noncitizen] may be admitted to the United States or, if the [noncitizen] has been so admitted, removed from the United States." (emphasis added)). The interest of the federal government in the field of entry, reentry, and removal, is more than a "brooding federal interest." See Virginia Uranium, Inc., 587 U.S. at 767. Rather, it garners textual support from the Immigration and Nationality Act itself.

Accordingly, finding Defendant's arguments unconvincing, the Court concludes Plaintiffs are likely to succeed on the merits of their field preemption claim.[13]

## II. Conflict Preemption

Beyond field preemption, the challenged provisions of SB 4 are also conflict preempted. A state law is preempted where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67. To show conflict preemption, Plaintiffs need not show that the laws achieve different ends. Rather, a "[c]onflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." Motor Coach Employees v. Lockridge, 403 U.S. 274, 287 (1971).

Arizona is again instructive. There, Section 5(c) of SB 1070 made it a state misdemeanor for "an unauthorized [noncitizen] to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor." Arizona, 567 U.S. at 403.[14] The Court found that "Congress enacted . . . a comprehensive framework for combatting the employment of illegal

---

[13] Accepting the Defendant's theories in a case such as this—where the state statute so clearly is field preempted—risks opening the door to additional state laws in Texas or beyond which intrude into areas once thought to be exclusively federal realms. The consequences of such a decision would be wide-reaching and extend far beyond the subject of immigration law.

[14] In a brief discussion, the Supreme Court also found Section 3 to be conflict preempted. See Arizona, 567 U.S. at 402–03.

[noncitizens].” Id. Namely, Congress combatted this by regulating domestic employers under the INA, whereas SB 1070 punished noncitizen employees. Id. Although federal law and SB 1070 both generally punished the employment of noncitizens, the Court found that SB 1070’s differing enforcement mechanism “would interfere with the careful balance struck by Congress with respect to unauthorized employment of [noncitizens].” Id. at 406.

Arizona shows that state restrictions on immigration that exceed or differ in enforcement mechanisms from federal regulations are preempted. The question for SB 4 is whether its operative provisions conflict with federal law, stand as an obstacle to the objectives of Congress, or employ disruptive or conflicting techniques. See id. at 405–06.

At the broadest level, SB 4 conflicts with federal immigration law because it provides state officials the power to enforce federal law without federal supervision. See Farmers Branch, 726 F.3d at 531–32 (ordinance preempted where it gives “state officials authority to act as immigration officers outside the limited circumstances specified by federal law”); Arizona, 567 U.S. at 408 (noting that federal law specifies only “limited circumstances in which state officers may perform the functions of an immigration officer”). Congress has enacted a statutory scheme to ensure that federal immigration law is conducted under the

watch of federal officials in a uniform way across all fifty states, and SB 4 interferes with that goal. See 8 U.S.C. § 1057(g).

SB 4 also divests federal immigration authorities of the discretion of the enforcement of immigration laws, which touches on delicate considerations of foreign affairs. Several circuit courts have held similar laws to be conflict preempted for this reason. See GLAHR, 691 F.3d at 1265 ("The [state laws], however, are not conditioned on respect for the federal concerns or the priorities that Congress has explicitly granted executive agencies the authority to establish."); Valle del Sol, 732 F.3d at 1027 ("[State law] conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute these crimes."); United States v. Alabama, 691 F.3d 1269, 1287 (11th Cir. 2012) ("[State law] undermines the intent of Congress to confer discretion on the Executive Branch in matters concerning immigration."); United States v. South Carolina, 720 F.3d at 532 (finding conflict because the state law would "strip federal officials of the authority and discretion necessary in managing foreign affairs").

SB 4's removal orders will also "prevent noncitizens from asserting affirmative defenses to removal that would have been available in the federal system, including asylum, see 8 U.S.C. § 1158(a)(1), withholding of removal, see id. § 1231(b)(3), or protections under the Convention Against Torture, see 8 C.F.R. § 1208.16(c)(2). SB 4 specifies that "a court may not abate the prosecution" on

"the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003. By expressly disallowing the consideration of federal admissibility determinations, SB 4 conflicts with federal law.

In Iowa Migrant Movement for Just. v. Bird, 157 F.4th 904 (8th Cir. 2025), the Eighth Circuit upheld a district court's order preliminarily enjoining an Iowa state statute similar to SB 4.[15] The Eighth Circuit concluded that the plaintiff in that case was likely to succeed on the merits of its *facial* challenge to the law, finding the Act was likely conflict preempted. Id. at 927. The Panel concluded that even if there was a degree of uncertainty about how the law might be enforced, the face of the statute conflicted with the federal law: "Any enforcement of the Act would likely conflict with federal law by interfering with the enforcement discretion that federal law gives to federal officers." Id.

