**No. 26-50418 consol. with No. 26-50469**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

**L.M.L. and K.G.S., on behalf of themselves and all those similarly situated,**

**Plaintiffs-Appellees,**

**v.**

**Freeman F. Martin, in his official capacity as Director of the State of Texas Department of Public Safety,**

**Defendant–Appellant.**

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION**

---

# BRIEF FOR *AMICUS CURIAE* FEDERATION FOR AMERICAN IMMIGRATION REFORM IN SUPPORT OF APPELLANT

---

**MATT A. CRAPO**
**CHRISTOPHER J. HAJEC**
**Federation for American Immigration Reform**
**25 Massachusetts Ave., NW, Suite 330**
**Washington, DC 20001**
**Telephone: (202) 328-7004**
**mcrapo@fairus.org**
**chajec@fairus.org**

**Attorneys for *Amicus Curiae***
**Federation for American Immigration Reform**

**SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS**

Pursuant to Fifth Circuit Rule 28.2.1 and Fed. R. App. P. 26.1, undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.:

1) For non-governmental corporate parties please list all parent corporations: None.

2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock: None.

3) The following entity has an interest in the outcome of this case: Federation for American Immigration Reform.

DATED: October 22, 2026 Respectfully submitted,

/s/ Matt Crapo

# TABLE OF CONTENTS


**Page**

SUPPLEMENTAL STATEMENT OF INTERESTED PERSONS

TABLE OF AUTHORITIES ........................................................................ ii

INTEREST OF *AMICUS CURIAE* ........................................................................ 1

INTRODUCTION ........................................................................ 1

ARGUMENT ........................................................................ 4

I. The Constitution Reserves a Power of Self-Defense to the States .................. 4

II. Texas's Good-Faith Exercise of its Power of Self-Defense is Nonjusticiable ........................................................................ 6

III. General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion ........................................ 16

CONCLUSION ........................................................................ 20

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Arizona v. United States*,
567 U.S. 387 (2012)....................17

*Baker v. Carr*,
369 U.S. 186 (1962)....................7

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997)....................7, 11

*Chiles v. United States*,
874 F. Supp. 1334 (S.D. Fla. 1994), *aff'd* 69 F.3d 1094 (11th Cir. 1995)..........8

*Florida v. United States*,
660 F. Supp. 3d 1239 (N.D. Fla. 2023)....................17

*Fourco Glass Co. v. Transmirra Products Corp.*,
353 U.S. 222 (1957)....................19

*Kennedy v. Mendoza-Martinez*,
372 U.S. 144 (1963)....................6

*Lichter v. United States*,
334 U.S. 742 (1948)....................15, 18

*Morton v. Mancari*,
417 U.S. 535 (1974)....................19

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
584 U.S. 453 (2018)....................4

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996)....................8, 11

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025)....................9

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892)....................................................................................4

*Nixon v. United States*,
506 U.S. 224 (1993)....................................................................................9

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) .........................................................................11

*Posadas de Puerto Rico Assocs. v. Tourism Co.*,
478 U.S. 328 (1986)..................................................................................15

*Sterling v. Constantin*,
287 U.S. 378 (1932)....................................................................................9

*United States v. Abbott*,
110 F.4th 700 (5th Cir. 2024) (en banc) ..................................................16

*United States v. Borden Co.*,
308 U.S. 188 (1939)..................................................................................19

*United States v. Estate of Romani*,
523 U.S. 517 (1998)..................................................................................19

*United States v. S.-E. Underwriters Ass'n*,
322 U.S. 533 (1944)..................................................................................13

*United States v. Texas*,
173 F.4th 660 (5th Cir. 2026) (en banc) ..........................................2, 12, 17

*United States v. Texas*,
719 F. Supp. 3d 640 (W.D. Tex. 2024) .............................9, 11, 12, 14, 16

*Young v. Hawaii*,
992 F.3d 765 (9th Cir. 2021) ......................................................................6

