**No. 26-50418 cons. with No. 26-50469**

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

---

L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

*Plaintiffs-Appellees*,

v.

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

*Defendant-Appellant*.

---

On Appeal from the United States District Court
for the Western District of Texas, Austin Division

---

# Brief *Amicus Curiae* of Lt. General Michael Flynn (USA-ret.), America's Future, Gun Owners of America, Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, and Conservative Legal Defense and Education Fund in Support of Defendant-Appellant and Reversal

---

J. MARK BREWER
Fredericksburg, TX
MICHAEL BOOS
Washington, DC
JOHN I. HARRIS III
Nashville, TN
PATRICK M. MCSWEENEY
Powhatan, VA
RICK BOYER
Lynchburg, VA

WILLIAM J. OLSON*
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180
(703) 356-5070
wjo@mindspring.com
**Counsel of Record*

Attorneys for *Amici Curiae*
October 22, 2026

No. 26-50418 cons. with No. 26-50469

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

L.M.L. AND K.G.S., ON BEHALF OF THEMSELVES AND ALL THOSE SIMILARLY SITUATED,

Plaintiffs-Appellees,

v.

FREEMAN F. MARTIN, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE STATE OF TEXAS DEPARTMENT OF PUBLIC SAFETY,

Defendant-Appellant.

**CERTIFICATE OF INTERESTED PERSONS**

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Fifth Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal.

Freeman F. Martin, Defendant-Appellant.

L.M.L. and K.G.S., on behalf of themselves and all those similarly situated, Plaintiffs-Appellees.

Lt. General Michael Flynn (USA-ret.), America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, and Conservative Legal Defense and Education Fund, *Amici Curiae*.

William J. Olson, J. Mark Brewer, Michael Boos, John I. Harris III, Patrick M. McSweeney, and Rick Boyer are counsel for *Amici Curiae*.

Pursuant to Federal Rules of Appellate Procedure 26.1 and 29(c), and 5th Circuit Rule 28.2.1, it is hereby certified that *Amici Curiae* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, and Conservative Legal Defense and Education Fund are non-stock, nonprofit corporations, have no parent companies, and no person or entity owns them or any part of them.

*/s/ William J. Olson*
William J. Olson
Attorney of Record for *Amici Curiae*

# TABLE OF CONTENTS

Page


TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

INTEREST OF THE *AMICI CURIAE* . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT

I. THE DISTRICT COURT HAS, ONCE AGAIN, ERRONEOUSLY ENJOINED TEXAS'S EXERCISE OF ONE OF ITS INHERENT POWERS AS A SOVEREIGN STATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

A. SB 4 Exercises a Valid State Power Not Yielded to the National Government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. The State of Texas Has the Same Inherent Authority to Protect Its Borders as Does the U.S. Government . . . . . . . . . . . . . . . 8

C. The Invasion Clause Expressly Reserves the Right of Self-Defense against Invasion to the States, Up to and Including War . . . . . . . 13

D. The Supremacy Clause Subordinates Only State Laws that Conflict with Proper Federal Laws . . . . . . . . . . . . . . . . . . . . 14

E. The District Court's Interpretation of the Guarantee, Invasion, and Supremacy Clauses Creates an Absurdity . . . . . . . . . . . . . 17

II. BY ANY MEASURE, TEXAS HAS BEEN INVADED AND MUST BE ALLOWED TO DEFEND ITSELF AS TEXAS AND OTHER STATES HAVE DONE IN THE PAST . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

A. The Objective Reality of the Border Invasion . . . . . . . . . . . . . 20

B. American States' History of Responding to Border Invasions with Military Force Demonstrates Texas's Constitutional Right to Defend Itself . . . . . . . . . . 21

C. The Historical Understanding of the Word "Invasion" Does Not Require Military Involvement . . . . . . . . . . 24

III. MASS MIGRATION IS SOMETIMES MILITARIZED AGAINST TARGETED NATIONS . . . . . . . . . . 27

CONCLUSION . . . . . . . . . . 29

# TABLE OF AUTHORITIES


**U.S. CONSTITUTION**

Article I, Section 8, clause 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
Article I, Section 8, clause 11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
Article I, Section 10, clause 3 . . . . . . . . . . . . . . . . . . . . . . . . . 3, *passim*
Article IV, Section 4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
Article VI, clause 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 18
Amendment X . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

**STATE CONSTITUTIONS**

Mass. Const., Part the Second, chapter II, Section 1, article VII . . . . . . 11, 26

**STATUTES**

5 *Stat*. 797 (Mar. 1, 1845) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

**CASES**

*Alden v. Me.*, 527 U.S. 706 (1999) . . . . . . . . . . . . . . . . . . . . . . . . 15, 16, 17
*Arizona v. United States*, 567 U.S. 387 (2012). . . . . . . . . . . . . . . . . 6, 8, 16
*Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135 (1892) . . . . . . . . . . . . . . . 6
*Gregory v. Ashcroft*, 501 U.S. 452 (1991) . . . . . . . . . . . . . . . . . . . . . . 9, 17
*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952) . . . . . . . . . . . . . . . . . . . 6
*Hinderlider v. La Plata River & Cherry Creek Ditch Co.*,
304 U.S. 92 (1938) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
*Marbury v. Madison*, 5 U.S. 137 (1803) . . . . . . . . . . . . . . . . . . . . . . . . 15
*United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024) . . . . . . . . . . . . . . . . 10
*United States v. Abbott*, 690 F. Supp. 3d 708 (W.D. Tex. 2023) . . . . . . . 9, 10
*United States v. Butler*, 297 U.S. 1 (1936) . . . . . . . . . . . . . . . . . . . . . . . 18
*United States v. Lopez*, 514 U.S. 549 (1995) . . . . . . . . . . . . . . . . . . . . . . 7
*United States v. Texas*, 173 F.4th 660 (5th Cir. 2026) . . . . . . . . . 3, 19, 27, 28
*United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024). . . . . . 2, 3, 24
*Nishimura Ekiu v. United States*, 142 U.S. 651 (1892) . . . . . . . . . . . . . . 6, 7

