**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

Docket No. 26-50418 consolidated with No. 26-50469

L. M. L., on behalf of themselves and all those similarly situated; K. G. S., on behalf of themselves and all those similarly situated,

*Plaintiffs – Appellees*

v.

FREEMAN F. MARTIN, in his Official Capacity as Director of the State of Texas Department of Public Safety,

*Defendant – Appellant*

**On Appeal from**
United States District Court for the Western District of Texas (Austin),
No. 1:26-cv-01170-DAE

# APPELLEES' BRIEF

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)
AMERICAN CIVIL LIBERTIES
UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Cody Wofsy
Hannah Steinberg
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
425 California Street, 7th Floor
San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
hsteinberg@aclu.org

Grace Choi
Omar Jadwat
AMERICAN CIVIL LIBERTIES

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Daniel Woodward
(TX Bar No. 24138347)
Zachary Dolling
(TX Bar No. 24105809)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 225
danny@texascivilrightsproject.org
zachary@texascivilrightsproject.org

UNION FOUNDATION
IMMIGRANTS' RIGHTS PROJECT
125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

Dustin Rynders
(TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org

*For Plaintiffs-Appellees*

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th Circuit Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

**Plaintiffs-Appellees:** L.M.L. and K.G.S., represented by American Civil Liberties Union Foundation attorneys Cody Wofsy, Hannah Steinberg, Omar Jadwat, and Grace Choi; and American Civil Liberties Union Foundation of Texas attorneys David A. Donatti, Adriana C. Piñon, and Carolina Rivera Nelson; and Texas Civil Rights Project attorneys Daniel Hatoum, Daniel Woodward, Zachary Dolling, and Dustin Rynders.

**Defendant-Appellant** is a government official.

*/s/ Cody Wofsy*

Cody Wofsy
*Attorney of Record for Plaintiffs-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

SB4 is an unprecedented effort by the State of Texas to seize control of entry into and removal from the United States, in the face of 150 years of Supreme Court precedent. The district court properly enjoined provisions of SB4 on behalf of a class of individuals subject to SB4's reentry provision. Plaintiffs agree that oral argument is appropriate given the gravity of the issues.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 2
BACKGROUND ........................................................................................ 4
SUMMARY OF ARGUMENT ........................................................................ 10
ARGUMENT .............................................................................................. 12
I. PLAINTIFFS HAVE STANDING. ............................................................. 12
II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. .............. 18
A. SB4 is Field Preempted. ..................................................................... 18
B. SB4 is Conflict Preempted. ................................................................ 28
C. The State War Clause Cannot Save SB4. .......................................... 37
III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS. ................................................................... 43
A. The District Court Conducted a Full and Appropriate Rule 23 Analysis. ........................................................................................................ 44
B. The Class Is Ascertainable. ................................................................ 47
C. The Plaintiffs Satisfy Typicality and Adequacy. ................................ 49
IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES. ................................................................. 51
CONCLUSION ......................................................................................... 54

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Afghan & Iraqi Allies v. Blinken*,
103 F.4th 807 (D.C. Cir. 2024) .....45

*Angell v. GEICO Advantage Ins. Co.*,
67 F.4th 727 (5th Cir. 2023) .....49

*Arizona v. United States*,
567 U.S. 387 (2012) .....*passim*

*Artway v. Att'y Gen. of State of N.J.*,
81 F.3d 1235 (3d Cir. 1996) .....16

*Baker v. Carr*,
369 U.S. 186 (1962) .....42

*Barbara v. Trump*,
790 F. Supp. 3d 80 (D.N.H. 2025) .....46

*Barzelis v. Flagstar Bank, F.S.B.*,
784 F.3d 971 (5th Cir. 2015) .....20

*Biden v. Texas*,
597 U.S. 785 (2022) .....6

*Bond v. United States*,
564 U.S. 211 (2011) .....12

*Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*,
70 F.4th 914 (5th Cir. 2023) .....47, 48

*California v. United States*,
104 F.3d 1086 (9th Cir. 1997) .....38

*Carpenter v. Davis*,
424 F.2d 257 (5th Cir. 1970) .....47

*Carriuolo v. Gen. Motors Co.*,
823 F.3d 977 (11th Cir. 2016) .....46

*Chamber of Com. of U.S. v. Whiting*,
563 U.S. 582 (2011)....................................................................................23

*Chy Lung v. Freeman*,
92 U.S. 275 (1875)....................................................................................19, 21, 54

*City of El Cenizo v. Texas*,
890 F.3d 164 (5th Cir. 2018) ....................................................................37, 53

*Crosby v. Nat'l Foreign Trade Council*,
530 U.S. 363 (2000)....................................................................................20, 33, 37

*De Canas v. Bica*,
424 U.S. 351 (1976)....................................................................................22

*DeBremaecker v. Short*,
433 F.2d 733 (5th Cir. 1970) ....................................................................47

*In re Deepwater Horizon*,
785 F.3d 1003 (5th Cir. 2015) ..................................................................50

*Does #1-10 v. Lee*,
608 F. Supp. 3d 588 (M.D. Tenn. 2022) ....................................................16

*Echavarria v. Pitts*,
641 F.3d 92 (5th Cir. 2011) ......................................................................48

*Escobar Molina v. U.S. Dep't of Homeland Sec.*,
811 F. Supp. 3d 1 (D.D.C. 2025)...............................................................45

*Fla. Immigrant Coal. v. Uthmeier*,
780 F. Supp. 3d 1235 (S.D. Fla. 2025).......................................................*passim*

*Fong Yue Ting v. United States*,
149 U.S. 698 (1893)....................................................................................39

*Fuld v. Palestine Liberation Org.*,
606 U.S. 1 (2025).......................................................................................21

*Ga. Latino All. for Hum. Rts. v. Governor of Ga.*,
691 F.3d 1250 (11th Cir. 2012) ..................................................................22, 51

*In re Gee*,
941 F.3d 153 (5th Cir. 2019) ....................................................................17, 18

*Hines v. Davidowitz*,
312 U.S. 52 (1941)...........................................................................................19

*Huisha-Huisha v. Mayorkas*,
27 F.4th 718 (D.C. Cir. 2022)..........................................................................52

*Idaho Org. of Res. Councils v. Labrador* (*IORC*),
780 F. Supp. 3d 1013 (D. Idaho 2025) ....................................................2, 45, 46

*J.G.G. v. Trump*,
No. 25-5067, 2025 WL 914682 (D.C. Cir. Mar. 26, 2025)...............................38

*Jones v. Diamond*,
519 F.2d 1090 (5th Cir. 1975) ..........................................................................48

*Kansas v. Garcia*,
589 U.S. 191 (2020)...........................................................................................32

*Kurns v. R.R. Friction Prods. Corp.*,
565 U.S. 625 (2012)...........................................................................................25

*Lackey v. Stinnie*,
604 U.S. 192 (2025)...........................................................................................48

*Loper Bright Enters. v. Raimondo*,
603 U.S. 369 (2024)...........................................................................................34

*Lozano v. City of Hazleton*,
724 F.3d 297 (3d Cir. 2013) ..............................................................................20

*Lucy v. Skrmetti*,
No. 3:26-CV-00763, 2026 WL 1847869 (M.D. Tenn. June 26,
2026) .................................................................................................................46

*McKee Foods Corp. v. BFP Inc.*,
173 F.4th 242 (6th Cir. 2026) ...........................................................................12

*McNutt v. U.S. Dep't of Just.*,
173 F.4th 204 (5th Cir. 2026) ...........................................................................12

*Meyer v. Portfolio Recovery Assocs., LLC*,
707 F.3d 1036 (9th Cir. 2012) ....................45

*Mullen v. Treasure Chest Casino, LLC*,
186 F.3d 620 (5th Cir. 1999) ....................50

*Nat'l Infusion Ctr. Ass'n v. Becerra*,
116 F.4th 488 (5th Cir. 2024) ....................14

*New Jersey v. United States*,
91 F.3d 463 (3d Cir. 1996) ....................38

*New York v. United States*,
505 U.S. 144 (1992) ....................16

*Newsom v. Trump*,
141 F.4th 1032 (9th Cir. 2025) ....................43

*Newsom v. Trump*,
--- F.4th ----, 2026 WL 3180273 (9th Cir. Oct. 23, 2026) ....................43

*Nishimura Ekiu v. United States*,
142 U.S. 651 (1892) ....................21, 27

*Nken v. Holder*,
556 U.S. 418 (2009) ....................52

*Pac. Gas & Elec. Co. v. State Energy Rsch. Conservation & Dev. Comm'n*,
461 U.S. 190 (1983) ....................24, 25

*Padavan v. United States*,
82 F.3d 23 (2d Cir. 1996) ....................38

*Padres Unidos de Tulsa v. Drummond*,
785 F. Supp. 3d 993 (W.D. Okla. 2025) ....................2, 32, 46

*Pederson v. La. State Univ.*,
213 F.3d 858 (5th Cir. 2000) ....................48

*Phillips v. Joint Legislative Comm. on Performance & Expenditure Rev. of State of Miss.*,
637 F.2d 1014 (5th Cir. 1981) ....................48

*Plyler v. Doe*,
457 U.S. 202 (1982)....................19

*Pub. Utils. Comm'n. of Ohio v. United Fuel Gas Co.*,
317 U.S. 456 (1943)....................53

*Rivera v. Wyeth-Ayerst Lab'ys*,
283 F.3d 315 (5th Cir. 2002)....................13

*Seeligson v. Devon Energy Prod. Co.*,
761 F. App'x 329 (5th Cir. 2019) (per curiam)....................47

*Speech First, Inc. v. Fenves*,
979 F.3d 319 (5th Cir. 2020), *as revised* (Oct. 30, 2020)....................18

*Sterling v. Constantin*,
287 U.S. 378 (1932)....................42

*Stirman v. Exxon Corp.*,
280 F.3d 554 (5th Cir. 2002)....................50

*M.D. ex rel. Stukenberg v. Perry*,
675 F.3d 832 (5th Cir. 2012)....................44

*Susan B. Anthony List v. Driehaus*,
573 U.S. 149 (2014)....................13, 15

*Trans World Airlines, Inc. v. Mattox*,
897 F.2d 773 (5th Cir. 1990)....................52

*Trump v. Barbara*,
146 S. Ct. 2438 (2026)....................45

*Trump v. California*,
No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026)....................18

*Trump v. CASA, Inc.*,
606 U.S. 831 (2025)....................45

*U.S. Dep't of Com. v. Montana*,
503 U.S. 442 (1992)....................41

*United States v. Abbott*,
110 F.4th 700 (5th Cir. 2024) (en banc) .....................................................39, 40

*United States v. Alabama*,
691 F.3d 1269 (11th Cir. 2012) ...................................................................20, 53

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936).........................................................................................21

*United States v. Flores-Montano*,
541 U.S. 149 (2004).........................................................................................21

*United States v. Iowa*,
737 F. Supp. 3d 725 (S.D. Iowa 2024) .....................................................*passim*

*United States v. Locke*,
529 U.S. 89 (2000).....................................................................................20, 25

*United States v. Peters*,
9 U.S. 115 (1809)..............................................................................................41

*United States v. Ramirez-Carcamo*,
559 F.3d 384 (5th Cir. 2009) ...........................................................................13

*United States v. South Carolina*,
720 F.3d 518 (4th Cir. 2013) ...........................................................................20

*United States v. Texas*,
719 F. Supp. 3d 640 (W.D. Tex. 2024) ..............................................................7