Asylum, withholding, and protection against torture are all federal

[15] The Court also notes that the Eleventh Circuit has a similar case pending before it and recently denied a stay of a district court's injunction pending appeal. In Florida Immigrant Coal v. Att'y General, 780 F. Supp. 3d 1235 (S.D. Fla. 2025), a district court enjoined enforcement of a Florida state statute creating state law offenses similar to the entry and reentry provisions of SB 4. On appeal, the Eleventh Circuit declined to stay the injunction pending appeal, finding the individual plaintiffs likely had standing, that the case likely fell within the Ex parte Young exception, and that the appellant had not shown that he had a "strong showing" of succeeding on the merits sufficient to justify the stay. Florida Immigrant Coal. v. Att'y General, No. 25-11469, 2025 WL 1625385, at *2–3 (11th Cir. June 6, 2025).

methods of determining a noncitizen's immigration status. See 8 U.S.C. § 1158(a)(1), id. § 1231(b)(3); 8 C.F.R. § 1208.16(c)(2). Refusal to abate removal pending these determinations clearly and unequivocally undermines federal law. See 8 U.S.C. § 1158(a)(1) ("Any [noncitizen] who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . .), irrespective of such [noncitizen's] status, may apply for asylum."); id. § 1158(c)(3) (authorizing removal upon determination of inadmissibility). A noncitizen cannot readily avail themselves of these defenses if the state court cannot abate removal pending its determination. Because a state court cannot follow both SB 4 and federal immigration defenses, they conflict. Like SB 1070, SB 4's removal provision "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Arizona, 567 U.S. at 399.

Returning to the Salerno test, Defendant sets forth a hypothetical in an attempt to demonstrate there is at least one application of SB 4 that does not conflict with federal immigration laws. (Dkt. # 29 at 13.) They provide the example of a "previously deported cartel drug smuggler" who enters the United States between ports of entry with a cargo of drugs. (Id. at 14.) However, the conflict between state and federal law was laid out in Arizona, which said that state laws such as SB 4 which "authoriz[e] state and local officers to engage in . . .

enforcement activities as a general matter . . . create[] an obstacle to the full purposes and objectives of Congress." 567 U.S. at 410. In the words of the en banc dissent: "all of the actions purportedly taken under state law by state officers or judges were unilateral, not at the request or approval of the federal government." United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *38 (5th Cir. 2026) (Richman, J., dissenting). This is basis enough for the conflict to take hold.

SB 4 also conflicts with federal law because it appears that noncitizens will be removed to Mexico, regardless of their country of origin and in contrast to federal law on removal destinations.

Federal law sets out the circumstances for where the federal government may remove a noncitizen, and the United States regularly engages in diplomatic discussions with foreign governments to determine whether they will accept noncitizens. See 8 U.S.C. § 1231(b). SB 4 states a judge may order a person "to the foreign nation from which the person entered or attempted to enter . . . ." Tex. Code of Crim. Proc. art. 5(B).002. It appears that these removals will all be to Mexico. (See Escalon Decl., Dkt. # 25-3 at 124–26). That policy decision conflicts with federal law, which requires officials to remove a noncitizen to their designated country of removal, subject only to certain exceptions. See 8 U.S.C. §§ 231(b)(2)(A), (C). Texas's decision to remove all noncitizens detained under SB 4 to Mexico will cause the federal government to

lose the ability to speak "with one voice" on removals. Arizona, 567 U.S. at 409; Jama, 543 U.S. at 348.

Mexico's objection to SB 4 shows why SB 4's choice-of-country removal is a serious problem. SB 4 will directly harm the United States's relationship with Mexico. Even before SB 4's enactment, Mexico "categorically reject[ed] any measure that," like SB 4, "allows state or local authorities to detain and return Mexican or foreign nationals to Mexican territory." Press Release, Secretaría de Relaciones Exteriores (Nov. 15, 2023), available at https://perma.cc/RP7H-JXZR. Mexico later filed an amicus brief in United States v. Texas reinforcing this position, stating that SB 4 would frustrate its ability to engage in diplomatic relations with the United States "by requiring Mexico to engage with not only the U.S. government, but also several levels of state and local law enforcement in Texas to address individual apprehensions, detentions, and removals pursuant to SB 4." Amicus Curiae Brief of the United Mexican States in Support of Plaintiffs-Appellees, in United States v. Texas, No. 24-50149 (Mar. 21, 2024). The Supreme Court agreed with a similar argument in Biden v. Texas, explained that attempting to force "non-Mexican nationals" to return to Mexico "impose[s] a significant burden upon the Executive's ability to conduct diplomatic relations with Mexico[.]" 597 U.S. 785, 806 (2022).