*Zivotofsky v. Clinton*,
566 U.S. 189 (2012)....................................................................................9

## CONSTITUTION

U.S. Const. art. I, § 10, cl. 3 (“State Self-Defense Clause”) ................................4, 5

U.S. Const. art. IV, § 4 ......................................................................................5

U.S. Const. amd. X ...........................................................................................5

## STATUTES

8 U.S.C. § 1101(a)(15) ......................................................................................5

8 U.S.C. § 1153 ..................................................................................................5

8 U.S.C. § 1182 ..................................................................................................5

8 U.S.C. § 1227 ..................................................................................................5

8 U.S.C. § 1325 ..................................................................................................5

8 U.S.C. § 1326 ..................................................................................................5

S.B. 4, 88th Leg., 4th C.S. (2023) .....................................................................3

Tex. Code Crim. Proc. Art. 5B.002 ....................................................................3

Tex. Penal Code § 51.02 ....................................................................................3

Tex. Penal Code § 51.02 ....................................................................................3

## MISCELLANEOUS

9 Nicolay and Hay, Works of Abraham Lincoln (1894) ........................................18

C. Hughes, War Powers Under the Constitution (Sept. 5, 1917) ...........................15

Declaration of Independence ..............................................................................4

Executive Order GA-41, 47 Tex. Reg. 4213 (July 7, 2022) .......................10, 12, 16

Executive Order GA-42, 47 Tex. Reg. 6521 (Sept. 21, 2022) ................................16

Proclamation 10888, *Guaranteeing the States Protection Against Invasion*, 90 Fed. Reg. 8333 (Jan. 20, 2025) (published Jan. 29, 2025) ..............................2

Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.) ..........13

## INTEREST OF *AMICI CURIAE*

*Amicus curiae* Federation for American Immigration Reform ("FAIR") is a nonprofit corporation and membership organization that was founded in 1979 and has its principal place of business in Washington, D.C.[1] FAIR's mission is to advocate for immigration policy that is in America's best interests. FAIR has been involved in hundreds of legal cases since 1980, either as a party or *amicus curiae*, with the aim of advancing this mission.

The decision in this case will likely have an impact on the ability of state and local officials to cooperate with and assist the federal government in identifying and dealing efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million. FAIR therefore has direct and vital interests in the outcome of this case.

## INTRODUCTION

The measures of Texas challenged in this case are in response to the federal government's abdication, from 2021 through 2024, of its duty to protect the states from invasion and to take care that the nation's immigration laws be faithfully executed. Beginning on January 20, 2021, the Biden administration purposely

[1] Both parties consented to the filing of this *amicus* brief. No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

facilitated mass illegal entries into this country. It temporarily paused all removals, gutted immigration enforcement guidelines, terminated the Migrant Protection Protocols (colloquially known as the "Remain in Mexico policy"), halted all border wall construction projects, reinstated "catch and release" at the border, weakened asylum requirements, and adopted various mass parole programs.

This abdication of both the federal government's duty to secure the border and its constitutional obligation to protect the states from invasion resulted in the illegal entry of millions of aliens into this country. This Court has already recognized the "jarring" statistics:

> More than 6 million illegal aliens, from over 100 countries, flooded Texas's international border during approximately 2021-2023. In one year alone, about 2.5 million unlawfully crossed, well over 100,000 of whom were unaccompanied minors. And in a three-year period, Border Patrol agents arrested over 15,000 illegal aliens with criminal convictions, apprehended roughly 2,000 gang members, and encountered, at the border, 336 persons on the terrorist watchlist. There, violent transnational cartels became paramilitary forces, whose illicit conduct ranged from pumping "illegal drugs like fentanyl" into the United States to "trafficking humans," all to the tune of billions of dollars.