**MISCELLANEOUS**

Governor Greg Abbott “Border Statement” (Jan. 24, 2024) . . . . . . . . . . . . 20
Bethany Blankley, “51st Texas county declares invasion at southern border,”
*TheCenterSquare.com* (Jan. 23, 2024) . . . . . . . . . . . . . . . . . . . . . . . 20

Luca Cacciatore, "Seven More States to Send National Guard to Texas Border," *TexasScorecard.com* (Feb. 12, 2024) . . . . . . . . . . . . . . . . . 20
Guillermo Contreras, "Hawaiian judge coming to Alamo City," *MySanAntonio.com* (Dec. 26, 2012) . . . . . . . . . . . . . . . . . . . . . . . . 3
Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union (1868) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution (Jonathan Elliot ed., 2d ed. 1836) . . . . . . . . . . . 12
Alden Fletcher, "The First Calling Forth Clause: The Constitution's Non-Emergency Power to Call Forth the Militia to Execute the Laws," 13 J. Nat'l Security L. & Pol'y. 1 (2022) . . . . . . . . . . . . . . . . . . . . . 11
Nathanael Greene, "The Reconquista: Mexico Sees Illegals Entering the U.S. Southern Border as Weapons – This Is Their Take Back Operation," (Jan. 21, 2026). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
Philip Hamburger, "Beyond Protection," 109 Colum. L. Rev. 1823 (Dec. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 11
Kaitlin Housler, "25 Republican Governors Release Joint Statement in Support of Texas," *Tennessee Star* (Jan. 25, 2024). . . . . . . . . . . . . . 20
Andrew Hyman, "What The Constitution's Framers Really Meant By 'Invasion,'" *Daily Caller* (Jan. 30, 2024) . . . . . . . . . . . . . . . . . . . . 26
Carlos Loret de Mola, "The Great Invasion: Mexico Recovers Its Own," (July 20, 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
James Madison, *Federalist 41* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
James Madison, *Federalist 43* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
James Madison, *Federalist 45* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
James Monroe, Letter to Caleb Strong, Governor of Massachusetts (Sept. 17, 1814) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Jason Mazzone, "The Security Constitution," 53 UCLA L. Rev. 29 (Oct. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
Rob Natelson, "Understanding the Constitution: How States May Respond to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024) . . . . . . . . . . 25
Rob Natelson and Andrew Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," Br. J. Am. Leg. Studies (2024) . . 25, 26
"Pancho Villa," *History.com* (Nov. 9, 2009). . . . . . . . . . . . . . . . . . . 22, 23
Report of U.S. House Special Committee on Texas Frontier Troubles (Feb. 29, 1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

James Rippy, The United States and Mexico (1926) . . . . . . . . . . . . . . . . . . 21
James Sandos, "The Plan of San Diego: War & Diplomacy on the Texas Border 1915-1916," *Arizona and the West* (Spring 1972) . . . . . . . . . . 22
Robert Stewart, "Letter to General D.M. Frost" (Dec. 10, 1860), in "Civil War on the Western Border," *Kansas City Public Library* . . . . . 27
Peter Schweizer, The Invisible Coup (2026) . . . . . . . . . . . . . . . . . . . . . . . 28
Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data" . . . . . . . . 20
John Tierney, Chasing Ghosts: Unconventional Warfare in American History (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
Emer de Vattel, The Law of Nations (2008) . . . . . . . . . . . . . . . . . . . . . . . 8, 9
II Vermont Historical Gazetteer (1871) . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## INTEREST OF THE *AMICI CURIAE*[1]

*Amici curiae* Lt. Gen. Michael Flynn (USA-ret.) served in the Army for 33 years, ending his military career as Director of the Defense Intelligence Agency, and his government career as National Security Advisor to President Donald Trump. *Amici* America's Future, Gun Owners of America, Inc., Gun Owners Foundation, Tennessee Firearms Association, Tennessee Firearms Foundation, Citizens United, Citizens United Foundation, and Conservative Legal Defense and Education Fund are nonprofit organizations which work to defend constitutional rights and protect liberties. The nonprofit *amici*, *inter alia*, participate in the public policy process, including conducting research, and informing and educating the public on the proper construction of state and federal constitutions, as well as statutes related to the rights of citizens, and questions related to human and civil rights secured by law.

Some of these *amici* filed an *amicus* brief in a prior challenge to SB 4. *See United States v. Texas*, U.S. Court of Appeals for the Fifth Circuit, No. 24-50149, Brief of *Amici Curiae* America's Future, et al. (Mar. 13, 2024),

---

[1] It is hereby certified that all parties consented to the filing of this brief *amicus curiae*; that no counsel for a party authored this brief in whole or in part; and that no person other than these *amici curiae*, their members, or their counsel made a monetary contribution to its preparation or submission.

which *amicus* brief was also accepted by this Court during its en banc consideration (*see* Dkt. 384-2). Some of these *amici* also recently filed an *amicus* brief in a case presenting similar issues. *See Bird v. Iowa Migrant Movement of Justice*, U.S. Supreme Court, No. 26-49, Brief *Amicus Curiae* of Lt. General Michael Flynn (USA-ret.), et al. (August 12, 2026).