*United States v. Texas*,
No. 23A814 (U.S. Mar. 4, 2024) ......................................................................34

*United States v. Texas* (*Texas Panel*),
144 F.4th 632 (5th Cir. 2025), *vacated* (*Texas En Banc*), 173 F.4th
659 (5th Cir. 2026) (en banc) ....................................................................*passim*

*United States v. Texas* (*Texas Priorities*),
599 U.S. 670 (2023)...........................................................................6, 23, 35, 36

*Uthmeier v. Fla. Immigrant Coal.*,
145 S. Ct. 2872 (2025).........................................................................................2

*Va. Uranium, Inc. v. Warren*,
587 U.S. 761 (2019)....25

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013)....51

*Villas at Parkside Partners v. City of Farmers Branch*,
577 F. Supp. 2d 858 (N.D. Tex. 2008)....51

*Villas at Parkside Partners v. City of Farmers Branch*,
726 F.3d 524 (5th Cir. 2013) (en banc)....19

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952)....40, 41

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012)....41, 42

*Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*,
134 F.4th 326 (5th Cir. 2025)....32

**Statutes**

8 U.S.C. § 1101(a)(15)(T)....5, 22, 30

8 U.S.C. § 1101(a)(15)(U)....5, 22, 30

8 U.S.C. § 1101(a)(27)(J)....5

8 U.S.C. § 1158(a)(1)....5, 22, 29

8 U.S.C. § 1158(d)....22

8 U.S.C. § 1182....4

8 U.S.C. § 1182(a)(6)....4

8 U.S.C. § 1182(a)(6)(A)(ii)....22, 30

8 U.S.C. § 1182(a)(14)....30

8 U.S.C. § 1182(d)(5)(A)....22

8 U.S.C. § 1182(d)(13)....30

8 U.S.C. § 1225(b) ....................22
8 U.S.C. § 1225(b)(1)....................4
8 U.S.C. § 1226(a) ....................22
8 U.S.C. § 1226(b) ....................22
8 U.S.C. § 1226(c) ....................22
8 U.S.C. § 1229a ....................4
8 U.S.C. § 1229b(b) ....................5, 22, 30
8 U.S.C. § 1231 ....................5
8 U.S.C. § 1231(b)(3)....................5
8 U.S.C. § 1254(a) ....................5
8 U.S.C. § 1255(l) ....................22
8 U.S.C. § 1255(m) ....................22
8 U.S.C. § 1321 ....................5
8 U.S.C. § 1323 ....................5, 21
8 U.S.C. § 1324 ....................5, 21
8 U.S.C. § 1325 ....................5, 21
8 U.S.C. § 1326 ....................*passim*
8 U.S.C. § 1326(a)(2)(A) ....................27
8 U.S.C. § 1327 ....................21
8 U.S.C. § 1328 ....................21
8 U.S.C. § 1329 ....................21
Tex. Code Crim. Proc. art. 5B.002(a) ....................7
Tex. Code Crim. Proc. art. 5B.002(b) ....................7, 17

Tex. Code Crim. Proc. art. 5B.002(c) ........ 7

Tex. Code Crim. Proc. art. 5B.002(d) ........ 7, 14

Tex. Code Crim. Proc. art. 5B.003 ........ 7

Tex. Gov't Code § 753.051 ........ 53

Tex. Penal Code § 12.33 ........ 7

Tex. Penal Code § 51.03 ........ 27

Tex. Penal Code § 51.03(a) ........ 6, 15

Tex. Penal Code § 51.04 ........ 7, 14, 15

**Rules & Regulations**

8 C.F.R. § 212.2(d) ........ 27

Fed. R. Civ. P. 23 ........ 10, 44, 45

Fed. R. Civ. P. 23(a) ........ 43

Fed. R. Civ. P. 23(b)(2) ........ 43, 47, 48, 51

Fed. R. Civ. P. 23(b)(3) ........ 48

Fed. R. Civ. P. 23(c)(1)(C) ........ 46

**Other Authorities**

2 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 4:30 (6th ed., June 2026 update) ........ 46

7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760 (4th ed. 2021) ........ 48

David Marcus, *The Class Action After* Trump v. Casa, 73 UCLA L. Rev. Discourse 2, 18 (2025) ("Marcus") ........ 45, 46

Phil Prazan, *Feud Between House and Senate Leaders may scuttle far reaching border security bill*, NBC DFW (Nov. 5, 2023, at 1:16 PM CT), https://perma.cc/9V3D4B59 ........ 17

Texas State Executive Order GA-41 .......... 38

U.S. Const. art. I, § 9, cl. 2 .......... 40

U.S. Const. art. I, § 10, cl. 3 .......... 37, 40

U.S. Const. art. VI, cl. 2 .......... 40

USCIS, Policy Manual, Vol. 3, Part C, Ch. 5, https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5 .......... 49

## ISSUES PRESENTED

1. Whether, given Plaintiffs' undisputed standing to challenge SB4's reentry crime, they can also challenge the "return order" mechanism accompanying a conviction.
2. Whether SB4 is field preempted, where it regulates in the field of entry into and removal from the United States, which is both a matter of uniquely dominant federal interest and the focus of an exhaustive federal regulatory regime.
3. Whether SB4 is conflict preempted, where it disrupts Congress's careful plan of providing various tools to federal officials to balance federal interests implicated by irregular border entry, instead placing the most punitive of those tools in the hands of state officials without federal control.
4. Whether the Texas governor's declaration of a purported "invasion" allows the State to enact a parallel state-law immigration scheme, and whether courts are barred from considering that fundamental question.
5. Whether the district court abused its discretion in certifying a provisional class after full briefing and expedited discovery.
6. Whether the district court abused its discretion in holding that the equities warrant an injunction.

## INTRODUCTION

"For nearly 150 years, the Supreme Court has recognized that the power to control immigration—the entry, admission, and removal of aliens—is *exclusively* a federal power." *United States v. Texas* (*Texas Panel*), 144 F.4th 632, 667 (5th Cir. 2025), *vacated*, (*Texas En Banc*), 173 F.4th 659 (5th Cir. 2026) (en banc). Under settled doctrine culminating in *Arizona v. United States*, 567 U.S. 387 (2012), SB4's state immigration regime, which criminalizes reentry into the United States and imposes state deportation orders, is patently field and conflict preempted. It is little surprise then that every court to address the merits has concluded that laws like SB4 are unlawful. *See Padres Unidos de Tulsa v. Drummond*, 785 F. Supp. 3d 993 (W.D. Okla. 2025); *Idaho Org. of Res. Councils v. Labrador* (*IORC*), 780 F. Supp. 3d 1013 (D. Idaho 2025); *Fla. Immigrant Coal. v. Uthmeier*, 780 F. Supp. 3d 1235 (S.D. Fla. 2025), *stay denied*, *Fla. Immigrant Coal.* v. *Att'y Gen.* (*FLIC*), No. 25-11469, 2025 WL 1625385 (11th Cir. June 6, 2025); *United States v. Iowa*, 737 F. Supp. 3d 725, 751 (S.D. Iowa 2024), *aff'd*, *Iowa Migrant Movement for Just. v. Bird* (*Iowa*), 157 F.4th 904 (8th Cir. 2025), *reh'g en banc denied*, 166 F.4th 688 (8th Cir. 2026) (mem.). And the Supreme Court declined to stay the injunction of Florida's version of SB4's entry-and-reentry crimes—with no noted dissents. *Uthmeier v. Fla. Immigrant Coal.*, 145 S. Ct. 2872 (2025).

Faced with this mountain of precedent, Texas focuses much of its fire on

threshold and procedural arguments, but they fall flat. It notably does *not* contest Plaintiffs' standing to challenge the core reentry crime—with good cause, as both Plaintiffs face a clear threat of arrest, conviction, and imprisonment under its terms. And its standing challenges as to SB4's removal provisions are flawed. SB4 *requires* issuance of a state "return" order upon a conviction (of which there can be little doubt, given the lack of any affirmative defenses), and that order puts noncitizens in an impossible position: Leave the country as Texas illegally directs, or remain and face up to 20 years in prison. Contesting Plaintiffs' standing to challenge that scheme blinks reality.

Texas's class certification challenges fare no better. The district court engaged in a full round of class certification briefing, and even permitted Texas extraordinary expedited discovery, including depositions of both Plaintiffs. While Texas vaguely attacks the certification order as insufficiently "rigorous," Br. 37, it can point to no actual shortcomings. And, far from an inappropriately "large, unascertainable class," Br. 3, the definition simply tracks the terms of SB4's own reentry provision, ROA.1263.

Ultimately, SB4 "threatens the fundamental notion that the United States must regulate immigration with one voice." ROA.1270. The district court's injunction and class certification should be affirmed.

## BACKGROUND

### A. Congress's Comprehensive Regulation of Entry and Removal.

"The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona*, 567 U.S. at 394. In the Immigration and Nationality Act, Congress created a complex system to regulate entry into and removal from the United States. *See generally* 8 U.S.C. §§ 1101-1537.

That scheme balances policy goals, including discouraging irregular entry between ports and providing for humanitarian and other protections. To do so, it offers federal officers a range of tools to regulate immigration, including civil immigration procedures and criminal charges.

On the civil side, Congress has specified categories of noncitizens who may be denied admission to the United States, *see* 8 U.S.C. § 1182, including those who enter between ports of entry, *see id.* § 1182(a)(6). To decide whether a person who entered without inspection at a port will be removed, Congress has established several alternative removal procedures, including full removal proceedings with trial-like processes subject to administrative and judicial appeals, 8 U.S.C. § 1229a, and expedited removal proceedings, a shortened form of proceedings applicable to recent border crossers, 8 U.S.C. § 1225(b)(1). On the criminal side, unlawful entry and reentry into the country are federal offenses, along with various other criminal

regulations related to irregular entries. *Id.* §§ 1325, 1326; *see also, e.g.*, §§ 1321, 1323, 1324.

Even as it rendered noncitizens entering between ports inadmissible and subject to criminal penalties, however, Congress enacted a range of protections that are available despite unlawful entry. Asylum is specifically available "whether or not" a noncitizen enters "at a designated port of arrival," and "irrespective of such [noncitizen's] status." *Id.* § 1158(a)(1). Congress also barred federal officials from removing people to likely persecution or torture, in compliance with the United States' obligations under international treaties. *See id.* § 1231(b)(3); Note to 8 U.S.C. § 1231. In addition, individuals who are placed in full removal proceedings may apply for other forms of relief Congress has extended, including cancellation of removal. 8 U.S.C. § 1229b(b). Noncitizens who have entered without inspection may also apply affirmatively for numerous other forms of relief outside of removal proceedings, including visas for victims of crimes and trafficking, 8 U.S.C. §§ 1101(a)(15)(U), 1101(a)(15)(T); temporary protected status, § 1254(a); and Special Immigrant Juvenile Status, § 1101(a)(27)(J).

Given the complexities of the immigration system, federal discretion and control are vital. A "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. Federal officials "decide whether it makes sense to pursue removal at all," *id.*, and choose among the

several removal processes Congress established, *see Biden v. Texas*, 597 U.S. 785, 801-03 (2022); *United States v. Texas* (*Texas Priorities*), 599 U.S. 670, 679 (2023). And "federal officials in charge of the comprehensive scheme" decide whether "to bring criminal charges against individuals" under the associated federal criminal laws, or whether doing so "would frustrate federal policies." *See Arizona*, 567 U.S. at 402. In making these decisions, federal officials take into consideration various factors, including foreign affairs, humanitarian concerns, and the need to encourage cooperation by victims and witnesses of crimes. *See id.* at 396-97, 408.