SB 4 conflicts with federal immigration law in other ways, too.

SB 4 lacks consent exceptions for re-entry into the United States, even though federal immigration law will allow it. See 8 U.S.C. § 1326. Penalties under SB 4 also exceed those under federal law. For example, failure to comply with a federal removal order generally includes a sentence of up to four years, see 8 U.S.C. § 1253; 8 U.S.C. § 1253(a)(1), but the penalty up to 20 years for violating a state removal order under SB 4. See Tex. Penal Code § 51.04.

Finally, 8 U.S.C. § 1357(g) specifies how and when a state may cooperate with federal law enforcement to assist with immigration enforcement. Section 1357(g) serves a dual role, allowing the federal government to utilize state and local personnel to assist with enforcement while retaining ultimate monitoring and implementation control for the federal government. Arizona, 567 U.S. at 409; see also 142 Cong. Rec. H2378-05, H2445, 1996 WL 120181 (Mar. 19, 1996) (Rep. Cox) (noting the purpose of § 1357(g) was to "expand the number of personnel who are involved in picking up people in violation of the law" while ensuring "everything will be conducted under the watch of the [federal government] and the [Secretary of Homeland Security] in conformity with Federal standards."). SB 4 and § 1357(g) conflict because Congress cannot limit the authority of state officials to assist with enforcement while the state itself claims unlimited concurrent immigration authority.

Given the "significant complexities involved in enforcing federal

immigration law," Congress delegated enforcement authority to state officials only under the supervision of DHS. Arizona, 567 U.S. at 409; 8 U.S.C. § 1357(g). "[N]o coherent understanding" of "cooperation" would "incorporate the unilateral decision of state officers to arrest [a noncitizen] for being removable absent any request, approval, or other instruction from the Federal Government." Arizona, 567 U.S. at 410. SB 4 frustrates key aspects of federal immigration law and is conflict preempted.

## III. Texas's Invasion Defense

In Governor Abbott's own words, these federal laws do not apply because "Texas's constitutional authority to defend and protect itself" against an invasion "is the supreme law of the land and supersedes any federal statutes to the contrary." Press Release, Greg Abbott, Governor of Texas, Statement on Texas's Constitutional Right to Self-Defense, (Jan. 24, 2024), https://gov.texas.gov/uploads/files/press/Border_Statement_1.24.2024.pdf. In a dissenting opinion in a separate but related case, several judges on the Fifth Circuit expressed the importance of analyzing Texas's invasion claim. See United States v. Abbott, No. 23-50632, 2024 WL 551412, at *7–8 (5th Cir. Feb. 9, 2024) (dissenting opinion). Further, at least one Fifth Circuit judge wrote separately in the recent en banc decision to note his agreement with Texas's state war power theory. United States v. Texas, --- F.4th ---, 2026 WL 1122127, at *6

(5th Cir. 2026) (Ho, J., concurring). That discussion, even if non-binding, weighs on this case. Accordingly, the Court will discuss—but ultimately reject—Texas's invasion defense.

Article I, Section 10 of the U.S. Constitution limits the states' power to undertake certain activities. U.S. Const. art. 1, § 10. Apart from the final few words, Section 10 describes what a state may *not* do, specifying that a state may not coin money, pass a bill of attainder or an ex post facto law, impose duties, keep troops, enter into foreign agreements, or "engage in war." Id. Clause 3 (the "State War Clause") says in full:

> No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay.

Id. art. 1, § 10, cl. 3.

In short, the State War Clause provides that a state shall *not* engage in war, with a narrow exception of when it is "actually invaded[.]" When a state—and by extension the United States—is invaded, the federal government must protect from the invasion. As Article IV, Section 4 (the "Guarantee Clause") states:

> The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the

> Executive (when the Legislature cannot be convened) against domestic Violence.

Id. art. IV, § 4.

Together, these provisions, along with the broad, interrelated provisions of the federal government's authority to wage war, lay out a structure where the state may respond to immediate military threats until "resources of the federal government can reach the invasion." United States v. Abbott, No. 1:23-CV-863, 2023 WL 5740596, at *12 (W.D. Tex. Sept. 6, 2023); Torres v. Tex. Dep't of Pub. Safety, 597 U.S. 580, 590 (2022) (detailing federal government's authority over war).