*United States v. Texas*, 173 F.4th 660, 662 (5th Cir. 2026) (en banc) (footnotes omitted). President Trump acknowledged that the federal government had failed in its obligation to protect the states from invasion and declared that "an invasion is ongoing at the southern border." Proclamation 10888, *Guaranteeing the States*

*Protection Against Invasion*, 90 Fed. Reg. 8333, 8334 (Jan. 20, 2025) (published Jan. 29, 2025).

In the face of this onslaught, Texas took several measures to secure its borders and repel an invasion by foreign criminal cartels that were trafficking a vast number of illegal aliens into Texas. One of those measures, challenged here, was the passage of Senate Bill 4 ("S.B.4"), which criminalizes both illegal entry and reentry into Texas from a foreign nation and authorizes state judicial officers to order offenders to return to the foreign nation from which they illegally entered. S.B.4, 88th Leg., 4th C.S. (2023) (codified at Tex. Penal Code §§ 51.02 and 51.03 and Tex. Code Crim. Proc. art. 5B.002). Although S.B.4 parallels similar federal criminal offenses and does not interfere with Congress's power to decide which classes of aliens are admissible or removable,[2] Plaintiffs seek to enjoin its enforcement, arguing that it is preempted by federal law. Because federal immigration regulations cannot preempt Texas's exercise of its sovereign self-defense power to repel an invasion, Plaintiffs cannot show a likelihood of success. The district court should therefore be reversed.

[2] Texas represents that a return order under S.B.4 merely requires an alien be transported to a port of entry and delivered to federal officials. Appellant's Opening Brief ("Tex. Br.") at 32.

## ARGUMENT

Under Article I, section 10, of the Constitution ("the State Self-Defense Clause"), Congress's regulation of immigration cannot preempt a state's valid invocation of its sovereign power, "without the consent of Congress," to "engage in War" if "actually invaded." To the extent that there is a conflict between Texas's valid exercise of its constitutional war power and the Immigration and Nationality Act ("INA"), it is the latter that must give way. To decide otherwise would read "without the consent of Congress" out of the State Self-Defense Clause.

### I. The Constitution Reserves a Power of Self-Defense to the States.

"When the original States declared their independence, they claimed the powers inherent in sovereignty—in the words of the Declaration of Independence, the authority 'to do all . . . Acts and Things which Independent States may of right do.'" *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 470 (2018) (quoting Declaration of Independence ¶ 32). Inherent in the sovereignty of an independent state, "and essential to self-preservation," is the power "to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe." *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892).

Under the Constitution, Congress is empowered to regulate immigration into the United States. Congress has exercised this power by defining the classes of

aliens who are admissible and removable. *See* 8 U.S.C. §§ 1101(a)(15) (defining classes of nonimmigrant aliens); 1153 (allocating immigrant visas among various classes of aliens); 1182 (defining inadmissible aliens); 1227 (defining deportable aliens). Congress has also criminalized illegal entry and reentry. *Id.* at §§ 1325, 1326.

When it comes to invasion, however, that same Constitution expressly recognizes the sovereign power of states to defend themselves. The State Self-Defense Clause reads:

> *No State shall, without the Consent of Congress*, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or *engage in War, unless actually invaded*, or in such imminent Danger as will not admit of delay.

U.S. Const. art. I, § 10 (emphases added). A corresponding constitutional provision, sometimes referred to as "the Invasion Clause," requires the federal government to protect each state from invasion. U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion").