## STATEMENT OF THE CASE

In 2023, Texas passed SB 4, the statute challenged here. *L.M.L v. Martin*, 833 F. Supp. 3d 692, 704 (W.D. Tex. 2026) ("*L.M.L.*"). The statute "makes it a crime for noncitizens to 'enter[], attempt to enter,' or be found in Texas after they have 'been denied admission to' or removed from the United States or departed the United States while an order of 'removal is outstanding.'" *Id.* at 706. If the alien is convicted of a crime in Texas, the law then instructs state judges to order the alien's removal to the country from which he entered. *Id.* at 707.

The law was previously challenged in the Western District of Texas in 2023 by the Biden administration, two advocacy groups for illegal aliens, and El Paso County. *United States v. Texas*, 719 F. Supp. 3d 640, 651 (W.D. Tex.

2024) ("*Texas I*"). Senior District Judge David Ezra[2] entered a preliminary injunction against the law at the time. *Id.* at 702.

After President Trump's inauguration, the United States withdrew from the suit. This Court en banc dismissed the suit in April 2026, finding that the alien-rights organizations and El Paso County lacked injury, and thus lacked standing to prosecute the suit. *United States v. Texas*, 173 F.4th 660 (5th Cir. 2026) ("*Texas II*"). Judges Ho and Oldham wrote concurring opinions addressing the merits.

The following month, a new challenge to SB 4 was filed in the Western District, by two plaintiffs from Honduras. And again, District Judge Ezra enjoined the law. The court found that the plaintiffs were likely to prevail on the merits, because federal immigration law preempts the field. *L.M.L.* at 722. The court rejected Texas's defense that the Constitution, in Article I, Sec. 10, cl. 3, permits the states to engage in war to combat invasion without first consulting Congress. The court declared that SB 4's removal provisions are not "operations

---

[2] Judge Ezra was nominated and confirmed to serve on the district court for the District of Hawaii, but in January 2013, Senior Judge Ezra was designated by Chief Justice John Roberts to the Western District of Texas, because judges in that court were "swamped largely with immigration and drug cases." Guillermo Contreras, "Hawaiian judge coming to Alamo City," *MySanAntonio.com* (Dec. 26, 2012).

of war," but only "standard operations of criminal enforcement by state civil authorities." *Id.* at 729. The court certified a massive plaintiff class of:

> [a]ll noncitizens who now or in the future enter, attempt to enter, or are found in the state of Texas after they have been denied admission to or excluded, deported, or removed from the United States, or after they have departed from the United States while an order of exclusion, deportation, or removal was outstanding. [*Id.* at 731.]

The district court denied Texas's request for stay pending appeal. *Id.* at 736-37.

## ARGUMENT

### I. THE DISTRICT COURT HAS, ONCE AGAIN, ERRONEOUSLY ENJOINED TEXAS'S EXERCISE OF ONE OF ITS INHERENT POWERS AS A SOVEREIGN STATE.

The district court summarized SB 4 as follows:

> SB 4 criminalizes at the state level unauthorized entry or re-entry of noncitizens into Texas from outside the country, authorizes noncitizen removals to Mexico, and instructs state court judges not to abate proceedings on the basis of a pending federal determination of admissibility.... Plaintiffs do not challenge the entry provision. [*L.M.L.* at 706.]

The district court stated that "[b]y regulating a sphere dominated by federal interests, SB 4 violates the Supremacy Clause." *Id.* at 719. The court asserted that the national government has "'broad, undoubted power over the subject of immigration'" (*id.* at 717) relying on some amalgam of (i) the

naturalization power and (ii) the power to regulate commerce with foreign nations. *Id.*

Believing the federal government to have exclusive power over borders and immigration, the district court found Texas to have no authority whatsoever over its own border. It entirely disregarded the fact that Texas has long exercised its authority as a sovereign state to control its borders — a power that Texas never yielded to the national government. Further, the district court had no problem dismissing almost out of hand (*id.* at 728-30) Texas's power expressly recognized in the U.S. Constitution to do much more than exclude individuals — but also to engage in war — if invaded or in imminent danger. The district court rationalized there was no such state war power set out in the Constitution "[a]part from the final few words" in Article I, Section 10. The constitutional phrase the district court disrespected for its brevity is "**or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay**," which contains 18 words. By contrast, if word count were to matter, the clause the district court primarily relied on, "**[t]o establish an uniform Rule of Naturalization**," contains only seven words.

### A. SB 4 Exercises a Valid State Power Not Yielded to the National Government.

The fundamental error of the courts below was in assuming that under the U.S. Constitution, the sovereign states yielded their authority to control their own borders. This assumption is incorrect. The Constitution never once even uses the word "border" or "immigration." The primary power relied on below was Article I, Sec. 8, cl. 4. — "To establish an uniform Rule of Naturalization." "Naturalization" has been defined as "the act of adopting a foreigner, and clothing him with the privileges of a native citizen." *Boyd v. Nebraska ex rel. Thayer*, 143 U.S. 135, 162 (1892). To be sure, the Supreme Court has tied Congress' power to admit, exclude, or deport aliens to the Naturalization Clause (and sometimes other provisions) and thus asserted that this power is possessed by the national government alone. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 599 (1952); *Arizona v. United States*, 567 U.S. 387, 395 (2012). However, early cases explain that power is inherent in sovereignty. *See Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892) ("It is an accepted maxim of international law, that every sovereign nation has the power, as inherent in sovereignty, and essential to self-preservation, to forbid the entrance of foreigners within its dominions, or to admit them only in such cases and upon

such conditions as it may see fit to prescribe [citing Vattel].") Since this power was not clearly yielded exclusively to the federal government in the Constitution, it remains a shared power with the states, which are also sovereign. The district court completely ignores the fact that Texas is also a sovereign. **Thus, the national power and the state power over immigration are both drawn from the same source.** The federal power in this area is not exclusive, and does not negate or limit the power of the states.