**B. Texas's Entry-and-Removal Scheme.**

SB4 is an unprecedented attempt to supersede this complex federal system. It establishes new state crimes that criminalize irregular entry into the United States and authorizes state deportation orders without any federal discretion.

As relevant here, SB4 creates a new state "reentry" charge, applicable if a noncitizen enters, attempts to enter, or is at any time found in Texas after the person has been denied admission to, excluded, deported, or removed from the United States, or departed from the United States while an order of exclusion, deportation, or removal was outstanding. Tex. Penal Code § 51.03(a). There are no affirmative defenses for this crime. *Id.* A person can be prosecuted by Texas under this provision even if the United States authorized their reentry, even if they are in federal removal proceedings or seeking federal humanitarian relief, and even if they have

lawful immigration status under federal law. *See* Br. 31-33.

SB4 also creates a mechanism for the State of Texas to unilaterally deport individuals from the United States. If a person is convicted under SB4's entry or reentry provisions, the state court "*shall*" enter "an order requiring the person to return to the foreign nation from which the person entered." Tex. Code Crim. Proc. art. 5B.002(d) (emphasis added). To push people to quickly accept state removal orders, a state court may alternatively enter an Order to Return at the beginning of prosecution with the defendant's nominal agreement. *Id.* art. 5B.002(a)-(c). Refusal to comply with an Order to Return is a state crime punishable by up to 20 years in prison; there are no affirmative defenses. Tex. Penal Code §§ 12.33, 51.04.

As to all of these offenses, SB4 specifically prohibits "abat[ing] the prosecution . . . on the basis that a federal determination regarding the immigration status of the defendant is pending or will be initiated." Tex. Code of Crim. Proc. art. 5B.003.

**C. Procedural History**

This case follows earlier litigation challenging SB4. The United States and certain organizational and governmental plaintiffs sued in parallel challenges, and SB4 was enjoined by the same district court that presides over this suit. *See United States v. Texas*, 719 F. Supp. 3d 640 (W.D. Tex. 2024) (Ezra, J.). This Court denied a stay pending appeal, 97 F.4th 268 (5th Cir. 2024). After a change in

administration, the United States dismissed its suit; this Court then affirmed the injunction (based on the still-pending private suit), *Texas Panel*, 144 F.4th at 632. On en banc reconsideration, the injunction was vacated for lack of standing, "without addressing the merits of the preemption claim." *Texas En Banc*, 173 F.4th at 662, 664 n.10.

Unlike the challengers in *Texas*, Plaintiffs here are individuals (proceeding under pseudonym, *see* ROA.905) subject to enforcement under SB4. Plaintiff L.M.L. reentered the country without inspection following an earlier removal. ROA.1195-1196. He is now a lawful permanent resident, has "lived in the United States for twenty years, and now has a lawful permanent resident wife, a 21-year-old lawful permanent resident daughter, and an 11-year-old United States citizen son." ROA.1196. Plaintiff K.G.S. departed the United States and was subsequently issued a removal order for failure to appear at her removal hearing. *Id.* She later unlawfully reentered the country and has lived here for five years. *Id.* She has received "prima facie approval on her petition for a U-Visa which she received as a result of domestic violence," and lives with her two young children, one of whom is a U.S. citizen. *See id.* The district court found that both "justifiably fear they will be arrested, detained, and deported under SB4's reentry provision." ROA.1197; *see also* ROA.1096, ROA.1108.

Plaintiffs moved for class certification and a preliminary injunction. ROA.30,

ROA.453. In response, Defendant Freeman Martin, Director of the Texas Department of Public Safety, sought expedited discovery "prior to any hearing," including depositions of Plaintiffs, ROA.528, and sought a "continuance or deferral" of class certification "until necessary discovery can be conducted" as sought in his expedited discovery motion, ROA.848. Plaintiffs opposed such expedited discovery as unwarranted, ROA.873, but the district court largely granted the requested discovery and ordered it to be conducted on an extraordinarily expedited basis to accommodate Texas's request that it occur prior to the scheduled hearing, ROA.911-915. Texas then deposed both Plaintiffs, and both the deposition transcripts and Plaintiffs' responses to interrogatories were before the district court. *See* ROA.1089-1185.

The district court granted provisional class certification and a preliminary injunction of the reentry and removal provisions of SB4. ROA.1194-1271. The court held that Plaintiffs had standing to challenge both the reentry and removal provisions. On the merits, the court held the challenged provisions were field preempted, explaining that SB4 "regulat[es] a sphere dominated by federal interests" and occupied by Congress's "massive, sprawling, detailed, complex, and pervasive" legislation. ROA.1230, ROA.1232. It also held the provisions conflict preempted because, among other things, they allow Texas officers "to enforce federal law without federal supervision," stripping "federal immigration authorities of the

discretion" vested in them by Congress. ROA.1243-1244. It rejected Texas's invocation of the State War Clause, and held the political question doctrine was inapplicable. ROA.1221-1224, ROA.1250-1256.

Finally, the court provisionally certified a class of noncitizens subject to SB4's reentry provision. ROA.1258. It assessed both the class certification legal requirements and the factual record (including the expedited discovery), holding that the Rule 23 factors were satisfied, and that the class was ascertainable because it was defined by "objective criteria" that would permit the court "to determine whether a particular individual is a member." ROA.1258-1265. It designated the class certification provisional, explaining that it anticipated "further inquiry into the appropriateness of formally certifying the class" in light of future proceedings including "additional discovery." ROA.1266.

## SUMMARY OF ARGUMENT

I. Plaintiffs have standing. Texas properly concedes their standing as to the reentry provision, contesting only their challenge to SB4's removal provisions. But all the challenged provisions work together, such that a noncitizen facing arrest under the reentry provision likewise faces a mandatory "return order" after conviction, which in turn presents an unconstitutional Hobson's choice of complying with a preempted state order to depart the country, or living under threat of 20 years in prison.

II. SB4 is both field and conflict preempted. For 150 years the Supreme Court has been clear that entry and removal are uniquely and exclusively federal arenas, and Congress has exhaustively legislated in that field, yet SB4 purports to establish state regulation of both. SB4 also usurps and disrupts the discretion Congress vested in the federal executive to choose among various tools—from criminal enforcement to asylum—to address irregular migration in particular cases. Texas's invocation of the State War Clause lacks merit, and certainly cannot deprive this Court of its authority to assess this preempted state immigration scheme.

III. There was no abuse of discretion in the class certification. Texas complains that the decision was not sufficiently rigorous, but cannot point to any error in the district court's analysis. It also complains about the district court's decision to label certification "provisional," but certification is *always* provisional until final judgment, and the district court merely indicated its willingness to reconsider certification as the case progresses.

IV. The district court did not abuse its discretion in weighing the equities. Plaintiffs and other class members face arrest, prosecution, imprisonment, and removal based on an illegal state immigration regime. And the State has numerous other tools at its disposal to cooperate with federal enforcement within the system Congress enacted.

## ARGUMENT

### I. PLAINTIFFS HAVE STANDING.

1. Texas does not contest that Plaintiffs have standing to challenge the core reentry provision, Texas Penal Code § 51.03(a). That concession is well supported. A plaintiff shows pre-enforcement standing when:

> (1) the plaintiff has "an intention to engage in a course of conduct arguably affected with a constitutional interest"; (2) that conduct is "proscribed by a statute"; and (3) "a credible threat of prosecution" exists.

*McNutt v. U.S. Dep't of Just.*, 173 F.4th 204, 213 (5th Cir. 2026) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)). As the district court held, both Plaintiffs satisfy each of those requirements here. ROA.1208-1217.

*First,* Plaintiffs' conduct—living their lives in Texas—"is arguably affected with a constitutional interest." ROA.1210. "[S]tructural principles" like federal supremacy protect everyone in the country, and so Plaintiffs have their own "constitutional interest" "in objecting to laws that upset the constitutional balance between the National Government and the States." *Bond v. United States*, 564 U.S. 211, 221-22, 225-26 (2011); *see Iowa*, 157 F.4th at 914 ("This conduct is 'arguably affected with a constitutional interest' because the Act criminalizing their presence in Iowa is arguably preempted by federal law, under the Supremacy Clause."); *McKee Foods Corp. v. BFP Inc.*, 173 F.4th 242, 258 (6th Cir. 2026) (similar); *see also McNutt*, 173 F.4th at 214 (challenge under Necessary and Proper Clause);

ROA.1212-1213 (discussing *McNutt*).

*Second*, both Plaintiffs are at least arguably subject to prosecution under the reentry provision. Despite his lawful permanent residence today, L.M.L. was previously deported and reentered without inspection, "placing him squarely within the ambit of SB 4's reentry provision." ROA.1209; *see* Br. 31 (citing *United States v. Gutierrez-Alba*, 128 F.3d 1324, 1328 (9th Cir. 1997)). And "K.G.S.'s continued presence is also arguably proscribed by SB 4's reentry provision." ROA.1209. This Court has held that a person in her position—namely, who departed the country before her removal order was issued—is amenable to prosecution under 8 U.S.C. § 1326, which SB4 seeks to track. *See United States v. Ramirez-Carcamo*, 559 F.3d 384, 389-90 (5th Cir. 2009).

*Third*, the district court correctly found a credible threat of enforcement. The court examined the evidence and concluded that Director Martin "intends to enforce the law," finding "no reason to doubt" that Texas will engage in "'vigorous' enforcement of its own state immigration laws." ROA.1215; *see also* ROA.1197 n.2. Thus, nothing about the threat here is "chimerical," *Susan B. Anthony List*, 573 U.S. at 164, and Texas does not argue otherwise, much less demonstrate clear error necessary to reject any "facts expressly or impliedly found by the district court," *Rivera v. Wyeth-Ayerst Lab'ys*, 283 F.3d 315, 319 (5th Cir. 2002).

2. Texas contests only Plaintiffs' "standing to challenge the return order

provisions," Br. 15, namely Article 5B.002 (directing issuance of return orders) and § 51.04 (criminalizing refusal to obey such orders).

As an initial matter, that argument would not defeat justiciability; instead, it would be relevant only to the scope and terms of the district court's injunctive order. Thus, even if Texas's standing arguments were correct, they would pose no barrier to this Court reaching the merits.

In any event, Texas's standing arguments are wrong. Each of the enjoined provisions of SB4 works together with the others, and Plaintiffs are harmed by all of them. SB4 *requires* issuance of a return order upon conviction under the reentry crime. *See* Tex. Code Crim. Proc. art. 5B.002(d); Br. 6 ("the court is instructed to enter a return order"); *Nat'l Infusion Ctr. Ass'n v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding standing where defendant was "statutorily required" to act in a way that contributed to harm). That order immediately coerces compliance by threatening the recipient with up to 20 years in prison for failure to leave the country. Tex. Penal Code § 51.04. Thus, an individual with a credible threat of prosecution for reentry (which Texas concedes Plaintiffs have) also by necessity faces a credible threat of a mandatory state removal order, and a credible threat of being subject to the unlawful coercion to leave the country or face additional incarceration.