But the State War Clause is not an unlimited grant of power in times of invasion. Rather, it grants states only the power to "engage in War[.]" U.S. Const. art. 1, § 10, cl. 3. Regardless of whether immigration is an invasion, SB 4 would still not be constitutional because it does not authorize or relate to any "engage[ment] in war." Id.

Again, SB 4 generally has three operating provisions. Officers may arrest noncitizens for unauthorized entry into the state, Tex. Penal Code § 51.02(a), noncitizens may be arrested for entering or attempting to enter after previous removals, id. § 51.03, and noncitizens may be removed if they agree to removal or are convicted of an offense under SB 4. Tex. Code of Crim. Proc. Art. 5(B).002.

None of these provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities. SB 4 is a "war" inasmuch as the "War on Drugs" is a war—a metaphorical invocation of the term "war" to denote a serious effort. Nothing more. SB 4 does not require use of a military, nor will the State send the National Guard into Mexico to wage war on cartels, call upon NATO allies for aid, or hold unauthorized immigrants as prisoners of war as a result of SB 4. In the most basic sense, SB 4 is not an act of war.

Further, the power to "engage in war" does not grant unlimited legislative or immigration authority. See, e.g., Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 642–45 (1952) (Jackson, J., concurring).[16] If this is true for the federal government, then it is most certainly the case for the temporary and narrow exception given to states under the State War Clause. Engaging in war is one function of government; controlling immigration is another. Madison's Report of 1800 specifically rejected the idea that control of immigration is incident to the

[16] See also id. at 649–50. ("[The Forefathers] knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies. Aside from suspension of the privilege of the writ of habeas corpus in time of rebellion or invasion, when the public safety may require it, they made no express provision for exercise of extraordinary authority because of a crisis.").

power of war. James Madison, The Report of 1800, (Jan. 7, 1800), founders.archives.gov/documents/Madison/01-17-02-0202.

The state's limited and temporary authority to engage in war to repel invasions of organized hostile forces does not amount to a wider authority to regulate in fields preempted by the federal government. The State War Clause itself makes this clear. Even when under invasion, the Clause forbids states from, *inter alia*, entering into treaties, granting letters of marque, laying duties, or keeping troops. The State War Clause authorizes a state only to "engage in war [if] actually invaded," it does not suspend any other restrictions contained in Section 10. U.S. Const. art. 1 § 10 cl. 3. The "actually invaded" clause affects only the power to engage in war and delegates no other powers to the state. Just as Texas cannot unilaterally enter treaties or lay duties in wartime, the State War Clause does not grant it the power to violate the Supremacy Clause.

Moreover, the provisions of SB 4 that Plaintiffs challenge are not limited to times of invasion. The law does not require the Governor's declaration of an invasion or war. Nor does SB 4 halt when immigration flows are reduced or when a new administration takes power or when the federal government increases border security measures. Indeed, the federal government's response to the purported invasion, or lack thereof, appears to be irrelevant in Defendant's analysis given he maintains the same invasion defense in spite of drastically changed

immigration enforcement circumstances since this Court's prior injunction. As Defendant acknowledges, Texas now works "cooperatively and successfully with United States Border Patrol and other federal law enforcement personnel." (Dkt. # 27 at 7.) Defendant Martin praises the current Presidential administration's enforcement efforts in his declaration, stating, "As of today, I believe the southern border of Texas is better defended than ever before in my decades in Texas law enforcement." (Dkt. # 29-1 at ¶ 7.)

Even accepting for argument that SB 4 is a wartime response to an invasion, that would not make SB 4 constitutional. The law would remain preempted and unenforceable after the end of any "invasion" because the State War Clause affirmatively forbids enforcement of wartime acts once the invasion has ended. See U.S. Const. art. 1, § 10, cl. 3. If the state, by arresting removable noncitizens, is "engaging in war," then the state cannot continue to pursue a wartime measure once the invasion has ended.[17] The result, then, is that SB 4 must expire when immigration flows ebb to levels below those at the time of the governor's declaration. SB 4 contains no such clause.

SB 4 does not begin when an invasion begins or end when an invasion ends. It has no characteristics of a wartime measure, nor does it support other

[17] The absurd result of determining that routine criminal prosecutions are "engaging in war" is that the State War Clause would then forbid all state criminal enforcement except in times of invasion.

operations of war. Under any rational sense of the phrase, Texas is not "engaging in war" by enforcing SB 4, and thus Defendant's invasion defense fails.