In these two constitutional provisions, read together with the reservation of state powers in the Tenth Amendment,[3] the people conferred on the federal

---

[3] The Tenth Amendment reads: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

government the responsibility to protect each state against invasion, but also reserved to the states their respective sovereign prerogatives to "engage in War" if "actually invaded." The protection against invasion was thus doubled, ensuring that, in the event of federal inattention to, or abdication of, the duty to repel an invasion (as happened between 2021 and 2024), "the Constitution" would not become "a suicide pact" for any state. *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 160 (1963). Rather, at the very least, if the federal government fails to protect a state against invasion, that state, as recognized by the State Self-Defense Clause, may exercise its reserved power to engage in war. *See Young v. Hawaii*, 992 F.3d 765, 815 (9th Cir. 2021) (citing the prohibition in the State Self-Defense Clause as "corresponding[]" to the federal government's duty to defend against invasion), *vacated and remanded on other grounds*, 142 S. Ct. 2895 (2022). This is not to say, however, that a state's power of self-defense is only available when the federal government *has* failed to protect it; rather, the sole condition for its exercise in the State Self-Defense Clause is that the state be "actually invaded."

## II. Texas's Good-Faith Exercise of its Power of Self-Defense is Nonjusticiable.

Because this case involves nonjusticiable questions, this Court should reverse. The questions of whether an invasion has occurred within the meaning of the State Self-Defense Clause and what measures a state may take in response to such an invasion are both committed by the Constitution to states.

In *Baker v. Carr*, the Supreme Court set forth the political question standard as follows:

> It is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. 186, 217 (1962).

Under this standard, as several courts of appeals have held, the question of whether an invasion has occurred within the meaning of the Invasion Clause is nonjusticiable and committed to the political branches of the federal government. For example, the Ninth Circuit has held that "to determine that the United States has been 'invaded' when the political branches have made no such determination would disregard the constitutional duties that are the specific responsibility of other branches of government and would result in the Court making an ineffective non-judicial policy decision." *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997). And the Third Circuit (quoting *Baker, supra*) has held this question

nonjusticiable because of "'a textually demonstrable constitutional commitment of the issue to a coordinate political department,' and 'a lack of judicially discoverable and manageable standards for resolving it.'" *New Jersey v. United States*, 91 F.3d 463, 468-470 (3d Cir. 1996). *See also Chiles v. United States*, 874 F. Supp. 1334, 1342-1344 (S.D. Fla. 1994) (finding the invasion question nonjusticiable because of a lack of judicially discoverable and manageable standards for resolving it), *aff'd* 69 F.3d 1094, 1097 (11th Cir. 1995) (citing *Baker* generally). In short, the Invasion Clause in Article IV of the Constitution, because it places responsibility to protect against invasion on the federal government, and because there are no workable judicial standards to resolve whether an invasion has occurred, commits that question to the policy making (or political) branches of the federal government, not the judicial branch.

Just as Article IV, § 4, of the Constitution commits the question of whether an invasion has occurred to the political branches of the *federal* government, the State Self-Defense Clause, at least within broad limits not reached here, commits the questions of invasion and response *to the states*. The Clause prohibits to the states the power to engage in war without the consent of Congress except when the states are "actually invaded." Meanwhile, the Tenth Amendment reserves to the states all powers neither prohibited to the states nor delegated to the federal government—including the power, expressly not prohibited to the states in the

State Self-Defense Clause, to engage in war without the consent of Congress in case of invasion.

The district court erred in concluding that, if a defense raises a nonjusticiable question, it should be rejected in the same way that claims raising a nonjusticiable question are rejected. ROA.1222 (Tab #3 of Appellant's record excerpts) (incorporating its earlier reasoning in *United States v. Texas*, 719 F. Supp. 3d 640, 694 (W.D. Tex. 2024)). Nonjusticiability applies to controversies, disputes, and questions, not defenses. "A *controversy* is nonjusticiable—i.e., involves a political question—where there is 'a textually demonstrable constitutional commitment of the issue to a coordinate political department ….'" *Nixon v. United States*, 506 U.S. 224, 228 (1993) (emphasis added). "In such a case, … a court lacks the authority to decide the *dispute* before it." *Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012) (emphasis added). Once the war-power defense was invoked, the nonjusticiability of Texas's exercise of its war power meant that the dispute before the court could not be resolved without deciding nonjusticiable questions—a reason to dismiss the case, not to deprive Texas of a defense under the Constitution.