The district court disregarded the unyielded, inherent power of Texas and constrained that authority based on the doctrine of "field preemption" because Congress created a complex and expansive system to regulate immigration.[3] Field preemption has no bearing here where states are authorized even to wage war to protect their borders, and where there is no express constitutional federal power over borders or immigration. The power over naturalization, discussed *supra*, has been stretched to justify control over immigration, but the better view is that it derives from the inherent power of a state. And the district court

[3] Moreover, according to the district court's theory, if Congress passed a comprehensive federal scheme to supplant state zoning law, that would be considered "field preemption" when it should be viewed as a usurpation of state police powers. *See generally United States v. Lopez*, 514 U.S. 549 (1995). No longer would the powers of the federal government be "few and defined" and the powers of the states be "numerous and indefinite," as James Madison explained the Framers' original plan in *Federalist 45*.

believes the power to "regulate commerce with foreign nations" should be judicially inflated to cover that which it clearly was never written to cover — free people are not commerce. Field preemption does not limit or extinguish Texas's inherent power over its border, and certainly does not override its constitutionally recognized power to wage war against invasion.

### B. The State of Texas Has the Same Inherent Authority to Protect Its Borders as Does the U.S. Government.

The Founders created a "Union of sovereign States." *Hinderlider v. La Plata River & Cherry Creek Ditch Co.*, 304 U.S. 92, 104 (1938). When Texas entered the union in 1845, it did so "on an equal footing" with the other States. 5 *Stat*. 797, 798 (Mar. 1, 1845). Thus, any analysis of State and national power here must begin with the reality that there are **two sovereigns in this case.** "[T]he defining characteristic of sovereignty [is] the **power to exclude** from the sovereign's territory people who have no right to be there." *Arizona v. United States* at 417 (Scalia, J., dissenting) (emphasis added). That was not only the opinion of Justice Scalia in a dissent; it was an undisputed principle described by Emer de Vattel in his treatise which was widely read during the Founding-era, The Law of Nations, which reads as follows:

> The **sovereign may forbid the entrance of his territory** either to **foreigners** in general, or in particular cases, or to certain persons,

> or for certain particular purposes, according as he may think it advantageous to the state. There is nothing in all this, that does not flow from the rights of domain and sovereignty…. [Emer de Vattel, The Law of Nations, bk. II, ch. VII, § 94, p. 196-97 (Béla Kapossy & Richard Whatmore eds. 2008) (emphasis added).]

The inherent — and unsurrendered — rights of the States to defend their own sovereignty is well established:

> The people of each State compose a State, having its own government, and **endowed with all the functions essential to separate and independent existence**, … it may be not unreasonably said that **the preservation of the States**, and the maintenance of their governments, **are as much within the design** and care of the Constitution **as the preservation of the Union** and the maintenance of the National government. [*Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991) (emphasis added) (internal quotations omitted).]

The district court viewed the state's express constitutional power even to wage war to defend itself as limited by the congressional war power, stating that a "state may respond to immediate military threats until 'resources of the federal government can reach the invasion.'" *L.M.L.* at 729. For that remarkable proposition, which disregards that war may be waged "without the Consent of Congress" (Art. I, Sec. 10, cl. 3), the district court cited itself — its own deeply flawed, and later reversed, decision in *United States v. Abbott*, 690 F. Supp. 3d

708 (W.D. Tex. Sept. 6, 2023)[4] issued by the same district judge, which also violates the federal structure as originally understood.

One indispensable attribute of a state's ability to maintain a "separate and independent existence" is the ability to defend itself from millions of aliens coming across its border. The militia provided State governments with the means to carry out that sovereign function. Founding-era State constitutions and State statutes addressed the power of a governor to call out the militia to defend their State's borders. "[M]ost state executives during the War of Independence detained, questioned, and expelled British enemy aliens without legislative authorization."[5]

- The post-Revolutionary 1784 New Hampshire Constitution authorized the governor to "be commander in chief [and to] expulse, repel, resist and pursue by force of arms … every such person … as shall … in a hostile

[4] The district court failed to provide the subsequent history to its own decision showing that this court en banc reversed the district court's order and remanded to vacate the preliminary injunction. *United States v. Abbott*, 110 F.4th 700 (5th Cir. 2024). Some of these *amici* filed an *amicus* brief when this "floating barrier" case was on appeal to this court. *See* Supplemental Brief *Amicus Curiae* of America's Future, et al., *United States v. Abbott*, No. 23-50632 (Feb. 23, 2024).

[5] Philip Hamburger, "Beyond Protection," 109 Colum. L. Rev. 1823, 1930 (Dec. 2009).

manner attempt or enterprize the destruction, invasion, detriment, or annoyance of this State." *Id*. at n.359.

- The 1780 Massachusetts Constitution, written by John Adams, had nearly identical language.[6]
- New Jersey provided by statute, "'[t]hat in case of sudden Invasion, Insurrection, Sedition, or Alarm … it shall be lawful for the governor … to call out and array the Whole of the Militia … as he may think necessary to repel the Invasion, and to Restore the Peace of the State.'"[7]
- Pennsylvania and New York had similar statutes. *Id*. at 19-20.

The district court misread history in assuming the Framers intended to limit the right of States to prevent aliens from unlawfully crossing their borders. In fact, "the ratifying generation put in place a uniquely federalist security apparatus…. [T]he national government is permitted, indeed encouraged, to … call[] forth the militia into federal employ to carry out the requirements of the

[6] Mass. Const., Part the Second, chap. II, § 1, art. VII, *ConSource.com*.