Texas resists this conclusion, but its arguments fall flat. It first suggests that a "speculative chain of possibilities" separates enforcement of the reentry crime

from the issuance of a removal order. Br. 16. Not so. One of those alleged contingencies—that Plaintiffs "would have to [] be arrested for violating" the reentry crime, *id.*—is already satisfied because Texas concedes that Plaintiffs have standing to challenge that crime based on the threat of such enforcement. Beyond that, the only contingency Texas points to before a return order issues is that Plaintiffs must "be convicted." *Id.* But that's hardly speculative; there are no affirmative defenses to the reentry crime, Tex. Penal Code § 51.03(a), and the district court explained that L.M.L. is "squarely within the ambit of SB 4's reentry provision." ROA.1209; *see also* Br. 32 ("Plaintiffs do not have federal defenses"). To the contrary, enforcement of the reentry crime carries with it a more-than-credible threat of the return order SB4 mandates upon conviction. *See Iowa*, 157 F.4th at 915-16 (finding standing to challenge Iowa's version of SB4's removal provision because "an order of removal is required after a successful conviction under" the reentry provision).

Texas next argues that Plaintiffs cannot challenge Tex. Penal Code § 51.04 because they may not "refuse to return" to Mexico as ordered by the state court, or prosecutors may not subsequently charge that offense. Br. 16-17. But that is similarly myopic. The order to depart the country *itself* represents a "threat of criminal prosecution" sufficient to establish standing to challenge both the order and its criminal enforcement mechanism. *Susan B. Anthony List*, 573 U.S. at 166. That threat is underscored by SB4's requirement that "Texas law enforcement must

monitor the noncitizen's compliance with the state removal order." ROA.1200.

Moreover, as explained above, the return order offers noncitizens a choice: Comply with the state court order to leave the United States, or live under the cloud of prosecution for refusal to do so. But *both* of those actions—the order to depart, and the threatened prosecution for noncompliance—are preempted by federal law (as the Court must assume for purposes of assessing standing), so "this Hobson's choice constitutes sufficient injury" as of the time the order is issued. *Artway v. Att'y Gen. of State of N.J.*, 81 F.3d 1235, 1246 (3d Cir. 1996) (rejecting mootness where plaintiff had to remain out of state, accept burden of registration, or face prosecution); *Does #1-10 v. Lee*, 608 F. Supp. 3d 588, 595-96 (M.D. Tenn. 2022) (similarly finding standing); *cf. New York v. United States*, 505 U.S. 144, 175-76 (1992) (rejecting ripeness argument, and explaining that "[a] choice between two unconstitutionally coercive regulatory techniques is no choice at all.").

Texas tries to muddy the picture by suggesting that whether an individual is "delivered to federal immigration authorities" would be relevant to this Hobson's choice. Br. 16. But that has nothing to do with SB4, which requires noncitizens to return to Mexico or face prison time. Even if a noncitizen is handed over to ICE, the state removal order and accompanying threat of prison will continue to unlawfully coerce him to leave the country (even if that means, for example, forgoing potential federal defenses). Texas cannot defeat standing by asking the

Court "to ignore the plain meaning of" the statutory text. *Iowa*, 157 F.4th at 926 (rejecting similar effort to rewrite Iowa's version of SB4); *Texas En Banc*, 173 F.4th at 741 (Higginson, J., dissenting) (explaining that "this argument merely obfuscates the practical realities of the law, which are apparent on the face of the text alone").

Finally, Texas argues that Plaintiffs lack standing to challenge Article 5B.002(b)—which contemplates supposedly voluntary acceptance of removal orders in lieu of prosecution—because it "benefits rather than harms" them. Br. 18. That fails too. This provision must be understood not in isolation, but as part of Texas's overall scheme to coerce individuals into accepting illegal state deportation orders. ROA.1217; *Texas En Banc*, 173 F.4th at 741 (Higginson, J., dissenting) ("It is not voluntary merely because of the appendage of a potential criminal sentence and fine as the second-best option."). By contrast, nothing about the challenged provisions that *In re Gee* concluded "benefit rather than harm women seeking abortions" was predicated on avoiding unconstitutional threatened action, like the mandatory state deportation orders at issue here. 941 F.3d 153, 165 (5th Cir. 2019).

As SB4's sponsor explained, the legislature's goal was "not to incarcerate more people . . . . [T]he primary focus would be to return those folks to the country from which they came."[1] The Speaker of the House further noted that a system

[1] Phil Prazan, *Feud Between House and Senate Leaders may scuttle far reaching border security bill*, NBC DFW (Nov. 5, 2023, at 1:16 PM CT), https://perma.cc/9V3D4B59.

with only entry and reentry crimes, but lacking the mechanisms to funnel people into state deportation as an alternative to conviction and prison terms, would impose "the exorbitant costs of [noncitizens'] long-term detention, including healthcare, housing, and meals" on Texas. *Id*. Where the provisions were designed to, and do, work together to extract purportedly voluntary removal orders rather than as traditional criminal enforcement provisions, Texas's effort to split standing hairs ignores reality. *See Speech First, Inc. v. Fenves*, 979 F.3d 319, 334-35 (5th Cir. 2020), *as revised* (Oct. 30, 2020) (finding standing to challenge "intertwined" policies).[2]

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. SB4 is Field Preempted.

SB4 intrudes into the federal field of entry into, and removal from, the United States; as such, it is field preempted. *Texas Panel*, 144 F.4th at 667-77. Such preemption may be inferred "from a framework of regulation so pervasive that Congress left no room for the States to supplement it or where there is a federal interest so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (cleaned up). Here, both alternatives are satisfied. ROA.1226; *Texas Panel*, 144 F.4th at

[2] The various provisions considered in *Trump v. California*, No. 26A124, 2026 WL 2473573 (U.S. Aug. 24, 2026), were not intertwined in any similar way.

667; *FLIC*, 2025 WL 1625385, at *3 (finding likely preemption of "the field of alien entry into and presence in the United States").

There can be no real question that the federal interest here is dominant. "For nearly 150 years, the Supreme Court has recognized" that regulation of entry and removal "is *exclusively* a federal power." *Texas Panel*, 144 F.4th at 667 & n.267 (collecting cases); *see, e.g.*, *Arizona*, 567 U.S. at 409 ("Policies pertaining to the entry of" noncitizens "are entrusted exclusively to Congress."); *Plyler v. Doe*, 457 U.S. 202, 228 n.23 (1982) ("the State has no direct interest in controlling entry into this country, that interest being one reserved by the Constitution to the Federal Government"); *Hines v. Davidowitz*, 312 U.S. 52, 62 & n.10 (1941) (noting the "continuous recognition by this Court" of "the supremacy of the national power . . . over immigration . . . and deportation"); *Chy Lung v. Freeman*, 92 U.S. 275, 280 (1875) (similar).

Indeed, in *Villas at Parkside Partners v. City of Farmers Branch*, every member of this Court sitting en banc agreed with "the longstanding, unremarkable principle that the federal government's authority to exclude or remove foreign nationals . . . is necessarily exclusive of infringement by state or local legislation." 726 F.3d 524, 545 (5th Cir. 2013) (en banc) (Dennis, J., specially concurring); *see id.* at 536-37 (plurality opinion); *id.* at 557, 559 & n.77 (Owen, J., concurring in part); *id.* at 567-68 (Jones, J., dissenting). Dismissing "this fundamental axiom,"

*Texas Panel*, 144 F.4th at 667-68, as merely "some brooding federal interest," Br. 24, 28, does not make it so.

Texas nevertheless suggests that the Court apply a presumption *against* preemption in this exclusively federal realm. Br. 22. But regardless of the State's supposed "historic police powers," Br. 22, the Supreme Court has explained "an 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence," *United States v. Locke*, 529 U.S. 89, 108 (2000); *see Barzelis v. Flagstar Bank, F.S.B.*, 784 F.3d 971, 973 n.2 (5th Cir. 2015) (same). That is indisputably the case here. Accordingly, the district court rightly joined *every* court to address the question in rejecting Texas's argument. *See* ROA.1232; *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (no "presumption against preemption applies" to an "attempt to regulate immigration"); *Lozano v. City of Hazleton*, 724 F.3d 297, 314 n.23 (3d Cir. 2013) (similar); *United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) (similar); *see also Texas Panel*, 144 F.4th at 675 (rejecting contrary reliance on "nineteenth century" state laws); *Iowa*, 157 F.4th at 919 (explaining "immigration is not a traditional subject of state regulation"). And even if a presumption applied, it would be overcome by Congress's intensive and exclusive legislation here. *See* ROA.1233; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 374 n.8 (2000).

Resisting this conclusion, Texas urges that *the State* has a "paramount interest in protecting . . . its territorial integrity." Br. 22 (quoting *United States v. Flores-Montano*, 541 U.S. 149, 153 (2004)). But its cited authority speaks to the "paramount interest" not of a single state, but of "*the United States*, as sovereign." *Flores-Montano*, 541 U.S. at 153 (emphasis added). Indeed, the Supreme Court long ago held that Congress's power "to forbid the entrance of foreigners" is "inherent in [the] sovereignty" of the United States as a nation. *Nishimura Ekiu v. United States*, 142 U.S. 651, 659 (1892). States, by contrast, are not endowed with such "powers of external sovereignty." *United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 316-18 (1936); *see also Chy Lung*, 92 U.S. at 280 (external sovereign power "belongs solely to the national government"); *Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 16 (2025) ("the Federal Government's broader sovereign authority" is "categorically different" than states').

Moreover, here Congress has exercised that exclusive authority by establishing "a comprehensive framework to identify *who* may enter, *how* they may enter, *where* they may enter, and *what* penalties apply for those who enter unlawfully." *Texas Panel*, 144 F.4th at 669 (collecting citations) (footnotes omitted); ROA.1230-1239. Congress has criminalized entry and reentry between ports of entry, 8 U.S.C. §§ 1325, 1326, as well as efforts to assist or facilitate entry between ports, *id.* §§ 1323, 1324, 1327, 1328, 1329. It has also provided a detailed set of

standards and procedures for when individuals who enter without inspection may be arrested and detained by federal officials. *See, e.g.*, *id.* §§ 1225(b), 1226(a)-(c), 1182(d)(5)(A). At the same time, Congress recognized that some people who enter unlawfully—such as victims of trafficking, refugees, and close relatives of U.S. citizens—should be permitted to stay, obtain lawful status, and make their residence permanent. *See, e.g.*, *id.* §§ 1101(a)(15)(U), (T), 1158(a)(1), (d), 1182(a)(6)(A)(ii), 1255(l), (m), 1229b(b). This federal entry scheme is as complex and "pervasive" as it gets, and therefore leaves "no room for the States to supplement it." *Arizona*, 567 U.S. at 399.

None of Texas's responses have merit.

*First*, perhaps recognizing the weight of authority that entry and removal are "overwhelmingly dominant" federal interests, *Ga. Latino All. for Hum. Rts. v. Governor of Ga.*, 691 F.3d 1250, 1264 (11th Cir. 2012), Texas sets up straw-man versions of the relevant field to knock down. Plaintiffs have never asserted preemption of the "entire field of laws related to immigration," of the "field of immigration enforcement," or of "all criminal laws touching on immigration." Br. 11, 23, 34. For example, the Supreme Court has permitted state regulations of employment touching on immigration in the past; but that is a far cry from state regulation of core immigration powers like entry and removal. *See De Canas v. Bica*, 424 U.S. 351, 354-55 (1976) (emphasizing that the "[p]ower to regulate

immigration is unquestionably a federal power" but upholding state employment law that had a "purely speculative and indirect impact on immigration"); *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 603-04 (2011) (similar). Further, there is nothing "abstract[]" about the relevant field here, namely entry and removal; Texas certainly cannot expand the proffered field and then complain it is too broad. And, notably, Texas never contests that SB4 *does* operate in the field of entry and removal. *See* ROA.1234-1239.