IRREPARABLE HARM

Plaintiffs here have shown that absent an injunction, they face irreparable harm. As described above, Plaintiffs have adequately demonstrated a substantial threat of enforcement of the challenged SB 4 provisions against them. Enforcement of this law would place Plaintiffs at risk of arrest, prosecution, detention, and ultimately, removal. See § 51.03. "A party may be irreparably injured in the face of the threatened enforcement of a preempted law." Villas at Parkside Partners v. City of Farmers Branch, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008). The Court finds this threatened enforcement and the severity of the harm imposed to Plaintiffs in the event the likely preempted law is enforced against them constitutes irreparable harm.

EQUITIES AND PUBLIC INTEREST

Defendant contends that the harm to Texas if a preliminary injunction is granted far outweighs any speculative harm to Plaintiffs, and that a preliminary injunction would "frustrate the democratic process in Texas and the right of Texas to make and enforce its own laws." (Dkt. # 27 at 16.) However, the Court must balance this against the countervailing public interest concerns, including the risk of "friction with foreign countries and weakening the effective diplomacy of the

Executive Branch." Iowa Migrant Movement for Just., 157 F.4th at 929. Further, a state's "[f]rustration of federal statutes and prerogatives [is] not in the public interest." United States v. Alabama, 691 F.3d at 1301. That is particularly true as to SB 4, which strips away an asylum applicant's option to raise credible fears or torture or persecution in a state hearing. See Nken v. Holder, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm."). Plaintiffs' exhibits make clear that removing noncitizens into Mexico risks subjecting them to death, torture, and rape. (See Dkt. # 3-3.)[18]

## PROVISIONAL CLASS CERTIFICATION

Plaintiffs seek provisional certification of a class concurrently with the decision on the preliminary injunction. (Dkt. # 5 at 7.) Plaintiffs advance the following class definition:

[18] The Court also acknowledges Defendant's Motion to Strike this declaration and accompanying exhibits for lack of relevance and improper hearsay. First, the Court finds the exhibits are relevant because they go to the conditions of Mexico for migrants who are returned, which is relevant in the equities analysis in weighing the risk of harm to individuals. Second, the Court may consider hearsay in deciding a preliminary injunction motion, so Defendant's argument is unsuccessful. See Sierra Club, Lone Star Chapter v. F.D.I.C., 992 F.2d 545, 551 (5th Cir. 1993) ("[A]t the preliminary injunction stage, the procedures in the district court are less formal, and the district court may rely on otherwise inadmissible evidence, including hearsay evidence."). Thus, Defendant's second Motion to Strike is, likewise, **DENIED**. (Dkt. # 47.)

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

(Id. at 9.)

A court may certify a class if the proposed class meets the four requirements in Rule 23(a) and one of the three additional requirements in Rule 23(b). See Fed. R. Civ. P. 23; see also Mullen v. Treasure Chest Casino, LLC, 186 F.3d 620, 623 (5th Cir. 1999). Rule 23(a) has four prerequisites to certify a class: numerosity, commonality, typicality, and adequacy of representation. Fed. R. Civ. P. 23(a). Plaintiffs have made an adequate showing at this stage of the litigation to warrant at least a provisional class certification.

## I. Rule 23(a) Requirements

The proposed class is certainly sufficiently numerous; Plaintiffs estimate the number of putative class members in the tens of thousands of individuals. (Dkt. # 5 at 11.) A class of this size is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1); see Mullen, 186 F.3d at 624. The proposed class is also geographically dispersed throughout Texas. See Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1038 (5th Cir., Unit A, 1981). As Plaintiffs argue, "[j]oinder is further complicated by the geographic dispersion of class members across Texas and the transitory nature of many

individuals subject to S.B. 4—who may be incarcerated, deported, or forced to leave the state." (Dkt. # 5 at 12.) Defendant also does not contest the numerosity requirement. (Dkt. # 28.) Plaintiffs have shown the numerosity requirement is met.

The commonality element is also uncontested by Defendant. (Dkt. # 28.) Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). On this requirement, Plaintiffs argue that whether the challenged provisions of SB 4 are field and conflict preempted is a question of law common to all plaintiffs. (Dkt. # 5 at 13.) Further, the threatened injuries asserted are common to the class, where all class members face arrest, prosecution, and removal under SB 4. (Id.) The Court is persuaded that the putative class satisfies the commonality requirement.

Typicality is contested. Rule 23(a)(3) mandates that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). This requirement is met when the members' claims arise from similar conduct and have similarities in legal and remedial theories. Angell v. Geico Advantage Ins. Co., 67 F.4th 727, 736 (5th Cir. 2023) ("'[A] complete identity of claims is not required; '[r]ather, the critical inquiry is whether the [named plaintiff's] claims have the same essential characteristics of those of the putative class. If the claims arise from a similar course of conduct and

share the same legal theory, factual differences will not defeat typicality.'" (quoting Stirman v. Exxon Corp., 280 F.3d 554, 562 (5th Cir. 2002)).