The States' invocation of the Self-Defense Clause is subject only to limited review on the question of whether the invocation is in "good faith." *Newsom v. Trump*, 141 F.4th 1032, 1050-51 (9th Cir. 2025); *Sterling v. Constantin*, 287 U.S.

378, 400 (1932)). There is no question that Texas has met that minimum standard. Indeed, even apart from being nonjusticable, Texas's invocation and exercise of its war power *is* constitutionally valid.

On July 7, 2022, Governor Abbott issued Executive Order GA-41, in which he invoked the State of Texas's inherent right to self-defense, as recognized by Article I, § 10, of the United States Constitution, and to "secure the State of Texas and repel the illegal immigration that funds the cartels." 47 Tex. Reg. 4213, 4214. Governor Abbott authorized State officials "to respond to this illegal immigration by apprehending immigrants who cross the border between ports of entry or commit other violations of federal law, and to return those illegal immigrants to the border at a port of entry." *Id.* Subsequently, Texas enacted S.B.4 as part of its effort to secure its border and repel the invasion by criminal cartels by reducing both their criminal activities—their trafficking of illegal immigrants and drugs—and their material support—profits from that trafficking. According to the sponsor of S.B.4, it was designed to "[p]rotect Texans from the danger of the border crisis" and to "address the issue of border security…." S.B. 4; Bill Analysis, Author's/Sponsor's Statement of Intent, available at: https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004I.pdf#navpanes=0 (last

visited Oct. 19, 2026).[4] Upon signing S.B.4 into law, Governor Abbott stated that "[t]he goal of Senate Bill 4 is to stop the tidal wave of illegal entry into Texas." CBS News, *Texas immigration law known as SB4, allowing state to arrest migrants, signed by Gov. Greg Abbott*, available at: https://www.cbsnews.com/news/texas-immigration-law-sb4-signed-greg-abbott/ (last visited Oct. 19, 2026).

In concluding, contrary to the judgment of the state's political representatives, that Texas is not being invaded, the district court relied on summary dicta from various Circuit courts that "immigration" cannot constitute an invasion. *Texas*, 719 F. Supp. 3d at 680-81 (incorporated at ROA.1222). In each such case, however, the court held that it lacked authority to decide that question, *see California*, 104 F.3d at 1091; *New Jersey*, 91 F.3d at 470; *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) ("In any event, the plaintiff's Invasion Clause claim is nonjusticiable."). These courts' admittedly unauthoritative statements that immigration cannot constitute an invasion can carry no weight.

---

[4] *See also* S.B.4 House Committee Report, available at: https://capitol.texas.gov/tlodocs/884/analysis/pdf/SB00004H.pdf#navpanes=0 (last visited Oct. 19, 2026) (noting "record-high" migrant encounters along the southern border, efforts such as "Operation Lone Star" to "help secure the border" and stating that "S.B. 4 seeks to further address the issue of border security by creating criminal offenses related to illegal entry….").

Crucially, moreover, the district court misconstrued the nature of the invasion by characterizing it as nothing more than immigration.[5] It is first and foremost an invasion by armed, hostile non-state actors, the foreign trafficking cartels. Governor Abbott recognized as much in Executive Order GA-41, in which he sought to "secure the State of Texas and repel the illegal immigration that funds the cartels." 47 Tex. Reg. at 4214. Texas's invocation of the Self-Defense Clause is therefore more than a "disagree[ment] with federal immigration policy," as the district court characterized it. *Texas*, 719 F. Supp. 3d at 683 (incorporated at ROA.1222); *see also id.* at 684 ("Unauthorized immigration is not akin to armed and organized insurrection against the government."). Whether or not the cartels are enaged in an "insurrection" against the government of Texas, they are certainly invading the state, and that invasion consists, in part, of the mass illegal entries that the cartels both facilitate and profit from. As former Border Patrol Chief Rodney Scott has stated: "[t]here's nothing that crosses the southwest border without working with the cartels. They're either directly paying the cartels or the cartels are controlling their movements for another benefit, meaning to systematically overwhelm Border Patrol, create a gap in the border security, and then bring the