[7] Alden Fletcher, "The First Calling Forth Clause: The Constitution's Non-Emergency Power to Call Forth the Militia to Execute the Laws," 13 J. Nat'l Security L. & Pol'y. 1, 19 n.104 (2022).

Protection Clause…. The remainder of the time, states are free to use their militia for their own purposes."[8]

George Nicholas responded directly to Anti-Federalist Patrick Henry's concern that the Constitution someday might be misread to grant the militia power exclusively to the national government:

> **The power of arming [the militias] is concurrent** between the general and state governments; for the power of arming them rested in the state governments before: and although the power be given to the general government, yet it is **not given exclusively**; for, **in every instance where the Constitution intends that the general government shall exercise any power exclusively of the state governments, words of exclusion are particularly inserted**. Consequently, in every case where such words of exclusion are not inserted, **the power is concurrent** to the state governments and Congress…. Virginia may arm the militia, should Congress neglect to arm them.[9]

Years after ratification of the Constitution, in 1814, Massachusetts Governor Caleb Strong called the militia into state service to resist a British invasion and then requested federal reimbursement of the expense. Three years before becoming President, then-Secretary of War James Monroe responded to

---

[8] Jason Mazzone, "The Security Constitution," 53 UCLA L. Rev. 29, 90 (Oct. 2005).

[9] Debate before the Convention of the Commonwealth of Virginia (Statement of George Nicholas) (June 14, 1788), in 3 The Debates in the Several State Conventions on the Adoption of the Federal Constitution at 391 (Jonathan Elliot ed., 2d ed. 1836) (emphasis added).

Strong, not to criticize his use of State militia to resist invasion, but rather to avoid reimbursement of state expenses: "The measures which may be adopted by a **State Government for the defence of a State** must be considered as its own measures and not those of the United States — The expences attending them are chargeable to the State and not to the United States."[10]

### C. The Invasion Clause Expressly Reserves the Right of Self-Defense against Invasion to the States, Up to and Including War.

Lest there be any doubt that the States retained sovereign power to defend their borders, even to the point of waging War, the Invasion Clause expressly reserves that power to the States: "No State shall, **without the Consent of Congress** … **engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay**." Article I, Sec. 10, cl. 3 (emphasis added). This clause speaks to a number of scenarios.

The obvious meaning of this clause is that, in the event of "invasion" or a risk of "imminent Danger," each State may even engage in "War" "without the consent of Congress." "War" presupposes the existence of a foreign threat, and thus is of particular significance to States which border foreign nations. This

[10] Letter from James Monroe, Secretary of War, to Caleb Strong, Governor of Massachusetts (Sept. 17, 1814), in 1 American State Papers: Military Affairs at 614 (1993) (emphasis added).

clause is located in section 10 of Article I (addressing Powers Denied to the States) and was designed to clarify that the War power expressly vested in Congress by Article I, Sec. 8, cl. 11 did not divest the States of the War power in specified circumstances. There is nothing express or implied in this clause that indicates that, short of waging war, the State's inherent power to defend its border is limited in any way.

Thus, this case does not turn on whether there was a military invasion into Texas. Texas's exercise of its power in SB 4 is modest and certainly cannot be considered a War power. Therefore, while it could wage war, together with the greater authority to use force and violence, which that implies, if it was invaded, its authority to resist immigration by non-citizens exists irrespective of whether there is an invasion.

### D. The Supremacy Clause Subordinates Only State Laws that Conflict with Proper Federal Laws.

The district court enjoined the Texas statute on the ground, *inter alia*, that it violates the Supremacy Clause:

> This Constitution, and the **Laws** of the United States which shall be **made in Pursuance thereof**; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land…. [Article VI, cl. 2 (emphasis added).]

The Supremacy Clause is not a general grant of power to the national government. It does not empower the national government to violate limitations on its own power or negate the inherent powers of the States not yielded to the national government. SB 4 in no way conflicts with the constitutional naturalization power or laws made pursuant thereto. The Supremacy Clause cannot be invoked to subtract from or weaken a State's reserved powers, authorizing the national government to violate the Tenth Amendment.

The Supremacy Clause does not claim — as the district court seemed to imply — that the States are subordinate to the national government's policy choices in every respect. Where an inherent State power is not yielded to the national government, and certainly because states (but not the federal government) are empowered even to wage war to defend their borders, federal law — and federal policy choices — are powerless to invade the reserved right. Indeed, it would be the national government that is acting in an unconstitutional manner, for "an act of the legislature, repugnant to the constitution, is void." *Marbury v. Madison*, 5 U.S. 137, 177 (1803).

> The federal system established by our Constitution … reserves to [the States] a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status…. **[E]ven as to matters within the competence of the National Government**, the constitutional design

> secures the founding generation's rejection of "the concept of a central government that would act upon and through the States" in favor of "a system in which the State and Federal Governments would exercise **concurrent authority** over the people – who were, in Hamilton's words, 'the only proper objects of government.'" [*Alden v. Me.*, 527 U.S. 706, 714 (1999) (emphasis added).]

Thus, the "constitutional design" rejects allowing federal "policy choices" to override powers expressly reserved to States. And the right to defend themselves against invasion — as well as the right to determine when an invasion occurs ("without the consent of Congress") — is expressly reserved to the States by the Constitution's language.

The clearest modern explanation on this topic came from Justice Scalia, who explained the thinking of the Framers meeting in Philadelphia in 1797:

> Through ratification of the fundamental charter that the Convention produced, the States ceded much of their sovereignty to the Federal Government. But much of it remained jealously guarded — as reflected in the innumerable proposals that never left Independence Hall. Now, **imagine a provision** — perhaps inserted right after Art. I, § 8, cl. 4, the Naturalization Clause — which included among the enumerated powers of Congress **"To establish Limitations upon Immigration that will be exclusive and that will be enforced only to the extent the President deems appropriate."** The delegates to the Grand Convention would have rushed to the exits. [*Arizona* at 436 (Scalia, J., concurring in part and dissenting in part) (emphasis added).]