*Second*, Texas seeks to narrow the congressional legislation relevant to this case to only the federal reentry crime, 8 U.S.C. § 1326. Br. 27-28. First, that ignores the dominant federal interest prong, which alone can establish field preemption. And, in any event, it disregards the lion's share of the statutory scheme. Congress gave federal officials a range of tools and options to deal with irregular immigration. Congress then reconciled the tools and pathways potentially pointing in different directions by affording federal officials the broad discretion that is "[a] principal feature" of Congress's immigration system. *Arizona*, 567 U.S. at 396; *see Iowa*, 157 F.4th at 921-22 (collecting cases). Federal prosecutors and immigration officials are empowered to deploy *or forgo* criminal charges or civil proceedings in their assessment of national interests. *See Arizona*, 567 U.S. at 396, 402, 409. And their discretion "implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Texas Priorities*, 599 U.S. at 679 (quoting *Reno v. Am.-*

*Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490-91 (1999)); *see* ROA.1227-1229. "The broadest exercise of this discretion is the Executive's decision not to pursue either civilly or criminally the very [noncitizens] whom the [State] legislature has drawn a bead upon in enacting new state laws." *Texas Panel*, 144 F.4th at 671. Texas ignores this overall statutory design.

*Third*, Texas argues that Congress *invited* States to disregard its own handiwork and fashion fifty different solutions to the challenges of irregular immigration. Br. 25-26. But the most it can muster are the "specific, limited circumstances" in which Congress allowed state officers to make immigration arrests under federal direction and supervision. *Arizona*, 567 U.S. at 410; *see Texas Panel*, 144 F.4th at 676-77, 683-85 (rebutting specific cited statutes).

Still, Texas contends, even that highly circumscribed state role is enough to defeat field preemption, asserting that "[t]he Supreme Court has never found field preemption where Congress has invited state participation." Br. 26. That is incorrect. Consider, for example, *Pac. Gas & Elec. Co. v. State Energy Rsch. Conservation & Dev. Comm'n*, 461 U.S. 190 (1983) (cited by Texas). There, Congress had permitted state regulation of various matters implicating nuclear safety, including authorizing "agreements" with the federal government under which States would assume "regulatory authority over certain nuclear materials under limited conditions," *id.* at 209 & n.20, and "specifically authoriz[ing]" States to

regulate radioactive air pollutants, *id.* at 212 n.25. Yet the Court rejected the argument that this scheme meant that "State safety regulation" would be "preempted only when it conflicts with federal law." *Id.* at 212. "Rather, the federal government has occupied the entire field of nuclear safety concerns, *except the limited powers expressly ceded to the states*." *Id.* (emphasis added).[3]

So too, here. While Congress has "expressly" permitted certain "limited powers" to State officers, such as making immigration arrests under federal supervision and pursuant to federally authorized "agreements," *id.* at 209, 212, nothing in federal law remotely approaches "a grant of authority to a state to enact a statute making it a state crime to be unlawfully present," *Texas Panel*, 144 F.4th at 683-84; *see also, e.g.*, *Kurns v. R.R. Friction Prods. Corp.*, 565 U.S. 625, 632-33 (2012) (cited by Texas) (field preemptive law allowed limited state role in "interstitial areas of railroad safety"); *Locke*, 529 U.S. at 112 (cited by Texas) (similar, acknowledging certain permissible "[l]ocal rules" in preempted field).

---

[3] Texas points out that certain other aspects of nuclear power generation were left to the states. Br. 26-27. That is true but irrelevant. *See Pacific Gas*, 461 U.S. at 208 (explaining that while "safety of nuclear technology was the exclusive business of the federal government, state power over the production of electricity was not otherwise displaced"). The important point is that the Court held that nuclear *safety* was field preempted, even though Congress permitted certain state *safety* activities, including by agreement with the federal government. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 769 (2019) (plurality opinion) (cited by Texas) (explaining that Congress authorized state regulation under agreements "for the protection of the public health and safety from radiation hazards") (quoting 42 U.S.C. § 2021(b)).

*Fourth*, for similar reasons, Texas can get no traction by invoking *Arizona*—which strongly supports field preemption here. Br. 24. There, the Court upheld one provision of the Arizona law by concluding it could be read to require only "a status check" with ICE, and that federal law specifically authorized such checks. 567 U.S. at 412, 414. That is, the State's limited involvement fell within one of those narrow, express roles Congress had carved out. And in striking down Section 6 of the statute, which authorized unilateral arrests, the Court rejected a similar argument, holding that the state had overstretched the limited statutory permission to cooperate. *Id*. at 410. Neither of those provisions addressed entry into the United States and neither addressed who would be removed, to what country, or subject to what penalties. *See Arizona*, 567 U.S. at 457 (Alito, J., concurring in part and dissenting in part) (under Arizona law, the federal "Executive retains complete discretion over whether those aliens are ultimately removed").[4] Whether a state abides by or exceeds the limited congressional permission to assist in federal immigration enforcement efforts may be a conflict preemption question, but that is beside the point: Texas does not even try to argue any provision of federal law specifically permits states to set up their own entry-and-removal regimes (because, of course, none does). *Texas Panel*, 144 F.4th at 683-84.

[4] Section 5(C) is even further afield; it addressed employment which, as explained above, is a distinct arena.

By contrast, all the reasons the Supreme Court gave for finding Section 3 of the *Arizona* statute field preempted "appl[y] with equal force to the Texas laws regarding entry and removal." *Id.* at 676. As with Arizona's noncitizen registration crime, "[i]f every state could regulate the unlawful entry, reentry, and removal of aliens, '[e]ach additional statute [would] incrementally diminish[] the [federal government]'s control over enforcement' and 'detract[] from the "integrated scheme of regulation" created by Congress,'" *id.* at 675, allowing prosecution "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies," *Arizona*, 567 U.S. at 402. And the regulation of entry is, if anything, *more* uniquely federal than registration, as it lies at the very core of Congress's sovereign immigration powers. *See Arizona*, 567 U.S. at 394-95; *Nishimura Ekiu*, 142 U.S. at 659; *Texas Panel*, 144 F.4th at 674.

Furthermore, as with Arizona's registration scheme, there are unacceptable "inconsistenc[ies] between" SB4 "and federal law." *Arizona*, 567 U.S. at 402-03. Most glaringly, the state reentry crime criminalizes people whom 8 U.S.C. § 1326 does not. Under the federal statute, a noncitizen cannot be convicted if she has obtained federal "consent" to seek admission to the United States after removal. 8 U.S.C. § 1326(a)(2)(A); 8 C.F.R. § 212.2(d). But SB4 contains no such limitation. *See* Tex. Penal Code § 51.03 (criminalizing noncitizen "found in this state after" she

"has been . . . removed"); *Iowa*, 157 F.4th at 915, 921 (noting same problem with Iowa statute); Br. 32-33 (conceding such prosecutions could be brought under SB4). "These specific conflicts between state and federal law simply underscore the reason for field preemption." *Arizona*, 567 U.S. at 403; *see also Texas Panel*, 144 F.4th at 673-74 (collecting other conflicts).

**B. SB4 is Conflict Preempted.**

"Beyond field preemption, the challenged provisions of SB 4 are also conflict preempted." ROA.1242. As the district court explained, SB4 authorizes state immigration enforcement "without federal supervision"; "divests federal immigration authorities of the discretion of the enforcement of immigration laws"; and "conflicts with federal immigration law in [various] other ways." ROA.1243, ROA.1244, ROA.1248. In other words, SB4 "runs roughshod" over Congress's scheme. *Texas Panel*, 144 F.4th at 678, 686 ("conflicts abound between [SB4] and a number of federal laws").

Indeed, conflict preemption here follows directly from *Arizona*. At its most fundamental level, that case held that a state may not "'achieve its own immigration policy,' ignoring the discretionary decisions of federal officials." *Iowa*, 157 F.4th at 923 (quoting *Arizona*, 567 U.S. at 408). *Arizona*'s throughline is that federal law does not allow "unilateral state action" in immigration enforcement. 567 U.S. at 410. Section 6—authorizing state immigration arrests—was conflict preempted

because it allowed "unilateral state action" that usurped the federal government's ability to exercise discretion. *Id.* at 407-10. Section 3, by claiming the "independent authority to prosecute" registration violations, would similarly "diminish[] the Federal Government's control over enforcement" and "frustrate federal policies." *Id.* at 401-02 (cleaned up). And with regard to Section 2(B), the Court explained that "it would disrupt the federal framework" to allow state detention "for possible unlawful presence without federal direction and supervision." *Id.* at 413. If state officers may not unilaterally detain or arrest for immigration violations, they obviously cannot unilaterally detain, arrest, prosecute, sentence, imprison, and order removal for such violations. *See id.* at 408; *Texas En Banc*, 173 F.4th at 709 (Richman, J., dissenting); *id.* at 740 (Higginson, J., dissenting).

Texas asserts that there can be no conflict preemption here because "[t]he purpose of the INA is to prohibit illegal immigration" and "S.B.4 shares that exact same purpose." Br. 30-31 (quoting *Texas Panel*, 144 F.4th at 726 (Oldham, J., dissenting)). That fundamentally misunderstands the federal scheme. To be sure, Congress made unlawfully crossing the border a crime and rendered those who do so removable. But it also provided for various circumstances in which unlawful entry might be outweighed by other important federal interests. For example, Congress specifically provided that asylum must be available "whether or not" the noncitizen arrives "at a designated port of arrival." 8 U.S.C. § 1158(a)(1). Likewise,

it has provided various forms of relief from removal leading to permanent immigration status that are available even if one enters the country unlawfully, including for victims of crime or trafficking and for those with close U.S. citizen family members. *See id.* §§ 1101(a)(15)(U), (T), 1182(a)(6)(A)(ii), (d)(13), (14), 1229b(b). To suggest that Congress had only one purpose—"to prohibit illegal immigration," Br. 30-31—ignores the wide range of statutory provisions addressing people who enter without inspection.

Resisting this conclusion, Texas argues that a person can be prosecuted under the federal reentry crime, § 1326, even if they have "a pending status determination or lawful residence," so the state's decision to prosecute without regard to such federal determinations or proceedings poses no conflict. Br. 31. That does not follow. Even if the federal executive *can* simultaneously both prosecute an asylum seeker for reentry and grant them asylum in the exercise of discretion, it would make little sense to do so; those tools will typically be employed to advance different, often competing federal interests. That is precisely the point. Congress vested those tools and complex decisions in the federal executive so it could enforce *or mitigate* the harshness of federal law, as particular circumstances may warrant.

In SB4, Texas upends that balance by placing some of those tools—the harshest—in the hands of a different government. Indeed, it goes so far as to "prohibit abatement of prosecutions . . . on the grounds that federal proceedings

have been or will be commenced regarding the immigration status of the defendant." *Texas Panel*, 144 F.4th at 680. That is, even when federal officials decline to pursue criminal enforcement and instead place a noncitizen in proceedings that might regularize her immigration status, not only may the State choose instead to prosecute—but the state courts are specifically forbidden from halting that prosecution in light of the federal government's contrary choice. "This is not the system Congress created." *Arizona*, 567 U.S. at 408.