Defendant argues that Plaintiffs' analysis overlooks "material differences between the named plaintiffs, who are lawful residents, and the members of the putative class, whose immigration statuses are unknown." (Dkt. # 28 at 10–11.) However, the standard articulated in Angell appears to be met here, where putative class members share the same legal theory—that the challenged provisions of SB 4 are preempted—and whose shared claims arise out of the same course of conduct: the implementation of SB 4. See 67 F.4th at 736. These factual differences do not make the claims and conduct any less "typical" across the class.

Finally, the parties disagree on adequacy of representation. (Dkt. ## 5, 28.) Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). The target of this requirement is to "uncover conflicts of interest between named parties and the class they seek to represent." Amchem Prods., Inc. v. Windsor, 521 U.S. 591, 625 (1997). Defendant first asserts that Plaintiffs' decision to proceed anonymously is unfair to other class members and risks conflicts. (Dkt. # 28 at 14) ("If Plaintiffs' identities remain concealed, how will Defendants or the Court uncover conflicts between them and other class members?"). However, as pointed out by Plaintiffs' counsel during the hearing, the risk of conflict in this particular

case is low where Plaintiffs do not seek monetary damages and only injunctive relief. Defendant's additional concerns regarding differing facts related to L.M.L's lawful status and K.G.S.'s pending U-visa do not change the adequacy of representation analysis. "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." Mullen, 186 F.3d at 625–26.

Accordingly, each of the Rule 23(a) requirements are met.

## II. Rule 23(b)(2)

The requirements of Rule 23(b)(2) are also met, which authorizes class certification in circumstances where "the party opposing the class has acted or refused to act on grounds that apply generally to the class," such that "final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

Defendant suggests that Plaintiff has not shown that SB 4 would harm all members "in essentially the same way." (Dkt. # 28 at 16–17) (citing Maldonado v. Ochsner Clinic Found., 493 F.3d 521, 524 (5th Cir. 2007)). However, the Supreme Court emphasized in Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011), that:

> The key to the (b)(2) class is "the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can

> be enjoined or declared unlawful only as to all of the class members or as to none of them." In other words, Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction or declaratory judgment against the defendant.

Id. at 360 (emphasis in original) (internal citations omitted). Reframing the inquiry in this way to look at whether the injunctive relief Plaintiffs request is indivisible and would cover the entirety of the putative class reveals that this requirement is met. Here, even if there may be factual differences between some class members, their ultimate harm—enforcement of SB 4, a state law which is likely preempted—would be resolved through a single injunction. Thus, the requirements of Rule 23(b)(2) appear to be met here.

## III. Ascertainability

Defendant further argues that setting aside the remaining 23(b)(2) requirements, Plaintiffs have failed to show that their proposed class is ascertainable. This requirement comes from an implicit reading of Rule 23 which requires a demonstration that the proposed class is "adequately defined and clearly ascertainable." DeBremaecker v. Short, 433 F.2d 733, 734 (5th Cir. 1970) (per curiam). The touchstone of this requirement is "whether the [proposed] class is 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'" Brecher v. Republic of Argentina, 806 F.3d 22, 24 (2d Cir. 2015).

Defendant argues that the Court is unable to ascertain all members of the class, and doing so would involve conducting an individualized review of thousands of immigration documents—a "herculean task." Indeed, such an individualized review of *all* putative class members would be unduly burdensome. But this is not what Defendant's cited standard requires. See Brecher, 806 F.3d at 24 (requiring feasibility on determinations of whether *a* particular individual, but not *all* individuals at once at the beginning of the case); see also Rodriguez v. Flower Foods, Inc., No. 4:16-cv-245, 2016 WL 7210943, at *4 (S.D. Tex. Dec. 13, 2016) ("Courts have held that a class is sufficiently ascertainable if it is circumscribed by 'some objective set of criteria.'"). There are objective criteria here for the proposed class. To the extent Defendant argues the proposed class is not ascertainable because it is broad, the Court notes that the class is only as broad as the SB 4 provisions which Plaintiffs challenge.

## IV. Appointment of Class Counsel

Pursuant to Rule 23(g), "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g). The rule proceeds to state factors the court must consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action;
> (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action;
> (iii) counsel's knowledge of the applicable law; and

(iv) the resources that counsel will commit to representing the class[.]