[5] Even if the district court were correct in characterizing the invasion as nothing more than immigration, immigration can be weaponized and constitute an invasion within the meaning of the Self-Defense Clause. *See United States v. Texas*, 173 F.4th 660, 668-72 (5th Cir. 2026) (Ho, J., concurring) (discussing weaponized migration).

narcotics across." Virginia Allen, THE DAILY SIGNAL (Feb. 10, 2023), https://www.dailysignal.com/2023/02/10/no-one-crosses-unlawfully-from-mexico-without-working-with-cartels-former-border-patrol-chief-says/ (last visited Oct. 19, 2026).

The term "invasion," as used in the Self-Defense Clause, is not limited to hostile state actors. First, the ordinary meaning of "invade" is not limited to actions by foreign states. "Ordinarily courts do not construe words used in the Constitution so as to give them a meaning more narrow than one which they had in the common parlance of the times in which the Constitution was written." *United States v. S.-E. Underwriters Ass'n*, 322 U.S. 533, 539 (1944), *superseded by statute on other grounds*. In a dictionary widely known when the Constitution was ratified, "invasion" was defined, without limitation to state action, as "[h]ostile entrance upon the rights or possessions of another; hostile encroachment." Samuel Johnson, *Dictionary of the English Language*, 1773 (4th folio ed.). "Encroachment," in turn, was defined as "[t]o advance into the territories or rights of another." *Id.*

In light of this broad understanding of the terms used in the Self-Defense Clause, there is no reason to conclude that it applies only to hostilities by foreign states and not to those by non-state actors such as cartels or gangs. Indeed, historically, the State of Texas has exercised its self-defense powers against non-state actors. For example, in 1859, the governor of Texas authorized "an

improvised expedition of state-funded Texas Rangers to counter" a Tejano militancy led by Juan Nepomuceno Cortina. Maj. Nathan Jennings, *The Army's Rio Grand Campaign of 1859: A Total Force Case Study*, Infantry Magazine, p. 36, Vol. 107, No. 2, April-June 2018. Cortina has been described as a "son of a respected Mexican ranching family" and also "the head of a band of desperadoes" who "was making life and property in the Brownsville area unsafe." William John Hughes, *"Rip" Ford, Texan: the Public Life and Services of John Salmon Ford, 1836-1883*, a Dissertation in History, pp. 228 (June 1958), available at: https://ttu-ir.tdl.org/items/26ee077d-4668-4526-8f3f-a816921c7f55 (last visited Oct. 19, 2026). The Governor "distrusted the dispersed U.S. Army garrisons to respond quickly," Jennings, at 36, and dispatched John S. Ford, with the rank of major, to lead a company of Texas Rangers with orders "to protect the western frontier against Cortinas and his band and to arrest them if possible." Hughes, at 230. Eventually, the U.S. Army consolidated its dispersed garrisons and joined forces with the Texas Rangers to combat Cortina's gang. Jennings, at 36.

The district court also claimed that "[n]one of these [S.B.4] provisions are operations of war. Rather, they are standard operations of criminal enforcement by state civil authorities." *Texas*, 719 F. Supp. 3d at 689 (incorporated at ROA.1222). Here, again, the district court takes a too narrow view of a constitutional power meant to ensure safety. "'The power to wage war is the power to wage war

successfully.'" *Lichter v. United States*, 334 U. S. 742, 780 (1948) (quoting address by C. Hughes, War Powers Under the Constitution (Sept. 5, 1917)). The greater power to "engage in War" granted in the Constitution unquestionably includes the lesser power to return illegal entrants to the country from which they entered in order to prevent or deter illegal entries and thereby thwart the criminal cartels that both drive and profit from illegal immigration. *See*, *e.g.*, *Posadas de Puerto Rico Assocs. v. Tourism Co.*, 478 U.S. 328, 345-46 (1986) (holding under this principle that the greater power to ban gambling casinos includes the lesser power to ban their advertising); *Lichter*, 334 U.S. at 778-79 ("[T]he exercise of broad discretion as to methods to be employed may be essential to an effective use of its war powers by Congress.").