### E. The District Court's Interpretation of the Guarantee, Invasion, and Supremacy Clauses Creates an Absurdity.

The district court explains the duty of the federal government to protect a state against invasion:

> [w]hen a state — and by extension the United States — is invaded, the federal government must protect from the invasion. As Article IV, Section 4 (the "Guarantee Clause") states: "The United States shall guarantee to every State … a Republican Form of Government, and shall protect each of them against Invasion…." [*L.M.L.* at 729.]

The district court misreads the existence of that obligation on the national government as if it constituted a restriction imposed on State governments, suggesting that "the state may respond to immediate military threats," but only "until 'resources of the federal government can reach the invasion.'" *Id.* But the constitutional text wholly undercuts the district court's position. Nothing in the Guarantee Clause limits the Invasion Clause to an "emergency" role, to be superseded as soon as the federal government says so. Nor does the Clause require States to submit to an invasion if the federal government, through negligence or otherwise, refuses to defend against it, as during the Biden administration. It expressly authorizes States to act "without the Consent of Congress." It is not limited temporally, in scale or in scope. Rather than being supplemental, it is concurrent. *See Alden* and *Gregory*, *supra*. It terminates

neither if the federal government steps in to assist, nor if the federal government refuses to do so.

The district court's view renders the Invasion Clause a nullity. Under its decision, if: (i) the national government has time to respond but refuses to defend a border; or (ii) the national government declares that no invasion exists, the State cannot act.

To all practical effect, the district court reads the Invasion Clause to say instead that "a state may not engage in War even if actually invaded if the national government refuses to consent or withdraws consent." But the Framers expressly specified that the consent of Congress was not required — giving the national government no role whatsoever. "[W]ords cannot be meaningless, else they would not have been used." *United States v. Butler*, 297 U.S. 1, 65 (1936). As Thomas Cooley's famous treatise put it, "the courts must … lean in favor of a construction which will render every word operative, rather than one which may make some idle and nugatory."[11]

The district court misreads both the Invasion and the Supremacy Clauses, reaching the wrong conclusion. Texas possesses reserved sovereign authority to

[11] Thomas Cooley, A Treatise on the Constitutional Limitations Which Rest Upon the Legislative Power of the States of the American Union at 58 (1868).

go to war to defend its borders, without congressional permission, when an invasion exists. The authority to act without congressional permission necessarily defeats the district court's position that the federal government is the sole determinant if an invasion exists. Texas has the authority it needs for SB 4 from the Constitution; it needs none from the federal government.

## II. BY ANY MEASURE, TEXAS HAS BEEN INVADED AND MUST BE ALLOWED TO DEFEND ITSELF AS TEXAS AND OTHER STATES HAVE DONE IN THE PAST.

Article I, Sec. 10, cl.3 allows the states the power to "engage in war" in time of invasion or imminent danger "without the Consent of Congress." If Congress's consent is not needed, neither is consent from the Executive or the Judiciary. No court has authority to override Texas's finding that it has been invaded. As Judge Ho put it in his concurrence in *Texas II*, "[t]he judiciary … has 'no business deciding which national security threats are sufficiently serious to warrant a military response, and which are not.'" *Texas II* at 671 (Ho, J., concurring). However, the fact is that here Texas, most certainly, has been invaded.

### A. The Objective Reality of the Border Invasion.

The district court blithely dismisses the immigration crisis in Texas. But in fiscal year 2023 alone, nearly 2 million illegal aliens poured over Texas's border, some 50 percent of all illegal U.S. border crossings.[12]

According to the Texas Department of Public Safety, since June 2011:

> 335,000 illegal noncitizens were charged with more than 603,000 criminal offenses which included arrests for 1,134 homicide charges; 79,089 assault charges; 10,669 burglary charges; 70,672 drug charges; 1,547 kidnapping charges; 30,692 theft charges; 48,105 obstructing police charges; 3,424 robbery charges; 7,713 sexual assault charges; 8,733 sexual offense charges; and 7,669 weapon charges.[13]

Texas asserts that it has been invaded. *L.M.L.* at 728.[14] Twenty-five governors signed a statement supporting Texas's constitutional right to defend against the invasion.[15] Twelve governors pledged National Guard troops to defend Texas's border militarily.[16] Fifty-one Texas counties have declared that an invasion exists.[17] The district court's opinion is irrelevant.

---

[12] Bethany Blankley, "51st Texas county declares invasion at southern border," *TheCenterSquare.com* (Jan. 23, 2024).

[13] Texas Dep't of Public Safety, "Texas Criminal Illegal Alien Data."

[14] *See also* Governor Greg Abbott "Border Statement" (Jan. 24, 2024).

[15] Kaitlin Housler, "25 Republican Governors Release Joint Statement in Support of Texas," *Tennessee Star* (Jan. 25, 2024).

[16] Luca Cacciatore, "Seven More States to Send National Guard to Texas Border," *TexasScorecard.com* (Feb. 12, 2024).

[17] Blankley, *supra*.

### B. American States' History of Responding to Border Invasions with Military Force Demonstrates Texas's Constitutional Right to Defend Itself.