Relatedly, Texas asserts that SB4 "mirrors and complements federal immigration law." Br. 30. But that, like so much of Texas's argument, is predicated on its myopic enforcement-only rewriting of Congress's handiwork. And a "conflict in technique can be fully as disruptive to the system Congress erected as conflict in overt policy." *Arizona*, 567 U.S. at 406 (cleaned up). Here, placing the harshest tools in the hands of Texas officials is a clear conflict in technique. Indeed, while Texas cites Judge Stras's dissent in *Iowa* to support its "mirror" argument, Br. 30, it omits that he was the *only* member of the Eighth Circuit to express this view, as the en banc court declined to disturb the unanimous panel opinion holding Iowa's nearly identical law creates "an obstacle to the exercise of the discretion that Congress gives federal officials charged with enforcing federal immigration law." 157 F.4th at 921.[5]

---

[5] Certiorari is pending in *Iowa* (No. 26-49), and on October 19, 2026, the Court

That is why SB4 cannot escape preemption by "tethering itself to federal law." Br. 31 (quoting *Texas Panel*, 144 F.4th at 726 (Oldham, J., dissenting)). Parallel state law may be permissible in many other circumstances, "[b]ut not here." *Iowa*, 157 F.4th at 922 (rejecting this argument). For example, in *Kansas v. Garcia*, the State prosecuted noncitizens under a generally applicable state identity theft statute for using fraudulent social security numbers on *tax withholding forms*. 589 U.S. 191, 195, 198-99 (2020). The noncitizens based their preemption theory on the fact that the tax withholding process at the beginning of a job is typically conducted alongside employment verification, which in turn is related to the immigration system. *Id*. at 197, 208-09. In contrast to tax forms' glancing relevance to immigration employment rules, SB4 does not merely "overlap to some degree" with federal immigration law. *Id*. at 211. Instead, it asserts state control in derogation of the comprehensive federal system in which Congress "made a considered decision" to balance various interests by placing discretion in federal officials' hands. *Id*. "Nothing similar" was present in *Garcia*. *Id*.; *see Texas Panel*, 144 F.4th at 685 (rejecting reliance on *Garcia*); *Iowa*, 157 F.4th at 922 (same); *Padres Unidos de Tulsa*, 785 F. Supp. 3d at 1005-07 (same).[6]

---

called for the views of the Solicitor General.

[6] Texas cites *Zyla Life Scis., L.L.C. v. Wells Pharma of Hous., L.L.C.*, 134 F.4th 326 (5th Cir. 2025), Br. 21, but as the Eighth Circuit explained, that case addressed "the state's 'traditional prerogative to police drug safety.'" *Iowa*, 157 F.4th at 922 (quoting *Zyla*, 134 F.4th at 330).

Texas claims there can be no conflict preemption here because "[t]he Supremacy Clause gives priority to 'the Laws of the United States,' not the criminal law enforcement priorities or preferences of federal officers." Br. 33 (quoting *Garcia*, 589 U.S. at 212). But the district court's preemption analysis *is* grounded in federal statute. As in *Crosby v. National Foreign Trade Council*, here "Congress clearly intended the federal Act to provide the [Executive] with flexible and effective authority." 530 U.S. at 374. And, just as in that case, Texas's "unyielding application" of criminal sanctions whenever it sees fit "undermines the [executive's] intended statutory authority by making it impossible" for the federal executive to chart the course it thinks best in particular circumstances. *Id.* at 377.

"The challenged provisions are not preempted because they conflict with the policy preferences of a particular administration—but because, inter alia, they rob every administration of the very discretion in alien removal matters that Congress granted to the federal executive and not to the States." *Texas Panel*, 144 F.4th at 681 (footnote omitted). That is why the State's reliance on the views of the current federal Administration falls flat. Br. 27, 30, 32-33. "Because the Act conflicts with the discretion that Congress gives to federal officials, the Act is preempted, even if federal officials support the Act." *Iowa*, 157 F.4th at 924.

Nor are the Justice Department's views even persuasive here, particularly given they represent an abrupt reversal from the positions it took previously in

challenges to SB4 and related laws—a fact it never explains. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (affording "respect" to "consistent" views). Rather, as the federal government correctly explained to the Supreme Court less than three years ago, "SB4 is flatly inconsistent with this Court's decision in [*Arizona*] and more than a century of this Court's precedents," Appl. to Vacate 1-2, *United States v. Texas*, No. 23A814 (U.S. Mar. 4, 2024), and "Texas is attempting to 'achieve its own immigration policy' by directly regulating the entry and removal of noncitizens," Reply in Supp. of Appl. to Vacate 1, *Texas* (U.S. Mar. 12, 2024).

Ultimately, Texas stakes its defense on the argument that SB4 is not facially preempted. Br. 28-30, 32-33. That fails, too. For one thing, the facial-challenge argument is no answer to Plaintiffs' *field* preemption claim. "[I]f a law intrudes on a field occupied by Congress, every application of that law is preempted." *Texas Panel*, 144 F.4th at 663. Texas effectively concedes as much, focusing its facial-challenge arguments on the question of conflict preemption.

In any event, every time the State enforces SB4, it flouts Congress's design that federal officials will exercise discretion to decide which tools are used to address irregular entries. Thus, "every application of the Act stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Iowa*, 157 F.4th at 927 (holding Iowa's statute facially conflict preempted); *Texas Panel*, 144 F.4th at 664 (same for SB4).[7]

Texas posits that SB4 could be legally applied to a person "who has already been adjudicated" to have illegally reentered "and who has no lawful defense against removal." Br. 29. That ignores both the central role discretion plays in the federal scheme, and *Arizona*'s fundamental teaching that a state may not "achieve its own immigration policy" by undertaking "unilateral state action" in immigration enforcement. *Arizona*, 567 U.S. at 408, 410. Even if there is no question that a person is *amenable* to prosecution and cannot assert any right to remain in this country, federal officials retain full discretion "over arrests and prosecutions" as well as "whether to remove a noncitizen from the United States." *Texas Priorities*, 599 U.S. at 679. There may be "some [noncitizens] (for instance, a veteran, college student, or someone assisting with a criminal investigation) who federal officials determine should not be removed." *Arizona*, 567 U.S. at 408. And "the Executive's enforcement discretion implicates not only 'normal domestic law enforcement

---

[7] Texas concedes that some applications of SB4 would conflict with federal law, such as a prosecution against an individual who reentered the country with the federal government's permission. Br. 32-33; *see Iowa*, 157 F.4th at 913-16 (holding such plaintiffs had standing to challenge nearly identical statute). The State denies that this conflict alone would justify facial relief, but that has never been Plaintiffs' argument or the district court's holding. However, as explained above, these specific conflicts do, for example, "underscore the reason for field preemption." *Arizona*, 567 U.S. at 403.

priorities' but also 'foreign-policy objectives.'" *Texas Priorities*, 599 U.S. at 679 (quoting *Reno*, 525 U.S. at 490-91). Under SB4, the State's unilateral enforcement decisions would result not only in the "unnecessary harassment of some aliens" that *Arizona* emphasized, but also in their prosecution, imprisonment, and coerced departure from the United States, all contrary to the discretion vested in the federal government. *Arizona*, 567 U.S. at 408; ROA.1247.

Nor would it matter, as Defendant suggests, if federal officers "encourage[] Texas to arrest and charge" people under such a state law. Br. 29. *Congress* decides what powers state officers may exercise, and the limitations it imposes apply even if federal agents disagree with that choice. And much the same could have been said in *Arizona*, where the Court struck down Section 6 on its face for permitting unilateral arrests, even while Justice Alito argued that there were "plenty" of permissible applications of the law. *See Texas Panel*, 144 F.4th at 663 n.234 (quoting *Arizona*, 567 U.S. at 458 (Alito, J., concurring in part and dissenting in part)). The majority held otherwise: "By authorizing state officers to decide whether an alien should be detained for being removable, § 6 violates the principle that the removal process is entrusted to the discretion of the Federal Government." *Arizona*, 567 U.S. at 409. So too, here.[8]

---

[8] Texas recycles its effort to rewrite the removal provision, citing its own statements in litigation that it will enforce its state deportation orders by handing people over to federal officials. Br. 32, 34. But that is simply not what SB4 says; it requires judges

Nor is *Arizona* alone in this regard. In *Crosby*, for example, a unanimous Court held the state sanctions law preempted because it threatened to "blunt the consequences" of the "flexible and effective authority" Congress had granted to the federal executive. 530 U.S. at 374, 376. The Court did not ask whether the state sanctions regime might align with the choices a particular Administration might make, nor whether some applications of the State's sanctions regimes could potentially be reconciled with federal law; instead, given the nature of the federal scheme and interests, the State's effort to inject itself was preempted in full. The same is true of SB4.

**C. The State War Clause Cannot Save SB4.**

Unable to defend SB4 under longstanding preemption doctrine, Texas turns to a deeply troubling argument. Texas has been "invaded," it claims, triggering the State War Clause, U.S. Const. art. I, § 10, cl. 3; that Clause, it further asserts, empowers the State to enact its own immigration scheme; the "invasion" also allows

---

to issue orders to depart the United States, backed by the threat of criminal prosecution and 20 years in prison. *Texas Panel*, 144 F.4th at 682; *Texas En Banc*, 173 F.4th at 741 (Higginson, J., dissenting). And, of course, Texas law already *compels* police to transfer custody of noncitizens to federal officials on request, without SB4's removal orders, *see City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018), so it is hard to see this argument as anything but an attempt to wish away an obviously preempted provision of state law. Texas also suggests SB4 is lawful when a noncitizen "agree[s]" to a state deportation order. Br. 29. But, as already explained, these supposedly voluntary choices are predicated on Texas dictating that a person must leave the country either way, on pain of decades in prison. A starker conflict is hard to imagine.

the State to ignore federal law preempting such legislation; and the political question doctrine prohibits any court from saying otherwise. That radical argument fails at every step.

First, there has been no invasion within the meaning of the State War Clause. Texas is studiously imprecise about what it thinks triggers the Clause here. Its state executive order purports "to respond to . . . illegal immigration," Executive Order GA-41 at 2, but Texas also invokes other concerns like gangs, "human trafficking, and weapons smuggling," Br. 19. None of this triggers the Clause. "The term 'invasion' was a legal term of art with a well-defined meaning at the Founding" which "required far more than an unwanted entry; to constitute an invasion, there had to be hostilities." *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *8 (D.C. Cir. Mar. 26, 2025) (Henderson, J., concurring); *see also id.* at *9 (canvassing historical sources and constitutional provisions, including the State War Clause, and concluding that "an invasion is a military affair, not one of migration"); *Padavan v. United States*, 82 F.3d 23, 28 (2d Cir. 1996) (similar); *New Jersey v. United States*, 91 F.3d 463, 468 (3d Cir. 1996) (similar); *California v. United States*, 104 F.3d 1086, 1091 (9th Cir. 1997) (similar).[9] Simply put: "Invasion is an operation of war."

[9] Some of these cases, which addressed the Guarantee Clause, also "concluded that declaring an invasion by judicial fiat would pervert the proper role of the political branches." *J.G.G.*, 2025 WL 914682, at *7 & n.4 (Henderson, J., concurring). In other words, these cases stand for the proposition that "the courts . . . will not start a war on the government's behalf"—which would not impact this case. *Id.* at *7.

James Madison, The Report of 1800 (Jan. 7, 1800), *in* 17 THE PAPERS OF JAMES MADISON 303, 309 (David B. Mattern et al. eds., 1991).