Fed. R. Civ. P. 23(g). Plaintiffs ask for appointment of Plaintiffs' counsel as class counsel, to include the American Civil Liberties Union ("ACLU") Immigrants' Rights Project, the ACLU of Texas, and the Texas Civil Rights Project.

Although this particular action is new, the litigation around SB 4 is not. Plaintiffs' counsel has worked on challenges to SB 4's validity for the last several years and therefore has become intimately acquainted with the potential claims in this action and highly knowledgeable about the applicable law. (Dkt. # 5 at 16.) They have experience litigating similar class actions in other jurisdictions, making them familiar with complex litigation. (Id.) Finally, as counsel are large organizations focusing on civil rights litigation, they "possess the experience and institutional resources necessary to effectively litigate this case through discovery, motion practice, class-wife relief, and any future enforcement proceedings." (Id.)

The Court finds that appointment of class counsel is appropriate at this stage only as to the provisionally certified class, and shall consist of: the ACLU Immigrants' Rights Project, the ACLU of Texas, and the Texas Civil Rights Project.

## V. Provisional Class Certification

Defendant's final challenge to Plaintiffs' motion is on the issue of provisional class certification more broadly. He urges the Court to deny the

request for provisional class certification until a more rigorous analysis can be undertaken with the benefit of discovery. (Dkt. # 28 at 18.)

However, at this stage of the litigation, and given the pendency of the motion for preliminary injunction and imminent enforcement of provisions of SB 4 that this Court has determined are likely preempted, Plaintiffs have presented a strong case as to provisionally certifying the class. This is not an uncommon practice in cases like these which challenge the facial constitutionality of a state law, which necessarily bears on individuals who otherwise would not be parties to the action. See Idaho Org. of Res. Councils v. Labrador, 7780 F. Supp. 3d 1013, 1046 (D. Idaho 2025) ("Courts routinely grant provisional class certification for purposes of entering injunctive relief."); Padres Unidos de Tulsa v. Drummond, 783 F. Supp. 3d 1324, 1349 (W.D. Ok. 2025); see also Barbara v. Trump, 790 F. Supp. 3d 80 (D. N.H. 2025).

In fact, this particular case has already had the benefit of limited, expedited discovery, in part on the issue of class certification. Thus, in deciding to provisionally certify the class, the Court additionally has reviewed and fully considered the contents of Plaintiffs' responses to Defendant's interrogatories and the deposition transcripts of both Plaintiffs. (Dkt. ## 48, 53.) The Court additionally had the benefit of detailed, full briefing on class certification from both parties before making its decision.

However, the Court wishes to make clear that this certification is for provisional purposes only for the purposes of injunctive relief, and further inquiry into the appropriateness of formally certifying the class should be conducted. Thus, Plaintiffs' Motion to Certify Class is **GRANTED IN PART**. (Dkt. # 5.) It is specifically granted as to Plaintiffs' request to provisionally certify the class for the purposes of injunctive relief. The remainder of Plaintiffs' motion, including the request to certify the class more broadly, is **HELD IN ABEYANCE** pending additional discovery.

SCOPE OF THE INJUNCTION

Plaintiffs' Complaint, (Dkt. # 1), and Motion for Temporary Restraining Order and Preliminary Injunction, (Dkt. # 3), limit the request relief to an injunction of certain provisions of SB 4 rather than the statute in its entirety. Specifically, Plaintiffs narrow their challenge to the reentry and removal provisions of SB 4, as found in Texas Penal Code §§ 51.03 and 51.04, and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003. Accordingly, the Court will preliminarily enjoin the enforcement of these provisions of SB 4 only, by Defendant Martin and his officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them, against members of the provisional class, defined as:

> All noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded,

deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding.

WAIVER OF BOND REQUIREMENT

Because the Court will issue the preliminary injunction, it must determine whether Plaintiffs must post bond. "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "[T]he amount of security required pursuant to Rule 65(c) 'is a matter for the discretion of the trial court . . . .'" Kaepa, Inc. v. Achilles Corp., 76 F.3d 624, 628 (5th Cir. 1996) (quoting Corrigan Dispatch Co. v. Casa Guzman, 569 F.2d 300, 303 (5th Cir. 1978)).

"Indeed, it has been held that the court may dispense with security altogether if the grant of an injunction carries no risk of monetary loss to the defendant." Id. Likewise, the Fifth Circuit has ruled that "the court 'may elect to require no security at all.'" Id. at 628 (quoting Corrigan Dispatch, 569 F.2d at 303). The lack of monetary loss to the Defendant in this case and lack of asserted costs and damages sustained by the state from being able to enforce an unconstitutional law weigh in favor of a nominal or waived bond. Accordingly, the Court will waive the bond requirement.