Seen in context, Texas's enactment and implementation of S.B.4 is plainly a self-defense measure. War may be fought by many means, and S.B.4 is part of a larger war effort by Texas that includes Texas's deployment of concertina wire along the Rio Grande to "prevent, detour, and interdict transnational criminal activity and illegal migration," FoxNews, *Texas installs miles of concertina wire along border near Rio Grande* (June 8, 2022), available at: https://www.foxnews.com/us/texas-installs-miles-concertina-wire-border-rio-grande (last visited Oct. 19, 2026); its placement of "a floating barrier along a 1,000-foot stretch of the Rio Grande near Eagle Pass to deter illegal border

crossings," *United States v. Abbott*, 110 F.4th 700, 707 (5th Cir. 2024) (en banc); Executive Order No. GA-41, 47 Tex. Reg. at 4214 (relating to returning illegal immigrants to the border); and Executive Order No. GA-42, 47 Tex. Reg. 6521 (Sept. 21, 2022) (designating certain Mexican drug cartels as foreign terrorist organizations).

In short, because the Constitution commits the question of whether an invasion has occurred to the policy-making branches of the State of Texas, and because Governor Abbott's invocation of the state's reserved power to defend itself was, at the very least, made in good faith, the state's invocation of its right to self-defense is a nonjusticiable political question for its people, through their elected representatives, to decide.

## III. General Immigration Regulations Cannot Constrain Texas's Constitutional Power to Repel an Invasion.

The district court also determined that even if S.B.4 were a war measure, Texas would be constrained by federal directives. *Texas*, 719 F. Supp. 3d at 694 (incorporated at ROA.1222) ("[I]f Texas is engaging in war, then the federal government retains complete war authority to direct that once it has capacity to respond. The structure of the Constitution prevents States from frustrating national objectives in this field.") (internal quotations omitted). But the district court failed to identify any federal directives that Texas violates. Instead, S.B.4 is congruent with Congress's immigration laws. *See* Tex. Br. at 30 ("S.B.4 does not conflict

with but instead mirrors and complements federal immigration law."). And, as noted above, the federal government had abdicated its duty to secure the border and enforce Congress's immigration laws. As one federal court observed, Executive branch officials had "effectively turned the Southwest Border into a meaningless line in the sand and little more than a speedbump for aliens flooding into the country." *Florida v. United States*, 660 F. Supp. 3d 1239, 1249 (N.D. Fla. 2023). The district court's doctrine that "national objectives" control a state's war power, even in the face of federal surrender, negates both the State Self-Defense Clause and its purpose.

The district court also concluded that S.B.4 is preempted by the INA. ROA.1225-37.[6] But, as Judge Ho has pointed out, no one can explain why Texas's exercise of its constitutional right to make war could be overridden by Congress, while the exercise of citizens' other constitutional rights, such as the First Amendment right to free speech, cannot be so overridden. *Texas*, 173 F.4th at 672 (Ho, J., concurring). Indeed, just as the First Amendment expressly limits Congress's authority, so does the Self-Defense Clause, by expressly not forbidding—and thus, through the Tenth Amendment, permitting—states to act "without the consent of Congress."

[6] The district court relied extensively on *Arizona v. United States*, 567 U.S. 387 (2012), but in that case, the State of Arizona did not invoke, and the Supreme Court did not consider, the constitutional state self-defense power.