From its earliest days, Texas has deployed State armed forces in resisting cross-border incursions from Mexico, including many incursions not conducted by regular troops of the Mexican government or military. Ten years after the Civil War, invasions of Texas by gangs of Mexican bandits forced Texas Governor Richard Coke to appeal repeatedly to the federal government for help:

> [A] joint committee of the state legislature … recommended the increase of state forces on the southwestern frontier and expressed the fervent hope that ere long the federal government would do its full duty…. The governor not only forwarded this report to Washington, but sent protest after protest and plea after plea for federal assistance.[18]

When the federal government failed to properly defend the border, the governor commissioned a force of Texans of Mexican descent, ordering them to engage the Mexican bandits: "Should the company be in close pursuit of thieves or marauders…, it will follow as far as possible, whether on this side of the Rio Grande or the other."[19] When U.S. Attorney General George Williams questioned the legality of the order, Coke replied:

---

[18] James Rippy, The United States and Mexico at 292 (1926).

[19] Report of U.S. House Special Committee on Texas Frontier Troubles at xv (Feb. 29, 1876).

> **No state has surrendered the right of defense** of its people in its own way against aggressions from neighboring states or people.... [I]nternational courtesy, comity, and amity have never been required by the law of nations, carried to the romantic extent of surrendering the great natural right of self-defense against the constant infliction of serious … injury upon the people of one nation by those of another. [*Id.* at xvi (emphasis added).]

United States "Attorney-General Williams acquiesced in these conclusions, and the orders remained in force." *Id.*

In the early 1900s, as Europe began to take up sides for World War I, the German government sought to destabilize the southern border of the United States. Groups of Mexican bandits, encouraged by German agents, developed the "Plan of San Diego."

> According to the Plan, there would be an armed uprising … against … the United States.... [T]he Plan would reclaim for Mexico, the territory comprising Texas, New Mexico, Arizona, Colorado, and California.[20]

In 27 cross-border incursions, "raiders killed thirty-three Americans and wounded twenty-four, and destroyed several thousand dollars worth of property. They disrupted economic activity in four Texas counties, causing thousands of families to flee the Lower Rio Grande Valley." *Id.* at 23.[21] The U.S. Army

[20] James Sandos, "The Plan of San Diego: War & Diplomacy on the Texas Border 1915-1916," Arizona and the West at 8 (Spring 1972).

[21] *See also* "Pancho Villa," *History.com* (Nov. 9, 2009).

played the primary role in putting down the "San Diego" raids and the associated cross-border raids of Pancho Villa, which killed some 30 additional Americans.[22] But the Texas Rangers continued to provide protection of the border and military defense against Mexican bandits.[23]

The deaths caused by Villa and the "San Diego" border raids, both in terms of death toll and economic destruction, pale in comparison to the number of Americans killed by illegal aliens in the modern border invasion. Yet apparently not until recent years has the authority of Texas to defend its border militarily ever even been questioned. Nor is Texas unique.

The history of governors calling out state and territorial militias, while largely unknown today, was a common occurrence over the first American century. Many of the incursions for which the militia were called up would likely fail to meet the district court's standard for "invasion." But they demonstrate the well-established right of states to protect their borders and citizens against both invasion and incursion.

---

[22] *Id*.

[23] John Tierney, Chasing Ghosts: Unconventional Warfare in American History at 117 (2006).

### C. The Historical Understanding of the Word "Invasion" Does Not Require Military Involvement.

In discussing Texas's "invasion defense," the district court noted that "the Court has already discussed this theory at length and rejected it [in *Texas I*]." *L.M.L.* at 716. In the earlier challenge to SB 4, the district court mocked Texas's argument, stating that "[t]o discuss 'invasion' at length is to take the argument more seriously than it deserves." *Texas I* at 679. The district court sought to build a historical case to show that the Framers understood "invasion" only to mean an armed assault against one nation by the organized military forces of another nation. But the court cited to unreliable sources and reached an incorrect historical conclusion.

In *Texas I*, the district court began by referencing two modern dictionaries that define "invasion" as the court wished to define it, then cited the 1828 Webster's Dictionary, which uses armed assaults by organized national militaries as a descriptor of "invasion." According to the district court in that case, an "invasion" must be an attack by "an organized military force" that "enter[s] a country with hostile intent, typically to assault, attack, seize, or plunder." *Texas I* at 681-82. But Webster's does not limit the term only to such military

operations. Most Founding-era dictionaries support Texas's view, as Professor Rob Natelson explains:

> [Of] 13 editions published between 1713 and 1789 … [o]nly one of the 13 limited "invade" and "invasion" to formal military incursions. The other 12 included the military definitions but also added definitions such as "to intrude," "to encroach," and "to enter in a hostile manner." [And] "hostile" usually meant only "without permission."[24]

In *Federalist No. 43*, Madison wrote, "The latitude of the expression here used [invasion] seems to secure each State, not only against foreign hostility, but against ambitious or vindictive enterprises of its more powerful neighbors." In other words, "invasion" is a broad term with considerable latitude, not limited to international militaries. In *Federalist No. 41*, Madison refers to "pirates and barbarians" as "invaders." Madison did not view invasion as limited to the likes of a D-Day or an Anzio.