Second, even if such circumstances could qualify as an "invasion," that would not authorize Texas to enact its own immigration scheme. The State War Clause provides authority to do a particular thing: namely, to *make war*. That makes sense—a military invasion permits the state to *fight back* in a military sense, at least until the federal government can respond. *See United States v. Abbott*, 110 F.4th 700, 759 (5th Cir. 2024) (en banc) (Douglas, J., dissenting) (powers under the Clause "lapse once Congress can be notified and respond"). But it does not unlock different powers otherwise denied to the State, such as the powers of external sovereignty that belong to the federal government. ROA.1252-53. For example, States may not "enter into any Agreement or Compact . . . with a foreign Power," *id.* at 1251, a constitutional denial of state authority that is not lifted in the case of invasion. *Id.* at 1254. So too the power to make "war" does not establish any authority to create a state immigration system—such powers are "forbidden" to the States. *Fong Yue Ting v. United States*, 149 U.S. 698, 712 (1893).

Texas asserts the state war power must include "the lesser power to 'arrest'" invaders. Br. 21. But Texas is defending a law which creates new immigration

Even if they might be read to undermine review here, that would be inconsistent with the Supreme Court's later explanation and application of the narrow political question doctrine, *see infra*.

crimes, punishable by prison time, to be followed with a summary state deportation order. That is not a matter of "[r]epelling" an organized, military force but one of fashioning the *immigration* policy Texas would prefer. *Cf. Abbott*, 110 F.4th at 737 & n.14 (Ho, J., dissenting in part) (acknowledging that states "do not enjoy unlimited war power" but contending that "a buoy barrier along an international border river" was permissibly analogous to "installing and enforcing a military perimeter"). Resolving longstanding immigration policy disputes is "a job for the Nation's lawmakers, not for its military authorities." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 587 (1952); *see id.* at 642, 644 (Jackson, J., concurring) (warning against "sinister and alarming" idea that war powers would make President "Commander-in-Chief of the country"). It is certainly not a job for one State to unilaterally decide. ROA.1253.

Third, any such war powers certainly could not override federal supremacy—so SB4 would be illegal even in case of an "invasion." Again, the State War Clause is a limited exception to a particular *denial* of state authority, namely that "[n]o State shall . . . engage in War." U.S. Const. art. I, § 10, cl. 3. Where the Framers intended an invasion exception to other constitutional provisions, they added one. *See, e.g.*, *id.* art. I, § 9, cl. 2 (Habeas Corpus Suspension Clause). But there is no such exception to the Supremacy Clause. *See id.* art. VI, cl. 2. Texas offers no evidence that the Framers intended "that a state could rely on this Clause—which, with limited

exceptions, primarily divests states of power—as a defense to a suit seeking to vindicate the Supremacy Clause, especially in an area of regulation that the Supreme Court has consistently reiterated is exclusively a federal power." *Texas Panel*, 144 F.4th at 686. To read the State War Clause as offering Texas a blank check free of all federal control would render the Constitution "a solemn mockery." *United States v. Peters*, 9 U.S. 115, 136 (1809); *see Youngstown*, 343 U.S. at 635 (Jackson, J., concurring) (warning against interpreting "isolated clauses" of the Constitution "torn from context" to defeat "a workable government").

Fourth, and finally, there is no merit to Texas's claim that its State War Clause argument is nonjusticiable, defeating Plaintiffs' challenge. Br. 19-21. The Supreme Court has been clear that the political question doctrine is a "narrow exception to [courts' presumptive exercise of jurisdiction]." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012). Interpreting constitutional provisions is "well within the competence of the Judiciary." *U.S. Dep't of Com. v. Montana*, 503 U.S. 442, 458 (1992). Likewise, "evaluating the constitutionality of statutes is firmly within the bailiwick of the judiciary." *Texas Panel*, 144 F.4th at 655 (discussing *Zivotofsky*). Rejecting Texas's arguments thus represents a "familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196; *cf. id.* (by contrast, imposing "the courts' own unmoored determination" of policy would be barred).

It makes sense that the Court is fully empowered to strike down SB4. The political question doctrine "is primarily a function of the separation of powers," *Baker v. Carr*, 369 U.S. 186, 210 (1962), and so "[t]he Judicial Branch appropriately exercises" review "where the question is whether [one branch] is 'aggrandizing its power at the expense of another branch,'" *Zivotofsky*, 566 U.S. at 197. Here, Texas's invocation of the State War Clause is an extraordinary effort to aggrandize the State's power at the expense of the federal government.

In this respect, Texas's claim of state supremacy echoes the one rejected in *Sterling v. Constantin*, 287 U.S. 378 (1932). There, the Texas governor sought to regulate oil production by declaring an insurrection. *See Texas Panel*, 144 F.4th at 656-57 (discussing *Sterling*). The Supreme Court rejected the notion that "the Governor's order had the quality of a supreme and unchallengeable edict," explaining that this "extreme position" would mean "the fiat of a state Governor, and not the Constitution of the United States, would be the supreme law of the land." *Sterling*, 287 U.S. at 397. The same is true here. *Texas Panel*, 144 F.4th at 657.

Texas invokes a Ninth Circuit stay decision to suggest that both the invasion declaration and "the means that Texas has chosen" to address it (namely, a state immigration scheme) are immune from "review by federal courts" except to assess the Governor's "'good faith.'" Br. 20 (quoting *Newsom v. Trump*, 141 F.4th 1032, 1050-51 (9th Cir. 2025)). That reliance is deeply misplaced. The cited opinion

*rejected* application of the political question doctrine (which Texas invokes), instead examining whether Congress had by statute "committed the challenged decision to the President's discretion" (an issue that is irrelevant here). *Newsom*, 141 F.4th at 1046. Moreover, the same panel subsequently explained, in rejecting the challenged National Guard order on the merits, that questions of interpretation are decided "without deference"; that "no showing of subjective bad faith is required" to reject an invocation of a supposed exigency; and that under *Sterling* "a court may review the President's predicate exigency determination" if the challenged "order has unjustifiably infringed upon" federalism principles and the "limits on governmental power that are the foundation of our democracy." *Newsom v. Trump*, __ F.4th __, 2026 WL 3180273, at *6 n.4, *10, *13 (9th Cir. Oct. 23, 2026). In other words, *Newsom* cuts squarely against Texas's effort to avoid review in this case.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN CERTIFYING THE CLASS.

The district court found, in a reasoned examination of the relevant law and the record before it, that the class satisfied each of the four Rule 23(a) factors (numerosity, commonality, typicality, and adequacy), Rule 23(b)(2), and ascertainability. ROA.1257-66. Texas advances three flawed arguments against class certification, but comes nowhere close to demonstrating any abuse of discretion. To the contrary, this is a textbook Rule 23(b)(2) class and the certification order should be affirmed.

### A. The District Court Conducted a Full and Appropriate Rule 23 Analysis.

Texas first contends that the certification analysis was not "rigorous" enough. Br. 38. That is meritless. The court considered briefing and oral argument on the class, and issued a careful opinion addressing the Rule 23 factors in detail. ROA.1257-1266; *cf. M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 842 (5th Cir. 2012) (cited by Texas) ("the district court conducted no analysis of the elements and defenses").[10] Indeed, the district court did *more* than is typical: While certification in conjunction with preliminary injunction proceedings is routine, the district court went so far as to grant Texas expedited discovery (over Plaintiffs' objection) including depositions of the named Plaintiffs. That discovery further bolstered the case for class certification here. *See* ROA.1265. And Texas does not point to any actual lack of rigorous analysis in the district court's opinion. Indeed, Texas did not even contest several of the class certification requirements, including numerosity

[10] Texas previously claimed it was denied an opportunity to argue class certification issues. That is incorrect: During the nearly two-and-a-half-hour hearing, Defendant's counsel chose to focus almost entirely on merits issues, without addressing the class motion—even though Plaintiffs' counsel had dedicated the bulk of his presentation to class issues. Pfs. Opp. to Stay 18 n.7.

and commonality, so can hardly complain about the depth of analysis on those issues. ROA.1258-1259.

Still, Texas complains that class certification was decided "on an expedited basis." Br. 38. There is nothing unusual or improper about that. "[P]laintiffs who challenge the legality of" governmental "action and request preliminary injunctive relief may sometimes seek to proceed by class action under [Rule] 23(b)(2) and ask a court to award preliminary classwide relief that may, for example, be statewide . . . ." *Trump v. CASA, Inc.,* 606 U.S. 831, 869 (2025) (Kavanaugh, J., concurring). Where, as here, the application of Rule 23 is straightforward, the certification process can appropriately "proceed quickly." David Marcus, *The Class Action After* Trump v. Casa, 73 UCLA L. Rev. Discourse 2, 18 (2025) ("Marcus").

Instead, the thrust of Defendant's argument seems to be that the certification should be reversed because it was labeled "provisional." Br. 38. But "[c]ourts routinely grant provisional class certification for purposes of entering injunctive relief." *IORC*, 780 F. Supp. 3d at 1046; *see, e.g.*, *Trump v. Barbara*, 146 S. Ct. 2438, 2445 (2026) (affirming injunction for provisional class); *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036, 1043 (9th Cir. 2012); *Afghan & Iraqi Allies v. Blinken*, 103 F.4th 807, 812 (D.C. Cir. 2024) (noting provisional certification); *Escobar Molina v. U.S. Dep't of Homeland Sec.*, 811 F. Supp. 3d 1, 54 (D.D.C. 2025) (cited by Texas, granting provisional certification). That includes several

cases challenging laws similar to SB4. *See IORC*, 780 F. Supp. 3d at 1052; *Fla. Immigrant Coal.*, 780 F. Supp. 3d at 1254, 1270; *Padres Unidos de Tulsa*, 783 F. Supp. 3d 1324, 1354 (W.D. Okla. 2025).

The use of the label "provisional" "has nothing to do with the rigor that went into entering the order." 2 William B. Rubenstein, Newberg and Rubenstein on Class Actions § 4:30 (6th ed., June 2026 update) (cited by Texas). Indeed, the term "provisional" is formally "redundant." Marcus, *supra*, at 20; *see Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) ("the certification of a class is always provisional"); Fed. R. Civ. P. 23(c)(1)(C). Rather, when a court labels certification "provisional," it serves "the useful purpose of conveying that the Court is open to revisiting class certification later in the litigation as the record is developed more fulsomely." *Lucy v. Skrmetti*, No. 3:26-CV-00763, 2026 WL 1847869, at *2 n.6 (M.D. Tenn. June 26, 2026); *see Barbara v. Trump*, 790 F. Supp. 3d 80, 90 (D.N.H. 2025) (explaining in order granting provisional certification that the court "may later modify or amend the order granting class certification"); Marcus, *supra*, at 20-21. That is how the district court used it here. ROA.1266 (anticipating revisiting certification after "additional discovery"). Nothing about that openness to reconsideration "lighten[ed] Plaintiffs' burden" or "suggest[ed] that a lower standard for certification was required . . . ." Br. 38, 39.

**B. The Class Is Ascertainable.**

Next, Texas argues that the class is not ascertainable—a requirement this Court has held applies to a Rule 23(b)(2) class. Br. 40. But a class is "adequately defined and clearly ascertainable[,]" *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970), when there are "sufficient objective criteria from which to identify class members[,]" *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019) (per curiam). As the district court held, that is the case here. ROA.1262-63.

The class is defined by clear and objective criteria that are set forth in SB4 itself—criteria simple enough to be outlined in a single sentence in Texas's brief. *See* Br. 41. The class definition describes those subject to SB4's reentry provision, and it tracks the language of that crime. It is not a class based on "a subjective factor" like "class members' state of mind[,]" nor is it "impermissibly vague in practice[.]" *Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 935 (5th Cir. 2023).