STAY PENDING APPEAL

In a footnote at the end of his Response in Opposition to Plaintiffs' Motion for Preliminary Injunction, Defendant requests that if the Court enter an injunction, that it also be stayed pending an interlocutory appeal. For largely the same reasons stated in its last order granting a preliminary injunction as to enforcement of SB 4, the Court similarly denies Defendant's request here.

The Fifth Circuit "consider[s] four factors in deciding whether to grant a stay pending appeal: (1) whether [Texas] has made a strong showing that [it] is likely to succeed on the merits; (2) whether [Texas] will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." SEC v. Barton, 79 F.4th 573, 581 (5th Cir. 2023) (quoting Nken v. Holder, 556 U.S. 418, 434 (2009)). Applying the Fifth Circuit's framework, the Court finds that a stay is not warranted.

First, given the discussion herein, Texas is not likely to succeed on the merits. Its arguments rest upon a narrow and untenable reading of Arizona and the many immigration preemption cases that preceded it. SB 4 intrudes onto especially dominant federal interests, such as the removal of noncitizens, and conflicts with federal law by disallowing consideration of pending asylum or withholding determinations. Texas is unlikely to succeed on the merits.

Second, Texas will not suffer sufficient irreparable injury to warrant a stay. Although an injunction generally automatically results in a form of irreparable injury to the state, several factors mitigate that injury here. See Vote.Org v. Callanen, 39 F.4th 297, 308 (5th Cir. 2022). Unauthorized immigration is not new to the Texas border, and Texas has relied for decades on the existing federal regime to regulate immigration. See Wireless Agents, L.L.C. v. T–Mobile USA, Inc., 2006 WL 1540587, at *3 (N.D. Tex. June 6, 2006) ("[D]elay in seeking a remedy is an important factor bearing on the need for a preliminary injunction.") (cleaned up). Additionally, federal law already provides for state officers to conduct immigration enforcement measures. See 8 U.S.C. § 1357(g). The state's true harm, then, is not that it cannot enforce immigration laws, but that it cannot do so free of federal supervision. Finally, the Court does not doubt the risk that cartels and drug trafficking pose to many people in Texas. But Texas can (and does) already criminalize those activities. Nothing in this Order stops those enforcement efforts.

The third and fourth Nken factors largely merge as applied to SB 4. If SB 4 takes effect, the law would immediately impose criminal liability on thousands of noncitizens who re-entered the state. The removal of noncitizens cannot be undone, even if a stay on this injunction is ultimately lifted. Thousands of individuals should not be arrested, incarcerated, or removed prior to resolution

of SB 4's constitutionality.

If allowed to proceed, SB 4 could open the door to each state passing its own version of immigration laws. The effect would moot the uniform regulation of immigration throughout the country and force the federal government to navigate a patchwork of inconsistent regulations. SB 4 threatens the fundamental notion that the United States must regulate immigration with one voice.

In the final analysis, it is clear that the Plaintiffs and provisional class members are at risk of suffering grave, irreparable harm were SB 4 to take effect in the form of arrests, prosecutions, and removals under a likely unlawful statute. The balance of equities thus unequivocally weighs in favor of denying the stay pending appeal.

## CONCLUSION

**IT IS ORDERED** that Defendant's Motion to Dismiss, (Dkt. # 25), is **DENIED**. Plaintiffs' motion for preliminary injunction (Dkt. # 3) is **GRANTED** and Defendant is preliminarily **ENJOINED** from enforcing Texas Penal Code §§ 51.03 and 51.04 and Tex. Code Crim. Proc. Ann. arts. 5B.002 and 5B.003. **IT IS FURTHER ORDERED** that Plaintiffs' Motion to Certify Class, (Dkt. # 5), is **GRANTED IN PART** and **HELD IN ABEYANCE IN PART**, and thus Defendant's Motion to Continue Hearing on Class Certification, (Dkt. # 30), is

**DENIED AS MOOT**. **IT IS FINALLY ORDERED** that Defendant's Motions to Strike are **DENIED.** (Dkt. # 16, 47.)

**IT IS SO ORDERED.**

**SIGNED:** May 14, 2026, Austin, Texas.

David A. Ezra
Senior United States District Judge

## Certificate of Service

On October 15, 2026, Appellant's Record Excerpts were served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; (2) the electronic submission is an exact copy of the paper document in compliance with Fifth Circuit Rule 25.2.1; and (3) the document has been scanned with the most recent version of Symantec Endpoint Protection and is free of viruses.

/s/ Daniel M. Ortner
Daniel M. Ortner