*Lichter* is instructive in the preemption analysis. There, the Supreme Court quoted President Lincoln's reflection on the power of Congress to pass a Conscription Act as follows:

> The Constitution gives Congress the power [to raise and support armies], but it does not prescribe the mode, or expressly declare who shall prescribe it. In such case Congress must prescribe the mode, or relinquish the power. There is no alternative . . . . The power is given fully, completely, unconditionally. It is not a power to raise armies if State authorities consent; nor if the men to compose the armies are entirely willing; but it is a power to raise and support armies given to Congress by the Constitution, without an "if."

*Lichter*, 334 U.S. at 756 n.4 (quoting 9 Nicolay and Hay, Works of Abraham Lincoln 75-77 (1894)). Likewise, there is no "if" in the State Self-Defense Clause pertaining to Congress or any political branch of the federal government, no condition allowing Congress to control the states in exercising their reserved war-making power. On the contrary, the Constitution recognizes that states may exercise this power even *without the consent of Congress*.

Whether Texas is bound by Congress's general rules and regulations, and whether the INA preempts S.B.4, is also decidable by the more specific provision over the more general canon. The INA is a general law governing immigration. In contrast, the State Self-Defense Clause deals with the specific circumstance of a state's exercising its war power in the event of an invasion. Ordinarily, specific terms prevail over general terms. "However inclusive may be the general language of a statute, it will not be held to apply to a matter specifically dealt with in another

part of the same enactment." *Fourco Glass Co. v. Transmirra Products Corp.*, 353 U.S. 222, 228 (1957) (citations omitted*). See also United States v. Estate of Romani*, 523 U.S. 517, 532 (1998) (holding that a later, more specific statute governs); *Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) (holding that a general statute will not repeal by implication a more specific one unless there is "clear intention otherwise"). As the Court held in *Mancari*,

> [t]he courts are not at liberty to pick and choose among congressional enactments, and when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective. "When there are two acts upon the same subject, the rule is to give effect to both if possible."

*Mancari*, 417 U.S. at 551 (quoting *United States v. Borden Co.*, 308 U.S. 188, 198 (1939)). The same reasoning applies to constitutional provisions. The INA and the State Self-Defense Clause, both being the supreme law of the land, should both be given effect, and that is accomplished by the displacement of the INA only in narrow situations where the State Self-Defense Clause is validly invoked.

In sum, even if the Court were to decide that S.B.4 conflicts with the terms of the INA, Texas has exercised a reserved power to implement S.B.4 under the State Self-Defense Clause. As long as Texas validly takes this action to repel an actual invasion, as it has, the Constitution recognizes its authority to take it without Congress's consent. Because Texas's valid invocation of its reserved power under the State Self-Defense Clause, and its valid choice of means of defense, takes

precedence over Congress's otherwise-applicable law, Plaintiffs cannot show any substantial likelihood of success on the merits of this action.

## **CONCLUSION**

For the forgoing reasons, the Court should reverse the district court and vacate its injunction.

DATED: October 22, 2026

Respectfully submitted,

/s/ Matt Crapo

MATT A. CRAPO
CHRISTOPHER J. HAJEC
Federation for American Immigration Reform
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
Telephone: (202) 328-7004
mcrapo@fairus.org
chajec@fairus.org

Attorneys for *Amicus Curiae*
Federation for American Immigration Reform

## CERTIFICATE OF SERVICE

I certify that on October 22, 2026, I electronically filed the foregoing *amicus* brief with the Clerk of the Court for the United States Court of Appeals for the Fifth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Matt Crapo

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with Fed. R. App. P. 29(a)(5) because it contains 4,642 words, as measured by Microsoft Word software, which is fewer than one-half of the 13,000 word limit for a party's principal brief under Fed. R. App. P. 32(a)(7)(B). The brief also complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) & 32(a)(6) because it has been prepared in a proportionally spaced, Roman-style typeface of 14 points or more.

DATED: October 22, 2026

Respectfully submitted,

/s/ Matt Crapo