The district court failed to consider numerous historical evidences that the Framers did not limit "invasion" solely to organized military actions. Before the Constitution's ratification, the State of Connecticut claimed the Wyoming Valley

---

[24] Rob Natelson, "Understanding the Constitution: How States May Respond to Illegal Immigration, Part I," *Epoch Times* (Jan. 8, 2024). *See also* Rob Natelson and Andrew Hyman, "The Constitution, Invasion, Immigration, and the War Powers of States," Br. J. Am. Leg. Studies at 13 (2024) (detailing the 13 dictionaries and their definitions of "invasion") (hereinafter "Natelson").

in Pennsylvania. "In 1754, [Benjamin] Franklin had authored a plan which he said would 'divert the Connecticut Emigrants from their Design of Invading this Province.' [I]n 1783, the Pennsylvania legislature labeled the illegal Connecticut settlers as 'invaders of the State.'"[25] The Connecticut "invasion" was a mere migration. But "the invaded state could use force against the peaceful invaders, as Pennsylvania did in the so-called Pennamite War…." *Id.* (The Massachusetts Constitution did, and still does, refer in the disjunctive to "time of war **or** invasion."[26])

"Invasion" need not refer to the organized military force of an opposing nation. "Participants in the constitutional debates referred to 'invasions of barbarous tribes,' 'invasion of the savages,' and 'hostile invasions of lawless and ambitious men intending … to … introduce anarchy, confusion, and every disorder.'"[27] "The actual or threatened detriment from invasion could be injury to persons; physical damage, such as that resulting from plundering; or the breakdown of normal processes of law and communication." *Id.* at 25-26.

---

[25] Andrew Hyman, "What The Constitution's Framers Really Meant By 'Invasion,'" *Daily Caller* (Jan. 30, 2024).

[26] Mass. Const., Part the Second, chap. II, § 1, art. VII (emphasis added).

[27] Natelson at 23.

The district court also utterly failed to reckon with the innumerable historical examples of governors calling out state militias, many of which would not count as "war" or "invasion" under the court's arbitrary definitions. The cross-border incursions from Canada in 1837-1839 — which led Vermont's governor to call our state militia — while involving some property destruction, could scarcely be considered actions of an "organized military force" if today's high-powered drug cartels cannot.[28] In calling out the militia in 1860, Missouri's Governor Stewart described the threat from border outlaws from Kansas as one of "outlaws and bandits," not an army.[29] Many of the historical clashes of the Texas Rangers likewise occurred against outlaw gangs, not organized military forces.

## III. MASS MIGRATION IS SOMETIMES MILITARIZED AGAINST TARGETED NATIONS.

Concurring in *Texas II*, Judge Ho explained a historical fact ignored by the district court — that nations unable to engage a targeted country militarily have used mass immigration to weaken that country. He noted that "[t]here is broad consensus among national security scholars and experts that countries deliberately

---

[28] II Vermont Historical Gazetteer 299 (1871).

[29] Robert Stewart, "Letter to General D.M. Frost" (Dec. 10, 1860), in "Civil War on the Western Border," *Kansas City Public Library*.

weaponize mass migration to harm other countries just as much as conventional arms." *Texas II* at 669 (Ho, J., concurring). He explained that the Mexican government has made no secret of its intent to use migration to reclaim *de facto* the American Southwest and California. *See id.*

In 1982, a former governor of the Mexican state of Yucatan proclaimed "[a] peaceful mass of people … carries out slowly and patiently an unstoppable **invasion** … conquering a great region … slowly returning [that land] to the jurisdiction of Mexico without the firing of a single shot."[30] In 2021, Mexican President Andres Manuel Lopez Obrador told a reporter, "we Mexicans are reconquering our lands again …."[31] In December 2024, Gabriella Rodriguez, the head of Mexico's National Population Council, stated, "[w]e Mexicans are reclaiming our territory…. Its size has been growing for 30 years." Peter Schweizer, The Invisible Coup at 13 (2026). Mass migration is not only an accident of history but can be a means of forcible conquest — by invasion.

---

[30] Carlos Loret de Mola, "The Great Invasion: Mexico Recovers Its Own," (July 20, 1982) (emphasis added).

[31] Nathanael Greene, "The Reconquista: Mexico Sees Illegals Entering the U.S. Southern Border as Weapons – This Is Their Take Back Operation" (Jan. 21, 2026).

## CONCLUSION

For these reasons, this Court should conclude that the district court erred both in granting a preliminary injunction and in provisionally certifying a class action. In addition, this Court should determine that Plaintiffs also lack standing to challenge the return order provisions.

Respectfully submitted,

*/s/ William J. Olson*

WILLIAM J. OLSON*
WILLIAM J. OLSON, P.C.
370 Maple Ave. W., Ste. 4
Vienna, VA 22180
(703) 356-5070
wjo@mindspring.com
**Counsel of Record*
Attorneys for *Amici Curiae*
October 22, 2026

J. MARK BREWER
BPLawyers, PLLC
1305 N. Milam St.
Fredericksburg, TX 78624

MICHAEL BOOS
CITIZENS UNITED
1006 Pennsylvania Avenue SE
Washington, DC 20003

PATRICK M. MCSWEENEY
3358 John Tree Hill Rd.
Powhatan, VA 23139

RICK BOYER
INTEGRITY LAW FIRM
P.O. Box 10953
Lynchburg, VA 24506

JOHN I. HARRIS III
SCHULMAN, LEROY & BENNETT, P.C.
3310 West End Avenue, Suite 460
Nashville, TN 37203

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED that service of the foregoing Brief *Amicus Curiae* of Lt. General Michael Flynn (USA-ret.), et al. in Support of Defendant-Appellant and Reversal, was made, this 22nd day of October, 2026, by the Court's Case Management/ Electronic Case Files system upon the attorneys for the parties.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*

**CERTIFICATE OF COMPLIANCE WITH RULE 32(a)**

IT IS HEREBY CERTIFIED:

1. That the foregoing Brief *Amicus Curiae* of Lt. General Michael Flynn (USA-ret.), et al. in Support of Defendant-Appellant and Reversal complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because this brief contains 6,287 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6), as well as Circuit Rule 32.1, because this brief has been prepared in a proportionally spaced typeface using WordPerfect version 21.0.0.194 in 14-point CG Times.

*/s/ William J. Olson*
William J. Olson
Attorney for *Amici Curiae*
Dated: October 22, 2026