Texas argues, however, that the class is "inherently indeterminate," apparently contending that the Court must be able to identify every member of the class. Br. 40-41. But that is not the rule. To the contrary, Rule 23(b)(2) was designed to permit classes "whose members are *incapable of specific enumeration*." *Carpenter v. Davis*, 424 F.2d 257, 260 (5th Cir. 1970) (emphasis added); *see id.* ("It is not necessary that the members of the class be so clearly identified that *any*

member can be presently ascertained.") (emphasis added). Indeed, classes containing future, currently unidentifiable members are commonplace; Defendant's position would mean that all such classes are and have always been improper. *See, e.g.*, *Echavarria v. Pitts*, 641 F.3d 92, 93 (5th Cir. 2011); *Pederson v. La. State Univ.*, 213 F.3d 858, 868 n.11 (5th Cir. 2000); *Phillips v. Joint Legislative Comm. on Performance & Expenditure Rev. of State of Miss.*, 637 F.2d 1014, 1022 (5th Cir. 1981); *Jones v. Diamond*, 519 F.2d 1090, 1093, 1100 (5th Cir. 1975), *abrogated on other grounds by Gardner v. Westinghouse Broad. Co.*, 437 U.S. 478 (1978); *Lackey v. Stinnie*, 604 U.S. 192, 196-97 (2025); 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1760 (4th ed. 2021).

Texas also argues that the class is not ascertainable because identifying class members would require "extensive and individualized fact-finding." Br. 41. That may be a problem in cases decided under Rule 23(b)(3), like those on which Texas relies (at 41), because class membership must be determined for notice and the opportunity to opt out—neither of which applies in this Rule 23(b)(2) case. But here any factual questions about who is in the class are easily disposed of: If Defendant proposes to enforce SB4 against an individual, then by necessity he believes that individual is subject to the statute, and therefore a class member. Because enforcement and class membership would go hand in hand, no ascertainability problem is presented "in practice[.]" *Braidwood Mgmt.*, 70 F.4th at 935.

**C. The Plaintiffs Satisfy Typicality and Adequacy.**

Finally, Texas contests typicality and adequacy because, it asserts, the Plaintiffs "are both authorized by the federal government to be in the United States" in contrast to other class members. Br. 43. That is flawed as well.

*First*, it is factually incorrect. As Texas notes, K.G.S. "has received 'preapproval' (a bona fide determination) but is still waiting for final approval of her pending U-visa application." Br. 7 n.3. That bona fide determination authorizes deferred action, but the federal government makes clear that such deferred action is "an exercise of prosecutorial discretion to make an alien a lower priority for removal from the United States." *See* USCIS, Policy Manual, Vol. 3, Part C, Ch. 5, https://www.uscis.gov/policy-manual/volume-3-part-c-chapter-5. If K.G.S. is "authorized by the federal government to be in the United States," Br. 43, it is only as a matter of the same discretion which the federal government has over *all* noncitizens, as discussed above. That is not a basis to reject class certification.

In any event, even as to L.M.L. (who is a lawful permanent resident), Texas's arguments fall flat.

Plaintiffs satisfy the typicality requirement because there is "similarity between [their] legal and remedial theories and the theories of those whom they purport to represent." *Angell v. GEICO Advantage Ins. Co.*, 67 F.4th 727, 736 (5th Cir. 2023). Plaintiffs and class members share the same legal and remedial theories:

SB4 is preempted, and its enforcement should be enjoined. ROA.1260-61. Nothing about Plaintiffs' immigration statuses changes that: "If the claims arise from a similar course of conduct and share the same legal theory," as in this case, "factual differences will not defeat typicality." *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002) (cited by Texas).

Similarly, Plaintiffs are adequate representatives because they "possess the same interest and suffer the same injury as the class members[,]" *In re Deepwater Horizon*, 785 F.3d 1003, 1015 (5th Cir. 2015) (internal quotation omitted), namely not being prosecuted under a preempted state law. Again, nothing about their immigration statuses changes that: "Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only if those differences create conflicts between the named plaintiffs' interests and the class members' interests." *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 625-26 (5th Cir. 1999) (citing *Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 472 (5th Cir. 1986) (cited by Texas)). As the district court found, in this case there is no such conflict. ROA.1260-1261.

Texas gestures at "potential conflicts," but does not identify any, instead claiming that a more "rigorous analysis" in the district court would have unveiled these hypothetical conflicts. Br. 44. Such vague assertions are not nearly enough to demonstrate an abuse of discretion. And, to the contrary, the district court allowed

pre-certification discovery, including depositions of both Plaintiffs, which did not reveal any conflicts. Texas suggests that class members may not want this suit brought on their behalf if it requires them to be identified. Br. 43. But no class member has an interest in being prosecuted under SB4, and (as already explained) this Rule 23(b)(2) class does not require any class member to be identified.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN WEIGHING THE EQUITIES.

Finally, Texas cannot show any abuse of discretion in the district court's weighing of the equities in this case. ROA.1256-57. "Plaintiffs and provisional class members are at risk of suffering grave, irreparable harm" under SB4 "in the form of arrests, prosecutions, and removals under a likely unlawful statute." ROA.1270 (rejecting stay); *see* ROA.1256 (similar, preliminary injunction equities). "[T]he threatened enforcement of [this] preempted law" against Plaintiffs and other class members constitutes irreparable injury. *Villas at Parkside Partners v. City of Farmers Branch*, 577 F. Supp. 2d 858, 878 (N.D. Tex. 2008), *aff'd*, 726 F.3d 524 (5th Cir. 2013) (en banc); *see also Iowa*, 157 F.4th at 927 (similar); *Ga. Latino All.*, 691 F.3d at 1269 (similar); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (similar).

Texas contests this harm, but focuses only on the dangers of *removal*. Br. 35-36. That ignores the irreparable harm of arrest, prosecution, conviction, and imprisonment under a preempted state immigration regime. *See FLIC*, 2025 WL

1625385, at *1 (injunction of law with no removal provision). And, in any event, there is nothing "speculative and attenuated" about the harms posed by SB4's removal provisions. As explained above, SB4 requires Texas courts to issue state removal orders. And those orders put recipients to a Hobson's choice: Either leave the United States, or face up to 20 years in prison. But either side of that choice is irreparable: The threat of prison is plainly irreparable, and leaving the country where many have lived for decades is a grave harm to class members and their families.

Texas claims ignorance of "what the conditions" are in Mexico (the country to which SB4 directs removal). But the district court expressly held that the record "make[s] clear that removing noncitizens into Mexico risks subjecting them to death, torture, and rape," ROA.1257—and Texas never offered any evidence to the contrary. *See also Huisha-Huisha v. Mayorkas*, 27 F.4th 718, 733 (D.C. Cir. 2022) (describing "stomach-churning evidence of death, torture, and rape" caused by policy of expelling migrants, primarily to Mexico); *Nken v. Holder*, 556 U.S. 418, 436 (2009) ("[T]here is a public interest in preventing [noncitizens] from being wrongfully removed, particularly to countries where they are likely to face substantial harm").

On the other side of the ledger, Texas suffers no comparable harm from being unable to enforce a preempted statute. *See Trans World Airlines, Inc. v. Mattox*, 897

F.2d 773, 784 (5th Cir. 1990), *abrogated on other grounds by Johnson v. Baylor Univ.,* 214 F.3d 630 (5th Cir. 2000). Texas claims to be harmed if it cannot use "all the tools at its disposal" to police immigration. Br. 35. But that is the point: A state-law immigration regime is *not* a tool at Texas's disposal. Moreover, "[f]ederal officials of course already enforce immigration law—and many [Texas] law-enforcement agencies have entered into agreements with the Department of Homeland Security that allow local police to enforce federal immigration law." *FLIC*, 2025 WL 1625385, at *6. The availability of such cooperation with the federal government thus "ameliorates [Defendant's] concern." *Iowa*, 157 F.4th at 929. Indeed, the State recently required localities to "enter into an immigration law enforcement agreement" with the federal government, Tex. Gov't Code § 753.051, building on prior mandatory cooperation provisions, *see City of El Cenizo*, 890 F.3d at 164. "The state's true [asserted] harm, then, is not that it cannot enforce immigration laws, but that it cannot do so free of federal supervision." ROA.1269.

And, of course, the "[f]rustration of federal statutes and prerogatives [is] not in the public interest." *Alabama*, 691 F.3d at 1301; *see Pub. Utils. Comm'n. of Ohio v. United Fuel Gas Co.*, 317 U.S. 456, 469 (1943). "There is a high risk that enforcement of S. B. 4 would cause international friction." *Texas Panel*, 144 F.4th at 687. And, "[i]f allowed to proceed, SB 4 could open the door to each state passing its own version of immigration laws," yielding "a patchwork of inconsistent

regulations." ROA.1270; *see Chy Lung*, 92 U.S. at 279-80 (warning that under such a patchwork "a single State c[ould], at her pleasure, embroil us in disastrous quarrels with other nations"). "The balance of equities thus unequivocally weighs" in favor of an injunction, ROA.1270 (addressing stay), and Texas cannot establish any abuse of discretion.

## CONCLUSION

The injunction and class certification should be AFFIRMED.

Dated: November 16, 2026

Respectfully Submitted,


/s/ Cody Wofsy
Cody Wofsy
Hannah Steinberg
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT 425 California Street, 7th Floor San Francisco, CA 94104
T: (415) 343-0770
F: (332) 220-1702
cwofsy@aclu.org
hsteinberg@aclu.org

Grace Choi
Omar Jadwat
AMERICAN CIVIL LIBERTIES UNION FOUNDATION IMMIGRANTS' RIGHTS PROJECT 125 Broad St., 18th Floor
New York, NY 10004
T: (212) 549-2660
gchoi@aclu.org
ojadwat@aclu.org

David A. Donatti
(TX Bar No. 24097612)
Adriana C. Piñon
(TX Bar No. 24089768)
Carolina Rivera Nelson (TX Bar No. 24132741)
AMERICAN CIVIL LIBERTIES UNION OF TEXAS
P.O. Box 8306
Houston, TX 77288
Telephone: (713) 942-8146
Facsimile: (713) 942-8966
ddonatti@aclutx.org
apinon@aclutx.org
criveranelson@aclutx.org

Daniel Hatoum
(TX Bar No. 24099136)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 219
Alamo, TX 78516
(956) 787-8171 ext. 208
daniel@texascivilrightsproject.org

Daniel Woodward
(TX Bar No. 24138347)
Zachary Dolling
(TX Bar No. 24105809)
TEXAS CIVIL RIGHTS PROJECT
P.O. Box 17757
Austin, TX 78760
(512) 474-5073 ext. 210
danny@texascivilrightsproject.org
zachary@texascivilrightsproject.org

Dustin Rynders
(TX Bar No. 24048005)
TEXAS CIVIL RIGHTS PROJECT
PO Box 1108
Houston, TX 77251-1108
dustin@texascivilrightsproject.org


*For Plaintiffs-Appellees*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with the type-volume limitation of Rule 5(c)(1) because it contains no more than 12,886 words, and complies with the typeface and style requirements of Rule 32(a)(5) and (a)(6) because it was prepared in Microsoft Word using 14-point Times New Roman typeface.

*/s/ Cody Wofsy*
Cody Wofsy

## CERTIFICATE OF SERVICE

I certify that, on November 16, 2026, a true and correct copy of this document was transmitted to the Clerk of the United States Court of Appeals for the Fifth Circuit via the Court's CM/ECF document filing system, and on all counsel of record.

*/s/ Cody Wofsy*
Cody Wofsy